UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| OMAN FASTENERS, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant. ) | Court No. 22-00348 |

## COMPLAINT

Oman Fasteners, LLC ("Oman Fasteners" or "Plaintiff"), by and through its attorneys, brings this civil action, alleging the following:

## ADMINISTRATIVE DETERMINATION TO BE REVIEWED

1. Oman Fasteners brings this action to contest the final results of review issued by the United States Department of Commerce ("Commerce") in its sixth administrative review ("Sixth Review") of the antidumping order on *Certain Steel Nails from the Sultanate of Oman*, covering the period July 1, 2020 through June 30, 2021. *See Certain Steel Nails from the Sultanate of Oman*, 87 Fed. Reg. 78,639 (Dec. 22, 2022) ("Final Results") and accompanying Issues and Decision Memorandum dated December 16, 2022 ("IDM").

## JURISDICTION

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), as this is an action commenced under Section 516A(a)(2)(A)(i)(I) and (B)(iii) of the Tariff Act of 1930 ("Act"), *as amended*, 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (B)(iii).

1

3. This Court also has jurisdiction under 28 U.S.C. § 2643(c)(1) to "order any other form of relief that is appropriate in a civil action, including, but not limited to, declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition."

**STANDING**

4. Oman Fasteners is a foreign producer, exporter, and U.S. importer of certain steel nails from Oman and is an interested party within the meaning of 19 U.S.C. § 1677(9)(A) and as defined in 19 C.F.R. § 351.102(b)(29)(i) and (ii). Oman Fasteners participated in the Sixth Review that resulted in the contested Final Results. Therefore, Plaintiff has standing to commence this action pursuant to 19 U.S.C. § 1516a(a)(2)(A), 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

**TIMELINESS OF THE ACTION**

5. On December 22, 2022, Commerce published in the *Federal Register* the contested Final Results of the Sixth Review. Plaintiff has filed concurrently herewith, on December 23, 2022, a Summons with this Court commencing this action, which is within thirty days after *Federal Register* publication of the contested Final Results. This Complaint is being filed concurrently with the Summons. Therefore, this action is timely pursuant to Section 516A(a)(2)(A)(1) of the Act, 19 U.S.C. § 1516a(a)(2)(A)(i), and pursuant to Rules 3(a)(2) and 6(a) of this Court.

**STATEMENT OF FACTS**

6. On July 13, 2015, Commerce published an antidumping duty order on certain steel nails from Oman and from certain other countries. *Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed.

Reg. 39,994 (July 13, 2015) (the "Order"). Commerce's Order assigned a dumping margin of 9.10% on imports of subject steel nails from Oman Fasteners.

7. Commerce later revised this rate downward to 4.22%, following Oman Fasteners' appeals of the Order to this Court and the United States Court of Appeals for the Federal Circuit. *See* Department of Commerce Final Results of Redetermination Pursuant to Court Remand, *Mid Continent Steel & Wire Inc. v. United States*, Consol. Court No. 15-00214 (Apr. 14, 2022).

8. Subsequent to the Order, and pursuant to the statute and the requests of interested parties, Commerce conducted five consecutive annual administrative reviews of Oman Fasteners' imports subject to the Order, which collectively covered the period December 29, 2014, through June 30, 2020. In each of these five administrative reviews, Commerce determined, based on the record of sales and cost data concerning Oman Fasteners' sale of products in the U.S. market, that the margin of dumping on Oman Fasteners' imports was 0.56%, 0.00%, 0.00%, 0.00% and 1.65%, respectively. *Certain Steel Nails from the Sultanate of Oman*, 83 Fed. Reg. 4030 (Jan. 29, 2018); 83 Fed. Reg. 58,231 (Nov. 19, 2018); 84 Fed. Reg. 71,372 (Dec. 27, 2019); 86 Fed. Reg. 14,309 (Mar. 15, 2020), and 86 Fed. Reg. 67,690 (Nov. 29, 2021).

9. Commerce based its dumping margin calculations in each of these five administrative reviews on the sales and cost of production information submitted by Oman Fasteners, in response to multiple Commerce questionnaires, which information Commerce found to be credible, accurate, and reliable.

10. On September 7, 2021, pursuant to requests by Oman Fasteners and petitioner Mid Continent Steel & Wire, Inc. (Mid Continent), Commerce initiated the Sixth Review, covering the period July 1, 2020, through June 30, 2021. 86 Fed. Reg. 43,240 (Sept. 7, 2021).

11. Commerce issued its Sixth Review antidumping questionnaire to Oman Fasteners on October 14, 2021. Between November 12, 2021, and December 13, 2021, Oman Fasteners timely responded to the applicable Sections A, C, and D of the questionnaire.

12. Between December 3, 2021, and February 4, 2022, Commerce issued supplemental questionnaires to Oman Fasteners regarding its initial responses to Sections A and D. Between December 20, 2021, and February 25, 2022, Oman Fasteners submitted timely responses to these supplemental questionnaires.

13. During this period, Commerce also set a deadline of February 7, 2022, for Oman Fasteners to submit factual information relevant to Commerce's calculation of constructed value profit and indirect selling expenses, and a deadline of February 14, 2022, for Oman Fasteners' rebuttal comments on those topics. Oman Fasteners timely submitted its extensive factual information response and rebuttal comments on February 7 and February 14, 2022, respectively.

14. During this same period, on January 24, 2022, Commerce also issued a supplemental Section C questionnaire to Oman Fasteners. The supplemental Section C questionnaire was extensive, containing 37 separately numbered questions, some in multiple parts, for a total of 48 separate requests for information, clarifications, and/or data covering a wide variety of subjects. Commerce requested information on, among other things, quantity and value, U.S. sales reconciliations, control numbers, physical characteristics, a weight derivation formula, payment terms, billing adjustments, movement expenses, import tariffs, bank charges, credit expenses, domestic indirect selling expenses, inventory carrying costs, packing, entered value, and the U.S. sales database. Commerce gave Oman Fasteners only 10 calendar days—until February 3, 2022—to respond.

15.     Oman Fasteners requested an extension until Monday, February 14, 2022. It explained that the supplemental questionnaire was voluminous, and the company was also "focused on preparing the CV profit submission { } due in th{e same} proceeding on February 7, 2022." Moreover, Oman Fasteners' accounting and sales departments were also hard pressed due to their involvement in its "quarterly {value added tax} return submission," and because "Oman Fasteners' Finance Manager tested positive for COVID on January 22 {and had} been in quarantine for 10 days while another accountant ha{d} been on annual leave since January 20."

16.     Commerce granted Oman Fasteners' request only in part, providing an extension until Thursday, February 10, 2022.

17.     The day before the new deadline, Oman Fasteners sought a second extension, again until February 14. Oman Fasteners reiterated the prior reasons necessitating the extension, noting that it had been "focused on preparing the CV profit submission and rebuttal, due on February 7 and 14, 2022, respectively." *Id.*

18.     Commerce granted Oman Fastener's modest extension request but stated that it "does not anticipate providing any additional extension for Oman Fasteners' response to the section C supplemental questionnaire." Thus, Oman Fasteners' Supplemental Section C Response was due at 5:00 pm Eastern Time on February 14, 2022.

19.     Given the multiple competing and overlapping deadlines that Commerce imposed, and the extraordinarily quick turnaround times Commerce demanded, Oman Fasteners and its counsel faced enormous challenges in preparing the Supplemental Section C Response. Nevertheless, Oman Fasteners was able to provide its counsel with the last of the necessary documents by late in the morning on February 14, and counsel was able to format the CV Profit Rebuttal and Supplemental Section C Response in the manner required by Commerce by late that

5

afternoon. Due to limitations of Commerce's ACCESS filing system, each submission consisted of numerous separate electronic files.

20. Counsel successfully uploaded the four component pieces of the CV Profit Rebuttal to ACCESS at 3:32 pm, 3:35 pm, 3:40 pm, and 3:43 pm. Counsel commenced the process of filing the Supplemental Section C Response at 3:41 pm by pre-screening the planned electronic files for submission using the ACCESS "check file" feature. The ACCESS check file system found no issues with the electronic files, suggesting that the remainder of the filing process should proceed without delay.

21. At approximately 4:10 pm—50 minutes before the deadline set by Commerce—counsel began uploading the Supplemental Section C Response files to ACCESS.

22. Counsel believed in good faith, based on personal experience in this and many other Commerce proceedings, that 50 minutes would be more than enough time for the files to upload to ACCESS. In particular, counsel's experience in filing similar responses to comparable Commerce questionnaires in the Sixth Review and immediately prior segments of the proceeding indicated that 50 minutes should have been more than sufficient. Counsel's ACCESS filing of comparable questionnaire responses in the Sixth Review and in the prior segment of this case usually required between 9-12 minutes, with the longest taking 32 minutes.

23. In this instance, however, ACCESS unexpectedly and inexplicably took much longer to receive the files. At 4:18 pm—approximately eight minutes after counsel submitted the first set of files for upload—counsel unexpectedly received an e-mail from the ACCESS system showing the system's rejection of the first set of five documents due to "Unauthorized Comment Type(s) found in document." Counsel tried again, and, at 4:27 pm, unexpectedly received another rejection notice for the first five pieces of the Supplemental Section C Response.

24. These ACCESS rejection messages were surprising for two reasons. First, the documents had been pre-screened in ACCESS using the "check file" system to ensure that no technical issues existed in the files, and the documents had "passed" that screening—an apparent technical failure by Commerce's system. Second, it took ACCESS approximately 17 minutes for ACCESS to deliver these error messages, effectively wasting 17 minutes before informing counsel that it had not accepted the upload.

25. After re-reformatting the filings (which, again, had been pre-screened and pre-approved by ACCESS), counsel for Oman Fasteners successfully filed the Supplemental Section C Response narrative and all supporting PDF exhibits at 4:41 pm and 4:46 pm.

26. Counsel then immediately continued uploading additional files, all but one of which were copies in native Excel format of the PDF exhibits that counsel had previously uploaded successfully in PDF form by 4:46 pm.

27. Despite the ACCESS system's relatively reliable track record with prior filings, ACCESS dragged in this instance, such that the final piece of the filing—a revised version of the U.S. sales SAS database, reflecting limited revisions to the reported U.S. sales data that was described in the timely-submitted portions of the Supplemental Section C Response—was not accepted by ACCESS until 5:16 pm.

28. This 16-minute delay resulting from ACCESS's inexplicably slow uploading of files was less time than the approximately 17 minutes that ACCESS had wasted—from 4:10 pm to 4:27 pm—in twice rejecting the attempted upload that the "check file" system had determined would be accepted.

29. Counsel did not know—and could not have known—until immediately before 5:00 pm that ACCESS would delay the uploading process for certain files until after 5:00 pm.

Again, Oman Fasteners' complete initial Section C Response, filed on December 9, 2021, including all exhibits and the SAS sales database file, had uploaded to ACCESS in only 9 minutes, so the system's glitchy and sluggish behavior from 4:10 pm until after 5:00 pm on February 14, 2022, was unusual. Even if counsel could have predicted that ACCESS would behave in this unexpected manner, Commerce already had warned counsel, in granting the extension until February 14, that Commerce "[did] not anticipate providing any additional extension for Oman Fasteners' response to the section C supplemental questionnaire." Counsel thus reasonably believed that that attempting to obtain an additional extension would only delay things further, and that the best course of action instead was continuing the effort to file before the 5:00 pm deadline.

30. In sum, by 4:46 pm on February 14, 2022, Commerce had received Oman Fasteners' complete Supplemental Section C Response in PDF form, together with all PDF exhibits. Commerce received certain native Excel files that duplicated the information in the PDF exhibits, as well as a revised SAS database file that reflected data revisions detailed in the PDF exhibits, by 5:16 pm on February 14, 2022.

31. Oman Fasteners' 16-minute partial filing delay had no impact whatsoever on Commerce or anyone else involved with this proceeding.

32. Because the Supplemental Section C Response that Oman Fasteners submitted on February 14, 2022, was in "bracketing not final" form, the final business-proprietary and public versions were timely filed via ACCESS the next day, pursuant to Commerce's "one-day lag rule." Those final versions were then served on Mid Continent via ACCESS and email. Mid Continent sought and received an extension of time in which to comment on the Supplemental Section C Response, and filed subsequently filed its substantive comments on March 4, 2022.

33. Mid Continent did not raise any claim of prejudice resulting from the 16-minute delay in Oman Fasteners' filing of the last electronic data file on February 14, 2022. Nor could Mid Continent have asserted any claim of prejudice in good faith, given that it was timely served—through the ACCESS system—with the final business proprietary version of Oman Fasteners' Supplemental Section C Response on the next business day after the initial filing.

34. For over five weeks, Commerce gave no indication to Oman Fasteners or its counsel that Commerce had any concerns regarding Oman Fasteners' February 14 filing of the Supplemental Section C response. Then on March 22, 2022, Commerce abruptly rejected the entire Supplemental Section C Response and removed it from the record of the review. Commerce's stated reason what that it had "received Oman Fasteners' Section C supplemental questionnaire response between 4:41 p.m. eastern standard time (EST) and 5:16 p.m. EST." Commerce Letter to Oman Fasteners (A-523-808; POR: 7/1/2020-6/30/2021), *Extension of Deadline to Submit Response to Section D Supplemental Questionnaire {sic}* (March 22, 2022) (Commerce's letter erroneously refers to the Section D Supplemental Questionnaire extension request in the subject line.)

35. On March 24, 2022, Oman Fasteners requested reconsideration of Commerce's rejection of its Supplemental Section C Response and asked, alternatively, for an extension of time to submit it. Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Request for Reconsideration and Out-of-Time Extension Request* (March 23, 2022).

36. Oman Fasteners thereafter submitted four additional letters to Commerce asking Commerce to either reconsider the initial rejection or else permit Oman Fasteners to resubmit either the entire Supplemental Section C Response or at least the parts of the response that had been timely filed before the 5:00 pm deadline. Oman Fasteners Letter to Commerce (A-523-808;

9

POR: 7/1/2020-6/30/2021), *Reply to Petitioner's Opposition to Oman Fasteners' Request for Reconsideration* (March 30, 2022); Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Oman Fasteners Request for Leave to Submit Supplemental Section C Response* (April 22, 2022); Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Oman Fasteners Response to Mid Continent's May 2, 2022 Letter* (May 4, 2022); Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Oman Fasteners Request for Reconsideration Regarding Leave to Submit Supplemental Section C Response* (May 24, 2022).

37. Oman Fasteners also requested and participated in an *ex parte* teleconference with Commerce regarding the same issues on April 28, 2022. Commerce Memorandum to File (A-523-808; POR: 7/1/2020-6/30/2021), *Teleconference Call with Counsel to Oman Fasteners LLC* (April 29, 2022) (Commerce's memorandum of the teleconference erroneously identifies the date as "May 28, 2022").

38. Oman Fasteners demonstrated in these submissions that (i) Commerce's unwarranted rejection of the Supplemental Section C Response was inconsistent with controlling court precedents and prior Commerce practice; (ii) Commerce should permit the re-filing of the entire Supplemental Section C Response, particularly given that the 16-minute delay in Commerce's receipt of certain electronic data files, which reflected data already timely filed in PDF form before 5:00 pm on the day of filing, had no discernable impact on Commerce's ability to conduct the review nor caused any prejudice to anyone; and (iii) Commerce has no lawful basis to draw an adverse inference against Oman Fasteners because the Sixth Review record, as well as the entire history of the Oman Nails proceeding, demonstrates that Oman Fasteners had

devoted its utmost efforts to fully cooperating in Commerce's investigation and responding to every request for information by Commerce.

39. Commerce refused to reconsider its initial rejection on the ground that it determined that Oman Fasteners failed to show "extraordinary circumstances" justifying consideration of an extension request filed after the applicable time limit expired. In addition, Commerce refused to grant Oman Fasteners leave to resubmit any portion of its Supplemental Section C Response. Commerce Letter to Oman Fasteners (A-523-808; POR: 7/1/2020-6/30/2021), *Rejection of Untimely Submission from Oman Fasteners LLC* (April 20, 2022); Commerce Letter to Oman Fasteners (A-523-808; POR: 7/1/2020-6/30/2021), *Rejection of Untimely Submission from Oman Fasteners LLC* (May 20, 2022).

40. Oman Fasteners reiterated its position in written comments filed on June 2, 2022, prior to Commerce's Preliminary Results determination. Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Oman Fasteners' Pre-Preliminary Comments* (June 2, 2022).

41. Oman Fasteners also argued in its Pre-Preliminary Comments that, under applicable decisions of this Court and the Court of Appeals, to the extent that Commerce chose to rely on other facts available to determine Oman Fasteners' dumping margin in the Sixth Review—and whether or not Commerce determined to apply an adverse inference—it would be grossly punitive and unlawful to apply the original (and entirely discredited) 154.33% dumping margin alleged by Mid Continent in its 2014 petition. Instead, if Commerce felt compelled to resort to alternative facts, Commerce's calculated dumping margin for Oman Fasteners in the immediately prior (fifth) administrative review—which was based on Oman Fasteners' actual sales and cost data that Commerce had found to be entirely credible and reliable—was the best

11

source of other facts available, given its recency, specificity to Oman Fasteners, and consistency with Oman Fasteners' overall history of very low dumping margins.

42. On July 6, 2022, Commerce issued its Preliminary Results, subsequently published in the Federal Register on July 20, 2022. *Certain Steel Nails from the Sultanate of Oman,* 87 Fed. Reg. 43240 (July 20, 2022). Commerce preliminarily assigned a 154.33% dumping margin for Oman Fasteners on the basis of total "adverse facts available" At the same time, Commerce preliminarily selected a 9.10% dumping margin for all other Omani companies based on the prior "all others" rate.

43. Commerce rejected each of Oman Fasteners' arguments. In its Preliminary Determination Memorandum, Commerce continued to exclude from the record the entirety of Oman Fasteners' Supplemental Section C Response on the basis that Oman Fasteners had not shown "extraordinary circumstances" justifying the 16-minute filing delay, which Commerce believed necessitated Commerce's use of "facts otherwise available" to determine Oman Fasteners' preliminary dumping margin. Commerce also preliminarily applied an adverse inference against Oman Fasteners in the selection of facts otherwise available, because it concluded that "Oman Fasteners failed to act to the best of its ability to comply with Commerce's request for information by not providing the requested information by the deadline for submission of that information." Preliminary Decision Memorandum at 11.

44. As a result, Commerce assigned the highest dumping margin alleged in the 2014 petition, i.e., 154.33%, as the dumping margin for Oman Fasteners. Commerce also concluded that it need not corroborate this adverse-facts-available rate, as required by statute, because it had applied the rate to a different mandatory respondent that had wholly failed to cooperate, and refused to participate entirely, in the first and second reviews.

45. At the same time, however, in determining the rate applicable to all other potential Omani exporters of subject steel nails, Commerce determined that the punitive margin it had assigned to Oman Fasteners was not reasonably reflective of the non-selected companies' potential dumping margins during the period of review, because, according to Commerce, "{i}n the four most recent administrative reviews of the Order, Commerce calculated margins for the mandatory respondents ranging from zero to 1.65%," and, "{m}oreover, the all-others rate in those reviews continued to be the 9.10% rate calculated in the investigation." Preliminary Decision Memorandum at 13.

46. Commerce neglected to note that there was only one "mandatory respondent" for which it had calculated actual dumping margins of zero to 1.65% in the prior reviews, and that respondent was Oman Fasteners. Commerce also neglected to note that it had revised downward the 9.10% investigation rate to 4.22%, based on remand instructions from this Court.

47. On August 5, 2022, in light of the severe and irreparable harm that Oman Fasteners was certain to suffer if Commerce's Preliminary Results were made final and implemented, Oman Fasteners requested that Commerce (i) immediately fully extend the deadline for the final results of the review so as to eliminate uncertainty regarding the effective date of the final results; and (2) commit to postpone the effective date of any new cash deposit rate until Oman Fasteners has an opportunity to seek review of Commerce's final results in this Court, in the event that Commerce, in its final results, were to continue to assign a punitive and aberrational 154.33% rate to Oman Fasteners. Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Oman Fasteners' Request for Postponement* (Aug. 5, 2022).

48. In its August 5 letter, Oman Fasteners detailed the severe and irreparable harm that Commerce's punitive rate would have on its business operations, as well as the profound

negative impact such a determination would have on critical sectors of the U.S. economy that depend on Oman Fasteners to supply steel nails, including the U.S. residential construction, light-commercial construction, and shipping-pallet industries.

49.     Oman Fasteners also emphasized that Commerce has the authority, pursuant to Section 705 of the Administrative Procedure Act ("APA"), to postpone the effect of its final results in an antidumping administrative review, including the implementation of a punitive and economically prohibitive cash deposit rate, to prevent irreparable harm or other manifest injustice. The APA provides that "{w}hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." 5 U.S.C. § 705. Oman Fasteners pointed out that the federal courts have held that the authority to postpone under Section 705 of the APA extends to any action that an agency may take.

50.     Oman Fasteners received no response from Commerce to its August 5 letter. Oman Fasteners renewed its request by letter submitted on September 7, 2022. Commerce eventually responded to Oman Fasteners on September 27, 2022, rejecting Oman Fasteners' requests and stating that "{i}t is Commerce's practice to issue cash-deposit instructions by no later than five business days after the publication of the final results of a proceeding." Commerce Letter to Oman Fasteners (A-523-808; POR: 7/1/2020-6/30/2021), *Denial of Extension of Deadline for Final Results and Cash Deposit Instructions Deadline* (Sept. 27, 2022).

51.     Separately, in accordance with Commerce's regulations, Oman Fasteners submitted its Case Brief to Commerce on August 23, 2022. Oman Fasteners Letter to Commerce (A-523-808; POR: 7/1/2020-6/30/2021), *Oman Fasteners' Case Brief* (Aug. 23, 2022). Therein, Oman Fasteners argued the following:

- Oman Fasteners' sixteen-minute delay in uploading the final exhibit to the Supplemental Section C Response was understandable and excusable, especially

- in light of the unusual technical problems in the ACCESS filing system that Oman Fasteners' counsel faced in uploading that final electronic exhibit the Supplemental Section C Response.

- Oman Fasteners' 16-minute delay in uploading the final electronic data file exhibits to the Supplemental Section C Response had no impact on, and did not prejudice, Commerce, Mid Continent, or anyone else involved in the review.

- Oman Fasteners was entitled to leniency under Commerce's long-standing practice of extending grace for first-time mistakes in a proceeding.

- At minimum, Commerce must allow Oman Fasteners to submit the portions of its Supplemental Section C Response that were successfully uploaded prior to the 5:00pm deadline, which provided Commerce with all the factual information responsive to its supplemental Section C questionnaire.

- Even a missing supplemental Section C Response could not support Commerce's refusal to calculate a dumping margin, because the questionnaire contained questions and requests for clarification regarding Oman Fasteners' Section C data that were virtually identical to the questions and requests for clarifications previously asked by Commerce and answered by Oman Fasteners.

- Commerce had no legal authority to draw any adverse inference against Oman Fasteners, which cooperated to the best of its ability with Commerce's investigation, because the "best of its ability" standard does not require perfection and recognizes that mistakes sometimes occur.

- To the extent Commerce nevertheless decided to rely on adverse facts available, given the very minor delay by Oman Fasteners, its sterling prior history of cooperation, and Oman Fasteners' prior history of zero and near-zero dumping margins, Commerce should select Oman Fasteners' most recent calculated dumping margin—1.65% in the fifth review—or at most the highest calculated margin in this proceeding—Oman Fasteners' original investigation margin of 4.22%—as the adverse facts available rate.

- Commerce's preliminary selection of the 153.44% petition-based adverse facts available rate was unjustifiably punitive and unlawful, because that margin was concocted by petitioner based on a variety of unfounded guesses and suppositions and was thoroughly discredited by Commerce's actual calculation of Oman Fasteners' dumping margin as 4.22% in the original 2014-2015 investigation.

52.     On December 16, 2022, Commerce issued its Final Results, subsequently published in the Federal Register on December 22, 2022. *Certain Steel Nails from the Sultanate*

15

*of Oman*, 87 Fed. Reg. 78,639 (Dec. 22, 2022). Commerce made no changes to its Preliminary Results. Commerce rejected each of Oman Fasteners' arguments and continued to assign a final dumping margin of 154.33% to Oman Fasteners on the basis of total adverse facts available.

53. Commerce stated in its Final Results that it will issue instructions to Customs and Border Protection ("CBP") to assess this rate on imports covered by the review and will direct CBP to begin collection of cash deposits of estimated antidumping duties on imports from Oman Fasteners at the rate of 154.33%, effective with merchandise entered on or after the date of Federal Register publication. 87 Fed. Reg. at 78,640.

54. As in the Preliminary Results, in the Final Results Commerce assigned a dumping margin rate of 9.10%—the actual dumping margin calculated by Commerce for Oman Fasteners in the original investigation (and later corrected to 4.22%)—to "all other" potential Omani exporters of subject steel nails. 87 Fed. Reg. at 78,640.

## STATEMENT OF CLAIMS

### COUNT I

55. The allegations of paragraphs 1-53 are incorporated herein by reference.

56. This Court shall hold unlawful any determination, finding, or conclusion found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1).

57. Commerce's decision to reject Oman Fasteners' entire Supplemental Section C Response based on its counsel's submission of certain exhibits thereto 16 minutes after the deadline was arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence on the record, and not in accordance with law.

## COUNT II

58. The allegations of paragraphs 1-53 are incorporated herein by reference.

59. This Court shall hold unlawful any determination, finding, or conclusion found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1).

60. Commerce's decision to apply an adverse inference against Oman Fasteners based on its counsel's submission of certain exhibits to the Supplemental Section C Response until 16 minutes after the deadline—despite Oman Fasteners' otherwise stellar record of cooperation with Commerce's investigation across the eight-year history of *Oman Nails,* and despite no discernable impact on Commerce's ability to conduct the review—was arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence on the record, and not in accordance with law.

## COUNT III

61. The allegations of paragraphs 1-53 are incorporated herein by reference.

62. This Court shall hold unlawful any determination, finding, or conclusion found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1).

63. Commerce's decision to select the wholly discredited and punitive 154.33% petition rate for Oman Fasteners—despite no discernable impact on Commerce's ability to conduct the review and despite Oman Fasteners' exemplary record of cooperation with Commerce and consistent record of zero or low single-digit dumping margins—was arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence on the record, and not in accordance with law.

## COUNT IV

64. The allegations of paragraphs 1-53 are incorporated herein by reference.

65. This Court shall hold unlawful any determination, finding, or conclusion found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1).

66. Commerce's refusal to postpone the implementation of a punitive and economically prohibitive 154.33% cash deposit rate, in light of the immediate and substantial irreparable harm that imposition of such rate will cause Oman Fasteners and important sectors of the U.S. economy that depend on supply from Oman Fasteners, was an abuse of Commerce's discretion under Section 705 of the Administrative Procedure Act, 5 U.S.C. § 705, and was otherwise arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence on the record, and not in accordance with law.

## DEMAND FOR JUDGMENT AND RELIEF

WHEREFORE, Oman Fasteners respectfully requests that this Court:

(a)     enter judgment in favor of Plaintiff on its claims as set forth in Counts I, II, III, and IV above;

(b)     hold that Commerce's Final Results are arbitrary and capricious, unsupported by substantial evidence, and contrary to law;

(c)     remand this case to Commerce for a re-determination of Oman Fasteners' dumping margin consistent with the holding of this Court; and

(d)     grant such other and additional relief in law and equity as the Court may deem just and proper.


Dated: December 23, 2022

/s/ Michael P. House
Michael P. House
Michael R. Huston
Andrew Caridas
**Perkins Coie LLP**
700 Thirteenth St., NW
Washington, D.C. 20005
202-654-6288
mhouse@perkinscoie.com

*Counsel to Oman Fasteners, LLC*