## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| OMAN FASTENERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 22-00348 |
| | ) | |
| UNITED STATES, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OF OMAN FASTENERS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 2

    I.    THE ANTIDUMPING ORDER ON *OMAN NAILS* ........................................ 3

    II.   OMAN FASTENERS' SUPPLEMENTAL SECTION C RESPONSE ................... 3

    III.  COMMERCE'S REJECTION OF THE SUPPLEMENTAL SECTION C RESPONSE ................. 7

    IV.  COMMERCE'S PRELIMINARY RESULTS ................................................. 7

    V.   COMMERCE'S FINAL RESULTS ............................................................. 9

ARGUMENT ............................................................................................................ 10

    I.    LEGAL STANDARD ............................................................................ 10

    II.   OMAN FASTENERS IS LIKELY TO SUCCEED ON THE MERITS ................. 11

         A.    Commerce violated the statutory text and abused its discretion when it bypassed the record and resorted to "facts otherwise available" ................................................. 12

         B.    Commerce violated the statutory text and abused its discretion by applying an adverse inference ............................................... 23

    III.  OMAN FASTENERS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF ............................................................. 33

         A.    Bankruptcy, reputational harm, lost customer relationships, and lost market share all constitute irreparable harm ............................... 34

         B.    Without interim relief, Oman Fasteners faces imminent, irreparable harm to its business .................................................. 35

    IV.  THE BALANCE OF HARDSHIPS FAVORS OMAN FASTENERS ................... 40

    V.   THE PUBLIC INTEREST FAVORS AN INJUNCTION ................................. 41

CONCLUSION ........................................................................................................ 44

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Lab'ys v. Sandoz, Inc.*,
500 F. Supp. 2d 807 (N.D. Ill. 2007) ......................................................................34

*Ajmal Steel Tubes & Pipes Indus., LLC v. United States*,
2022 WL 15943670 (Ct. Int'l Trade Oct. 28, 2022) ................................................1

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010) .................................................................................41

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
726 F.3d 1296 (Fed. Cir. 2013) ...............................................................................34

*Azurin v. United States*,
632 F. Supp. 30 (Ct. Int'l Trade 1986) ....................................................................41

*Bebitz Flanges Works v. United States*,
433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020) ..........................................................18

*Bebitz Flanges Works v. United States*,
433 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ..........................................................19

*Belgium v. United States*,
452 F.3d 1289 (Fed. Cir. 2006) ...............................................................................10

*BMW of N. Am. LLC v. United States*,
926 F.3d 1291 (Fed. Cir. 2019) ......................................................2, 28, 29, 30, 31

*Bosun Tools Co., Ltd. v. United States*,
405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) .......................14, 15, 16, 18, 22, 29, 32

*Bosun Tools Co. v. United States*,
493 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ..........................................................14

*Celik Halat ve Tel Sanayi A.S. v. United States*,
485 F. Supp. 3d 1404 (Ct. Int'l Trade 2020) ..........................................................11

*Celik Halat ve Tel Sanayi A.S. v. United States*,
557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022)
...................................1, 6, 7, 11, 12, 13, 15, 16, 17, 18, 19, 21, 22, 23, 25, 26, 27, 29, 30, 32

*Celik Halat ve Tel Sanayi A.S. v. United States*,
557 F. Supp. 3d 1363 (Ct. Int'l Trade 2022)
.......................................................13, 15, 16, 17, 18, 19, 22, 23, 25, 27, 29, 30, 32

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012) ............................................................34

*CPC Int'l Inc. v. United States*,
    896 F. Supp. 1240 (Ct. Int'l Trade 1995) .................................................34

*Dongtai Peak Honey Industry Co., Ltd. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015)............................................................18

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975)........................................................................34

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000) ...........................................................27

*Gallant Ocean (Thailand) Co. v. United States*,
    602 F.3d 1319 (Fed. Cir. 2010)....................................24, 28, 31, 32, 33

*Hitachi Energy USA Inc. v. United States*,
    34 F.4th 1375 (2022)......................................................................24

*Invenergy Renewables LLC v. United States*,
    422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ..............................34, 41, 42

*Kirk v. Comm'r of Soc. Sec. Admin.*,
    987 F.3d 314 (4th Cir. 2021) .........................................................21, 22

*Kwo Lee, Inc. v. United States*,
    24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014) ...............................................39

*Mid Continent Steel & Wire, Inc. v. United States*,
    2022 WL 3153664 (Ct. Int'l Trade Aug. 8, 2022)....................................31

*Mid Continent Steel & Wire Inc. v. United States*,
    No. 15-00214 (Apr. 14, 2022) .............................................................3

*Mid Continent Steel & Wire, Inc. v. United States*,
    No. 23-1039, 941 F.3d 530 (Fed. Cir. 2019) ......................................41, 42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).........................................................................21

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed Cir. 2003)..................................................2, 24, 25

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995)............................................................11

*Papierfabrik August Koehler AG v. United States*,
180 F. Supp. 3d 1211 (Ct. Int'l Trade 2016) ............................................32

*POSCO v. United States*,
296 F. Supp. 3d 1320 (Ct. of Int'l Trade 2018) ....................................28, 31

*Qingdao Taifa Grp. Co., Ltd. v. United States*,
581 F.3d 1375 (Fed. Cir. 2009)...................................................10, 41

*Silfab Solar, Inc. v. United States*,
892 F.3d 1340 (Fed. Cir. 2018)..........................................................11

*SKF USA Inc. v. United States*,
28 C.I.T. 170 (2004) .......................................................................41

*SKF USA Inc. v. United States*,
630 F.3d 1365 (Fed. Cir. 2011)......................................................21, 22

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
897 F.2d 511 (Fed. Cir. 1990)............................................................34

*Star Fruits S.N.C. v. United States*,
393 F.3d 1277 (Fed. Cir. 2005)...........................................................12

*Sunpreme Inc. v. United States*,
145 F. Supp. 3d 1271 (Ct. Int'l Trade 2016) .................................11, 38, 39

*Tau-Ken Temir v. United States*,
587 F. Supp. 3d 1346 (2022) .............................................................18

*U.S. Auto Parts Network, Inc. v. United States*,
307 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ...........................................41

*Ugine-Savoie Imphy v. United States*,
121 F. Supp. 2d 684 (Ct. Int'l Trade 2000) ............................................40

*Univ. of Texas v. Camenisch*,
451 U.S. 390 (1981).......................................................................10

*Winter v. Nat. Res. Defense Council, Inc.*,
555 U.S. 7 (2008)...........................................................................34

## STATUTES & REGULATIONS

5 U.S.C. § 705...................................................................................8

19 U.S.C. § 1516a.............................................................................11

19 U.S.C. § 1677e ..............................................1, 15, 16, 23, 24, 28, 31

19 C.F.R. § 351.808 ................................................................................................24

*Preamble*, 78 Fed. Reg. 57,790 (Sept. 20, 2013) .................................................17

Statement of Administrative Action accompanying the Uruguay Round
    Agreements Act, H.R. Rep. No. 103-316, vol. 1 (1994),
    *reprinted in* 1994 U.S.C.C.A.N. 4040 .......................................................24

## RULES

Rule 65 ...................................................................................................................10

## ADMINISTRATIVE DECISIONS

*Certain Corrosion-Resistant Steel Products from Korea*,
    No. A-580-878, Commerce Letter (Aug. 3, 2018) ......................................19

*Certain Fine Denier Polyester Staple Fiber from India*,
    No. C-533-876, Commerce Letter (Aug. 23, 2017).....................................21

*Certain New Pneumatic Off-the-Road Tires from China*,
    No. A-570-912, Commerce Letter (Dec. 10, 2016) .....................................21

*Certain Softwood Lumber Products from Canada*,
    No. A-122-857, Commerce Letter (Mar. 2, 2017)......................................20

*Certain Tool Chests and Cabinets from Vietnam*,
    No. A-552-821, Commerce Letter (Aug. 4, 2017) ......................................21

*Circular Welded Carbon Quality Steel Line Pipe from China*,
    No. C-570-936, Commerce Letter (Apr. 18, 2019) .....................................21

*Dioctyl Terephthalate from Korea*,
    No. A-580-889, Department Memorandum (June 12, 2019).....................21

*Large Vertical Shaft Engines from China*,
    No. A-570-119, Commerce Memorandum (July 7, 2020).........................20

*Narrow Woven Ribbons from Taiwan*,
    No. A-583-844, Commerce Letter (Feb. 27, 2015) .....................................20

*Polyethylene Terephthalate Film, Sheet, and Strip from China*,
    No. A-570-924, Commerce Letter (July 17, 2012)......................................26

*Polyethylene Terephthalate Film, Sheet and Strip from India*,
    No. C-533-825, Commerce Letter (Aug. 1, 2018).......................................21

*Polyethylene Terephthalate Resin from Oman*,
    No. A-523-810, Commerce Letter (Mar. 28, 2019).....................................20

*Prestressed Concrete Steel Wire Strand from Turkey*,
   No. A-489-842, Redetermination Pursuant to Court Remand (Apr. 1, 2022) ........................13

*Prestressed Concrete Steel Wire Strand from Turkey*,
   No. C-489-843, Redetermination Pursuant to Court Remand (Apr. 15, 2022) .....................14

*Ripe Olives from Spain*,
   No. A-469-817, Commerce Memorandum (Jan. 25, 2022) ....................................................20

*Small Vertical Shaft Engines from China*,
   No. C-570-125, Commerce Memorandum (May 22, 2020) ...................................................20

*Solid Urea from Russia*,
   No. A-821-801, Commerce Letter (Nov. 14, 2013) .............................................................26

*Steel Concrete Reinforcing Bar from Turkey*,
   No. A-489-829, Commerce Letter (Jan. 27, 2017) ..............................................................20

*Steel Nails from India, Oman, Sri Lanka and Turkey*,
   87 Fed. Reg. 61,631 (Oct. 22, 2022) .......................................................................................44

## INTRODUCTION

Plaintiff Oman Fasteners, LLC ("Oman Fasteners") respectfully moves for a preliminary injunction to prevent the Department of Commerce ("Commerce") from driving it out of business before this Court can hear its case. In the administrative decision at issue, Commerce imposed what amounts to a corporate death sentence—a staggering antidumping duty rate of 154.33% on Oman Fasteners' imports—because part of one administrative filing came in 16 minutes late. If not enjoined pending review, that draconian rate will likely make it impossible for Oman Fasteners to remain in operation.

Oman Fasteners' single, inadvertent, 16-minute partial filing delay indisputably had no impact on the administrative process. But Commerce nevertheless invoked it as justification for rejecting the filing *five weeks later*, and for refusing to consider *any* of Oman Fasteners' evidence in the administrative proceeding. Commerce then compounded its abuse of discretion by pointing to that same minor filing misstep as grounds for drawing an adverse inference against Oman Fasteners, and then selecting the exorbitant 154.33% dumping margin—a rate with no resemblance to the single-digit margins that have historically applied to the company's merchandise.

Commerce's decision was unlawful several times over. First, this Court has recently and repeatedly held that, when a party's submission is filed a few minutes late and causes no prejudice, Commerce "is not free to apply" its deadline "in so harsh a way as to produce an unjust and punitive result." *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348, 1361 (Ct. Int'l Trade 2022) ("*Celik I*"); *see, e.g.*, *Ajmal Steel Tubes & Pipes Indus., LLC v. United States*, 2022 WL 15943670, at *4 (Ct. Int'l Trade Oct. 28, 2022) (Commerce may not "enforce its deadlines in the strictest way possible" where "no prejudice to any party could result" from a "minor delay{ }"). Second, Commerce was not permitted to apply an adverse inference because Oman Fasteners did not "fail to cooperate" under 19 U.S.C. § 1677e(b)(1): "that standard does not require perfection

and recognizes that mistakes sometimes occur." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed Cir. 2003). And third, Commerce certainly cannot use such a minor mistake to impose a maximally punitive rate that does not reflect "the seriousness of {Oman Fasteners'} conduct." *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1302 (Fed. Cir. 2019).

Because Commerce's decision in this case so clearly contradicts the statutory text and applicable precedent, when this Court reaches the merits Oman Fasteners is likely to prevail: the Tariff Act does not permit Commerce to impose a company-killing penalty for a 16-minute partial filing delay. Without a preliminary injunction, however, Oman Fasteners will not get the opportunity to be heard. Commerce's ruthless margin has forced Oman Fasteners to stop shipping subject merchandise to the United States at all, and the company has already begun terminating employees in an attempt to remain solvent. The company's President and C.E.O. has stated in a sworn declaration that, without a preliminary injunction, there is a grave risk that Oman Fasteners will be unable to stave off bankruptcy long enough to pursue its challenge.

This Court should grant the motion for a preliminary injunction because every relevant factor supports Oman Fasteners. The company has demonstrated a strong likelihood of success on the merits and massive irreparable harm without a preliminary injunction. By contrast, an injunction will not burden the government at all, so the balance of hardships tips overwhelmingly in favor of maintain the existing deposit rate—the dumping rate that Commerce calculated for Oman Fasteners in the prior review—so that Oman Fasteners can survive while this Court considers the merits. And the public interest strongly favors preserving Oman Fasteners' existence as a valued U.S. trading partner that supplies an important product for key domestic industries.

## STATEMENT OF FACTS

This action challenges Commerce's final results in its sixth administrative review of the antidumping duty order on *Certain Steel Nails from Oman*, Case No. A-523-808. Exhibits 1 & 2.

## I.      THE ANTIDUMPING ORDER ON *OMAN NAILS*

In July 2015 Commerce published an antidumping duty order on certain steel nails from Oman. *Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed. Reg. 39,994 (July 13, 2015) ("Order"). Notwithstanding the petitioner's baseless allegation that Oman Fasteners was dumping steel nails into the United States at a margin of 154.33%, Commerce ultimately determined, based on Oman Fasteners' sales and cost data, that the actual dumping margin was 4.22%.[1] Commerce thereafter conducted five annual reviews of Oman Fasteners' subject imports, finding that the dumping margin was zero or near zero—specifically, 0.63%, 0.00%, 0.00%, 0.00% and 1.65%.[2] In each review Commerce found that Oman Fasteners fully cooperated and based its margin calculation on Oman Fasteners' submitted data. *Id.*

In September 2021 Commerce initiated the administrative review at issue here, the sixth review of the original antidumping Order, concerning sales of subject merchandise between July 1, 2020 and June 30, 2021. 86 Fed. Reg. 50,034. Commerce selected Oman Fasteners as the sole mandatory respondent. Exhibit 3.[3] Oman Fasteners had likewise been the sole mandatory respondent in Commerce's original antidumping investigation and in the third, fourth and fifth reviews, and it was the sole cooperating mandatory respondent in the first and second reviews.

## II.      OMAN FASTENERS' SUPPLEMENTAL SECTION C RESPONSE

As part of the sixth administrative review, Commerce issued a supplemental section C

---

[1] Final Results of Redetermination Pursuant to Court Remand, *Mid Continent Steel & Wire Inc. v. United States*, No. 15-00214 (Apr. 14, 2022).

[2] 83 Fed. Reg. 4,030 (Jan. 29, 2018) (1st review); 83 Fed. Reg. 58,231 (Nov. 19, 2018) (2d review); 84 Fed. Reg. 71,372 (Dec. 27, 2019) (3d review); 86 Fed. Reg. 14,309 (Mar. 15, 2020) (4th review); and 86 Fed. Reg. 67,690 (Nov. 29, 2021) (5th review).

[3] Because this brief precedes the administrative record, relevant documents are attached as exhibits.

questionnaire to Oman Fasteners on January 24, 2022. Exhibit 4. The questionnaire was extensive: it contained 37 separately numbered questions, some in multiple parts, for a total of 48 separate requests for information, clarifications, and data covering a wide variety of subjects. *Id.* Commerce gave Oman Fasteners only 10 days to respond—until February 3, 2022. *Id.*

Oman Fasteners requested an extension until Monday, February 14. Exhibit 5. It explained that the supplemental questionnaire was voluminous, and the company was also "focused on preparing the CV profit submission { } due in th{e same} proceeding on February 7, 2022." *Id.* Moreover, Oman Fasteners' accounting and sales departments were also hard pressed due to their involvement in its "quarterly {value added tax} return submission," and because "Oman Fasteners' Finance Manager tested positive for COVID on January 22 {and had} been in quarantine for 10 days while another accountant ha{d} been on annual leave since January 20." *Id.* Commerce gave Oman Fasteners only until Thursday, February 10. Exhibit 6.

The day before the new deadline, Oman Fasteners sought a second extension, again until February 14. Exhibit 7. Oman Fasteners reiterated its prior reasons for needing an extension and noted that it had been "focused on preparing the CV profit submission and rebuttal." *Id.* Commerce granted the modest extension request but stated that it "does not anticipate providing any additional extension for Oman Fasteners' response to the section C supplemental questionnaire." Exhibit 6.

Oman Fasteners ultimately overcame the numerous challenges associated with its February 14 submissions: it was able to completely provide its counsel with the necessary documents by late in the morning on February 14, allowing counsel to format the CV profit rebuttal and the supplemental section C response ("Response") by late that afternoon. Exhibit 26 at 14:18-15:6 (M. House testimony). Due to limitations of Commerce's ACCESS filing system, each submission consisted of numerous separate electronic files. Counsel completed submission to

ACCESS of the four component pieces of the CV profit rebuttal at 3:32 pm, 3:35 pm, 3:40 pm, and 3:43 pm, and then immediately commenced filing the Response at 3:41 pm by pre-screening it with ACCESS's "check file" feature. *Id.* "Check file" found no issues with the planned submission, suggesting that the remainder of the filing should proceed without delay.

At approximately 4:10 pm—50 minutes before the Department's 5:00 pm deadline—counsel began uploading the Response to ACCESS. *Id.* Counsel believed in good faith, based on personal experience in this and many other Commerce proceedings, that 50 minutes would be more than enough time to upload the files to ACCESS: in the fifth review, Oman Fasteners' supplemental section C and D responses had uploaded in 12 and 9 minutes, respectively, and in the sixth review, Oman Fasteners' initial section C and D responses had uploaded in 9 and 32 minutes, respectively. *See* Exhibit 9 at Attachment 2 (containing ACCESS documentation of the filing times for the referenced submissions).

In this instance, however, ACCESS unexpectedly and inexplicably took much longer to receive the files. At 4:18 pm—approximately eight minutes after counsel had submitted the first set of Response files—counsel unexpectedly received an e-mail showing the ACCESS system's rejection of the documents due to a technical defect. *See id.* at Attachment 1. Counsel tried again, and at 4:27 pm, received another rejection notice. These rejection messages were surprising for two reasons. First, the documents had been pre-screened by ACCESS's check-file feature to ensure that they had no technical deficiencies and had "passed" that screening. Second, it took approximately 17 minutes for ACCESS to deliver these error messages, effectively wasting 17 minutes before informing counsel that there was an issue with the submission.

After re-reformatting the filings (which, again, had been pre-screened and pre-approved by ACCESS), counsel for Oman Fasteners successfully filed the Response narrative and all

supporting PDF exhibits at 4:41 pm and 4:46 pm. *Id.* Counsel then immediately continued uploading additional files, all but one of which were Excel-format copies of the PDF exhibits that counsel had already uploaded. *Id.* Despite the ACCESS system's relatively reliable track record with prior filings, ACCESS dragged in this instance, such that the final piece of the filing—a revised version of the U.S. sales SAS database, reflecting limited revisions to the reported U.S. sales data described in the timely-submitted portions of the Response—was not accepted until 5:16 pm. *Id.*

Counsel could not have known until just before 5:00 pm that ACCESS would delay the uploading process for certain files until after 5:00 pm. Again, Oman Fasteners' *complete* initial Section C Response had uploaded to ACCESS in only 9 minutes, so the system's glitchy and sluggish behavior on February 14, 2022, was unusual. Even if counsel could have attempted to reach Commerce in the minutes between receiving the ACCESS error messages and the deadline, Commerce had already warned that it "{did} not anticipate providing any additional extension for Oman Fasteners' response to the section C supplemental questionnaire." Exhibit 7. Counsel thus reasonably believed that "attempting to obtain {an additional extension} would only delay things further, and that the best course of action instead was continuing the effort to file before the 5:00 p.m. deadline." *Celik I*, 557 F. Supp. 3d at 1360.

The 16-minute delay had no impact whatsoever on this proceeding. The submissions on February 14 were Oman Fasteners' "bracketing not final" versions, and the final business proprietary and public versions were timely filed *the next day* pursuant to Commerce's "one-day lag rule." Exhibit 10. Petitioner then sought and received an extension of time to comment on the Response, *see* Exhibits 11 and 12, and filed its comments on March 4, 2022. Exhibit 13.

### III.    COMMERCE'S REJECTION OF THE SUPPLEMENTAL SECTION C RESPONSE

On March 22, 2022, more than five weeks after Oman Fasteners submitted the Response and more than two weeks after Petitioner had availed itself of an extended opportunity to comment on that Response, Commerce rejected the *entire submission* on the ground that it had "received Oman Fasteners' Section C supplemental questionnaire response between 4:41 p.m. … and 5:16 p.m." Exhibit 14.

Oman Fasteners immediately sought reconsideration, *see* Exhibit 9, and thereafter submitted four additional letters asking Commerce to either reconsider the rejection or permit Oman Fasteners to resubmit the Response—or at least the parts of it that had been timely filed before the 5:00 pm deadline, *see* Exhibits 10, 16, 18 and 20. Oman Fasteners also participated in an *ex parte* teleconference with Commerce on April 28, 2022. *See* Exhibit 17. But Commerce steadfastly refused to reconsider its rejection or allow Oman Fasteners to resubmit any portion of its filing. *See* Exhibits 15 and 19.

### IV.    COMMERCE'S PRELIMINARY RESULTS

In July 2022, Commerce issued its preliminary results and accompanying decision memorandum. Exhibit 22. Commerce preliminarily selected a 154.33% dumping margin that was not based on the record evidence but instead on what it termed "adverse facts available" ("AFA"). *Id.* at 12.[4] Commerce selected a 9.10% dumping margin for all other Omani companies. Exhibit 22.

Faced with the possibility that Commerce would keep the draconian 154.33% rate in its final results, Oman Fasteners determined that it had no choice but to cease U.S. imports of subject merchandise. As explained in the attached sworn declaration of Oman Fasteners' President and C.E.O. Steve Karaga, Oman Fasteners cannot raise prices to offset the exorbitant 154.33% cash

---

[4] In using this term, Commerce "conflates {two distinct} statutory authorities." *See Celik I*, 557 F. Supp. 2d at 1353 n.3.

deposits, and it lacks the financial resources to pay the deposits for even a few months. Decl. at ¶ 28. Oman Fasteners thus faces grave risk to its ability to stay in business. Being forced by Commerce to cease U.S. imports of subject merchandise will devastate the company: these sales represent [      ] of revenue and drive its U.S. sales of other merchandise. Decl. at ¶¶ 13, 16. Without U.S. sales of subject merchandise, Oman Fasteners expects to operate at approximately [         ] of its present level, necessitating the termination of [               ] of its production workers to remain solvent. Decl. at ¶¶ 34-38. The dramatic reduction in revenue also places Oman Fasteners at grave risk of bankruptcy, [

                                                    ]. Decl. at ¶ 31.

    In an attempt to prevent or at least mitigate these disastrous consequences, on August 5, 2022, Oman Fasteners requested that Commerce delay the effective date of its final results pending this Court's review, *see* 5 U.S.C. § 705, or at minimum fully extend the due date for the final results until January 16, 2023. Exhibit 23. Nearly two months later, on September 27, 2022, Commerce refused that request. Exhibit 25.

    With no viable options, Oman Fasteners ceased taking new U.S. orders for subject merchandise in mid-October, to ensure that all shipments would enter the U.S. before Commerce imposed a new cash deposit rate based on its final results. Decl. at ¶ 20. Then on November 14— just days before the final results deadline—Commerce extended its own deadline to December 16. Exhibit 27. Oman Fasteners briefly resumed shipments, but was forced to cease again on November 26, to ensure that all shipments would enter the U.S. before the end of December. *Id.* Oman Fasteners has not been able to make any shipments since November 26.

    After Commerce issued its preliminary results, several American companies that do business with Oman Fasteners submitted letters documenting the substantial harm that

Commerce's decision will inflict on their businesses and those of their customers. *See* Exhibits 28-31. These Oman Fasteners customers explained that the company produces more than 18% of the entire U.S. supply of collated steel framing nails, a product that is critical to both the U.S. construction industry and the wooden pallet industry that (literally) undergirds the U.S. supply chain. Exhibits 28, 30.

In addition, the Government of the Sultanate of Oman and U.S. Ambassador to Oman Leslie M. Tsou both submitted letters to Commerce. *See* Exhibits 32, 33. They stressed the importance of Oman Fasteners to Oman's economy and to the U.S.-Oman commercial and strategic relationship, and they urged Commerce to treat Oman Fasteners fairly. *See id.*

## V.  COMMERCE'S FINAL RESULTS

On December 16, Commerce released its final results notice, *Steel Nails from Oman*, *Final Results of Antidumping Duty Administrative Review; 2020-2021*, and accompanying issues and decisions memorandum ("IDM").[5] Commerce again selected a 154.33% AFA dumping margin for Oman Fasteners, but a 9.10% dumping margin for all other Omani companies. IDM 19-20. Commerce explained that it continued to reject Oman Fasteners' Response in its entirety, *id.* at 6-10, notwithstanding contrary precedent from this Court and Commerce's own prior decisions extending grace to other parties for late filings, *see id.* at 4-5 (summarizing Oman Fasteners' comments). Commerce applied an adverse inference against Oman Fasteners for having "failed to act to the best of its ability and provide requested information by the deadline," *id.* at 15, and stated that "the 154.33 percent rate" from the petition—the most punitive rate possible—was "the most appropriate rate," *id.* at 19-20. Commerce's sole justification for selecting the 154.33% petition

---

[5] The IDM is attached as Exhibit 2.

rate was that Oman Fasteners "failed to timely submit {the Response}" and "did not provide a convincing explanation for why its submission was late." *Id.* at 19.

Commerce published its final results in the Federal Register on December 22, 2022. 87 Fed. Reg. 78,639. As of that date U.S. Customs and Border Protection ("CBP") will require cash deposits of 154.33% on any Oman Fasteners subject merchandise imported into the United States. So long as Oman Fasteners faces cash deposits of such magnitude, it cannot resume any U.S. sales of subject merchandise and will be forced to operate at approximately [         ] of its normal level. *See* Decl. at ¶ 34. While this situation persists, Oman Fasteners will have to implement progressively more devastating cuts to its workforce, and the risk of Oman Fasteners' imminent bankruptcy will escalate rapidly.

## ARGUMENT

### I.  LEGAL STANDARD

This Court has authority under its Rule 65 to issue a preliminary injunction to preserve the relative positions of the parties until the case can be resolved on the merits. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The Court balances: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm absent the requested relief; (3) whether the balance of hardships favors the movant; and (4) whether granting relief serves the public interest. *See Qingdao Taifa Grp. Co., Ltd. v. United States*, 581 F.3d 1375, 1378 (Fed. Cir. 2009). The "likelihood of success and irreparable harm factors" are "{c}entral," *id.*, but "no one factor … is necessarily dispositive, because the weakness of the showing regarding one factor may be overborne by the strength of the others." *Belgium v. United States*, 452 F.3d 1289, 1292-93 (Fed. Cir. 2006) (cleaned up). If a plaintiff shows, for example, that it faces "grave injury to its financial viability and its reputation in the industry," then its "burden to show a likelihood of

success {on the merits is} necessarily lower." *Sunpreme Inc. v. United States*, 145 F. Supp. 3d 1271, 1295 (Ct. Int'l Trade 2016) (cleaned up).

## II.    OMAN FASTENERS IS LIKELY TO SUCCEED ON THE MERITS

The party seeking a preliminary injunction must "demonstrate that it has at least a fair chance of success on the merits." *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018) (internal quotations omitted). Here, Oman Fasteners has far more than a fair chance: it is substantially likely to prevail under this Court's precedent. The Tariff Act requires Commerce to work diligently "to determine dumping margins 'as accurately as possible.'" *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (citation omitted). But Commerce selected a margin against Oman Fasteners that has no support whatsoever in the record evidence: the agency's 154.33% margin is nearly *100 times greater* than the highest margin that Commerce assigned to Oman Fasteners in any prior administrative review, and nearly 40 times greater than the margin assigned in the original antidumping investigation.

Oman Fasteners is likely to establish that Commerce's decision was unlawful several times over. *See* 19 U.S.C. § 1516a(b)(1)(B)(i) ("The court shall hold unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."). First, the "agency abuse{d} its discretion {by} reject{ing} information that would not be burdensome to incorporate and which would increase the accuracy of the calculated dumping margins" just because one filing was completed a few minutes late. *Celik Halat ve Tel Sanayi A.S. v. United States*, 485 F. Supp. 3d 1404, 1412 (Ct. Int'l Trade 2020). Second, the statute does not permit an adverse inference as punishment for an isolated and inconsequential filing mistake. And third, even if an adverse inference had been permissible here, Commerce had no basis for a draconian 154.33% margin. Those are the very same errors that caused this Court to reverse Commerce's decision in *Celik I. See* 557 F. Supp. 3d at 1354-57.

Moreover, in addition to contravening statutory text and precedent, Commerce's decision punished Oman Fasteners arbitrarily and capriciously, deviated from the agency's established practices without explanation, treated similarly situated parties differently, and reached a conclusion wholly unsupported by the record.

### A. Commerce violated the statutory text and abused its discretion when it bypassed the record and resorted to "facts otherwise available"

Commerce's refusal to calculate a dumping margin based on the record, and to instead resort to "facts otherwise available," rested on the agency's conclusion that "the record lacks necessary information because Oman Fasteners did not timely file its {Response}." IDM 15 (citing 19 U.S.C. § 1677e(a)(2)). But the agency misinterpreted the statute. *See Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005) (an agency abuses its discretion when its "decision is based on an erroneous interpretation of the law"). As this Court has repeatedly explained, Commerce may not treat relevant information as missing from the record simply because of a brief and unintentional filing delay that has no impact on the investigation.

### 1. Commerce abused its discretion by refusing to accept briefly out-of-time information which caused no prejudice

a.  *Celik I* is particularly instructive in light of its strikingly similar facts: Commerce had rejected the respondent's entire section B and C questionnaire responses because counsel was unable to file one of the exhibits until 21 minutes after Commerce's deadline. 557 F. Supp. 3d at 1354-55. This Court remanded, holding that "Commerce lacked the discretion to impose a draconian and punitive sanction in the circumstance presented." *Id.* at 1358. The Court found that Commerce had "imposed a grossly disproportionate penalty for what essentially was a minor technical violation that had no discernible effect on the investigation." *Id.* at 1361. "While Commerce has the authority to establish and enforce its own regulations, it is not free to apply" its rules "in so harsh a way as to produce an unjust and punitive result." *Id.* This Court also held that

-12-

Commerce's "insist{ence} on technical perfection in the filing of documents on its ACCESS system" was unreasonable and inconsistent with its own precedent, given Commerce's "acknowledg{ment} that it has allowed for out-of-time extensions due to technical filing issues in the past." *Id.* at 1361-62. The Court stressed: "No one who has confronted issues in using automated filing systems would dispute that unanticipated technical difficulties do sometimes occur." *Id.* at 1362. The Court also held that Commerce further abuses its discretion when it "base{s} its use of the facts otherwise available and an adverse inference on what was no more than a minor incident of non-compliance with an ACCESS filing requirement that had no appreciable effect on the antidumping duty investigation." *Id.* at 1357.

This Court's rejection of Commerce's draconian approach to filing delays in *Celik I* significantly improved the accuracy of the ultimate margin in that case: On remand, Commerce reopened the record and calculated Celik's dumping margin based on the data in Celik's resubmitted questionnaire responses, which reduced the margin from 53.65% to 17.88%. *See Prestressed Concrete Steel Wire Strand from Turkey*, No. A-489-842, Redetermination Pursuant to Court Remand (Apr. 1, 2022).

This Court reached a similar result in Celik's parallel countervailing duty investigation. *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1363 (Ct. Int'l Trade 2022) ("*Celik II*"). There, Commerce had rejected Celik's questionnaire response because, after timely filing the "bracketing not final" version by the applicable deadline, Celik's counsel had filed the final business proprietary and public versions 87 minutes late on the following business day. *Id.* at 1366. Once again this Court held that "Commerce abused its discretion when imposing a drastic and disproportionate penalty for a technical error by plaintiff's counsel that had no appreciable effect on the investigation." *Id.* And again the Court's insistence that Commerce make its decisions based

on the record evidence, rather than perfect deadline compliance, produced a far more accurate result: On remand, Commerce's reopened the record for Celik to resubmit its questionnaire response and recalculated the estimated subsidy rate as 2.96%, rather than Commerce's punitive initial rate of 158.44%. *See Prestressed Concrete Steel Wire Strand from Turkey*, No. C-489-843, Redetermination Pursuant to Court Remand (Apr. 15, 2022).

This Court's decision in *Bosun Tools Co., Ltd. v. United States*, 405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019), also holds that Commerce abuses its discretion when it rejects untimely submissions that do not meaningfully delay Commerce's review or prejudice any interested party. There, Commerce had rejected a supplemental response based on the respondent's failure to file a complete public version of that response by the applicable deadline. *Id.* at 1365. After realizing the error two days later, the respondent submitted the complete public version without requesting an extension. *Id.* This Court held that Commerce had abused its discretion in two distinct ways by rejecting the company's partially late response. First, the late filing did not "infringe{ } or delay{ } in any meaningful way Commerce's review of the information submitted," nor would it "be burdensome to incorporate the information proffered." *Id.* at 1366. Second, no "interested parties were prejudiced or burdened by the two-day delay in filing the redacted version of the submission on ACCESS," given that "{a}ll interested parties received the redacted and unredacted versions of the submission by the relevant deadline and had notice and opportunity to comment on the submission." *Id.* On remand, Commerce accepted respondent's questionnaire response and revised the dumping margin from 82.05% to zero. *See Bosun Tools Co. v. United States*, 493 F. Supp. 3d 1351, 1354 (Ct. Int'l Trade 2021).

b.      Those precedents amply demonstrate that Commerce abused its discretion in this case. The Response was just one of eight factual submissions in the sixth review, which totaled

thousands of pages. And the 16-minute partial filing delay here was shorter than the 21-minute delay at issue in *Celik I*, the 87-minute delay in *Celik II*, or the two-day delay in *Bosun Tools*.

This Court's recent decisions also reject every part of Commerce's reasoning for imposing a grossly inflated margin on Oman Fasteners. Commerce claimed that it was necessary "to apply facts {otherwise} available pursuant to {19 U.S.C. § 1677e(a)}" because "the record lacks adequate information to calculate an antidumping duty margin." IDM 12. But this Court in *Celik II* explained why "th{at} finding was impermissible and nonsensical: the information Commerce characterized as 'missing' is information Commerce itself removed from the record." 557 F. Supp. 3d at 1372-73. Oman Fasteners submitted all the information that Commerce needed to calculate an accurate margin, but the agency refused to consider *any of it*—including the information that was timely submitted—because part of one submission was completed a few minutes late.

Commerce next reasoned that "the record lacks necessary information because Oman Fasteners did not timely file its {Response}." IDM 15. Commerce apparently meant to invoke 19 U.S.C. § 1677e(a)(2)(B), which permits resort to facts otherwise available when the respondent "fails to provide such information by the deadlines for submission of the information or in the form and manner requested." But this Court has already rejected that interpretation of Section 1677e(a)(2)(B), calling it "seriously troubl{ing}." *Celik II*, 557 F. Supp. 3d at 1374. As the Court held, Commerce may not apply that provision to "impose{ } a drastic and disproportionate penalty" on Oman Fasteners for "noncompliance with a technical filing requirement" that "went unremedied for only an insignificant period of time" and therefore "had no appreciable effect" on the Department's investigation." *Id.*

Commerce also reasoned that Oman Fasteners, by submitting part of a filing a few minutes late, "*greatly inhibited* Commerce's ability to calculate an accurate dumping margin based on the respondent's own data." IDM 19 (emphasis added). Insofar as Commerce meant to assert that Oman Fasteners "significantly impede{d} {this} proceeding," 19 U.S.C. § 1677e(a)(2)(C), again this Court has explained why that conclusion "lack{s} any support in the record evidence." *Celik II*, 557 F. Supp. 3d at 1373. A "technical violation" like Oman Fasteners' or Celik's "could not conceivably have impeded the investigation" or prejudiced any party. *Id.* Petitioner was timely served with Oman Fasteners' Response on February 15, and Commerce granted Petitioner additional time to comment. When Petitioner filed substantive comments on March 4, 2022, it claimed no disadvantage. Thus, "{t}he only consequence of the missed deadline was that Commerce was delayed by {16} minutes" in getting that supplemental response. *Id.* And Commerce had all of the information that it requested from Oman Fasteners for *five weeks*—during which Commerce's review carried on uninterrupted—before it decided to strike the Response from the record.

Unable to plausibly assert that Oman Fasteners' filing delay prejudiced anyone, Commerce brazenly asserts that "prejudice … is not a prerequisite" for rejecting a filing based on an unexpected technical problem, and that being forced to consider prejudice would render Commerce's deadlines "meaningless." IDM 8-9. Those statements are little more than a refusal to accept this Court's precedents in *Celik I*, *Celik II*, and *Bosun Tools*, all of which found that Commerce abused its discretion precisely because of the absence of prejudice. And even beyond that precedent, Commerce's sky-would-fall reasoning is impossible to take seriously. As described below, Commerce has repeatedly extended grace to parties for inadvertently late filings—and its deadlines have not crumbled. *See* IDM 8 (admitting that Commerce "occasionally accepts late

filings"). Indeed, this Court recently explained—a day after Oman Fasteners submitted the Response—that Commerce even has a long-"buried" regulatory statement permitting a filer experiencing a technical difficulty to obtain an automatic extension until 8:30 am the next business day. *Celik I*, 557 F. Supp. 3d at 1360-61 (citing *Preamble*, 78 Fed. Reg. 57,790, 57,792 (Sept. 20, 2013)). That agency statement reinforces that "Commerce made far too much of" submitting a portion of one filing 16 minutes late—but well in advance of 8:30 am the next business day. *Id.* at 1361.

c.      Commerce's attempts to distinguish this Court's precedents are feeble. Commerce states that, "{i}n *Celik I*, the respondent requested multiple extensions which Commerce did not grant, unlike the case here, where Commerce granted ten of Oman Fasteners' requested twelve days." IDM 9 (citations omitted). But that was not the basis for this Court's decision in *Celik I*, and Commerce makes no attempt to engage with this Court's reasons for finding an abuse of discretion. Moreover, *Celik I* involved three extension requests: an initial request that was partially granted for 14 extra days, a second request that was denied, and a third request that was granted in full for three extra days. 557 F. Supp. 3d at 1358-59. If anything, Celik received *more generous* extensions from Commerce than Oman Fasteners. And there, as here, Commerce warned Celik that "it would not be able to 'grant any further extension of the deadlines,'" *id.* at 1359, which is why this Court found that requesting another extension at the last minute would have been futile, *id.* at 1359-60. *Compare* Exhibit 6 (Commerce telling Oman Fasteners that it "d{id} not anticipate providing any additional extensions"), *with* IDM 9 (observing that Oman Fasteners did not request "a further extension of the deadline" in the minutes before 5:00 pm).

Regarding *Celik II*, Commerce states that "the plaintiff's counsel made a technical error, which is not the case here." IDM 9. But Commerce is flatly incorrect in its characterization of this

case. On the same day it decided *Celik II*, this Court also described the identical problem at issue here—a questionnaire response submitted a few minutes late due to counsel's unexpected problems with the ACCESS system—as a "technical violation." *Celik I*, 557 F. Supp. 3d at 1361.

Regarding *Bosun Tools*, Commerce states that "the late filing at issue was a public version uploaded two days after the 'one-day lag rule' due to a submission error, while the corollary business proprietary version was timely filed." IDM 9. But here again that specific factual detail made no difference to this Court's *legal* holding that Commerce abuses its discretion when it rejects important information based on an inadvertent filing mistake that caused no prejudice.

The scant precedent that Commerce marshals to support its decision does not come close to showing that Commerce acted reasonably. Commerce chiefly invokes (IDM 9) *Dongtai Peak Honey Industry Co., Ltd. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015). But the parties' conduct there was far more egregious: Dongtai Peak did not submit its supplemental questionnaire response until *more than ten days* after the due date. Moreover, the Federal Circuit concluded that "all of the causes of delay" had been known to Dongtai Peak "prior to the … deadline, and {therefore} did not prevent the company from filing an extension request before that date." *Id.* at 1351. This case is starkly different. Oman Fasteners' submission was a mere 16 minutes, not 10 days, late and Oman Fasteners could not have realized that it might be unable to complete its submission on time until minutes before the deadline. At that point, submitting a timely extension request was impracticable. And in any event, as in *Celik I*, Commerce had already instructed Oman Fasteners not to seek further extensions. *See* 557 F. Supp. 3d at 1357; Exhibit 6.

Commerce also relies (IDM 9) on two cases from this Court, *Tau-Ken Temir v. United States*, 587 F. Supp. 3d 1346, 1357 (2022), and *Bebitz Flanges Works v. United States*, 433 F. Supp. 3d 1297, 1302 (2020), where the respondents submitted extension requests just before the

submission deadlines—thereby gaining the benefit of Commerce's little-known automatic extension to 8:30 am the next day—but nevertheless missed the following morning's deadline by nearly two hours. Given that those respondents claimed *15.5-hour* extensions by submitting disfavored last-minute extension requests, their failures to meet the new deadlines were far more egregious than Oman Fasteners' inadvertent 16-minute delay.

Last, Commerce invokes (IDM 9) *Bebitz Flanges Works* v. *United States*, 433 F. Supp. 3d 1309 (Ct. Int'l Trade 2020). But that only drives home the weakness of Commerce's authority: That case involved at least three separate untimely submissions, each at least several hours late. *See id.* at 1319-20.

### 2. Commerce acted arbitrarily and capriciously by deviating, without explanation, from its established practice

Commerce's abuse of discretion is even more apparent when considered alongside its past practice. Commerce's punitive rejection of the entirety of Oman Fasteners' Response is one of only a handful of recent deviations—along with *Celik I* and *II*—from Commerce's long-standing policy of leniency for filing errors. As the agency stated in *Certain Corrosion-Resistant Steel Products from the Republic of Korea*: "Commerce's practice is to allow a law firm that misses a filing deadline one opportunity to submit the untimely information where { } the law firm failed to … file a complete submission before the specified hour on the date of the deadline," so long as "that law firm has: 1) not previously been afforded such an opportunity in a past segment of any proceeding; and 2) identified the steps it has taken to avoid untimely filings in the future." No. A-580-878, Commerce Letter (Aug. 3, 2018). Commerce did not explain its refusal to extend that grace to Oman Fasteners' counsel in this proceeding. The agency did not find that Oman Fasteners' counsel had previously sought to submit untimely information, nor that the company's counsel

had failed to offer concrete steps to prevent future untimely filings. Instead, Commerce's final results failed to discuss its grace policy at all.

Commerce routinely follows its practice of extending grace at least once for filing mistakes. In *Certain Softwood Lumber Products from Canada*, No. A-122-857, Commerce Letter (Mar. 2, 2017), Commerce accepted a section A response submitted 24 minutes past the deadline where counsel submitted a letter indicating that counsel "underst{ood} Commerce's filing requirements" and outlining "procedures being implemented by {the} firm to prevent the recurrence of such a missed deadline." Commerce "advised" counsel "that, from this point forward, all late submissions from you (or your firm) in this or any other proceeding before Commerce will be rejected" unless counsel sought a timely extension. *Id.*

Commerce has accordingly excused untimely or incomplete submissions by law firms in at least *twelve other recent cases*:

(1)   *Ripe Olives from Spain*, No. A-469-817, Commerce Memorandum (Jan. 25, 2022) (Commerce notified counsel they had omitted exhibits from a filing);

(2)   *Large Vertical Shaft Engines from China*, No. A-570-119, Commerce Memorandum (July 7, 2020) (Commerce informed counsel they had neglected to file three PDF exhibits to their surrogate value comments and Excel versions of exhibits);

(3)   *Small Vertical Shaft Engines from China*, No. C-570-125, Commerce Memorandum (May 22, 2020) (Commerce informed counsel they had neglected to submit scope comments in the countervailing duty investigation);

(4)   *Polyethylene Terephthalate Resin from Oman*, No. A-523-810, Commerce Letter (Mar. 28, 2019) (Commerce informed counsel they had failed to file public version of a questionnaire response);

(5)   *Narrow Woven Ribbons from Taiwan*, No. A-583-844, Commerce Letter (Feb. 27, 2015) (counsel filed response two days late);

(6)   *Steel Concrete Reinforcing Bar from Turkey*, No. A-489-829, Commerce Letter (Jan. 27, 2017) (counsel failed to timely submit public version of response);

(7) *Circular Welded Carbon Quality Steel Line Pipe from China*, No. C-570-936, Commerce Letter (Apr. 18, 2019) (counsel failed to timely submit notice of intent to participate);

(8) *Certain Fine Denier Polyester Staple Fiber from India*, No. C-533-876, Commerce Letter (Aug. 23, 2017) (Commerce notified counsel of improper submission and subsequently notified counsel of failure to properly submit response by new deadline—counsel responded that it inadvertently uploaded the documents to the wrong agency);

(9) *Polyethylene Terephthalate Film, Sheet and Strip from India*, No. C-533-825, Commerce Letter (Aug. 1, 2018) (one-day late public version due to initial submission error);

(10) *Certain New Pneumatic Off-the-Road Tires from China*, No. A-570-912, Commerce Letter (Dec. 10, 2016) (counsel's docketing error resulted in two-day late submission);

(11) *Dioctyl Terephthalate from Korea*, No. A-580-889, Commerce Memorandum (June 12, 2019) (counsel's technical difficulties caused one-day late filing);

(12) *Certain Tool Chests and Cabinets from Vietnam*, No. A-552-821, Commerce Letter (Aug. 4, 2017) (counsel's technical difficulties caused one-day late exhibit filing).

Rather than afford Oman Fasteners the same grace that it has extended to many other parties, Commerce acted arbitrarily and capriciously by departing from its consistent practice without "supply{ing} a reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 56-57 (1983); *see SKF USA Inc. v. United States*, 630 F.3d 1365, 1368 (Fed. Cir. 2011); *see also id.* at 1373 ("When an agency changes its practice, it is obligated to provide an adequate explanation for the change."). Federal courts have recognized that an "agency 'can be said to be at its most arbitrary' when it 'treat{s} similar situations dissimilarly.'" *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 321 (4th Cir. 2021) (citation omitted). And in *Celik I*, this Court ruled against Commerce in part because the agency "ha{d} allowed for out-of-time extensions due to technical filing issues in the past" but refused to allow the same to Celik. 557 F. Supp. 3d at 1362.

Commerce's attempt to distinguish a handful of these prior actions comes up well short of providing a reasoned basis for its decision here. Commerce summarily notes that, in three of the thirteen examples cited above, the respondent notified Commerce of the untimely filing shortly before or after the deadline. *See* IDM 8. But Commerce fails to explain why that notice would have any legal significance given that Commerce is automatically notified of the time of a party's submission. And even that distinction would still leave multiple examples where respondents received leniency without quickly notifying Commerce about the mistake, including five examples where Commerce brought the mistake to counsel's attention. Commerce also previously attempted to distinguish two other prior instances of leniency on the ground that, in one, "the party erroneously (but timely) uploaded its response to a Commerce inquiry to the website for {the International Trade Commission rather than Commerce}," and in another, "the party failed to upload an accompanying public version of its submission to the otherwise timely filed business proprietary version." Exhibit 19. But Commerce has never explained why those factual distinctions are material. The cases share the same fundamental point: in each, a party's counsel made an inadvertent technical error that caused no prejudice. Commerce also refers in passing to three "instances provided by the petitioner where Commerce did not allow refiling of untimely submitted documents." IDM 8; *see also* IDM 5. But Commerce does not assess the facts of those cases, does not explain why Commerce's decisions there were not similarly arbitrary and capricious under this Court's decisions in *Celik I* and *II* and *Bosun Tools*, and does not attempt to explain why those discrete decisions should outweigh Oman Fasteners' thirteen examples of leniency.

Commerce's "differential treatment is arbitrary and capricious in violation of the APA." *Kirk*, 987 F.3d at 321; *see SKF USA*, 630 F.3d at 1376. And that is all the more so given Oman

Fasteners' eight-year history of exemplary cooperation with Commerce's investigations and unbroken record of low dumping margins.

### B. Commerce violated the statutory text and abused its discretion by applying an adverse inference

For the reasons discussed above, Commerce abused its discretion in rejecting the Response. Commerce then compounded that error by invoking its "adverse inference" authority to impose the patently unreasonable and punitive rate of 154.33%. That rate was contrary to law under this Court's precedents.

"Under § 1677e, a valid finding under § 1677e(a) is a statutory prerequisite for the use of an adverse inference under § 1677e(b)." *Celik I*, 557 F. Supp. 3d at 1375. Because "Commerce erred" for the reasons explained above "in making the decision under § 1677e(a) to remove timely-submitted information from the record and substitute 'the facts otherwise available,'" "no such valid finding {under § 1677e(a)}" was made in this case, and "the Department's use of an adverse inference to determine the {dumping} rate" was "beyond the Department's statutory authority." *Id.* If this Court agrees that Commerce should have accepted Oman Fasteners' submission a few minutes after the deadline, then the Court need proceed no further.

But even if Commerce could lawfully conclude that information was missing from the record, Commerce's decision was still contrary to law for at least two reasons. First, Commerce lacked authority to apply an adverse inference to Oman Fasteners on these facts. And second, even if Commerce applied an adverse inference, its selection of the maximum 154.33% AFA rate was arbitrary and unsupported by substantial evidence.

### 1. The adverse-inference provision applies to companies that fail to cooperate, not companies that make an inadvertent mistake

a. The Tariff Act permits Commerce to apply an adverse inference in determining an antidumping margin only if "an interested party has failed to cooperate by not acting to the best of

its ability to comply with Commerce's request for information." 19 U.S.C. § 1677e(b)(1); *see also* 19 C.F.R. § 351.808(a). As the statute makes clear, an adverse inference is reserved for parties that undermine the proceeding by refusing to cooperate with Commerce's investigation. *See Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) ("The purpose of the AFA rate is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins."). The agency itself has previously recognized as much, explaining that the purpose of the adverse-inference provision is "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199.

That adverse-inference authority has no application to Oman Fasteners, which undeniably strove to cooperate fully throughout Commerce's review, as it had throughout the history of this case, and did substantially cooperate by submitting thousands of pages of information on time. Oman Fasteners merely failed—on a single occasion—to achieve *perfect* compliance with Commerce's instructions. The Federal Circuit has held that "Commerce has no authority to apply adverse facts and inferences unless the respondent has failed to provide requested information when notified of the deficiency, and has not acted to the best of its ability in responding to such requests." *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1385 (2022). In other words, "'{b}efore making an adverse inference, Commerce must examine a respondent's actions and assess the extent of the respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information.'" *Id.* (quoting *Nippon Steel*, 337 F.3d at 1382). The Federal Circuit has further explained that, while the statutory "best of its ability" standard "does not condone inattentiveness, carelessness, or inadequate record keeping," "th{at} standard *does not*

*require perfection* and *recognizes that mistakes sometimes occur.*" *Nippon Steel*, 337 F.3d at 1382 (emphasis added). This Court has accordingly observed that "{n}ot every failure to comply with a filing deadline will result in authority to use an adverse inference." *Celik II*, 557 F. Supp. 3d at 1375. And Commerce may not use the adverse-inference procedure to impose "a draconian and punitive sanction" for a missed filing deadline. *Celik I*, 557 F. Supp. 3d at 1358.

Under that standard, Commerce had no authority to impose an adverse inference against Oman Fasteners. The company cooperated with Commerce's investigation throughout this sixth review, just as in every prior proceeding before the agency. To the extent any gap exists in the record, it did not result from refusal to cooperate or any intent to mislead.

b.      Commerce summarily stated that an adverse inference was authorized here because "Oman Fasteners failed to act to the best of its ability." IDM 15. But Commerce provided no basis for that conclusion beyond the bare fact that the Response was submitted 16 minutes late due to counsel's unforeseeable technical difficulties.

Commerce's assertion that Oman Fasteners "failed to act to the best of its ability" is not supported by the record, which shows that Oman Fasteners exerted immense effort to prepare a complete and timely Response. The company and its counsel overcame multiple overlapping deadlines to answer 48 separate requests for information and provide 31 supporting PDF exhibits, all on top of Oman Fasteners' timely responses to Commerce's initial questionnaires, supplemental Section A questionnaire, and supplemental Section D questionnaire. Commerce's final decision discussed none of that in reaching the conclusion that Oman Fasteners had "failed to cooperate."

Moreover, Commerce ignored the fact that the inconsequential 16-minute delay was due to the actions of counsel, not Oman Fasteners itself. Commerce has previously acknowledged that a respondent's effort to cooperate to the best of its ability is not negated by its counsel's error. For

example, in *Polyethylene Terephthalate Film, Sheet, and Strip from China*, Commerce accepted untimely-filed supplemental section A, C, and D responses after distinguishing between "counsel's chronic errors in handling client submissions," and respondent's "effort and good faith in complying with the Department's request for information." No. A-570-924, Commerce Letter (July 17, 2012). Similarly, in *Solid Urea from Russia*, Commerce excused a late filing after "recogniz{ing} … that {respondent's} untimely filings may have been the result of its counsel's procedural errors," and also recognizing respondent's own "good faith efforts in complying with the Department's request for information." No. A-821-801, Commerce Letter (Nov. 14, 2013). The chronic errors by counsel in these earlier cases are a far cry from the isolated, unintentional and inconsequential lapse of counsel in this case, making Commerce's punishment of Oman Fasteners even more egregious.

Oman Fasteners' counsel fell short only in uploading a portion of one filing 16 minutes after the deadline. On those undisputed facts, Commerce's decision to treat Oman Fasteners as uncooperative effectively requires perfection and makes no allowance for inadvertent mistakes, contrary to the clear instructions of the Federal Circuit and this Court. Moreover, in equating Oman Fasteners' partial filing delay with a failure to cooperate, Commerce failed to recognize "that unanticipated technical difficulties do sometimes occur." *Celik I*, 557 F. Supp. 3d at 1362. That is especially true given the failure of Commerce's "check file" system to identify any problem in the electronic files to be submitted, the surprising error messages generated by ACCESS at 4:18 and 4:27 pm, and the inexplicable slowness of uploads compared with past ACCESS experience, all of which significantly impeded counsel's diligent efforts to complete the submission.

Commerce also abused its discretion in drawing an adverse inference because there was no possibility on this record that Oman Fasteners might benefit from submitting part of its Response

slightly after the deadline. *See Celik II*, 557 F. Supp. 3d at 1376 (observing that an 87-minute delay "had no conceivable effect" on the proceeding). As explained above, "the purpose of {the adverse inference provisions of} section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). This is certainly not a case in which a party withheld harmful information strategically, hoping that Commerce would overlook the omission and make a more favorable determination. Oman Fasteners collected and submitted all of the requested information, timely served it on petitioner the next day, and argued strenuously that Commerce should include all of it in the record. Moreover, the information solicited in Commerce's supplemental section C questionnaire overwhelmingly consisted of the same kind of verification questions that Oman Fasteners previously answered to Commerce's complete satisfaction in prior reviews. Oman Fasteners thus had every expectation that Commerce would calculate a dumping margin at or near zero based on the record of this review—as in every prior review.

If Commerce was determined to chastise Oman Fasteners for a single missed deadline, then a responsible administrative action would have been a "warning." *Celik I*, 557 F. Supp. 3d at 1362. The agency was not free to use the brief inadvertent delay as an excuse to avoid its statutory duty to calculate an accurate rate.

2.    <u>Even if Commerce could apply an adverse inference, the margin it selected is unsupported by substantial evidence and contrary to law</u>

Commerce not only erred by imposing an adverse inference at all, it also erred by selecting a discredited 154.33% rate drawn from the 2014 petition filed by Oman Fasteners' competitor. That rate was unsupported by substantial evidence and contrary to law. The statute and applicable precedents establish that, even if an adverse inference were warranted, Commerce should have

selected a rate by drawing on the record of this proceeding, which includes six separate calculations by Commerce of Oman Fasteners' dumping margins over seven years. Commerce was not permitted to select an outrageously punitive dumping margin that was nearly *100 times* higher than Oman Fasteners' highest margin in the five prior administrative reviews of the Order, and nearly 40 times higher than the margin assigned in the underlying antidumping investigation.

a. Even when the Tariff Act permits Commerce to use an adverse inference, it does not allow Commerce to "select unreasonably high rates having no relationship to the respondent's actual dumping margin." *Gallant Ocean*, 602 F.3d at 1323 (cleaned up). While the Act states that Commerce *may* select the highest rate requested by the petition, it may do so only "based on the evaluation by {Commerce} of the situation that resulted in {the agency} using an adverse inference in selecting among the facts otherwise available." 19 U.S.C. § 1677e(d)(2). Thus, as the Federal Circuit has explained, "Commerce must consider the totality of the circumstances in selecting an AFA rate, including, if relevant, the seriousness of the conduct of the uncooperative party." *BMW*, 926 F.3d at 1302. And at bottom, "{a}n AFA rate must be a reasonably accurate estimate of the respondent's actual rate." *Id.* This Court has also explained that, because the statutory requirement for "evaluation was added to the pre-existing statutory requirements for using adverse facts available, *clearly some additional evaluation is required* beyond that which justified the adverse inference." *POSCO v. United States*, 296 F. Supp. 3d 1320, 1349 (Ct. of Int'l Trade 2018) (emphasis added). In other words, "{t}hat the facts merited the use of an adverse inference does not necessarily mean that those same facts merited selection of the highest rate." *Id.*

The Federal Circuit rejected Commerce's AFA rate in *BMW* after finding that the agency had failed to "consider or address BMW's argument regarding its mitigating circumstances or explain why it determined that the 126.44% rate was appropriate given the unique factual

circumstances." 926 F.3d at 1302. And as discussed above, this Court in multiple recent cases has specifically rejected Commerce's use of petition-based AFA rates in circumstances similar to those here: a filing that was completed a few minutes after the deadline, with no discernible impact or prejudice. *See Celik I*, 557 F. Supp. 3d 1348 (rejecting imposition of a 53.65% AFA rate where part of a filing was 21 minutes late); *Celik II*, 557 F. Supp. 3d 1363 (rejecting imposition of a 158.44% AFA rate where some information was submitted 87 minutes late); *Bosun Tools*, 405 F. Supp. 3d 1359 (rejecting imposition of an 82.05% AFA rate based on respondent's failure to timely submit all required information).

b.      Commerce's extraordinarily high duty rate in this case cannot pass muster under those standards. Commerce's final results made no attempt to engage with the legal standard that the Federal Circuit announced in *BMW*. And as in *BMW*, Commerce did not assess Oman Fasteners' culpability beyond a bald statement that "Oman Fasteners failed to act to the best of its ability and provide requested information by the deadline for submission of that information." IDM 15. Commerce merely stated that it found Oman Fasteners' explanation for its late submission "{un}convincing," and it observed that the company "did not notify Commerce of its error in not filing the complete submission." IDM 19-20. But those statements do not come close to satisfying the *BMW* standard or explain why Oman Fasteners' minor, inadvertent mistake warrants the maximum punishment. As discussed above, Oman Fasteners provided a compelling explanation for counsel's failure to complete the submission until 5:16 pm. Oman Fasteners found it unnecessary to notify Commerce of the submission delay because Oman Fasteners reasonably believed that Commerce would consider the submission—given counsel's timely submission of the full narrative and PDF exhibits and the brief delay before the remaining exhibits were uploaded.

The respondent in *Celik I* and *II* similarly did not notify Commerce of its late submission, and this Court found that Commerce abused its discretion by applying a punitive AFA rate.

Commerce attempted to justify its enormous 154.33% duty rate as "*a rate* on the record which would … induce cooperation," IDM 20 (emphasis added), without making any effort to determine whether it is "a reasonably accurate estimate of {Oman Fasteners'} actual rate, albeit with some built-in increase intended as a deterrent to non-compliance," *BMW*, 926 F.3d at 1300 (internal quotation omitted). But there is no plausible argument that the 154.33% rate is either "reasonably accurate" for Oman Fasteners or necessary to induce Oman Fasteners' future cooperation, given Oman Fasteners' spotless prior record of compliance and consistently near-zero dumping margins. In fact, a 154.33% rate will only serve to ensure that Oman Fasteners *cannot* cooperate in the future—by bankrupting the company.

If Commerce *had* meaningfully considered Oman Fasteners' culpability, it could not have concluded that such a sky-high duty rate was warranted without abusing its discretion. Oman Fasteners' "culpability" boils down to this: faced with competing deadlines and the 48 separate information requests in the supplemental section C questionnaire, the company made a good-faith effort to file everything on time but received confusing and unexpected error messages from the filing system and ended up completing the filing 16 minutes late. Even if this modest and isolated mistake may support an adverse inference, falling 16 minutes short of perfection cannot possibly support application of the most punitive AFA rate that Commerce can muster. And again, even that 16-minute lapse was by counsel, not Oman Fasteners itself. As in *Celik I*, "Commerce abused its discretion to impose a draconian penalty *upon plaintiff* for a minor and inadvertent technical error *by its counsel*." 557 F. Supp. 3d at 1362 (emphasis added).

Commerce's AFA rate selection is also unsupported by substantial evidence because it has no connection to the actual dumping margins calculated by Commerce during this case. True, Commerce is not required to "estimate what the countervailable subsidy rate or dumping margin would have been" if an uncooperating party had in fact cooperated, or to "demonstrate that the {AFA rate it selected} reflects an alleged commercial reality" of the uncooperating party. 19 U.S.C. § 1677e(d)(3). Commerce *is* required, however, to "evaluat{e} … the situation that resulted in the administering authority using an adverse inference in selecting among the facts otherwise available," 19 U.S.C. § 1677e(d)(2), as the Federal Circuit instructed in *BMW* and this Court instructed in *POSCO*. Even assuming that Oman Fasteners could be properly described as an uncooperating party, Commerce drew the 154.33% margin from the petition rate concocted in 2014 by Oman Fasteners' competitor based on a variety of guesses and suppositions. That rate was plainly incorrect, as Commerce itself previously determined: Commerce originally calculated the actual dumping margin for Oman Fasteners as 9.10%, *Steel Nails from Oman*, 80 Fed. Reg. 28,972 (May 20, 2015), and then revised that margin to 4.22% after Oman Fasteners successfully challenged Commerce's use of unreliable data. *See Mid Continent Steel & Wire, Inc. v. United States*, 2022 WL 3153664 (Ct. Int'l Trade Aug. 8, 2022). The petition-based margin that Commerce imposed here is thus nearly *40 times* higher than the evidence-based rate that Commerce calculated for Oman Fasteners in response to the petition. The petition rate is also nearly *100 times* higher than the 1.65% rate that was calculated by Commerce in the most recent (fifth) administrative review of the antidumping order.

The Federal Circuit has previously vacated Commerce's orders for selecting a discredited petition rate as an AFA rate in a subsequent review. In *Gallant Ocean*, for example, Commerce had "imposed dumping margins between 5.91% and 6.82% for the {subject} products after its

initial investigation." 602 F.3d at 1323. When Commerce then changed course and, as here, selected a petition-based AFA rate (57.64% in that case), the Federal Circuit rejected that rate as "unreasonably high." *Id.* The court found that, because Commerce had calculated much lower actual dumping margins following its investigation, Commerce's selection of the petition rate was "aberrational," "uncorroborated" and "punitive." *Id.* at 1323-24.

More recently, in *Celik I*, *Celik II*, and *Bosun Tools*, this Court rejected Commerce's selections of 53.65%, 158.44%, and 82.05% AFA rates as unreasonably high given the records in each case. *Celik I*, 557 F. Supp. 3d 1348; *Celik II*, 557 F. Supp. 3d 1363; *Bosun Tools*, 405 F. Supp. 3d 1359. Commerce cited a single case (IDM 20) to support its AFA rate here, *Papierfabrik August Koehler AG v. United States*, 180 F. Supp. 3d 1211 (Ct. Int'l Trade 2016). But *Koehler* involved a respondent that "'engaged in an elaborate scheme to conceal certain otherwise reportable home market sales from the Department,'" including "*intentional, and fraudulent*, misreporting of the home market sales database {that} prevented Commerce from determining any valid margin for Koehler." *Id.* at 1232 (emphasis added). It is both contrary to law and divorced from reality to equate Oman Fasteners' unintentional 16-minute filing delay with Koehler's intentional and outrageous conduct. Never mind that Koehler's extraordinary fraud led Commerce to select a 75.36% dumping rate—*less than half* what it seeks to impose for Oman Fasteners' innocent 16-minute delay. *See id.*

Oman Fasteners has an eight-year history of cooperation with Commerce's antidumping proceedings, which resulted in a 4.22% initial investigation rate and, at most, a 1.65% rate in prior reviews. Adding insult to injury, Commerce again gave other Omani companies the benefit of a low margin based on *Oman Fasteners'* actual sales data, while hitting the company itself with a

154.33% rate that is plainly "aberrational," "uncorroborated" and "punitive." *Gallant Ocean*, 602 F.3d at 1323-24.

*   *   *

In sum, Oman Fasteners is likely to succeed on the merits several times over. This Court's precedent condemns Commerce's exclusion of highly probative evidence on the ground that one filing was partially submitted 16 minutes late due to unforeseeable technical difficulties with Commerce's ACCESS system. Commerce was able to take that draconian action only by inexplicably departing from its well-established policy of lenity for inconsequential administrative mishaps. On top of those errors, Commerce unlawfully invoked its adverse-inference authority against a company with a long history of cooperating with the agency. And Commerce then used that wrongly invoked authority to impose a dumping margin unmoored from the evidence and dramatically unlike any rate that Commerce had previously calculated. Commerce's unlawful action must be enjoined.

## III.    OMAN FASTENERS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Oman Fasteners faces imminent and irreparable harm absent preliminary injunctive relief from this Court. Oman Fasteners' revenue depends almost entirely on U.S. sales of subject merchandise. It has already had to cease all U.S. shipments of those products to avoid 154.33% antidumping duty deposits that would otherwise quickly exhaust its dwindling operational capital and bankrupt the company. Oman Fasteners is unable to resume those shipments—the lifeblood of its operations—until that exorbitant 154.33% margin is lifted. But a final ruling on the merits correcting the agency's deeply flawed final results would come far too late for Oman Fasteners to survive in its present state. Unless it can quickly resume U.S. sales and maintain them during this case, Oman Fasteners will likely face insolvency through default on its financial obligations. At best, the company will suffer crippling and irreparable harm to its operational capacity, customer

relationships, and business reputation. That imminent threat of irreparable—indeed existential—harm facing Oman Fasteners weighs heavily in favor of preliminary injunctive relief.

### A. Bankruptcy, reputational harm, lost customer relationships, and lost market share all constitute irreparable harm

A party seeking an injunction need not show that irreparable harm is certain; a "likelihood" of irreparable harm suffices. *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 19 (2008). And courts have long recognized that the types of harm currently facing Oman Fasteners are sufficiently damaging and irreparable to warrant a preliminary injunction.

Bankruptcy unsurprisingly qualifies as irreparable harm, as the Supreme Court observed: "Certainly {that} type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). The Federal Circuit has similarly recognized that the threat of "insolvency, and, possibly, extinction" is irreparable harm because, without intervention, the injured party "may well cease to exist." *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 515-16 (Fed. Cir. 1990).

In addition, "loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm," *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013), as are significant layoffs and loss of market position, *see Abbott Lab'ys v. Sandoz, Inc.*, 500 F. Supp. 2d 807, 843 (N.D. Ill. 2007) (termination of 190 employees and likely loss of market position), *aff'd*, 544 F.3d 1341, 1362 (Fed. Cir. 2008). Even purely financial harm "is irreparable when 'no damages payment, however great, could address {it}.'" *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1290 (Ct. Int'l Trade 2019) (quoting *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)); *see also CPC Int'l Inc. v. United States*, 896 F. Supp. 1240, 1242-44 (Ct. Int'l Trade 1995) (irreparable

harm includes "costs, expenditures, business disruption or other financial losses" that plaintiff has "no legal redress to recover in court").

**B.** **Without interim relief, Oman Fasteners faces imminent, irreparable harm to its business**

As explained in the attached declaration of Oman Fasteners' President and C.E.O. Steve Karaga, without a preliminary injunction, Oman Fasteners will suffer catastrophic business losses, lasting cutbacks in operational capacity, and likely bankruptcy.

Commerce's preliminary decision forced Oman Fasteners to cease all U.S. shipments of subject merchandise in anticipation of the final results. Decl. ¶ 20. None of Oman Fasteners' U.S. customers [

]. Decl. ¶ 26. Oman Fasteners is therefore unable to raise prices to offset a material portion of the 154.33% duty deposits, and it lacks other financial resources to pay those deposits. Decl. ¶ 20. As a result, Oman Fasteners has had no choice but to ensure that subject merchandise will not enter the United States after Commerce orders duty deposits at the 154.33% rate. *Id.* And Oman Fasteners will not be able to resume U.S. imports until it is no longer required to submit antidumping duty cash deposits at—or anywhere near—that exorbitant rate.

Oman Fasteners sells its products almost exclusively in the United States, deriving [

] of its revenue from U.S. sales in 2022. Decl. ¶ 12. Sales of the subject merchandise comprise the vast majority of that activity and accounted for [        ] of its revenue in 2022. Decl. ¶ 13. Oman Fasteners has no material ability to expand its sales to other countries or to expand its U.S. sales of other products to mitigate the adverse effects from ceasing U.S. sales of the subject merchandise. Decl. ¶¶ 14-18. Indeed, because much of the demand for its remaining products is driven by demand for the subject merchandise, Oman Fasteners expects that its U.S. sales of non-subject merchandise will significantly decrease once it ceases sales of subject merchandise. *Id.*

Thus, so long as the requirement for heightened antidumping duty cash deposits remains in place, Oman Fasteners will realize only [          ] of its prior revenues. Decl. ¶ 34.

In addition to the severe harm that Oman Fasteners is already experiencing from lost U.S. sales of subject merchandise, far greater irreparable injury looms in the immediate future.

First, at its present reduced level of operations, Oman Fasteners faces serious risk of default on its existing credit facilities, which would immediately render Oman Fasteners insolvent. Oman Fasteners [

                    ]. Decl. ¶ 30. Because Oman Fasteners has been forced to cease its U.S. sales of subject merchandise, [



                                                                                        ].

Decl. ¶ 31. For example, [




                                                                                        ].

*Id.* Similarly, [




                                                    ]. *Id.* Oman Fasteners [



          ]. Decl. ¶ 32.

Second, even if Oman Fasteners is able to stave off immediate bankruptcy, it cannot

[

]. Decl. ¶ 33. To remain solvent while realizing only [          ] of its current revenue, Oman Fasteners will need to make drastic cuts to its workforce. As a result, Oman Fasteners [

]. Decl. ¶¶ 35-38. [                                                                    ] have received years of training in Oman Fasteners' production operations, their loss would be especially devastating to Oman Fasteners' ability to resume normal operations even after a favorable judgment by this Court. *Id.* If forced to implement all of the personnel reductions necessary to have a chance of remaining solvent during this proceeding without importing subject merchandise, it would take Oman Fasteners at least one to two years to rehire and train an equivalent workforce. Decl. ¶ 39.

Third, and again assuming the company could survive until judgment, Oman Fasteners would be unable to return to its present operations due to the dramatic loss of goodwill and business reputation caused by months or years of interrupted sales to key customers. Oman Fasteners is the single largest supplier of subject merchandise to the U.S. market, having supplied at least 12.72% of all U.S. imports of subject merchandise since 2018. Decl. ¶ 22. In particular, Oman Fasteners' two largest customers have indicated that the company is their primary supplier of subject merchandise. *See* Exhibits 28, 30. Those customers—and the broader U.S. market—cannot simply ride out the loss of their largest supplier for any significant period of time; they will have no choice but to seek supply from other sources around the world. Indeed, even before Commerce issued the final results, [

] expressed grave concerns regarding Commerce's preliminary results and indicated that they would need to aggressively seek alternate suppliers. Decl. ¶ 42. If Oman

Fasteners must wait to resume sales of subject merchandise to these customers until after a final decision on the merits, then that loss of goodwill will prove impossible to repair. Securing new suppliers will require a significant investment of both time and resources by both the U.S. customers and their new suppliers, [

]. Decl. ¶¶ 43-45. If customers are forced to completely replace Oman Fasteners with new suppliers, they will be bound to honor their new purchasing commitments even if Oman Fasteners reenters the market.

Even the purely financial harm to Oman Fasteners will be entirely irreparable because no damages are available from Commerce to compensate for Oman Fasteners' lost sales. Each month that Oman Fasteners cannot sell subject merchandise in the United States will result in lost revenue exceeding [            ], representing over [       ] of its normal monthly revenue. *See* Decl. ¶ 34. Given the likely duration of this case, that means that Oman Fasteners will lose hundreds of millions of dollars in sales absent a preliminary injunction. Commerce will not be liable for these losses, irrespective of this Court's final decision on the merits.

This Court has found irreparable harm in similar situations. In *Sunpreme*, the Court found that CBP's continued collection of cash deposits during the pendency of the review might "very well force Plaintiff out of business, or, at the very least, cause serious disruption to Plaintiff's business." 145 F. Supp. 3d at 1278 (cleaned up). CBP had imposed estimated antidumping duty deposits of 239.42% and countervailing duty deposits of 15.24% on the plaintiff's products. *Id.* at 1280. The Court concluded that the duties would destroy the company's cash reserves and cause "loss of goodwill, damage to its reputation, and loss of business opportunities," including denial of a term loan. *Id.* at 1295. Moreover, because the plaintiff was "reliant on the importation of subject merchandise into the United States for {an undisclosed, but apparently significant

percentage} of its {annual} revenues," it "ha{d} little chance of turning around its precarious financial position" if the duty deposits remained in force. *Id.* So too here.

Similarly, in *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014), this Court held that the plaintiff would face irreparable harm if CBP were permitted to require— in lieu of estimated antidumping duty cash deposits—a bond sufficient to cover a new duty rate that was more than 13 times higher than the prior rate. *Id.* at 1327-28. A "bond … would require full collateral for the millions of dollars at issue," and plaintiff "represent{ed} that he cannot provide this collateral any more than he can post the full amount as a cash deposit." *Id.* at 1328. As a result, the "{p}laintiff also suffer{ed} loss of goodwill and damage to his reputation from his domestic customers due to his failure to deliver." *Id.* And because he was "{u}nable to meet either Customs' or his customers' demands, {p}laintiff face{d} imminent and immediate bankruptcy, loss of business, and, therefore, loss of access to meaningful judicial review." *Id.*

Oman Fasteners has thus amply demonstrated the types of irreparable harm that this Court and the Federal Circuit have recognized warrant a preliminary injunction. Oman Fasteners is being asked to provide security at entry based on an outrageously inflated antidumping duty rate that it has no ability to pay and that would eliminate an overwhelming percentage of its business. Oman Fasteners also faces [

], which poses substantial risk of imminent bankruptcy. And Commerce's decision will drastically damage Oman Fasteners' long-term business prospects due to the loss of goodwill and customer relationships, in addition to the downsizing necessary to weather the enormous loss of revenue. Without an injunction, the crippling effects of Commerce's final determination would make any judgment in Oman Fasteners' favor in this proceeding a hollow victory indeed—if the company could even survive long enough to see that day.

IV.    **THE BALANCE OF HARDSHIPS FAVORS OMAN FASTENERS**

In evaluating whether to grant a motion for injunctive relief, the Court must "determine which party will suffer the greatest adverse effects as a result of the grant or denial of the preliminary injunction." *Ugine-Savoie Imphy v. United States*, 121 F. Supp. 2d 684, 688 (Ct. Int'l Trade 2000). Here, the balance of hardships here tips overwhelmingly in Oman Fasteners' favor.

As explained above, if the Court does not enjoin collection of estimated duty deposits at the 154.33% rate, then Oman Fasteners will be forced to continue suspending imports of subject merchandise indefinitely. In addition to the catastrophic and wholly unrecoverable loss of nearly all of the company's projected revenue, Oman Fasteners faces a severe risk of bankruptcy before Commerce's illegal action can be reviewed on the merits. And even if Oman Fasteners can somehow avoid bankruptcy, the resulting loss in market share, prolonged damage to customer relationships, and drastic reduction in operations necessary for it to survive the loss of more than [    ] of its revenue could not be reversed promptly following judgment; the harm would persist for years. In short, absent an injunction, Oman Fasteners' future prospects range from decimation to extirpation.

The harm to the government, on the other hand, is nonexistent. Commerce has no legitimate interest in driving Oman Fasteners out of business. And an injunction would not interfere with the government's ability to collect duty revenue—indeed, without an injunction, Oman Fasteners will have no imports and the government will have no duties to collect. Besides, the record of the underlying antidumping proceeding plainly shows that Oman Fasteners' dumping margins have consistently ranged from zero to 1.65%, so it is virtually certain that the dumping margin Commerce ultimately assesses for any future entries of Oman Fasteners' subject merchandise will likewise be minimal. The result of the injunction would thus be that Commerce is temporarily unable to prevent importation of subject merchandise that Commerce itself will likely determine

was fairly traded. That is not cognizable harm. Even in the unlikely event that Commerce ultimately calculates a dumping margin for Oman Fasteners higher than the deposit rate this Court orders in a preliminary injunction, the resulting postponement of collection of duties "at most inconveniences the Government." *SKF USA Inc. v. United States*, 28 C.I.T. 170, 175 (2004); *see also Qingdao Taifa*, 581 F.3d at 1382.

## V. THE PUBLIC INTEREST FAVORS AN INJUNCTION

"The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). Courts also consider the economic welfare of a U.S. industry in the public-interest analysis. *See Invenergy*, 422 F. Supp. 3d at 1293 (considering the "future of solar energy in the United States" and the "importance of the solar energy industry to the public interest"), *modified*, 476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020); *U.S. Auto Parts Network, Inc. v. United States*, 307 F. Supp. 3d 1373, 1380 (Ct. Int'l Trade 2018) (considering the effect of a preliminary injunction on the "auto parts market"). And in addition, promoting U.S. "foreign policy concerns" serves the public interest. *Azurin v. United States*, 632 F. Supp. 30, 35 (Ct. Int'l Trade 1986).

The public interest supports an injunction here. First, Commerce acted unlawfully by refusing to consider the Response and imposing a punitive 154.33% margin. It singled out Oman Fasteners for disastrously punitive treatment despite Oman Fasteners' eight-year track record of full cooperation with Commerce's investigations. The public interest favors ensuring that Commerce correctly and equitably applies the trade laws when conducting antidumping duty investigations, and denying a preliminary injunction may well allow the Department's unlawful conduct to stand without ever facing judicial review. Denying an injunction would also frustrate the Federal Circuit's pending review in *Mid Continent Steel & Wire, Inc. v. United States*, No.

23-1039, which is the latest phase in Oman Fasteners' long-running challenge to the original July

2015 antidumping order. Oman Fasteners has already prevailed once before the Federal Circuit in

that challenge, 941 F.3d 530 (Fed. Cir. 2019), and doing so again could wipe away the original

antidumping duty order—and with it, the statutory basis for imposing *any* antidumping duties on

Oman Fasteners. Yet neither proceeding can serve the public's interest in fair and accurate trade

investigations if Oman Fasteners cannot survive to see them through.

Second, this Court considers the impact that a preliminary injunction will have on the

relevant U.S. industries and broader U.S. economy. *See, e.g.*, *Invenergy*, 422 F. Supp. 3d at 1294.

Here, there is no question that an injunction would benefit U.S. economic interests. Several of

Oman Fasteners' customers submitted letters to Commerce explaining how its decision to

effectively bar Oman Fasteners' shipments would substantially harm their own businesses and

those of their customers. *See* Exhibits 28-31. For example, Oman Fasteners' two largest customers

noted that the company produces more than 18% of the entire U.S. supply of collated steel framing

nails, a subset of the subject merchandise that is critical to the U.S. residential and light-

commercial construction industries. Exhibits 28, 30. The loss of Oman Fasteners' supply of subject

merchandise will impair those critical industries with immediate and significant shortages until

other suppliers can be found to absorb Oman Fasteners' dominant market share. And as one Oman

Fasteners customer points out:

> {B}ecause there is no readily-av{a}ilable alternative source either
> abroad or within the U.S. that would be able to make up the shortfall,
> allowing Commerce's punitive decision to stand would wreak havoc
> on the U.S. domestic housing construction sector at a time when the
> industry is already experiencing staggering inflation, supply
> shortages and global supply chains that are already under significant
> strain.

Exhibit 30 at 3. Oman Fasteners' subject merchandise is also used by the U.S. "wooden pallet

industry that forms a critical building block of the U.S. supply chain." Exhibit 28 at 3. Absent an

injection, "wooden pallets will become even scarcer and more expensive at a time when the U.S. faces rampant inflation and supply chain stress." *Id.*

Third, the public interest favors an injunction because Oman Fasteners plays an outsized role in the health of the economy of its home country of Oman, a strategic U.S. ally in the Gulf Region. As U.S. Ambassador Leslie Tsou noted in her letter to Commerce, "Oman Fasteners is one of Oman's largest companies" and "provides livelihoods to over a thousand families from its base in the Omani city of Sohar, an industrial hub key to Oman's efforts to provide employment opportunities to its people." Exhibit 33. Ambassador Tsou further explained that "{f}acilitating bilateral commerce" between the United States and Oman "is … among {her} top priorities," because "{t}he United States and Oman enjoy a close and productive economic and commercial relationship, the benefits of which extend to other critical pillars of our bilateral partnership." *Id.* The Ambassador closed by asking Commerce to show "flexibility" in "reviewing the company's case," because "{a} resolution that would permit the company to remain in business would go far in advancing our bilateral partnership with Oman, a strategic regional ally." *Id.* The Sultanate of Oman also wrote to Commerce on its own behalf, asking Commerce to "fully vet" Oman Fasteners' case, such that "any final determination is rendered consistent with the facts, the Department's practice, and the law." Exhibit 32 at 5.

Conversely, allowing the ruinous 154.33% deposit rate to remain in force during this Court's review does not advance any public interest. Oman Fasteners' consistent record of fair pricing—evidenced by its zero or low-single-digit dumping margins in prior reviews—means that its continued participation in the U.S. market cannot harm defendants, the petitioner, or any party. The U.S. International Trade Commission recently concluded that imports from Oman, and from Oman Fasteners in particular, do not presently injure or pose imminent threat of injury to domestic

producers of subject merchandise. *See Steel Nails from India, Oman, Sri Lanka and Turkey*, 87 Fed. Reg. 61,631 (Oct. 22, 2022).

In these circumstances, the public interest plainly favors granting injunctive relief.

## CONCLUSION

Oman Fasteners has shown that it is very likely to prevail on the merits under this Court's precedents. It has demonstrated that it faces enormous, irreparable harm without an injunction. The balance of hardships tips decisively in the company's favor, and the public interest supports preventing Oman Fasteners from being driven out of business before the Court can hear this case. In light of all of those factors, this Court should preliminarily enjoin imposition of the 154.33% antidumping duty cash deposit rate pending its review of this case.

Dated: December 26, 2022

/s/ Michael R. Huston
Michael R. Huston
Michael P. House
Andrew Caridas
**PERKINS COIE LLP**
700 Thirteenth St., NW
Washington, D.C. 20005
202-654-6200
mhuston@perkinscoie.com

## CERTIFICATE OF COMPLIANCE
## WITH WORD COUNT LIMITATION

This brief complies with the word count limitation in the Court's Standard Chambers Procedures. Excluding the portions exempted by those procedures, the brief contains 13,991 words as counted by the word-processing software used to prepare it.

Dated: December 26, 2022

/s/ Michael R. Huston
Michael R. Huston