# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| OMAN FASTENERS, LLC,<br><br>       Plaintiff,<br><br>       v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>       and<br><br>MID CONTINENT STEEL &<br>WIRE, INC.,<br><br>       Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **Court No. 22-00348**<br><br>   **NON-CONFIDENTIAL**<br>   **VERSION** |

## OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Adam H. Gordon, Esq.
Jennifer M. Smith, Esq.
Lauren Fraid, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street N.W.
Washington, D.C.  20036
(202) 991-2701
*Counsel to Mid Continent Steel &
Wire, Inc.*

January 10, 2023

# TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................ii

Introduction............................................................................1

Supplemental Statement of Facts .........................................8

Discussion...............................................................................9

I.   Oman Fasteners' Claims Of Irreparable Harm Are Speculative And Not Imminent....................................9

     A.   Legal Standard ..................................................9

     B.   Oman Fasteners Will Suffer No Irreparable Harm.........10

     C.   Oman Fasteners' Claims of Irreparable Harm Are Speculative and Based on Misleading Evidence..............11

II.   Oman Fasteners Is Not Likely To Succeed On The Merits......28

     A.   Commerce Acted Lawfully and Did Not Abuse Its Discretion When It Rejected the Late Filing and Denied a Retroactive Extension ......................................28

     B.   Commerce Lawfully Used a Previously-Corroborated, Previous-Applied AFA Margin .........................................47

III.   The Balance Of Hardships Weighs In Favor Of Denying A Preliminary Injunction .........................................55

IV.   Denial Of The Motion Is In The Public Interest.......................57

V.   Conclusion..................................................................................61

VI.   Responses To Supplemental Questions ....................................62

# TABLE OF AUTHORITIES

## CASES

*Am. Signature, Inc. v. United States,*
    598 F.3d 816 (Fed. Cir. 2010)................................................................58

*ArcelorMittal USA LLC v. United States,*
    __ C.I.T. __, 399 F. Supp. 3d 1271 (Ct. Int'l Trade 2019)..............44, 45

*Bosun Tools Co., Ltd. v. United States,*
    __ C.I.T. __, 405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019)..............33, 34

*Celik Halat ve Tel Sanayi A.S. v. United States,*
    __ C.I.T. __, 557 F. Supp. 3d 1348
    (Ct. Int'l Trade 2022)........................................................29, 30, 31, 45

*Celik Halat ve Tel Sanayi A.S. v. United States,*
    __ C.I.T. __, 557 F. Supp. 3d 1363
    (Ct. Int'l Trade 2022)........................................................29, 32, 33, 45

*Confederación de Asociaciones Agrícolas del Estado
    de Sinaloa AC v. United States,*
    __ CIT __, 389 F. Supp. 3d 1386 (2019) ...................................9, 55, 56

*Dongtai Peak Honey Industries Co., Ltd. v. United States,*
    777 F.3d 1343 (Fed. Cir. 2015)....................................................passim

*Essar Steel Ltd. v. United States,*
    678 F.3d 1268 (Fed. Cir. 2012)............................................................45

*Kwo Lee, Inc. v. United States,*
    __ C.I.T. __, 24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014)...............26, 27

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ...............................................................................1

*Otter Prods., LLC v. United States*,
 __ CIT __, 37 F. Supp. 3d 1306 (2014) .................................................. 10

*PSC VSMPO-Avisma Corp. v. United States*,
 688 F.3d 751 (Fed. Cir. 2012) .............................................................. 42

*Sampson v. Murray*,
 415 U.S. 61 (1974) ............................................................................... 11

*Severstal Export GMBH v. United States*,
 Court No. 18-00057, 2018 WL 1705298
 Ct. Int'l Trade Apr. 5, 2018) ......................................................... 10, 25

*Sunpreme Inc. v. United States*,
 892 F.3d 1186 (Fed. Cir. 2018) ............................................................ 26

*Sunpreme, Inc. v. United States*,
 __ C.I.T. __, 145 F. Supp. 3d 1271 (Ct. Int'l Trade 2016) .................... 26

*Trinity Manufacturing, Inc. v. United States*,
 __ C.I.T. __, 549 F. Supp. 3d 1370 (Ct. Int'l Trade 2021),
 *appeal docketed*, No. 22-1329 (Fed. Cir. Jan. 5, 2022) ............ 45, 46, 57

*U.S. Shoe Corp. v. United States*,
 114 F.3d 1564, 1577 (Fed. Cir. 1997), *aff'd*, 523 U.S. 360 (1998)........ 25

*Winter v. Nat. Res. Def. Council*,
 555 U.S. 7 (2008) ............................................................................. 9, 55

## STATUTES

19 U.S.C. § 1673b ................................................................................. 56

19 U.S.C.§ 1673b(d)(1)(A)(i) ................................................................. 52

19 U.S.C. §  1673d ................................................................................ 56

19 U.S.C. § 1673d(c)(1)(B)(i)................................................................. 52

19 U.S.C. § 1675(a)(2)(A)....................................................................... 52

19 U.S.C. § 1677e ...................................................................58

19 U.S.C. § 1677e(b)(1) .........................................................50

19 U.S.C. § 1677e(b)(2)(A) ....................................................50

19 U.S.C. § 1677e(c)(2) ..........................................................50

19 U.S.C. § 1677e(d)(2) ..........................................................50

19 U.S.C. § 1677e(d)(3) ..........................................................50

## REGULATIONS

19 C.F.R. § 351.302(c)......................................................28, 30

19 C.F.R. § 351.302(d) .............................................................28

## ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Certain Steel Nails From the Sultanate of Oman: Preliminary
  Results of Antidumping Duty Administrative Review and
  Partial Rescission of Antidumping Duty Administrative
  Review; 2014–2016,*
  82 Fed. Reg. 36,738 (Dep't of Commerce Aug. 7, 2017)......................53

*Certain Steel Nails From the Sultanate of Oman: Preliminary
  Results of Antidumping Duty Administrative Review and
  Partial Rescission of Antidumping Duty Administrative
  Review; 2016-2017,*
  83 Fed. Reg. 22,246 (Dep't of Commerce May 14, 2018) ....................54

Defendant-Intervenor Mid Continent Steel & Wire, Inc. ("Mid Continent") respectfully presents this opposition to the Motion for Preliminary Injunction and accompanying Memorandum ("OF Br.") filed December 26, 2022 on behalf of Plaintiff Oman Fasteners, LLC ("Oman Fasteners").[1]  For the reasons discussed below, its motion should be denied.

## Introduction

Oman Fasteners has failed to satisfy the high burden required to obtain the "drastic and extraordinary remedy" of a preliminary injunction.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (internal citation omitted).

Indeed, the situation before the Court is entirely of Oman Fasteners' own creation, as are the consequences flowing therefrom.  After requesting and receiving multiple extensions to prepare and file its response to a critical supplemental questionnaire, Oman Fasteners failed to file the response in full by the U.S. Department of Commerce's ("Commerce") deadline.  Oman Fasteners missed the deadline because

---

[1] *See Memorandum of Oman Fasteners In Support of Motion for Preliminary Injunction* (Dec. 26, 2022) at 18, 29 (ECF Doc. 15-1).

its counsel lacked sufficient internal controls, and because its counsel made unwarranted and incorrect assumptions about its ability to file the response in a timely manner.[2]

Oman Fasteners' counsel knew that they would not be able to complete the filing on time, yet they did not reach out to Commerce to seek assistance or a modest additional extension.  In their own words, Oman Fasteners' counsel – inexplicably – failed to recognize the importance of seeking such help or an additional small extension,[3] and

---

[2] *See* Letter from Perkins Coie, LLP to Sec'y of Commerce, *Certain Steel Nails from Oman; Sixth Review; Reply to Petitioner's Opposition to Oman Fasteners' Request for Reconsideration* (Mar. 30, 2022).  In their own words:

- admitting "fail{ure} to ensure that all the electronic data files accompanying Oman Fasteners' Supplemental Section C Response were confirmed in ACCESS before the 5:00pm deadline, and fail{ure} to recognize the importance of immediately requesting an extension with respect to those electronic data files";
- "counsel's expectations regarding the time required to submit all the accompanying electronic data files proved incorrect";
- "counsel failed to appreciate the materiality of the late submission of certain of the electronic data files";
- "undersigned counsel regrettably failed to appreciate that the Department would deem the entire submission untimely, and therefore failed to immediately request leave to submit out of time".

[3] *See id.* at 2.

decided that filing such a request would be "impractical" and was "unnecessary".[4]

Oman Fasteners' counsel completed filing the response after the deadline, and knew it was late. But even then, counsel did not file a request for a retroactive extension of time, as Commerce's regulations explicitly allow. Instead, Oman Fasteners ignored the problem, bringing it to no one's attention and evidently hoping that no one would notice the late filing.

But Commerce did notice it, and in accordance with its clear regulations, as well as precedent from both the U.S. Court of International Trade and the U.S. Court of Appeals for the Federal Circuit, rejected the filing. Only then did Oman Fasteners demand that Commerce accept the late filing, using a variety of misleading statements and ultimately threats of interlocutory appeal. Commerce allowed Oman Fasteners multiple opportunities to plead its case, but correctly concluded each time that the circumstances surrounding the late filing – at best, carelessness, inattention, and incompetence of counsel in missing the deadline, coupled critically with ignoring the

---

[4] OF Br. at 18, 29.

matter for 38 days in hopes it would not be noticed – failed to demonstrate the "extraordinary circumstances" that its regulations require.

Oman Fasteners complains vehemently that all it wants is "a 16-minute extension."  Had Oman Fasteners acted responsibly and immediately brought its error to Commerce's attention, that may have been the case.  The truth, however, is that Oman Fasteners only began demanding a retroactive extension after Commerce realized the attempted sleight of hand 38 days later, and rejected the filing.  In reality, this is the extension Oman Fasteners demands: 38 days.

The importance of the filing at issue – a supplemental response pertaining to numerous flaws in Oman Fasteners' U.S. sales data reporting – cannot be overstated.  Two things reside at the heart of Commerce's antidumping analysis: a respondent's U.S. sales data, and a respondent's data to establish normal value.  The response at issue addressed numerous problems with some of the most fundamental parts of Oman Fasteners' U.S. sales response.[5]

---

[5] *See* Oman Fasteners' Compl. ¶ 14 ("The supplemental Section C questionnaire was extensive, containing 37 separately numbered questions, some in multiple parts, for a total of 48 separate requests for

It is curious that after eight years of reporting sales data to Commerce, Oman Fasteners would file an initial questionnaire response so riddled with significant issues, though many respondents "slow walk" development of the record as a matter of course even when they could submit more complete responses. Indeed, Oman Fasteners itself acknowledges that in the supplemental questionnaire at issue, Commerce was forced to ask many supplemental questions *identical* to those asked in prior reviews.[6]

---

information, clarifications, and/or data covering a wide variety of subjects. Commerce requested information on, among other things, quantity and value, U.S. sales reconciliations, control numbers, physical characteristics, a weight derivation formula, payment terms, billing adjustments, movement expenses, import tariffs, bank charges, credit expenses, domestic indirect selling expenses, inventory carrying costs, packing, entered value, and the U.S. sales database.").

[6] *See* Letter from Perkins Coie LLP to Sec'y of Commerce, *Certain Steel Nails from Oman, 2020-2021 Administrative Review: Oman Fasteners' Pre-Preliminary Comments* (June 2, 2022) at 30 ("The Department's supplemental Section C questionnaire in this review contains questions and clarification regarding Oman Fasteners' Section C data that are virtually identical to the questions and clarifications asked by the Department in its supplemental Section C questionnaires in the second, third, fourth, and fifth administrative reviews."). In other words, Oman Fasteners knew or should have known that its initial response was flawed and deficient in numerous respects. Whether its reporting represents the level of effort and cooperation required by the statute is an open question.

Having properly rejected the late filing, Commerce correctly determined that its ability to conduct a reliable and accurate margin calculation was fatally undermined, and that the reason for this was Oman Fasteners' failure to file its important response in a timely manner, coupled with the company's choice to ignore the issue until Commerce rejected the late filing.

Because of this, and in order to induce future full cooperation by Oman Fasteners, Commerce correctly assigned a dumping margin based on total facts available with inferences adverse ("total AFA") to Oman Fasteners, as the statute permits. Commerce's margin options were limited – the record of the proceeding, going back to the 2014 petition, contained several very low margins, in the range of 4 percent or lower. It also contained the margin alleged in the 2014 petition, 154.33%.[7] This margin has previously been used as a total AFA rate in earlier reviews, and indeed its earlier use had been validated by

---

[7] As is typically the case with margins alleged in a petition, this is a transaction-specific margin, that is, it relates to a single sale or offer to sell. This is in contrast to the weighted-average margin calculated at the end of an investigation or review, which averages the margins for *all* of a foreign company's U.S. sales – some of which may be quite small, but others of which may be quite large.

reference to the range of dumping margins observed in U.S. sales *made by Oman Fasteners itself.*

Consistent with its past practice in this very proceeding, Commerce correctly determined to assign the 154.33% margin to Oman Fasteners. The very low margins previously calculated on the record would not have provided a sufficient inducement to ensure full future cooperation. And Commerce could not simply conjure a compromise margin to "split the baby".

It is against this background that Oman Fasteners demands extraordinary and perhaps unprecedented relief: enjoining Commerce from implementing a presumptively lawful determination that is wholly consistent with its practice, regulations, the statute, and precedent from both of the agency's reviewing courts. This Court should reject Oman Fasteners' attempt to twist a situation of its own creation into a reason to enjoin Commerce from taking lawful action under the statute and its regulations while this appeal is litigated. Indeed, as is demonstrated below, Oman Fasteners is not likely to succeed on the merits. Its claims of irreparable harm are overstated and speculative. The balance of hardships — which hinges entirely on Oman Fasteners' speculative

claims of irreparable harm — do not tip in favor of the company. And the public interest in ensuring that Commerce has the ability to enforce its own deadlines in the face of carelessness and inattention by counsel who attempt to ignore filing failures, as well as to wield its only tool to ensure full and timely cooperation by foreign parties who so often seek to "slow walk" the development of the record, clearly outweigh Oman Fasteners' commercial interests, especially given the actual circumstances at issue.

## Supplemental Statement of Facts

In order to ensure that the Court has a complete and accurate understanding of the events in the underlying review, attached as Exhibits 1 through 7 hereto are copies of Mid Continent's responses to Oman Fasteners' repeated requests for reconsideration and a retroactive extension of time, Mid Continent's rebuttal brief, Mid Continent's response to the letter from the U.S. Ambassador to Oman that was sent on Oman Fasteners' behalf, and Oman Fasteners' reply thereto.

## Discussion

### I. Oman Fasteners' Claims Of Irreparable Harm Are Speculative And Not Imminent

Oman Fasteners bears the "high burden required to show irreparable harm and that injunctive relief is warranted." *Confederación de Asociaciones Agrícolas del Estado de Sinaloa AC v. United States*, __ CIT __, 389 F. Supp. 3d 1386, 1403 (2019). Oman Fasteners has not met this burden, and therefore, its motion for injunctive relief should be denied.

#### A. Legal Standard

The U.S. Supreme Court has stated that "{i}ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief . . . ." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). Thus, Oman Fasteners must be able to "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original).

"Irreparable harm constitutes potential harm that cannot be redressed by a legal or equitable remedy at the conclusion of the proceedings, so that a preliminary injunction is the only way of protecting the plaintiffs." *Severstal Export GMBH v. United States*,

Court No. 18-00057, 2018 WL 1705298, at *3 (Ct. Int'l Trade Apr. 5, 2018) (internal citations omitted).  In general, "financial loss alone is not irreparable." *Otter Prods., LLC v. United States*, __ CIT __, 37 F. Supp. 3d 1306, 1315 (2014) (internal citations omitted).

"Critically, irreparable harm may not be speculative." *Id.* (internal citation omitted).  As such, "a mere possibility of injury, even where prospective injury is great," is insufficient to show irreparable harm.  *Id.* (internal citations and quotation marks omitted).  Rather, "{a} presently existing, actual threat must be shown." *Id.* (internal citations and quotation marks omitted).

## B.    Oman Fasteners Will Suffer No Irreparable Harm

Any harm that Oman Fasteners may incur by reason of Commerce's determination – financial, reputational, good will, bankruptcy, "existential risk" to the company, or other – will not be irreparable.  With all due respect, under the uncontested facts of this case any harm suffered by Oman Fasteners will be made whole by its counsel's professional liability insurance policy.  Indeed, it would be astonishing (and professionally reckless) if Oman Fasteners' counsel has not already notified its carrier of the case at bar, and if its

insurance carrier is not funding this litigation as a means of mitigating its risk. Any and all "harm" suffered by Oman Fasteners due to the errors and omissions of its counsel will be quantified by damages experts, and its claims paid either through a negotiated settlement or litigation. As the U.S. Supreme Court has held, financial loss alone – compensable with monetary damages – is not irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). That is the case here.

Based on this, Oman Fasteners simply cannot demonstrate irreparable harm required to support the extraordinary relief of a preliminary injunction in this appeal. The Court's analysis need proceed no further.

### C. Oman Fasteners' Claims of Irreparable Harm Are Speculative and Based on Misleading Evidence

As is often the case, careful review of the evidence presented by Oman Fasteners reveals that its claims are exaggerated and not supported.

Oman Fasteners claims that Commerce's preliminary results "forced" the company to cease all U.S. shipments of subject merchandise. OF Br. at 54. In fact, Oman Fasteners has the ability to continue shipping, but chose not to do so. It chose to stop shipping

because, as a matter of its own antidumping risk management strategy, it acts as its own non-resident importer of record.[8]  It does this to shield its U.S. customers from antidumping duty liability and the possibility that its duty rate might increase from one review to another, as it has done in the underlying review.  As a result, Oman Fasteners is liable for all antidumping duties, and in this case, chose to stop shipping to the United States rather than support its U.S. customers.  Any injury in this regard is self-inflicted.

Oman Fasteners claims that it has "no material ability to expand its sales to other countries or to expand its U.S. sales of other products" to mitigate the adverse effects of its decision to shop shipping to the United States.  OF Br. at 55.  This claim is not supported by Oman Fasteners' own evidence.  In fact, paragraph 14 of the Karaga Declaration reveals that Oman Fasteners sales of [

].

---

[8] *See* Karaga Decl. ¶ 24 ("Oman Fasteners is the importer of record for virtually all of the Subject Merchandise it exports to the United States.").

Moreover, paragraph 15 of the Karaga Declaration indicates that Oman Fasteners' efforts to increase its sales of non-subject merchandise, primarily staples, [

]. These facts, assuming they are correct, reflect successful efforts to diversify sales and operations.

Oman Fasteners claims that demand for its non-nail products is a function of demand for its subject merchandise, and that its choice to stop shipping to the United States will lead to a reduction in sales of other products. *See* OF Br. at 55. Oman Fasteners states that it "*expects* that its U.S. sales of non-subject merchandise will significantly decrease *once it ceases sales of subject merchandise*." *Id.* (emphases added).

This statement indicates that Oman Fasteners has *not* ceased making sales to the United States, thus undermining any claim of imminent irreparable harm in the form of lost business. Furthermore, its claim is entirely speculative. Oman Fasteners provides no evidence that any of its customers for other products have stopped purchasing them, and says nothing about steps Oman Fasteners has taken or plans

to take to ensure that these sales continue – the company obviously has a duty to mitigate its losses, though its motion for preliminary injunction gives the impression of a company that intends to do nothing of the sort.

Oman Fasteners also claims that it "faces serious risk of default on its existing credit facilities, which would immediately render Oman Fasteners insolvent." *Id.* Specifically, Oman Fasteners claims that [

]. *Id.* at 56. The Karaga Declaration (¶¶ 30-31) also speaks to this assertion and provides documents that allegedly support its claim – [                                          ], Exhibits E through G, as well as a statement described as [

] at Exhibit H.

Oman Fasteners' suggestion that [

] is entirely speculative. There is no evidence that any of its [

]

We also note that Exhibits E through G relate to only [

].

First, Exhibit H identifies a [

].

Second, Exhibit H identifies a [

].

Third, Exhibit H identifies a [

].

As noted above, the three documents provided as Exhibits E through G relate to only [                                        ]. The Karaga Declaration refers to [                              ]." Karaga Decl. ¶ 30.  The record, however, does not include any documents related to [

].  As the record stands, there is

simply no evidence that there is any risk to Oman Fasteners that [

].

Moreover, while Exhibit H to the Karaga Declaration describes

[          ] of these credit facilities, the record contains no information

of the [

]. It is simply impossible to assess the true risk of default

without knowing [                                    ]. Given

Oman Fasteners' [                    ] identified in the Exhibit J to

the Karaga Declaration – [          ] average monthly revenue[9] – it

appears entirely likely that the company is not [

]. Exhibit J calculates [

]. Deducting Oman

Fasteners' [

], identified in Exhibit K to the Karaga Declaration as

---

[9] We note that this [                          ] reported in Exhibit J
appears to [
], which can be independently calculated using Exhibit A.
Exhibit A reports [
], which annualizes to [
] per month. This value is approximately [   ] percent
higher than the value provided in Exhibit J. If this is the case, the
above analysis is ever stronger.

[            ], yields an apparent monthly net cash inflow of [

            ] per year.  Based on this calculation, it is entirely likely

that the company is [                                        ]  By all

appearances, Oman Fasteners' claim of imminent bankruptcy is

speculative.

    Oman Fasteners claims that if the injunction is not granted it will

be forced to operate at [        ] percent of its current capacity, which

means it [                                        ], and that it

[

            ]."  OF Br. at 57; *see also* Karaga Decl. ¶¶ 36-38.  The

Karaga Declaration states that [




            ].

    These statements speak to potential future events, not events that

have occurred or are presently occurring.  [



                                        ].

Moreover, Oman Fasteners has provided no support for its claim, such as [                                                    ].

Oman Fasteners then claims that if its speculative predictions come true and it is required to operate at [        ] percent of capacity, it will not be able to [                                                ], referring to Exhibits J and K.

This claim is baseless.  To conclude that it will be [

] as shown in Exhibit K, Oman Fasteners appears to be [

] in Exhibit J.  This is wildly inaccurate.  If Oman Fasteners operates [



].  It is simply impossible to credit Oman Fastener's claims based on the record it has presented to the Court.

As an aside, we note that Exhibit K [

].  This is relevant because while many of the data provided in the Karaga Exhibits [

].  If, as Oman Fasteners claims, it has [

] – and all of Oman Fasteners' arguments flowing therefrom.

Oman Fasteners next claims that it faces imminent irreparable harm in the form of loss of goodwill and business reputation.  *See* OF Br. at 57-58.  In both the Brief and in the Karaga Declaration, Oman Fasteners relies on [

].  It is entirely unclear how such commentary is admissible to provide an evidentiary basis to support a finding of irreparable harm to Oman Fasteners' goodwill and business reputation, never mind the fact that Oman Fasteners has steadfastly and

vehemently blamed Commerce for all of its woes and rejected any notion that it bears responsibility for its predicament. Moreover, Oman Fasteners has not provided anything to substantiate its claim – such as

[

].

That said, Oman Fasteners claims that its "customers — and the broader U.S. market — cannot simply ride out the loss of their largest supplier for any significant period of time; they will have no choice but to seek supply from other sources around the world." *Id.* at 58.

The parade of horribles described by Oman Fasteners, however, does not comport with market reality. As discussed in Exhibit 18 hereto, the Declaration of George Skarich, Mid Continent's Executive Vice President of Sales & Marketing, since late Q3-2022 the U.S. market for nails has deteriorated significantly.

Since late Q3-2022 the U.S. market for steel nails has deteriorated significantly due to the following factors. *See* Skarich Decl. ¶ 5. First, significantly higher mortgage interest rates have significantly reduced demand for home purchasing. Second, the United States has seen a 21% decline in residential wood to wood construction. Third, inflation

has caused a decline in the consumption of wood pallets, the second largest market segment for nails. Fourth, currently there is a glut of nail inventories at all customer levels in the United States. Due to supply chain issues over the pandemic, shipments of imported steel nails that were scheduled to arrive in early 2022 were delayed. As supply chain problems eased over the course of 2022, large amounts of orders began all arriving in close succession, with many arriving just as demand dropped for the reasons above. *See id.*

Because of this, customers across the entire United States have excessive inventories of steel nails. New orders for steel nails are off more than [    ] as customers try to right size their stocking levels to meet the new slower demand. This is the situation across the board. The glut of steel nails in the United States combined with the capacity of other import sources and domestic steel nail producers far exceeds the supply needed to match the current and projected demand for steel nails over the next few years. *See id.* ¶ 6.

In the residential construction market, the seasonally adjusted annual rate of new privately-owned housing units started is down 21%

from April 2022 to November 2022. New permits issued over the same time-period are down 29%. *See id.* ¶ 7 & Ex. 1.

As seen in Skarich Declaration Exhibit 2, "Pallet Customer 12.12.22 Inventory Levels", Mid Continent did an evaluation by contacting over 30 customers to determine when they would need to start ordering pallet nails again. Pallet nails are one type of steel nails. In normal times, pallet producers carry 30 days of inventory of pallet nails, but now, due to all the changes noted above, [

]. *See id.* at Ex. 2. Skarich Declaration Exhibit 3 provides an email from one of the largest pallet producers in the United States, [

]. *See id.* ¶ 8 & Ex. 2.

On January 5, 2023, Mr. Skarich spoke with [

]. He indicated that they have available capacity to produce steel nails of [   ] containers per month

([      ] tons/month) right now and no U.S. customers are placing orders for steel nails.  *See id.* ¶ 9.

In late October 2022, Mr. Skarich spoke with the owner of the [                                                        ], who informed him that they have idled [    ] of their steel nail production equipment due to lack of orders and future projected demand for steel nails from customers.  *See id.* ¶ 10.

On January 6, 2023, [                                    ], an importer of steel nails [                                ], informed Mr. Skarich that [                                ] of the [      ] nail producer [                                ], told him that [        ] has [    ] containers of available capacity to produce steel nails ([      ] tons/month) and that their largest customer for steel nails, [                                    ], has no orders on file with them because they are selling off their bloated inventories of steel nails before placing any new orders.  *See id.* ¶ 11.

Pricing of steel nails in the United States has fallen dramatically since the end the summer of 2022.  Prices of imported steel nails have

fallen 30 to 40% since Q3-2022 and prices of domestically produced steel nails are down [   ]% over the same time period. *See id.* ¶ 12.

Prices of imported pallet nails are down 34% since Q3-2022 and prices of domestically produced pallet nails are down [   ]% as the domestic industry tries to retain its market share. *See id.* ¶ 13.

As shown in Skarich Declaration Exhibit 5, large U.S. importers of steel nails have resorted to extreme offers in an effort to reduce excess inventory. *See id.* ¶ 14. For example, [

].

*See id.* ¶ 14 & Ex. 5.

As this shows, the current market reality is that customers are sitting on very large volumes of inventory that they need to shed before they resume purchasing. This is a process that will take months at the least, given current economic uncertainty. By all appearances, Oman Fasteners' customers will be working down excess inventory for a long period before contemplating new orders. Rather than being likely to leave Oman Fasteners while waiting for the outcome of this litigation, its customers will simply consume inventory. This makes sense, because it would make little business sense to disrupt their relationship

with an existing supplier if they do not need to – as Oman Fasteners notes, finding and qualifying a new supplier is burdensome. *See* OF Br. at 58-59.

Oman Fasteners next claims that "even the purely financial harm" it might suffer "will be entirely irreparable because no damages are available from Commerce to compensate for Oman Fasteners' lost sales." *Id.* at 59. As the U.S. Court of Appeals for the Federal Circuit has recognized, "precedent reveals that an aggrieved party may secure the refund of a tax or tariff ultimately found to be unconstitutionally levied." *Severstal*, 2018 WL 1705298, at *4 (*citing U.S. Shoe Corp. v. United States*, 114 F.3d 1564, 1577 (Fed. Cir. 1997), *aff'd*, 523 U.S. 360 (1998)). Oman Fasteners will therefore have options for obtaining a refund of any duties deposited if Commerce's determination is found to be unlawful. Moreover, we observe, as noted above, that while Oman Fasteners may not be able to seek damages from Commerce, under the facts of this case it has a strong and arguably irrefutable claim to file with its counsel's professional liability insurance carrier, which will satisfy any and all damages incurred.

In support of its argument, Oman Fasteners relies on two cases, *Sunpreme, Inc. v. United States*, __ C.I.T. __, 145 F. Supp. 3d 1271 (Ct. Int'l Trade 2016) and *Kwo Lee, Inc. v. United States*, __ C.I.T. __, 24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014).  The facts underlying both of these cases are readily distinguishable from the facts in this appeal.

As an initial matter, Oman Fasteners fails to acknowledge that the U.S. Court of Appeals for the Federal Circuit reversed the court's decision in *Sunpreme*, finding that the court lacked jurisdiction.  *See Sunpreme Inc. v. United States*, 892 F.3d 1186 (Fed. Cir. 2018).  Thus, the court's decision is of questionable precedent in this appeal.

Setting that aside, *Sunpreme* involved a unilateral decision by U.S. Customs and Border Protection ("CBP") to impose a rate advance on an importer's goods without the benefit of the quasi-judicial process based on the record that Commerce conducts.  *See generally Sunpreme*, __ C.I.T. __, 145 F. Supp. 3d 1271.  That is fundamentally different from the case at bar, in which the circumstances surrounding Commerce's decision to reject Oman Fasteners' late filing and impose the 154.33% margin was fully litigated on a fully developed record.

In *Kwo Lee*, the plaintiff provided much greater evidence of imminent irreparable harm than Oman Fasteners has done here. Kwo Lee involved a unilateral decision by CBP to require "single transaction" bonds instead of continuous entry bonds for imports of fresh garlic.[10] __ C.I.T. at __, 24 F. Supp. 3d at 1327. In that case, shipments of fresh garlic were sitting in storage at the port, incurring demurrage charges, and spoiling. *See id.* at 1328. Moreover, the plaintiff provided at least one letter from a customer demonstrating a loss of goodwill or business reputation due to his failure to deliver a customer's order of fresh garlic. *See id.* It bears noting that the plaintiff in *Kwo Lee* had even paid the higher costs of single entry bonds on two shipments in an effort to service his customers. *See id.*

The evidence presented in *Kwo Lee* supported a finding of irreparable harm. The evidence presented by Oman Fasteners does not.

---

[10] Single entry bonds are a heightened form of security that CBP may require. Instead of having one bond in an amount based on past importing activity, CBP can require an importer to secure potential duty liability on an entry-by-entry basis. This is more expensive, but serves to protect the revenue when CBP determines that a heightened risk to the revenue exists.

## II.    Oman Fasteners Is Not Likely To Succeed On The Merits

Oman Fasteners claims that it is "substantially likely" to prevail in this appeal for three reasons.  First, Commerce abused its discretion by rejecting its untimely filed response.  Second, Commerce's application of an adverse inference was unlawful.  Third, the 154.33 percent margin selected by Commerce is unsupported by substantial record evidence.  *See* OF Br. at 11.  None of these has merit.

### A.    Commerce Acted Lawfully and Did Not Abuse Its Discretion When It Rejected the Late Filing and Denied a Retroactive Extension

Oman Fasteners does not challenge Commerce's regulation concerning rejection of late filing, 19 C.F.R. § 351.302(d), and does not dispute that it failed to file the questionnaire response in its entirely by the applicable deadline.  Oman Fasteners also does not challenge Commerce's regulatory requirement requiring that "extraordinary circumstances" be shown in order to obtain a retroactive deadline extension when the request is made after the deadline has passed, 19 C.F.R. § 351.302(c).  Oman Fasteners also does not dispute that it knew the filing was late yet did nothing to bring this Commerce's attention or take other action to seek an extension until Commerce rejected the filing 38 days later.  Indeed, as discussed above, Oman Fasteners

admits that it missed the deadline because of counsel's errors in judgment and practice.

Oman Fasteners entirely disregards directly relevant Federal Circuit precedent, *Dongtai Peak Honey Industries Co., Ltd. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015) ("*Dongtai Peak*"), which we discuss in detail below. Instead, Oman Fasteners relies heavily on a pair of CIT decisions in which the extraordinary circumstances standard required by Commerce's regulations was not addressed: *Celik Halat ve Tel Sanayi A.S. v. United States*, __ C.I.T. __, 557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ("*Celik AD*") and *Celik Halat ve Tel Sanayi A.S. v. United States*, __ C.I.T. __, 557 F. Supp. 3d 1363 (Ct. Int'l Trade 2022) ("*Celik CVD*"). In those cases, the court reversed Commerce's decisions to reject late filings, but the circumstances were different. In *Celik AD*, for example, the filing party filed repeated, timely extension requests before the deadline. *See* __ C.I.T. at __, 557 F. Supp. 3d at 1358-1360. Commerce only provided partial extensions, and ultimately told Celik that "it would not be able to 'grant *any* further extension of the deadlines. . . .'" *Id.* at 1359 (emphasis in original). The court held that this "emphatic and unambiguous statement . . . was itself an abuse

of discretion on the part of Commerce" because it "foreclosed any future extension whatsoever (whether or not upon a timely request, even a brief one on an emergency basis) and even on necessitated by what Commerce might consider an "extraordinary circumstance as described in 19 C.F.R. § 351.302(c)." *Id.* at 1360.

In contrast, Commerce granted Oman Fasteners' extension requests, and while the agency cautioned that it "does not anticipate providing any additional extension for Oman Fasteners' response to the section C supplemental questionnaire", that is a fundamentally different position that saying it would *not* grant *any* further extension. Yet, on the filing deadline, Oman Fasteners' counsel chose not even to attempt to seek additional time, deeming such action "impractical" and "unnecessary".

In its evaluation of the record before it, the court in *Celik AD* gave significant weight to the fact that Celik had repeatedly sought timely extension requests that Commerce "in large part denied." *Id.* at 1357. With respect to Commerce's determination to resort to total AFA, the court observed: "Commerce reached this decision despite record

evidence that Celik Halat timely requested extensions to file the submission in question, which Commerce in large part denied." *Id*.

Concerning its holding that Commerce had abused its discretion under the circumstances of the case at bar, the court observed: "The court's examination of the larger body of record evidence bearing on that circumstance, including Celik Halat's attempts to comply and the events that occurred . . ., support the court's conclusion." *Id*. at 1358.

After reciting the numerous requests for extension made by Celik, which culminated in Commerce's absolute statement that it would not grant any further extensions, the court "note{d}, first, that Celik Halat made repeated, timely extension requests . . . and that Commerce was somewhat parsimonious in granting those requests." *Id*. at 1359.

A theme inherent in the *Celik AD* court's analysis is that the respondent, in good faith, actively sought Commerce's assistance by filing timely requests, and that its failure to file on time was at least, in part, a function of Commerce's improper statement that it would not provide any additional time.

This situation stands in stark contrast to the case at bar. Oman Fasteners requested and received multiple extensions. When it knew it

would not be able to complete the filing on time, rather than seek assistance or file an emergency extension request, Oman Fasteners unilaterally decided it did not need to do so, finished filing late, and then completely ignored the error, evidently hoping that no one would notice. It was successful for 38 days, until Commerce realized what had happened and rejected the filing. Only then did Oman Fasteners begin its campaign to characterize itself as a blameless victim of bureaucratic overreach, who should be allowed to ignore Commerce's regulations without consequence.

In *Celik CVD*, the court overturned Commerce's rejection of a submission where the respondent had timely filed the complete "bracketing not final" version, but finished filing its final and public versions of the document the next day – unchanged but for bracketing – 87 minutes after the deadline. __ C.I.T. at __, 557 F. Supp. 3d at 1371-1373. In other words, the respondent did, in fact, timely file the complete response, unlike Oman Fasteners in the underlying review. The court rejected Commerce's action as unreasonable "in light of all

the relevant circumstances". *Id.* at 1374.[11]  At bottom, this situation has no relevance to the instant proceeding.

Oman Fasteners next argues that *Bosun Tools Co., Ltd. v. United States*, __ C.I.T. __, 405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) "holds that Commerce abuses its discretion when it rejects untimely submissions that do not meaningfully delay Commerce's review or prejudice any interested party." OF Br. at 22.  Oman Fasteners states that in *Bosun*, Commerce "rejected a supplemental response based on then respondent's failure to file a complete public version of that response by the applicable deadline", where "{a}fter realizing its error two days later, the respondent submitted the complete public version without requesting an extension." *Id.* at 22.

Oman Fasteners omits critical facts underlying the court's decision in *Bosun*.  First, the respondent timely filed the complete proprietary version of the submission, unlike Oman Fasteners.  Second, contrary to Oman Fasteners' description of the facts, the respondent

---

[11] As a separate matter, we note then-Chief Judge Stanceu's observation in *Celik CVD* that "{a}s a general matter, an attorney's inadvertently missing a filing deadline can be described as a failure to cooperate that is attributed to the client."  __ C.I.T. at __, 557 F. Supp. 3d at 1375.

was unaware that its public version had not completely uploaded, and "within an hour of receiving two Workflow Rejection Notices from Commerce staff with the directive to 'refile th{e} {redacted} version with a cover letter and the narrative,' Chengdu's counsel complied and re-filed the complete redacted version of its submission." *Bosun Tools Co., Ltd.*, __ C.I.T. at __, 405 F. Supp. 3d at 1365. Third, Commerce rejected Chengdu's late filing despite the fact that Commerce had instructed the company to refile the submission and that Chengdu complied with that directive. *See id.*

These facts are very different, and in the case of the respondent in *Bosun*, supported a determination to reverse Commerce's rejection. Here, Oman Fasteners failed to timely file the complete confidential version of its submission. It was aware that it would not be able to file on time and then that it had failed to do so, but decided not to seek an additional extension or to alert Commerce of its challenges, deeming it "impractical" and "unnecessary". And unlike the situation in *Bosun*, Commerce did not instruct Oman Fasteners to refile. Instead, Oman Fasteners buried its head in the sand 38 days and hoped that Commerce would not notice the late filing.

Oman Fasteners then argues that Commerce abused its discretion by acting in an arbitrary and capricious manner when rejecting the belated demands for a retroactive extension of time, referring repeatedly to purported policies of "grace" and "leniency". Oman Fasteners lists 12 alleged instances in which Commerce "excused" untimely or incomplete submissions by law firms. *See* OF Br. at 31-33.

Oman Fasteners' attempt to compare these circumstances to other situations must fail. Indeed, in *Dongtai Peak*, the U.S. Court of Appeals for the Federal Circuit rejected the appellant's argument "regarding Commerce's 'long practice' of approving untimely extension requests". 777 F.3d at 1352. The court instead held that in the "various administrative reviews cited by the Appellant, Commerce found good cause was shown and therefore exercised its discretion in granting the untimely extension requests." *Id.* It is, in other words, a fact-driven inquiry.

Moreover, the circumstances surrounding Commerce's discretionary decisions in these cases are fundamentally distinguishable.

Oman Fasteners describes *Ripe Olives from Spain*, No. A-469-817, as involving a situation in which "Commerce notified counsel they had omitted exhibits from a filing", implying that Commerce allowed the respondent to submit missing information after the deadline. OF Br. at 31.[12] In fact, Commerce notified counsel that the final BPI version of their submission included exhibits that were not in their one-day-lag version, and that Commerce was *rejecting* the final version that contained new factual information. Commerce allowed the company to resubmit a revised final version that *removed* the new factual information. *See* Ex. 7 hereto.

Oman Fasteners states that in *Certain New Pneumatic Off-the-Road Tires from China*, No. A-570-912, "counsel's docketing error resulted in two-day late submission". OF Br. at 32. What Oman Fasteners fails to acknowledge is that counsel filed a request for extension immediately upon learning of the issue, and that the issue arose due to personnel changes, internal miscommunication, and travel. *See* Ex. 15 hereto.

---

[12] Oman Fasteners identifies this document as being dated January 25, 2022. In fact, it is dated January 25, 2021.

Oman Fasteners states that in *Large Vertical Shaft Engines from China*, No. A-570-119, "Commerce informed counsel they had neglected to file three PDF exhibits to their surrogate value comments and Excel versions of exhibits". OF Br. at 31. In fact, contrary to Oman Fasteners' mischaracterization, counsel contacted Commerce to report "that while the PDF versions of the Excel exhibits listed in the submission were filed timely, the companion excel data were not filed." Commerce then identified information missing from three Exhibits. *See* Ex. 8 hereto.

Oman Fasteners states that in *Small Vertical Shaft Engines from China*, No. C-570-125, "Commerce informed counsel they had neglected to submit scope comments in the countervailing duty investigation", implying that counsel had missed a filing deadline and Commerce had excused an untimely filing. OF Br. at 32. In fact, counsel had timely filed the scope rebuttal comments at issue, but only on the record of the antidumping case when Commerce wanted them filed on the record of the companion countervailing duty case as well. *See* Ex. 9 hereto.

In *Dioctyl Terephthalate from Korea*, No. A-580-889, Oman Fasteners states that "counsel's technical difficulties caused one-day

late filing." OF Br. at 32.  What Oman Fasteners fails to mention, however, is that counsel had brought this to Commerce's attention the morning after the technical issues occurred.  *See* Ex. 16 hereto.

Oman Fasteners describes *Polyethylene Terephthalate Film, Sheet and Strip from India*, as involving a "one-day late public version due to initial submission error".  OF Br. at 32.  What Oman Fasteners fails to mention is that the party (overseas counsel) filed the document by the deadline, but it was rejected due to a typographical error.  What's more, counsel refiled the document the next day, and immediately contacted Commerce to report the issue and seek assistance.  *See* Ex. 10 hereto.

In *Certain Fine Denier Polyester Staple Fiber from India*, No. C-533-876, Oman Fasteners states that "Commerce notified counsel of improper submission and subsequently notified counsel of failure to properly submit response by new deadline – counsel responded that it inadvertently uploaded the documents to the wrong agency."  OF Br. at 32.  In fact, counsel (at an Indian law firm) had emailed the submission to Commerce in a timely manner, following which Commerce advised the party on proper filing procedures.  When the party failed to re-file the document using proper procedures, Commerce allowed them to

provide a submission identifying the issues encountered and remedial steps. As this shows, the actual submission was provided to Commerce on time, though via email and not by filing on ACCESS. *See* Ex. 13 hereto.

Oman Fasteners describes *Narrow Woven Ribbons from Taiwan*, No. A-583-844, as involving a situation where "counsel filed response two days late." OF Br. at 31. In fact, due to an inadvertent clerical error, the submission at issue was late because an associated request for extension of time referred only to Sections B and C, and not to Section D as intended. *See* Ex. 11 hereto.

Oman Fasteners describes *Circular Welded Carbon Quality Steel Line Pipe from China*, No. C-570-936, as involving a situation in which "counsel failed to timely submit notice of intent to participate". OF Br. at 32. In fact, the notice of intent to participate was timely filed on the record of the companion antidumping case. Senior attorneys in the party's law firm were informed that the filing *had* been made but were

not able to confirm this via ACCESS.  After learning of the issue, the law firm contacted Commerce the very next day.  *See* Ex. 12 hereto.[13]

As the foregoing demonstrates, Oman Fasteners' characterizations of these Commerce decisions are somewhat lacking and unpersuasive when examined in light of the actual facts.  Far from supporting its case, they tend to highlight the importance of acting promptly remedy a filing problem, rather than deciding that seeking an extension is "impractical" and "unnecessary".

More to the point, Commerce's discretionary determination whether to reject a filing is based on the particular circumstances before it and its authority to strictly enforce its deadlines have been affirmed by both this court and in precedent from the U.S. Court of Appeals for the Federal Circuit.  In *Dongtai Peak*, a respondent missed a filing deadline, and two days later requested a retroactive extension.  *See* 777

---

[13] Counsel has been unable to locate the letters Oman Fasteners references from *Certain Softwood Lumber Products from Canada*, No. A-122-857, Commerce Letter (Mar. 2, 2017), OF Br. at 30, and *Steel Concrete Reinforcing Bar from Turkey*, No. A-489-829, Commerce Letter (Jan. 27, 2017), *id.* at 32.  Based on the ways the decisions discussed above have differed from Oman Fasteners' loose characterizations of them, we have little doubt that they also are fundamentally distinguishable.

F.3d at 1354. The respondent, who had previously been warned to file requests for extension as soon as it was aware of the need, claimed good cause supported its request, pointing to overlapping questionnaire response deadlines, a national holiday, "and various issues with its translator, its United States-based attorneys, and its computers." *Id.* at 1347. While its request was pending, the respondent submitted its belated response. Commerce denied the company's request for retroactive extension, finding that the company had not shown good cause for its request.

Both the court and the U.S. Court of Appeals for the Federal Circuit affirmed Commerce's determination. The Federal Circuit held that Commerce:

> reasonably determined Dongtai Peak was entirely capable of at least submitting an extension request on time, but simply failed to do so; therefore, good cause did not exist to retroactively extend the deadline. . . . Having properly denied the extension requests, Commerce also reasonably determined the Supplemental Response was untimely and removed it from the record pursuant to 19 C.F.R. § 351.302(d).

*Id.* at 1352. The Federal Circuit also noted that it is fully within Commerce's discretion to "set and enforce deadlines" and this court "cannot set aside application of a proper administrative procedure

because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered." *Id.* (citing *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760-61 (Fed. Cir. 2012).

Like the respondent in *Dongtai Peak*, Oman Fasteners "was entirely capable of at least submitting an extension request on time, but simply failed to do so." 777 F.3d at 1352. Indeed, Oman Fasteners admits in numerous places that its counsel made unwarranted and incorrect assumptions about its ability to file the response in a timely manner.[14] Moreover, in *Dongtai Peak*, the Federal Circuit held that:

---

[14] *See, i.e.*, Letter from Perkins Coie, LLP to Sec'y of Commerce, *Certain Steel Nails from Oman; Sixth Review; Reply to Petitioner's Opposition to Oman Fasteners' Request for Reconsideration* (Mar. 30, 2022):
- admitting "fail{ure} to ensure that all the electronic data files accompanying Oman Fasteners' Supplemental Section C Response were confirmed in ACCESS before the 5:00pm deadline, and fail{ure} to recognize the importance of immediately requesting an extension with respect to those electronic data files";
- "counsel's expectations regarding the time required to submit all the accompanying electronic data files proved incorrect";
- "counsel failed to appreciate the materiality of the late submission of certain of the electronic data files"; and
- "undersigned counsel regrettably failed to appreciate that the Department would deem the entire submission untimely, and

> Because Dongtai Peak was aware of the deadline and
> had the opportunity to file an extension request prior
> to its expiration, its failure to do so indicates an
> inattentiveness or carelessness with regard to its
> obligations. This warranted application of AFA.

*Id.* at 1355-56.

It bears noting that the Federal Circuit affirmed Commerce's denial of a retroactive extension request under a previous version the regulations that only required good cause to support a retroactive extension. As the Court is aware, since 2013 Commerce's regulations explicitly require a showing of extraordinary circumstances – a higher, tougher standard – in order to support a retroactive extension. Oman Fasteners does not challenge the regulation. Moreover, the reasons underlying Oman Fasteners' missed deadline – poor judgment, a failure to appreciate the importance of the deadline and the need to immediately request an extension, and ultimately, determinations that requesting another, emergency extension would have been "impractical" and "unnecessary" fail to demonstrate good cause, much less the

---

therefore failed to immediately request leave to submit out of time".

current requirement of extraordinary circumstances warranting a retroactive extension of time.

The court has applied *Dongtai Peak* to find that Commerce did not abuse its discretion by rejecting untimely submissions, explaining that "{s}trict enforcement of time limits . . . is neither arbitrary nor an abuse of discretion when Commerce provides a reasoned explanation of its decision." *ArcelorMittal USA LLC v. United States*, __ C.I.T. __, 399 F. Supp. 3d 1271, 1279 (Ct. Int'l Trade 2019).  In *ArcelorMittal*, a respondent failed to timely comment on Commerce's draft remand results.  __ C.I.T. at __, 399 F. Supp. 3d at 1275.  The respondent submitted an extension request one week after the deadline, claiming that it had just learned of the deadline because its counsel was out of the country when the draft was released and the notification for the draft had been "lost in the email traffic during that period." *Id.* Commerce rejected the request and the court, following *Dongtai Peak*, found no "extremely compelling circumstances." *Id.* at 1282.  Instead, on the facts and "in light of the '{i}mportant principles of timeliness and finality {that} undergird all aspects of litigation,'" the court found that it was not an abuse of discretion for Commerce to reject respondent's

untimely extension request and submissions. *Id.* (*quoting Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012)).

While Oman Fasteners at least mentions *Dongtai Peak* in passing on page 18 of its Brief, it completely ignores a different, relevant decision issued by the court just three months before the two *Celik* cases: *Trinity Manufacturing, Inc. v. United States*, __ C.I.T. __, 549 F. Supp. 3d 1370 (Ct. Int'l Trade 2021), *appeal docketed*, No. 22-1329 (Fed. Cir. Jan. 5, 2022), involved a sunset review in which the domestic industry's representative, experiencing a combination of technical and medical issues, failed to file the substantive response. He did not bring this to Commerce's attention, but only became aware of the lapse when Commerce issued a letter to the U.S. International Trade Commission indicating that the filing had not been made and that the agency intended to revoke the antidumping duty order at issue. *See id.* at 1375. Only then did he request reconsideration and a retroactive extension, a request that was renewed and denied several times, identifying "intermittent internet problems . . . during the course of the pandemic", *id.*, and medical issues that are not detailed in the opinion. *See id.* at 1378.

On these facts, the court affirmed Commerce's denial of the extension request, finding that the technical and medical issues did not establish extraordinary circumstances. The court rejected the plaintiffs' argument that Commerce abused its discretion, finding that:

> The factors plaintiffs would have the court apply to resolve the current dispute do not mention the Department's interest in orderly administration of the antidumping duty law and, specifically, its interest in deterring late filings for which extension requests are not made prior to the expiration of the filing period. These interests are served by a rule confining the granting of such requests to extraordinary circumstances.

*Id.* at 1378-79. It bears noting that as a result of Commerce's rejection of the plaintiffs' retroactive extension request, it revoked an antidumping order that had been in place for decades – an outcome far more damaging than receiving an adverse rate in a review, which only lasts until the completion of a subsequent review. Indeed, to regain the protections of an order, the domestic industry would need to bring and litigate to successful completion an entirely new case.

As the foregoing discussion shows, Commerce acted reasonably and in accordance with its regulations and judicial precedent when rejecting Oman Fasteners' late-filed questionnaire response. Oman

Fasteners counsel knew it would not to be able to file on time, yet inexplicably chose not to file a request for extension. More seriously, counsel chose to ignore its error, either believing that it did not matter or hoping that no one would notice. And then, counsel only began demanding a retroactive extension of time after Commerce had realized what the company had done, and rejected the response. Far from demonstrating extraordinary circumstances to grant a retroactive extension, these circumstances fully support Commerce's decision to reject the response, deny the tardy request for extension, and resort to total AFA.

## B. Commerce Lawfully Used a Previously-Corroborated, Previous-Applied AFA Margin

As an initial matter, we note that Oman Fasteners does not challenge Commerce's authority to select the highest rate from any segment of the proceeding when applying inferences adverse to the interests of a respondent, or that Commerce need not consider a company's "economic reality" when assigning a margin based on total AFA.

As noted in the Introduction to this submission, when selecting a rate to assign as total AFA in this case, Commerce had very limited

choices on this record. The petition provided a transaction-specific dumping margin of 154.33%, which was corroborated by Commerce and formed the basis for initiation of the investigation. This margin also has been used over the course of the proceeding as a total AFA rate, and it has been corroborated by reference to the range of individual transaction margins calculated for Oman Fasteners itself.

The original investigation yielded a weighted-average dumping margin based on all of Oman Fasteners' sales during the period of investigation of 9.11%, which was subsequently revised to 4.22%. Subsequent reviews have yielded margins ranging from 0.00% to 1.65%.

Oman Fasteners claims that Commerce "lacked authority to apply an adverse inference to Oman Fasteners on these facts", and that Commerce's "selection of the maximum 154.33% rate was arbitrary and unsupported by substantial evidence." OF Br. at 23. These claims are meritless and should be rejected.

In *Dongtai Peak*, the Federal Circuit dealt with a challenge to Commerce's decision to resort to AFA in the context of a missed filing deadline:

> As this court has noted, "{c}ompliance with the 'best of its ability' standard is determined by assessing

whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries," and "{w}hile the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382 (emphases added). Because Dongtai Peak was aware of the deadline and had the opportunity to file an extension request prior to its expiration, its failure to do so indicates an inattentiveness or carelessness with regard to its obligations. This warranted application of AFA.

777 F.3d at 1355-56.

Oman Fasteners next claims that the 154.33% margin selected as the AFA rate, which it describes as "outrageously punitive", was "unsupported by substantial evidence and contrary to law." OF Br. at 27. Commerce's choice was in accordance with law and supported by substantial evidence on the record of the underlying review.

When it finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available; and is not required to determine, or make any adjustments to, a countervailable subsidy rate or weighted average dumping margin based on any assumptions about information the interested party would

have provided if the interested party had complied with the request for information.  *See* 19 U.S.C. § 1677e(b)(1).

The statute specifically identifies the petition as a potential source of information for adverse inferences.  *See id.* at § 1677e(b)(2)(A).  The statute also specifically excuses Commerce from having to corroborate "any dumping margin . . . applied in a separate segment of the same proceeding," *id.* at § 1677e(c)(2), and gives Commerce the discretion to apply the highest rate or margin, based on the evaluation by the administering authority of the situation that resulted in the administering authority using an adverse inference in selecting among the facts otherwise available.  *See id.* at § 1677e(d)(2).  Moreover, Commerce is not required to estimate what the dumping margin would have been if the interested party found to have failed to cooperate under had cooperated, or to demonstrate that the dumping margin used by the administering authority reflects an alleged commercial reality of the interested party.  *See id.* at § 1677e(d)(3).

The facts of this proceeding – as reflected in Oman Fasteners' own numerous admissions – plainly indicate "an inattentiveness or carelessness with regard to its obligations" which warranted application

of AFA. Having made that determination, Commerce had the discretion to select and apply the highest rate, as it did. Its choice is both lawful and reasonable in the context of the record of the underlying proceeding.

Oman Fasteners claims that the 154.33% margin "has no connection to the actual dumping margins calculated by Commerce during this case", characterizing it as "concocted in 2014 by Oman Fasteners' competitor based on a variety of guesses and suppositions." OF Br. at 48. Of course, Oman Fasteners offers no evidence to support these claims. Oman Fasteners also complains that the 154.33% rate is nearly 40 times higher than the rate calculated in the original investigation, and nearly 100 times greater than the rate calculated in the fifth antidumping duty review. *Id.*

Oman Fasteners' comments reflect a fundamental lack of understanding of how petitions are prepared and evaluated by Commerce during the initiation phase of an investigation. As pointed out above, the margin alleged in the petition was transaction-specific, that is, based on a single sale or offer to sell subject merchandise in the United States during the proposed period of investigation. This is

different from the margin calculated upon completion of an investigation or review, which reflects the weighted average of all transaction margins during the period of time examined. *See* 19 U.S.C. § 1673b(d)(1)(A)(i) (preliminary determinations); 19 U.S.C. § 1673d(c)(1)(B)(i) (final determinations); 19 U.S.C. § 1675(a)(2)(A) (periodic or "annual" reviews).

More to the point, once a petition is filed, Commerce carefully reviews all aspects of the petition and margin calculations to satisfy itself that all statutory requirements have been satisfied. In other words, Commerce corroborates the margin or margins that are alleged.

With respect to this particular proceeding, not only did Commerce corroborate the petition margin when the case was filed, it subsequently corroborated it again when it was first assigned to a non-cooperative respondent as the total AFA rate in the first annual review:

> Specifically, we are applying a rate of 154.33 percent, which was calculated by Petitioner in the petition in this investigation. We have corroborated this rate with information obtained in the course of this administrative review, consistent with section 776(c)(1) of the Act. For further discussion, see the Preliminary Decision Memorandum.

*Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2014–2016*, 82 Fed. Reg. 36,738 (Dep't of Commerce Aug. 7, 2017). The Preliminary Decision Memorandum[15] elaborates:

> Because the margin alleged in the petition is secondary information under section 776(c)(1) of the Act, in order to determine the probative value of the dumping margin alleged in the petition for assigning an AFA rate, we examined the information on the record. We compared the petition dumping margin of 154.33 percent to the transaction-specific margins calculated for Oman Fasteners, which were not calculated using total AFA. We preliminarily find that the 154.33 percent petition margin falls within the range of the highest transaction-specific margins calculated for Oman Fasteners, which appear to be non-aberrational sales in terms of transaction quantities or other such terms when compared with other sales in Oman Fasteners' database. Thus, in accordance with section 776(c)(1) of the Act, we have preliminarily corroborated the highest dumping margin contained in the petition, 154.33 percent, as AFA, using transaction-specific margins from the mandatory respondent Oman Fasteners.

Preliminary Decision Memorandum at 10 (footnotes omitted). The 154.33% rate was again used in the second review as AFA. *See Certain*

---

[15] The Preliminary Decision Memorandum is available at https://access.trade.gov/Resources/frn/summary/oman/2017-16497-1.pdf.

*Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 22,246 (Dep't of Commerce May 14, 2018).  As this shows, Oman Fasteners' claims that the 154.33% margin is unsupported are meritless.  The margin is plainly in line with Oman Fasteners' pricing behavior in prior reviews, and there is no basis on which to find it inapplicable to the review underlying this litigation.

As noted above, the record of this proceeding contains a limited number of margin options for use as total AFA.  Apart from the petition margin, the record contains a number of very low calculated margins.  The impropriety of any of these lower margins — the lack of an adequate deterrent from future violation of Commerce's regulatory requirements and inducement to full future cooperation — is demonstrated by Oman Fasteners' own words: "Oman Fasteners has experience selling merchandise while facing duty deposits ranging between 0 and 9.1 percent."  Karaga Decl. ¶ 9.[16]  In other words, Oman

---

[16] This does not tell the entire story, of course.  Oman Fasteners also has experience selling merchandise, unimpeded, while paying duties of 25%, which have been in place since January 2020 and remain in place

Fasteners knows how to manage business as usual with such margins. It is patently obvious that rates of 4.22% or lower would be manifestly inadequate to deter future late filings and to induce full future cooperation.

## III. The Balance Of Hardships Weighs In Favor Of Denying A Preliminary Injunction

"When assessing the balance of hardships, courts 'must balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief.'" *Confederación de Asociaciones Agrícolas del Estado de Sinaloa AC*, __ C.I.T at __, 389 F. Supp. 3d at 1404 (quoting *Winter*, 555 U.S. at 24). Relying on its uncertain claims of irreparable harm, Oman Fasteners contends that the balance of hardships "tips overwhelmingly in Oman Fasteners' favor," while the harm to the government is "nonexistent". OF Br. at 17.

---

on some of the highest volume steel nails due to Presidential Proclamation 9980, which imposed duties on certain derivatives steel articles including a variety of steel nails. *See Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles Into the United States*, 85 Fed. Reg. 5,281 (USTR Jan. 24, 2020). This provides still more evidence that the very low margins Oman Fasteners prefers are unsuited for use as a total AFA margin.

Specifically, Oman Fasteners claims that "the result of the injunction would thus be that Commerce is temporarily unable to prevent importation of subject merchandise that Commerce itself will likely determine was fairly traded." *Id.* at 63. This is both speculative and false.

In this appeal, a preliminary injunction would "suspend the effect of the statute", 19 U.S.C. §§ 1673b and 1673d, enjoining Commerce from ordering suspension of the liquidation of entries of nails from Oman and from instructing CBP to require a cash deposit or bond for each entry of nails. As the court determined in *Confederación de Asociaciones Agrícolas del Estado de Sinaloa AC*, the government would face hardship in light of these facts. *See* __ C.I.T at __, 389 F. Supp. 3d at 1404. Indeed, in that case, the court held that the balance the hardships tipped in favor of denying the preliminary injunction, in part, due to such circumstances. *See id.*

Because Oman Fasteners fails to demonstrate that a balance of hardships weighs in favor of granting an injunction, the third criterion of the injunction standard has not been met. Accordingly, Oman Fasteners' motion should be denied.

## IV. Denial Of The Motion Is In The Public Interest

Oman Fasteners claims that the public interest supports granting its motion because Commerce acted unlawfully by refusing to allow it to file its response late, and by assigning the 154.33% margin. *See* OF Br. at 64. To the contrary, the public interest weighs in favor of the government, support a decision to deny Oman Fasteners' motion.

First, as observed by the court in *Trinity Manufacturing*, is Commerce's "interest in orderly administration of the antidumping duty law and, specifically, its interest in deterring late filings for which extension requests are not made prior to the expiration of the filing period." 549 F. Supp. 3d at 1378-79. Indeed, the court specifically found that "{t}hese interests are served by a rule confining the granting of such requests to extraordinary circumstances." *Id.*

Second, given the facts of this appeal, Mid Continent submits that denial is supported by a public interest in respecting and preserving Commerce's authority to resort to facts available with adverse inferences in order to induce full future cooperation by respondents. Commerce acts in a quasi-judicial capacity and is best situated to make the difficult factual determinations involved in its proceedings.

Commerce's enforcement power is limited, however, and the use of its statutory authority under 19 U.S.C. § 1677e is a critical administrative tool. The agency's authority to reject an untimely submission and apply AFA should be respected, given its specialized role and expertise, particularly where a party decides not to seek an extension — deeming it impractical and unnecessary — and instead, risks filing after the deadline, with the hope that the missed deadline would not be discovered. The record before the Court demonstrates that Commerce has complied with the law, and has interpreted and applied trade statutes "uniformly and fairly", which the U.S. Court of Appeals for the Federal Circuit has held falls within the public interest. *See Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010).

Oman Fasteners also claims that Commerce "singled out Oman Fasteners for disastrously punitive treatment". OF Br. at 64. What exactly this could mean is unclear because Oman Fasteners was the only mandatory respondent in the underlying review – by definition the company was "singled out". As is also clear from the foregoing discussion, Commerce has applied total AFA to respondents in other cases with similar circumstances.

Oman Fasteners further asserts that "there is no question that an injunction would benefit U.S. economic interests", arguing that its significant market presence requires that it be allowed to avoid the consequences of its errors in the underlying review. *Id.* at 65. While it is true that Oman Fasteners has grown to be a large source of imports, demand in the United States has dropped significantly over the past few months, and the impact of Oman Fasteners pulling back from the market because it chooses not to ship would not be severe. *See generally* Skarich Decl.

Oman Fasteners lastly claims that granting an injunction is warranted "because Oman Fasteners plays an outsized role in the health of the economy of its home country of Oman, a strategic U.S. ally in the Gulf Region." OF Br. at 66-67. To support this assertion, Oman Fasteners quotes liberally from a highly irregular letter submitted on its behalf by the U.S. Ambassador to Oman, the Hon. Leslie Tsou. *See id.*

Exhibit 4 hereto provides Mid Continent's response to the Ambassador's letter, requesting that it be rejected and removed from the record. As Mid Continent pointed out, "it is simply extraordinary

for a sitting U.S. ambassador to a foreign country to lobby the Secretary of Commerce on behalf of a foreign company – here, Oman Fasteners LLC ("Oman Fasteners") – in an active antidumping proceeding." Ex. 4 at 1. Further, the Ambassador's "effort to secure a more favorable outcome for Oman Fasteners – which would directly disadvantage U.S. producers and U.S. jobs – is fundamentally at odds with her responsibilities as an Executive Branch official." *Id*. at 2.

Viewing the Ambassador's letter for what it is – a blatant attempt by Oman Fasteners, either directly or through an agent, to exert improper influence on Commerce's decision-making process – highlights another public interest that supports denying its motion: the public interest in safeguarding the integrity of a rules-based process surrounding the administration of the trade laws, free from heavy-handed attempts to influence decisionmakers. As pointed out in Mid Continent's letter, the Ambassador's actions should "be rejected in order to avoid the appearance of improper influence on this administrative proceeding and to prevent establishing what could become a regrettable precedent." *Id*. at 3. Far from supporting a determination to grant the

motion, the Ambassador's letter underscores the public interest in denying it.

## V.     Conclusion

As the foregoing demonstrates, Oman Fasteners has failed to satisfy the standard for a preliminary injunction in this case.  The evidence and law simply do not support its application for extraordinary relief.  Indeed, upon examination and careful consideration, Oman Fasteners' claims of imminent irreparable harm are unfounded and speculative, and its legal analysis is unsound.  Commerce's actions were wholly consistent with its regulations, the statute, and precedent from both the court and the U.S. Court of Appeals for the Federal Circuit.  Further, given the facts and law at issue, the balance of hardships weighs against injunctive relief, and multiple compelling public interests support a decision to reject Oman Fasteners' motion for a preliminary injunction.

For these reasons, Mid Continent respectfully submits that Oman Fasteners' motion should be denied.

## VI.    Responses To Supplemental Questions

By Order dated December 28, 2022, the Court instructed the

parties to respond to the following questions in their filings regarding

the motion for preliminary injunction:

> 1.  USCIT Rule 65(a)(2) provides that "{b}efore or after
> beginning the hearing on a motion for a preliminary
> injunction, the court may advance the trial on the
> merits and consolidate it with the hearing."  In the
> context of a case brought under 28 U.S.C. § 1581(c),
> does that language allow the court to treat the motion
> for a preliminary injunction as a motion for judgment
> on the agency record under USCIT Rule 56.2?
>
> 2.  If the court concludes that Rule 65(a)(2) permits the
> consolidation of Plaintiff's preliminary injunction
> motion with a motion for judgment on the agency
> record under Rule 56.2, should the court do so?

ECF No. 26.

Mid Continent does not believe that the language of Rule 65(a)(2)

should be read to allow the Court to treat a motion for preliminary

injunction, on its own, as a motion for judgment on the agency record

under USCIT Rule 56.2.  A motion for preliminary injunction

necessarily proceeds in an expedited manner, before the underlying

record has been provide to the court, and addresses issues outside the

scope of a Rule 56.2 motion for judgment.  The court also reviews the

record, such as it is, under a different standard of review with respect to

a motion for a preliminary injunction — *i.e.*, considering likelihood of irreparable injury, likelihood of success, the balancing of hardships, and public interest — rather than whether Commerce abused its discretion in rejecting an untimely filing, and whether the agency's decision is supported by substantial evidence and otherwise in accordance with law.

That said, Mid Continent believes that the Court could address both the Motion for Preliminary Injunction and Rule 56.2 analyses concurrently.  To do so, however, would require an additional briefing schedule in order to allow Plaintiff to flesh out any additional issues and arguments, and to allow Defendant and Defendant Intervenor to properly respond.

In this appeal, Mid Continent would support either addressing the Motion for Preliminary Injunction on its own at this time, or an appropriate additional period to allow additional briefing of Rule 56.2 issues.

*     *     *

Respectfully submitted,


*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Jennifer M. Smith, Esq.
Lauren Fraid, Esq.
*Counsel to Mid Continent Steel &*
*Wire, Inc.*

January 10, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor's Brief in Opposition to Motion for Preliminary Injunction, as computed by The Bristol Group PLLC's word processing system, is 12,308 words.

<u>*/s/ Adam H. Gordon*</u>
Adam H. Gordon, Esq.
*Counsel to Mid Continent Steel &*
*Wire, Inc.*

Dated: January 10, 2023

## EXHIBIT LIST

| Exhibit | Description |
|---------|-------------|
| 1 | Letter from Mid Continent Steel & Wire, Inc. to Sec'y of Commerce, Certain Steel Nails from Oman, Commerce Case No. A-523-808 (Mar. 28, 2022) (Dep't Commerce ACCESS Barcode 4225690-01) |
| 2 | Letter from Mid Continent Steel & Wire, Inc. to Sec'y of Commerce, Certain Steel Nails from Oman, Commerce Case No. A-523-808 (Apr. 1, 2022) (Dep't Commerce ACCESS Barcode 4228031-01) |
| 3 | Letter from Mid Continent Steel & Wire, Inc. to Sec'y of Commerce, Certain Steel Nails from Oman, Commerce Case No. A-523-808 (May 2, 2022) (Dep't Commerce ACCESS Barcode 4236888-01) |
| 4 | Letter from Mid Continent Steel & Wire, Inc. to Sec'y of Commerce, Certain Steel Nails from Oman, Commerce Case No. A-523-808 (Nov. 18, 2022) (Dep't Commerce ACCESS Barcode 4312214-01) |
| 5 | Letter from Oman Fasteners to Sec'y of Commerce, Certain Steel Nails from Oman, Commerce Case No. A-523-808 (Nov. 21, 2022) (Dep't Commerce ACCESS Barcode 4313284-01) |
| 6 | Rebuttal Brief of Mid Continent Steel & Wire, Inc., Certain Steel Nails from Oman, Commerce Case No. A-523-808 (Sep. 2, 2022) (Dep't Commerce ACCESS Barcode 4281468-01) |
| 7 | Letter from Commerce to Agro Sevilla Aceitunas S. Coop. And., Ripe Olives from Spain, Commerce Case No. A-469-817 (Jan. 25, 2021) (Dep't Commerce ACCESS Barcode 4079784-01) |
| 8 | Memorandum from Commerce to the File, Antidumping Duty Investigation of Certain Vertical Shaft Engines |

| | |
|---|---|
| | between 225cc and 999cc, and Parts Thereof from the People's Republic of China, Commerce Case No. A-570-119 (Jul. 7, 2020) (Dep't Commerce ACCESS Barcode 3997914-01) |
| 9 | Memorandum from Commerce to the File, Antidumping and Countervailing Duty Investigations of Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof, from the People's Republic of China, Commerce Case Nos. A-570-124 & C-570-125 (May 22, 2020) (Dep't Commerce ACCESS Barcode 3977539-01) |
| 10 | Letter from Commerce to OCTAL SAOC – FZC, Certain Polyethylene Terephthalate Resin from the Sultanate of Oman, Commerce Case No. A-523-810 (Mar. 28, 2019) (Dep't Commerce ACCESS Barcode 3811897-01) |
| 11 | Letter from Commerce to Roung Shu Industry Corporation, Narrow Woven Ribbons with Woven Selvedge from Taiwan, Commerce Case No. A-583-844 (Feb. 27, 2015) (Dep't Commerce ACCESS Barcode 3261940-01) and Letter from Roung Shu Industry Corporation to Commerce, Narrow Woven Ribbons with Woven Selvedge from Taiwan, Commerce Case No. A-583-844 (Feb. 23, 2015) (Dep't Commerce ACCESS Barcode 3261152-01) |
| 12 | Letter from Commerce to Domestic Interested Parties, Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China, Commerce Case No. C-570-936 (Apr. 18, 2019) (Dep't Commerce ACCESS Barcode 3821817-01) and Letter from Domestic Interested Parties to Commerce, Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China, Commerce Case No. C-570-936 (Apr. 17, 2019) (Dep't Commerce ACCESS Barcode 3821488-01) |
| 13 | Letter from Commerce to Bombay Dyeing & Manufacturing Company Limited, Certain Fine Denier Polyester Staple |

| | |
|---|---|
| | Fiber from India, Commerce Case No. C-533-879 (Aug. 23, 2017) (Dep't Commerce ACCESS Barcode 3610785-01) |
| 14 | Letter from Commerce to the Government of India, Polyethylene Terephthalate Film, Sheet, and Strip from India, Commerce Case No. C-533-825 (Aug. 1, 2018) (Dep't Commerce ACCESS Barcode 3737662-01) |
| 15 | Letter from Commerce to Weihai Zhongwei Rubber Co., Ltd., New Pneumatic Off-the-Road Tires from the People's Republic of China, Commerce Case No. A-570-912 (Dec. 20, 2016) (Dep't Commerce ACCESS Barcode 3530938-01) Letter from Weihai Zhongwei Rubber Co., Ltd. to Commerce, New Pneumatic Off-the-Road Tires from the People's Republic of China, Commerce Case No. A-570-912 (Dec. 19, 2016) (Dep't Commerce ACCESS Barcode 3530805-01) |
| 16 | Memorandum From Commerce to the File, Dioctyl Terephthalate from the Republic of Korea, Commerce Case No. A-580-889 (Jun. 12, 2019) (Dep't Commerce ACCESS Barcode 3847651-01) |
| 17 | Letter from Commerce to Clearwater Metal, Certain Tool Chests and Cabinets from the Socialist Republic of Vietnam, Commerce Case No. A-552-821 (Aug. 4, 2017) (Dep't Commerce ACCESS Barcode 3604603-01) |
| 18 | Declaration of George J. Skarich, Executive Vice President of Sales & Marketing for Mid Continent Steel & Wire, Inc. |

# Exhibit 1

# GT GreenbergTraurig

Rosa S. Jeong
Tel 202.533.2328
Fax 202.261.2653
jeongr@gtlaw.com

March 28, 2022

**VIA ACCESS**

The Honorable Gina M. Raimondo
Secretary of Commerce
Enforcement and Compliance, AD/CVD
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No.: A-523-808
Total Pages: 7
Administrative Review
(7/1/2020 – 6/30/2021)
AD/CVD Operations Office IV

**PUBLIC DOCUMENT**

Attention:  Robert Bolling, Dakota Potts

Re:     **Certain Steel Nails from Oman** – *Opposition to Oman Fasteners' Request for Reconsideration*

Dear Secretary Raimondo:

On behalf of Mid Continent Steel & Wire, Inc. ("Petitioner"), we hereby write in opposition to Oman Fasteners LLC's ("Oman Fasteners") request for reconsideration and out-of-time extension request.[1] The Department of Commerce ("Department") should deny the request because Oman Fasteners has not demonstrated the existence of extraordinary circumstances justifying its out-of-time extension request.

As noted in the Department's letter dated March 22, 2022, despite being granted the full extension that it requested, Oman Fasteners' supplemental section C questionnaire response was not submitted in its entirety by the established deadline of 5:00 pm ET, February 14, 2022. Therefore, the submission was untimely and justified the Department's rejection and removal of the submission from the record. Under the Department's regulations at 19 C.F.R. § 351.303(b)(1),

---

[1] Letter from Perkins Coie LLP to Sec'y Commerce re: Certain Steel Nails from Oman; Sixth Review; Request for Reconsideration and Out-of-Time Extension Request (March 24, 2022) ("Reconsideration Request").

"An electronically filed document must be received successfully in its entirety by the Department's electronic records system, ACCESS, by 5 p.m. Eastern Time on the due date." Under 19 C.F.R. § 351.301(c)(1), a request for an extension of the time limit must be received prior to the expiration of the time limit. It is undisputed that Oman Fasteners failed to submit an extension request prior to the expiration of the time limit.

"An untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists." 19 C.F.R. § 351.301(c). The Department makes a determination "whether extraordinary circumstances exist based on the specific facts, taking into account whether reasonable means could have been used to file a timely request or if reasonable measures could have been taken to prevent the unexpected event from occurring."[2] Examples of extraordinary circumstances cited by the Department "include a natural disaster, riot, war, *force majeure,* or medical emergency. Examples that are unlikely to be considered extraordinary circumstances include insufficient resources, inattentiveness, or the inability of a party's representative to access the Internet on the day on which the submission was due."[3] The Department also specified that a technical failure of the ACCESS system generally is not an extraordinary circumstance.[4]

In its Reconsideration Request, Oman Fasteners cites the following as reasons for reconsideration: (1) the .pdf version of the response was filed by 5 pm, and the untimely portion to "all but one of which consisted of voluntarily submitted back-up Excel data files…."[5]; (2) the submission of back-up Excel files was "entirely voluntary"[6]; (3) Oman Fasteners experienced technical issues with the ACCESS system close to the filing deadline[7]; (4) prior filings done by

---

[2] *See Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,793 (Sept. 20, 2013).
[3] *Id.*
[4] *Id.*
[5] Reconsideration Request at 2.
[6] *Id.* at 8.
[7] *Id.* at 8.

counsel took less time to complete on ACCESS[8]; (5) granting the extension will not cause any prejudice or harm to the Department or any parties to this proceeding[9]; and (6) the U.S. Court of International Trade ("CIT") and the Department has previously excused late filings caused by technical issues or other errors.[10] None of these excuses constitutes an extraordinary circumstance that warrants a reconsideration of the rejection and granting of a retroactive extension.

First, contrary to Oman Fasteners' claims, the submission of Excel files was not "entirely voluntary." The Department's initial questionnaire clearly instructed Oman Fasteners to submit electronic versions of all calculation worksheets and data, which is well-understood to apply to all subsequent supplemental questionnaires.[11] Moreover, even if the Department finds some of the Excel files were not strictly required, the submission of the SAS dataset containing the revised U.S. sales database was not voluntary but constituted an essential – and perhaps the most critical – part of the supplemental questionnaire response and was specifically requested by the Department in question 37 of the supplemental questionnaire. There is no question that the U.S. sales database was untimely submitted and a timely extension was not sought.

Second, the technical issues described by Oman Fasteners do not constitute an extraordinary circumstance but are part of the normal process of document preparation and reflects Oman Fasteners' failure to allocate sufficient resources. As an experienced respondent with experienced counsel, Oman Fasteners was well aware of the steps required to prepare the document for filing on ACCESS and should have managed its time and resources to address any unexpected issues.[12] Oman Fasteners' assertion that certain prior filings took less time to file is irrelevant and

---

[8] *Id.* at 7.
[9] *Id.* at 12.
[10] *Id.* at 12-13.
[11] *See* Questionnaire at B-1 and C-1 (requesting respondents to "submit a copy of the computer program/spreadsheet/worksheet that you used to calculate the prices, expenses, and adjustments reported in your … sales lists").
[12] We note that the information contained in Attachments 1 and 2 of Oman Fasteners' Reconsideration Request and related discussion may constitute new factual information that was improperly submitted. While Oman Fasteners

certainly does not provide a basis for Oman Fasteners to rely on the current filing to take similar amount of time.[13] Moreover, the fact that Oman Fasteners' counsel was able to resolve the technical issues discovered at 4:18 pm and 4:27 pm within a few minutes and complete one part of the filing by 4:41 pm indicates that any issues encountered by counsel was not due to a technical failure of ACCESS (which would not constitute extraordinary circumstances) but reflects only poor planning by Oman Fasteners.

Oman Fasteners further argues that technical limitations of ACCESS – i.e., being able to upload only five files at one time – prevented its counsel from uploading all parts of the response by the deadline. We note that Oman Fasteners' counsel could have uploaded more than five files at one time by having multiple users log in and upload files. ACCESS also permits multiple users to log in under a single registered username, which would have allowed counsel and, say, an assistant to upload files simultaneously. In other words, Oman Fasteners and its counsel could have taken measures – by planning for sufficient time and staff to upload all files – to prevent the unexpected event from occurring. Thus, these claims regarding purported technical issues or limitations do not constitute extraordinary circumstances and Oman Fasteners only has its own poor management of time and resources to blame.

Third, the Department does not bear the burden of demonstrating that it was impeded or prejudiced by Oman Fasteners' late filing prior to rejecting untimely submissions. The Department maintains strict deadlines to conduct its proceedings in an orderly manner and to meet its statutory deadlines. Oman Fasteners was well aware of the deadline and was warned repeatedly that a failure to submit its responses in their entirety by the established deadline could result in the submission being rejected from the record. The Department's ability to manage its proceedings would be

---

enclosed company and attorney certificates, it fails to identify the subsection of 19 C.F.R. 351.102(b)(2) under which the information is being submitted nor explain whether it is timely.

[13] Rather, given that the time required to file prior submissions varied, counsel should have anticipated that more time may be required for what counsel describes as a lengthier than usual supplemental response.

severely compromised if the Department had to affirmatively demonstrate harm caused by each late submission. All parties, including Petitioner, are subject to filing deadlines and excusing late submissions caused by Oman Fasteners' wholly avoidable failures would be fundamentally unfair to all other participants in Department proceedings.

Also telling is the fact that Oman Fasteners did not seek an extension until the Department rejected the submission. Oman Fasteners could have filed a timely extension request during the afternoon of February 14, 2022 but did not do so. Moreover, once it realized that it would miss or has missed the deadline, a diligent respondent acting in good faith would have contacted the Department immediately to notify the Department of the circumstances and the purported technical difficulties. Oman Fasteners, however, did nothing – apparently hoping that the Department officials would not notice and banked on the fact that Petitioner's counsel would be unaware of the filing times of the bracketing-not-final version of the submission.[14] This conduct illustrates bad faith and a disregard for the Department's procedures.

Oman Fasteners cites two cases, *Celik Halat Ve Tel Sanayi A.S. v. United States,* Court No. 21-00045, Slip Op. 22-12 (CIT Feb. 15, 2022) and *Certain Hot-Rolled Steel Flat Products from the Republic of Korea* (Case No. C-580-884), as examples in which either the CIT remanded the rejection of a late submission or the Department allowed refiling of late responses. Those cases, however, pertain only to the facts of those cases and do not control the instant proceeding.[15] The fact that the CIT or the Department found the exercise of discretion to be appropriate in those cases has no bearing on this case. Rather, the courts have repeatedly upheld the Department's authority

---

[14] Under the current filing procedures, Petitioner's counsel is not served with a copy of the bracketing-not-final submission and only receives the final BPI versions via ACCESS.

[15] The two cited cases are also distinguishable from this case. In *Celik Halat,* the respondent had requested multiple extensions which were not granted in full by the Department. By contrast, Oman Fasteners was ultimately granted the full extension that it requested. Additionally, in *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, the respondent had filed the business proprietary version of the response on a timely basis and the late filing pertained only to the public version of the submission.

and discretion to reject late submissions. *See, e.g., Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1352 (Fed. Cir. 2015) (upholding the rejection of the untimely response and finding that the Department properly determined that the respondent was at least capable of filing a timely extension request but simply failed to do so).

In sum, despite being aware of the Department's requirements and deadlines, Oman Fasteners failed to submit its section C supplemental response in its entirely by the established deadline and failed to seek a timely extension of the deadline. The circumstances described by Oman Fasteners reflect only Oman Fasteners and counsel's poor planning of time and resources, and do not constitute extraordinary circumstances supporting an out-of-time extension request. For these reasons, the Department should deny Oman Fasteners' Reconsideration Request.

Finally, Oman Fasteners requests a meeting with Department staff to discuss its Reconsideration Request. If the Department decides to hold such a meeting with Oman Fasteners, we respectfully request a similar opportunity to discuss our opposition.

A certificate of service is attached. If you have any questions, please do not hesitate to contact the undersigned.

Sincerely,

*/s/ Rosa S. Jeong*

Rosa S. Jeong

**Case No. A-523-808**
**Administrative Review**
**(07/01/2020 – 06/30/2021)**
**Certain Steel Nails from Oman**

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing submission to the Department of Commerce in the above-captioned Certain Steel Nails from Oman, Antidumping Duty Administrative Review (07/01/20 – 06/30/21) was served via email on behalf of **Mid Continent Steel & Wire, Inc.,** this March 28, 2022, on the following parties:

| | |
|---|---|
| *On Behalf of Oman Fasteners LLC*<br>Michael P. House<br>**Perkins Coie, LLP**<br>700 13th Street, NW<br>Suite 600<br>Washington, DC 20005-3960 | mhouse@perkinscoie.com |

*/s/ Rosa S. Jeong*
Rosa S. Jeong

# Exhibit 2

# GT GreenbergTraurig

Rosa S. Jeong
Tel 202.533.2328
Fax 202.261.2653
jeongr@gtlaw.com

April 1, 2022

**VIA ACCESS**

The Honorable Gina M. Raimondo
Secretary of Commerce
Enforcement and Compliance, AD/CVD
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No.: A-523-808
Total Pages: 6
Administrative Review
(7/1/2020 – 6/30/2021)
AD/CVD Operations Office IV

**PUBLIC DOCUMENT**

Attention:  Robert Bolling, Dakota Potts

Re:     **Certain Steel Nails from Oman – *Response to Oman Fasteners' March 30, 2022 Letter***

Dear Secretary Raimondo:

On behalf of Mid Continent Steel & Wire, Inc. ("Petitioner"), we write in response to Oman Fasteners LLC's ("Oman Fasteners") letter dated March 30, 2022 ("Oman Fasteners' March 30 Letter"), regarding its earlier request for reconsideration and out-of-time extension request.[1] As discussed in our opposition dated March 28, 2022,[2] the Department of Commerce ("the Department") should deny the request because Oman Fasteners has not demonstrated the existence of extraordinary circumstances justifying its out-of-time deadline extension request as required by the Department's regulations.[3] Oman Fasteners' March 30 Letter does not provide any new or additional grounds to support its request.

---

[1] Letter from Perkins Coie LLP to Sec'y Commerce re: Certain Steel Nails from Oman; Sixth Review; Reply to Petitioner's Opposition to Oman Fasteners' Request for Reconsideration (March 30, 2022) ("March 30 Letter"); *see also* Letter from Perkins Coie LLP to Sec'y Commerce re: Certain Steel Nails from Oman; Sixth Review; Request for Reconsideration and Out-of-Time Extension Request (March 24, 2022) ("Reconsideration Request").

[2] See Letter from Greenberg Traurig LLP to Sec'y Commerce re: Certain Steel Nails from Oman – Opposition to Oman Fasteners' Request for Reconsideration (March 28, 2022).

[3] See 19 C.F.R. § 351.302(c).

In its letter, Oman Fasteners reiterates that the late submission occurred because its counsel misjudged the time required to upload all parts of the supplemental questionnaire response and that Oman Fasteners' counsel has now established several new procedures to ensure that similar untimely filings do not recur.[4] Notwithstanding the expressed regret, counsel's errors in judgment simply do not constitute extraordinary circumstances that could justify a retroactive extension of time. Moreover, contrary to counsel's characterization, the Department is not unfairly penalizing Oman Fasteners for its counsel's error in judgment.[5] In its Reconsideration Request, counsel claimed that information from Oman Fasteners was not received until close to the deadline, during the afternoon of the due date, which contributed to the delay in the completion of the response and the late submission. The late submission, at least in part, is attributable to Oman Fasteners' delay in completing the response. Furthermore, the new procedures adopted by Oman Fasteners and its counsel to avoid future untimely submissions in fact highlight the lack of proper procedures and the failure to take reasonable measures that would have prevented the untimely filed submission.

Oman Fasteners' March 30 Letter also states that counsel "wrongly and regrettably assumed that because the files submitted after 5:00pm were merely native electronic files that were duplicative of, and provided as additional support for, the timely-submitted Supplemental Section C Response in PDF format (which included both the complete narrative response and all printed exhibits thereto), the submission of the additional electronic data files shortly after 5:00pm was not material."[6] As discussed previously, the electronic data files were not merely additional support but were required parts of the supplemental questionnaire response. And even if the Department finds some of the Excel files were not strictly required, Oman Fasteners ignores the fact that the SAS dataset containing the revised U.S. sales database, which was a critical part of

---

[4] See Oman Fasteners' March 30 Letter at 3-5.

[5] As a legal matter, errors made by counsel, whether procedural or substantive, result in consequences to the client, even if the client was not involved in making the error.

[6] See Oman Fasteners' March 30 Letter at 4.

the response, was among the files submitted after the deadline. In any case, the Department need not find a sinister motive or any particular intent before rejecting and removing untimely filed submissions from the record.

Similarly, neither the statute, binding judicial precedent, nor past agency practice imposes upon the Department the burden of demonstrating actual or theoretical prejudice or harm caused by Oman Fasteners' untimely filed submission. Arguably, any time an interested party untimely files a response to a supplemental questionnaire there could be limited or virtually no prejudice or harm caused by the delay of a few minutes. However, the same could be said for a delay of 16 minutes, an hour, a few hours, or even a few days. If the Department had to consider the extent of prejudice or harm caused by each late submission before rejecting the same, the 5:00 pm deadline would effectively become meaningless as every deadline could be pushed to the latest time and date after which the filing could be prejudicial, and thereby severely compromising the Department's ability to manage its proceedings.

Oman Fasteners cites to a few cases in which the Department exercised its discretion to allow refiling of late submissions. However, that the Department found the exercise of discretion to be appropriate in those cases are based on the specific facts of those cases and has no bearing on this case. Furthermore, we note that in two cases cited by Oman Fasteners, *Ripe Olives from Spain* and *Solid Urea from the Russian Federation*, the respondent itself alerted the Department of the filing lapses shortly after the late submissions.[7] By contrast, Oman Fasteners, despite being aware that its submission was filed late, did nothing for over a month until the Department took action to reject the submission. As noted above, Oman Fasteners' claim that it did not contact the Department due to its belief that the late portions of its supplemental questionnaire response were

---

[7] In *Large Vertical Shaft Engines from China,* the third case cited by Oman Fasteners, the late submission was the petitioner's surrogate value submission. Unlike a questionnaire response, a petitioner is not under an affirmative obligation to submit information regarding proposed surrogate values but does so to assist the Department in its analysis.

merely voluntarily submitted back-up files is belied by the fact that one of the late files was its U.S. sales database, which was a critical and material part of the response.

The Department's regulations and practice are clear and consistent: submissions that are not submitted in their entirety by the established deadline will be rejected and retroactive deadline extensions are granted only upon a showing of extraordinary circumstances. *See, e.g., Certain Chassis and Subassemblies Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 26,694 (May 17, 2021), and accompanying Issues and Decision Memorandum at cmt. 1 (rejecting the entire response of which the respondent filed 11 out of 14 parts of the BPI version after 5 pm and finding that the claimed technical difficulties were not extraordinary circumstances within the meaning of the regulations); *Certain Walk-Behind Snow Throwers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 17,987 (Mar. 29, 2022), and accompanying Issues and Decision Memorandum at cmt. 1 (rejecting a response filed between 5:27 and 5:30 pm with no extension request filed by the 5:00 pm deadline and finding no extraordinary circumstances which prevented the timely submission of its questionnaire response or an extension request); *Utility Scale Wind Towers From India: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 56,890 (Oct. 13, 2021), and accompanying Issues and Decision Memorandum at cmt. 2 (rejecting the late submission of a portion of a supplemental questionnaire response filed next day).

For the reasons discussed herein and in our March 28, 2022 opposition, the Department should deny Oman Fasteners' Reconsideration Request because Oman Fasteners failed to submit its section C supplemental response in its entirely by the established deadline, failed to seek a timely extension of the deadline, and has not demonstrated the existence of extraordinary circumstances, as defined by the Department's regulations, that would justify a retroactive

extension of the deadline for Oman Fasteners' supplemental questionnaire response.

A certificate of service is attached. If you have any questions, please do not hesitate to contact the undersigned.

Sincerely,

*/s/ Rosa S. Jeong*

Rosa S. Jeong

**Case No. A-523-808**
**Administrative Review**
**(07/01/2020 – 06/30/2021)**
**Certain Steel Nails from Oman**

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing submission to the Department of Commerce in the above-captioned Certain Steel Nails from Oman, Antidumping Duty Administrative Review (07/01/20 – 06/30/21) was served via email on behalf of **Mid Continent Steel & Wire, Inc.,** this April 1, 2022, on the following party:

| | |
|---|---|
| *On Behalf of Oman Fasteners LLC*<br>Michael P. House<br>**Perkins Coie, LLP**<br>700 13th Street, NW<br>Suite 600<br>Washington, DC 20005-3960 | mhouse@perkinscoie.com |

*/s/ Rosa S. Jeong*
Rosa S. Jeong

# Exhibit 3

# GT GreenbergTraurig

Rosa S. Jeong
Tel 202.533.2328
Fax 202.261.2653
jeongr@gtlaw.com

May 2, 2022

**VIA ACCESS**

The Honorable Gina M. Raimondo
Secretary of Commerce
Enforcement and Compliance, AD/CVD
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No.: A-523-808
Total Pages: 5
Administrative Review
(7/1/2020 – 6/30/2021)
AD/CVD Operations Office IV

**PUBLIC DOCUMENT**

Attention: Robert Bolling, Dakota Potts

Re:     **Certain Steel Nails from Oman –** *Response to Oman Fasteners' April 22, 2022 Letter*

Dear Secretary Raimondo:

On behalf of Mid Continent Steel & Wire, Inc. ("Petitioner"), we write in response to Oman

Fasteners LLC's ("Oman Fasteners") letter dated April 22, 2022 ("Oman Fasteners' April 22

Letter"), requesting leave to submit its out-of-time questionnaire response.[1] Oman Fasteners' April

22 Letter is essentially a renewed request for reconsideration of the Department's decision (twice

confirmed) to reject the untimely supplemental response.[2] As discussed in our earlier oppositions

dated March 28 and April 1, 2022,[3] the Department of Commerce ("the Department") should deny

---

[1] Letter from Perkins Coie LLP to Sec'y Commerce re: Certain Steel Nails from Oman; Sixth Review; Oman Fasteners' Request for Leave to Submit Supplemental Section C Response (April 22, 2022) ("April 22 Letter").
[2] *See* Letter from Perkins Coie LLP to Sec'y Commerce re: Certain Steel Nails from Oman; Sixth Review; Reply to Petitioner's Opposition to Oman Fasteners' Request for Reconsideration (March 30, 2022) ("March 30 Letter"); Letter from Perkins Coie LLP to Sec'y Commerce re: Certain Steel Nails from Oman; Sixth Review; Request for Reconsideration and Out-of-Time Extension Request (March 24, 2022) ("Reconsideration Request").
[3] *See* Letter from Greenberg Traurig LLP to Sec'y Commerce re: Cer Response (April 22, 2022) ("April 22 Letter").
[3] *See* Letter from Perkins Coie LLP to Sec'y Commerce re: Certain Steel Nails from Oman; Sixth Review; Reply to Petitioner's Opposition to Oman Fasteners' Request for Reconsideration (March 30, 2022) ("March 30 Letter"); Letter from Perkins Coie LLP to Sec'y Commerce re: Certain Steel Nails from Oman; Sixth Review; Request for Reconsideration and Out-of-Time Extension Request (March 24, 202tain Steel Nails from Oman – Opposition to Oman Fasteners' Request for Reconsideration (March 28, 2022); Letter from Greenberg Traurig LLP to Sec'y

the request because Oman Fasteners has not demonstrated the existence of extraordinary circumstances justifying its out-of-time deadline extension request as required by the Department's regulations.[4] Oman Fasteners' April 22 Letter does not provide any new or additional grounds to support its request. While Oman Fasteners characterizes its request as a request for leave to submit the response, its request still amounts to a request for a retroactive extension of time, for which there is no appropriate justification.

In its letter, Oman Fasteners reiterates that the late submission was caused by the failure of the law firm and its client should not be penalized for such failure.[5] As we discussed previously, counsel's errors do not constitute extraordinary circumstances that could justify a retroactive extension of time. Moreover, contrary to counsel's characterization, the Department is not unfairly penalizing Oman Fasteners for its counsel's error in judgment.[6]  In its Reconsideration Request, counsel claimed that information from Oman Fasteners was not received until close to the deadline, which likely contributed to the delay in the completion of the response and the late submission. Thus, the late submission, at least in part, is attributable to Oman Fasteners.

In its April 22 Letter, Oman Fasteners cites several additional cases in which the Department exercised its discretion to allow refiling of late submissions and argues that the Department has an "established" practice of being lenient with first-time offenders of the time limit. On the contrary, there is no such established practice. The fact the Department found the exercise of discretion to be appropriate in prior cases are based on the specific facts of those cases and has no bearing on this case. As noted in our previous letter, there were often other factors that

---

Commerce re: Certain Steel Nails from Oman – Response to Oman Fasteners' Letter dated March 30, 2022 (April 1, 2022).
[4] *See* 19 C.F.R. § 351.301(c).
[5] See Oman Fasteners' March 30 Letter at 3-5.
[6] As a legal matter, errors made by counsel, whether procedural or substantive, result in consequences to the client, even if the client was not involved in making the error.

led to the Department's discretion in prior cases. For instance, in *Ripe Olives from Spain* and *Solid Urea from the Russian Federation*, the respondent itself alerted the Department of the filing lapses shortly after the late submissions.[7] By contrast, Oman Fasteners, despite being aware that its submission was filed late, did nothing for over a month until the Department took action to reject the submission and only expressed its "profound{} regret" only upon facing consequences of its failure.

The Department's regulations and practice are clear and consistent: submissions that are not submitted in their entirety by the established deadline will be rejected and retroactive extensions are granted only upon a showing of extraordinary circumstances.[8] The fact that this is the first time that Oman Fasteners has missed a filing deadline in this proceeding does not constitute extraordinary circumstances.

For the reasons discussed herein and in our prior oppositions, the Department should deny Oman Fasteners' request. Oman Fasteners failed to submit its section C supplemental response in its entirely by the established deadline, failed to seek a timely extension of the deadline, and has not demonstrated the existence of extraordinary circumstances, as defined by the Department's regulations, that would justify a retroactive extension of the deadline for Oman Fasteners'

---

[7] In *Large Vertical Shaft Engines from China,* the third case cited by Oman Fasteners, the late submission was the petitioner's surrogate value submission. Unlike a questionnaire response, a petitioner is not under an affirmative obligation to submit information regarding proposed surrogate values but does so to assist the Department in its analysis.

[8] *See, e.g., Certain Chassis and Subassemblies Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 26,694 (May 17, 2021), and accompanying Issues and Decision Memorandum at cmt. 1 (rejecting the entire response of which the respondent filed 11 out of 14 parts of the BPI version after 5 pm and finding that the claimed technical difficulties were not extraordinary circumstances within the meaning of the regulations); *Certain Walk-Behind Snow Throwers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 17,987 (Mar. 29, 2022), and accompanying Issues and Decision Memorandum at cmt. 1 (rejecting a response filed between 5:27 and 5:30 pm with no extension request filed by the 5:00 pm deadline and finding no extraordinary circumstances which prevented the timely submission of its questionnaire response or an extension request); *Utility Scale Wind Towers From India: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 56,890 (Oct. 13, 2021), and accompanying Issues and Decision Memorandum at cmt. 2 (rejecting the late submission of a portion of a supplemental questionnaire response filed next day).

supplemental questionnaire response. A lengthier letter for reconsideration and repeated expression of regret do not constitute extraordinary circumstances to justify a reversal of the Department's decisions.

A certificate of service is attached. If you have any questions, please do not hesitate to contact the undersigned.

Sincerely,

*/s/ Rosa S. Jeong*

Rosa S. Jeong

**Case No. A-523-808**
**Administrative Review**
**(07/01/2020 – 06/30/2021)**
**Certain Steel Nails from Oman**

# PUBLIC CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing submission to the Department of Commerce in the above-captioned Certain Steel Nails from Oman, Antidumping Duty Administrative Review (07/01/20 – 06/30/21) was served via email on behalf of **Mid Continent Steel & Wire, Inc.,** this May 2, 2022, on the following party:

| | |
|---|---|
| *On Behalf of Oman Fasteners LLC*<br>Michael P. House<br>**Perkins Coie, LLP**<br>700 13th Street, NW<br>Suite 600<br>Washington, DC 20005-3960 | mhouse@perkinscoie.com |

*/s/ Rosa S. Jeong*
Rosa S. Jeong

# Exhibit 4

**GT** GreenbergTraurig

Rosa S. Jeong
Tel 202.533.2328
Fax 202.261.2653
jeongr@gtlaw.com

November 18, 2022

**VIA ACCESS AND U.S. MAIL**

The Honorable Gina M. Raimondo
Secretary of Commerce
Enforcement and Compliance, AD/CVD
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No.: A-523-808
Total Pages: 5
Administrative Review
(7/1/2020 – 6/30/2021)
AD/CVD Operations Office IV

**PUBLIC DOCUMENT**

Attention: Robert Bolling, Dakota Potts

Re:     **Certain Steel Nails from Oman – *Request to Reject October 19 Letter from Ambassador Tsou***

Dear Secretary Raimondo:

On behalf of Mid Continent Steel & Wire, Inc. ("Mid Continent"), we write in regard to the October 19, 2022 letter from the U.S. Ambassador to Oman that the Department of Commerce ("the Department") placed on the record of this review on October 25, 2022.[1]  For the reasons discussed below, we strongly object to the U.S. Ambassador's letter and its inclusion in the record of this proceeding.

In the experience of the undersigned, it is simply extraordinary for a sitting U.S. ambassador to a foreign country to lobby the Secretary of Commerce on behalf of a foreign company—here, Oman Fasteners LLC ("Oman Fasteners")—in an active antidumping proceeding.

---

[1] *See* Letter from Amb. Leslie M. Tsou to The Honorable Gina Raimondo (Oct. 19, 2022) (ACCESS Barcode 4303823).

*ACTIVE 683443573v3*

This antidumping proceeding ensures that U.S. steel nail producers, including Mid Continent, compete on a level-playing field and are protected from unfairly traded imports. In the absence of the protection afforded by U.S. antidumping law, the jobs of thousands of U.S. workers employed by U.S. producers of steel nails are put at risk. Ambassador Tsou's overt effort to influence the Department's decision-making and the final results of this administrative review constitutes a gross misuse of her office. Her effort to secure a more favorable outcome for Oman Fasteners—which would directly disadvantage U.S. producers and U.S. jobs—is fundamentally at odds with her responsibilities as an Executive Branch official.

Ambassador Tsou's letter displays a level of credulity that borders on dangerous when presented by a career U.S. diplomat. By simply accepting the description of events as portrayed by Oman Fasteners, i.e., "…that they missed submitting information in support of an AD case by 16 minutes after a 5pm deadline…," Ambassador Tsou demonstrates a deeply flawed understanding of the statutory obligations that direct the Department's decisions and of the facts of this case.

The Department is the "Administering Authority" of the U.S. antidumping law.[2] As such, it is in the Department's competency to establish deadlines for interested parties to make filings in response to requests for information made by the Department. If interested parties are unable to meet those deadlines, the Department allows for requests for deadline extensions, and frequently grants such requests, as it did twice for Oman Fasteners.[3] What Ambassador Tsou may not have

---

[2] 19 U.S.C. § 1677(1).

[3] Letter from Perkins Coie LLP to Sec'y Commerce, re: Certain Steel Nails from Oman; Sixth Review; Oman Fasteners' Supplemental Section C Extension Request (Feb. 1, 2022) (requesting first extension); Letter from Robert Bolling, Program Manager, Office IV, Enforcement & Compliance, to Perkins Coie LLP, re: Re: Antidumping Duty Review of the Antidumping Duty Order on Certain Steel Nails from Oman; 2020-2021: Extension of Deadline to Submit Response to Section C Supplemental Questionnaire (Feb. 2, 2022) (granting request for first extension); Letter from Perkins Coie LLP to Sec'y Commerce, re: Certain Steel Nails from Oman; Sixth Review; Oman Fasteners' Supplemental Section C Extension Request (Feb. 9, 2022) (requesting second extension); Letter from Robert Bolling, Program Manager, Office IV, Enforcement & Compliance, to Perkins Coie LLP, re: Antidumping Duty Review of

Barcode:3112214-01 A-523-808 REV - Admin Review 7/1/20 - 6/30/21

been told by Oman Fasteners is the fact that it requested no other deadline extension for the filing in question, and once it completed its filing it failed to notify any Department official that it had indeed missed the deadline. Rather than filing a request for an extension or in good faith notifying Department officials and explaining why the deadline was missed, Oman Fasteners did nothing. Oman Fasteners acted as if it could grant a deadline extension to itself, without any need to consult with Department officials.

The Department is tasked with administering hundreds of antidumping and countervailing duty orders, and within those hundreds of proceedings there are thousands of interested parties. The Department has limited resources and has a clear interest in ensuring that those resources not be expended conducting post-hoc analyses of whether any given interested party was justified when it took upon itself the authority to grant itself a deadline extension. Furthermore, the Department has the sole authority to determine the appropriate antidumping duty rate based on facts otherwise available where a party has failed to comply with rules and deadlines, as Oman Fasteners has done in this case. The Department must do so based on the record and in accordance with U.S. law, and not based on undue external pressures.

Regardless of Ambassador Tsou's intentions, her efforts were grossly inappropriate and must be rejected in order to avoid the appearance of improper influence on this administrative proceeding and to prevent establishing what could become a regrettable precedent. While Mid Continent understands and appreciates the importance of maintaining good relations with foreign countries, interference by a U.S. ambassador on behalf of a foreign company in a proceeding administered by the Department, and against the interests of a U.S. industry, warrants the highest

---

the Antidumping Duty Order on Certain Steel Nails from Oman; 2020-2021: Extension of Deadline to Submit Response to Section C Supplemental Questionnaire (Feb. 9, 2022) (granting request for second extension).

Filed By: jeongr@gtlaw.com, Filed Date: 11/18/22 2:51 PM, Submission Status: Approved

degree of opprobrium and demands the removal of Ambassador Tsou's letter from the record of this proceeding.

Oman Fasteners has spared no effort, apparently including persuading the U.S. Embassy in Oman, in an attempt to avoid the consequences of its failure to abide by the Department's deadlines in this review. Mid Continent has been measured in its responses throughout this review, but feels compelled to present these comments and objection in light of the extraordinary nature of the Ambassador's interference.

For these reasons, we respectfully request that the Department remove Ambassador Tsou's letter from the record and refer her letter to the Department of State for further action.

A certificate of service is attached. If you have any questions, please do not hesitate to contact the undersigned.

Sincerely,

*/s/ Rosa S. Jeong*

Rosa S. Jeong
Matthew Kanna

cc:     The Honorable Antony J. Blinken (via First Class Mail)
        Secretary of State

        The Honorable Leslie M. Tsou (via First Class Mail)
        U.S. Ambassador to the Sultanate of Oman

**Case No. A-523-808**
**Administrative Review**
**(07/01/2020 – 06/30/2021)**
**Certain Steel Nails from Oman**

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing submission to the Department of Commerce in the above-captioned Certain Steel Nails from Oman, Antidumping Duty Administrative Review (07/01/20 – 06/30/21) was served via email on behalf of **Mid Continent Steel & Wire, Inc.,** this November 18, 2022, on the following party:

| | |
|---|---|
| *On Behalf of Oman Fasteners LLC*<br>Michael P. House<br>**Perkins Coie, LLP**<br>700 13th Street, NW<br>Suite 600<br>Washington, DC 20005-3960 | mhouse@perkinscoie.com |

*/s/ Rosa S. Jeong*
Rosa S. Jeong

# Exhibit 5

# PERKINSCOIE

700 13th Street, NW
Suite 800
Washington, D.C. 20005-3960

+1.202.654.6200
+1.202.654.6211
PerkinsCoie.com

November 21, 2022

Michael P. House
MHouse@perkinscoie.com
D.  (202) 654-6288
F.  (202) 654-9667

**PUBLIC DOCUMENT**
Case No.: A-523-808
Total Pages: 6
Admin Rev. (§ 751) 7/1/20-6/30/21
AD/CVD Operations, Office IV

**BY ACCESS**

Secretary of Commerce
Attn: Enforcement & Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Re:    **Certain Steel Nails from Oman:**
       **Request to Reject and Remove from the Record Petitioner's November 18 Letter**
       **Regarding U.S. Ambassador Tsou's Letter to Commerce**

Dear Madam Secretary:

On behalf of Oman Fasteners, LLC ("Oman Fasteners"), we hereby request that the

Department promptly reject and remove from the record the November 18, 2022 letter filed by

petitioner Mid Continent Steel & Wire, Inc. ("Mid Continent") in this review. In this letter, Mid

Continent requests that the Department strike from the record a letter addressed to the Secretary

of Commerce from the Honorable Leslie M. Tsou, U.S. Ambassador to the Sultanate of Oman,

Secretary of Commerce
November 21, 2022
Page 2

dated October 19, 2022, which the Department placed on the record of this proceeding on October 25, 2022.

Mid Continent's letter, filed nearly one month after the Ambassador's letter to the Secretary, is a pretext to submit untimely arguments on the merits of this case, as well as untimely and unsolicited factual allegations, months after the briefing deadlines closed. Mid Continent's letter also contains false and scurrilous claims with respect to Oman Fasteners, and the U.S. Ambassador herself, that have no basis in fact.

Pursuant to 19 C.F.R. § 351.309, the opportunity for written argument by parties in this review closed on September 2, 2022. The Department reiterated this at the conclusion of its October 18, 2022 public hearing, when it reminded the parties that the Department "will not accept any written arguments" from the parties "that are filed after the hearing." Tr. 37:3–6 (R. Bolling). Mid Continent's November 18 letter, containing predominantly arguments and factual allegations on the merits of this case, must be stricken from the record as untimely.

Furthermore, Mid Continent's November 18 letter contains a gross mischaracterization of the Ambassador's letter, as well as false and scurrilous allegations regarding Oman Fasteners and the provenance of the Ambassador's letter.

Oman Fasteners did not seek the U.S. Embassy's assistance in this review. The Ambassador's letter to the Secretary of Commerce was initiated solely by the U.S. Embassy. The U.S. Ambassador was clearly exercising her responsibility, as the U.S. Government's most senior liaison to the Government of the Sultanate of Oman, to express concern over matters that

Secretary of Commerce
November 21, 2022
Page 3

affect the United States' longstanding "bilateral partnership with Oman, a strategic regional

ally." Letter from Ambassador Tsou to Secretary of Commerce (Oct. 19, 2022).

The Department, not Ambassador Tsou, placed the Ambassador's letter on the record of

this review. It was appropriate and correct for the Department to do so, as it has routinely done

with other letters the Secretary has received from high-level U.S. and foreign government

officials in this and other proceedings, including letters from Members of the U.S. Congress,

Secretaries of other U.S. cabinet-level departments and agencies, foreign ministers, and other

ambassadors. This comports with the Department's obligation to include in the official record of

this review "all factual information, written argument, or other material developed by, presented

to, or obtained by the Secretary during the course of a proceeding that pertains to the

proceeding." 19 C.F.R. § 351.104.

And the Ambassador's October 19 letter is plainly appropriate. It does not seek any

extraordinary relief outside the bounds of the Department's authority. It recounts factually

accurate circumstances and simply asks the Department to exercise the lawful discretion that the

Department already possesses under the antidumping statute. The Ambassador naturally

identifies facilitating bilateral commerce as among her top priorities. The Ambassador's letter

reflects her dedication to the United States' foreign policy interests, and her particular purview

over the relationship between the United States and the Sultanate of Oman, to inform the

Secretary about the disastrous consequences that selecting an unreasonably high AFA rate for

Oman Fasteners in the final results would have for Oman and for the Ambassador's efforts to

foster its relationship with the United States.

Secretary of Commerce
November 21, 2022
Page 4

Mid Continent's November 18 letter demanding that the Department reject the

Ambassador's letter displays a hyperbolic and gross misrepresentation of the facts of this case,

set forth over numerous paragraphs of untimely and unfounded factual assertions, scurrilous

allegations and untimely argument. Mid Continent cannot be permitted to re-argue its case, now,

almost three months after the close of the record in this review.

Nor should the Department permit the record to contain the *ad hominem* attacks that Mid

Continent levels here. Mid Continent's allegation that the Ambassador perpetrated "a gross

misuse of her office," Mid Continent November 18 letter at 2, and accusing the Ambassador of

"a level of credulity that borders on dangerous," *id.* at 3-4, is shockingly disrespectful and wholly

unwarranted. And Mid Continent's demand that the Department "refer {the Ambassador's} letter

to the Department of State for further action," *id.* at 4, is beyond the pale. Such attacks on a

senior official of the U.S. Government—an Ambassador no less—has no place in Department

proceedings and should be stricken from the record.

\*     \*     \*

Mid Continent's letter is replete with untimely argument, levels scurrilous and unfounded

accusations against a sitting U.S. Ambassador, and grossly misrepresents the facts of this case. It

is Mid Continent's letter that "warrants," to borrow a phrase, "the highest degree of

opprobrium." It is a disturbing reminder that Mid Continent will stop at nothing in its efforts to

misuse and even bully the arms of U.S. government to gain unfair and unwarranted business

advantage. Mid Continent's November 18 letter should be rejected and stricken from the record.

Secretary of Commerce
November 21, 2022
Page 5

In accordance with the Department's regulations, we are filing electronically today this

submission. We are also serving today copies of this response directly on interested parties on

the public service list.

Please contact us if you have any questions regarding this matter.

Respectfully submitted,

/s/ Michael P. House

Michael P. House
Andrew Caridas
Shuaiqi Yuan
Caroline D. Bisk
Sandra C. Wright, Trade Analyst

cc:    The Honorable Antony J. Blinken (via First Class Mail)
       Secretary of State

       The Honorable Leslie M. Tsou (via First Class Mail)
       U.S. Ambassador to the Sultanate of Oman

## PUBLIC CERTIFICATE OF SERVICE

**Certain Steel Nails from Oman (A-523-808)**
**6th Administrative Review (7/1/20-6/30/21)**

I hereby certify that on November 21, 2022, I caused copies of the annexed submission to be served on the following party via electronic mail, unless indicated otherwise.

Rosa S. Jeong, Esq.
Greenberg Traurig, LLP
2101 L Street NW
Suite 1000
Washington, DC 20037
jeongr@gtlaw.com

/s/ Michael P. House
_____
Michael P. House

154461801.1

# Exhibit 6

**GT** GreenbergTraurig

Rosa S. Jeong
Tel 202.533.2328
Fax 202.261.2653
jeongr@gtlaw.com

September 2, 2022

**VIA ACCESS**

The Honorable Gina Raimondo
Secretary of Commerce
Enforcement and Compliance, AD/CVD
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Attn: Robert Bolling, Dakota Potts

Case No.: A-523-808
Total Pages: 46
Administrative Review
POR: 07/01/2020-06/30/2021
E&C Office IV

**PUBLIC DOCUMENT**

Re:     **Certain Steel Nails from Oman:** *Rebuttal Brief*

Dear Secretary Raimondo:

On behalf of Mid Continent Steel & Wire, Inc. ("Mid Continent" or "Petitioner"), we hereby submit Mid Continent's rebuttal brief in the above-captioned administrative review. This submission contains no new factual information and certifications are not enclosed in accordance with the Department of Commerce's (the "Department") practice. This brief is timely pursuant to *Certain Steel Nails from the Sultanate of Oman: Preliminary Results of Antidumping Duty*

*Administrative Review and Preliminary Determination of No Shipments; 2020-2021*, 87 Fed. Reg.

43,240 (July 20, 2022) and the extension granted by the Department.[1]

A copy of this submission has been served on each party listed in the Department's service

list, as indicated in the attached certificate of service. Please contact the undersigned should you

have any questions regarding this submission.

Sincerely,

*/s/ Rosa S. Jeong*
Rosa S. Jeong
Stephanie Velez, Assistant Director*
Greenberg Traurig, LLP

* Not engaged in the practice of law in the District of
Columbia. Work performed under the supervision of
attorneys who are members for the District of
Columbia Bar. Licensed only in Colombia.

---

[1] *See* Memorandum from Drew Jackson to The File, Re: Antidumping Duty Review of the Antidumping Duty Order
on Certain Steel Nails from Oman; 2020-2021: Extension of Deadline for Rebuttal Briefs (Aug. 26, 2022).

**Case No. A-523-808**
**Antidumping Administrative Review (07/01/2020-06/30/2021)**
**Steel Nails from Oman**

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing submission to the Department of Commerce in the above-captioned Steel Nails from Oman, Antidumping Administrative Review (07/01/20 - 06/30/21) was served on behalf of our client, **Mid Continent Steel & Wire, Inc.,** as indicated below, this September 2, 2022, on the following parties:

*On behalf of Oman Fasteners LLC*

Michael P. House, Esq.
**Perkins Coie, LLP**
700 13th Street, NW
Suite 600
Washington, DC 20006

**VIA EMAIL**
mhouse@perkinscoie.com

trade@perkinscoie.com

*/s/ Rosa S. Jeong*
Rosa S. Jeong

# UNITED STATES DEPARTMENT OF COMMERCE
# ENFORCEMENT AND COMPLIANCE

CERTAIN STEEL NAILS FROM
THE SULTANATE OF OMAN

Case No. A-823-808
Administrative Review
(7/1/20-6/30/21)
E&C/OIV

**PUBLIC DOCUMENT**

## REBUTTAL BRIEF OF MID CONTINENT STEEL &WIRE, INC.

Rosa S. Jeong
Stephanie Velez, Assistant Director*
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC  20037
Telephone:  (202) 331-3100
Facsimile:  (202) 331-3101

*Counsel for Mid Continent Steel & Wire, Inc.*

* Not engaged in the practice of law in the District of Columbia.
Work performed under the supervision of attorneys who are
members for the District of Columbia Bar. Licensed only in
Colombia.

Date:  September 2, 2022

## **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

II.   SUMMARY OF ARGUMENT ...................................................................................... 3

III.  OMAN FASTENERS' UNTIMELY FILED SUPPLEMENTAL QUESTIONNAIRE RESPONSE WAS PROPERLY REJECTED FROM THE RECORD AND IN ACCORDANCE WITH THE LAW, REGULATIONS AND ITS LONGSTANDING PRACTICE ..................................................................................................................... 4

     A.    The Department Should Reject Additional New Factual Information Submitted by Oman Fasteners ........................................................................................................ 4

     B.    Oman Fasteners is Not "Entitled" to a Retroactive Extension of Time ................... 6

        1.    The Supplemental Section C Response Was Properly Rejected As Untimely ....... 7

        2.    The Department Properly Rejected Oman Fasteners' Request for a Retroactive Extension of Time .............................................................................. 9

        3.    The Department's Longstanding Practice and Court Precedents Support the Rejection of a Retroactive Extension .................................................... 13

     C.    There is No Basis to Allow the Refiling of Certain Portions of the Supplemental Section C Response ................................................................................ 19

IV.  THE RECORD DOES NOT CONTAIN A RELIABLE COST AND SALES DATA BASED ON WHICH ACCURATE DUMPING MARGINS MAY BE CALCULATED 20

V.   THE DEPARTMENT SHOULD CONTINUE TO APPLY ADVERSE INFERENCES . 23

VI.  THE DEPARTMENT SHOULD CONTINUE TO ASSIGN 154.33 PERCENT AS THE TOTAL AFA RATE ...................................................................................................... 25

VII. IF THE DEPARTMENT DECIDES TO CALCULATE A DUMPING MARGIN BASED ON OMAN FASTENERS' SUBMITTED DATA, IT SHOULD DISREGARD THE FINANCIAL STATEMENTS SUBMITTED BY THE RESPONDENT AS SOURCES FOR VALUING CV PROFIT AND SELLING EXPENSES ............................................ 27

     A.    Al Jazeera is Not a Reliable Surrogate Source For CV Profit And ISE Because It Does Not Produce Comparable Merchandise ........................................................ 29

     B.    The Department Should Disregard the Other Financial Statements Submitted by Oman Fasteners as Sources For Valuing CV Profit and Selling Expenses ............ 31

     C.    The Department Should Rely on ISWP and Sundram as the Source of CV Profit and ISE Ratios ......................................................................................................... 33

VIII. THE DEPARTMENT SHOULD DISREGARD OMAN FASTENERS' ARGUMENT REGARDING A CIRCUMSTANCES-OF-SALE ADJUSTMENT ................................ 36

IX.  CONCLUSION ............................................................................................................ 37

i

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bebitz Flanges Works Private Ltd. v. United States*,
    433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020) ..........................................................................19

*Bebitz Flanges Works Private Ltd. v. United States*,
    433 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ..........................................................................19

*BMW of N. Am. LLC v. United States*,
    926 F.3d 1291 (Fed. Cir. 2019)..............................................................................................26

*Bosun Tools Co. v. United States*,
    405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) ....................................................................18, 19

*Celik Halat Ve Tel Sanayi A.S. v. United States*,
    557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ..........................................................................18

*Celik Halat Ve Tel Sanayi A.S. v. United States*,
    557 F. Supp. 3d 1363(Ct. Int'l Trade 2022) ...........................................................................18

*Dongtai Peak Honey Indus. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015)..............................................................................................19

*Gallant Ocean (Thailand) Co. v. United States*,
    602 F.3d 1319 (Fed. Cir. 2010)..............................................................................................26

*Gourmet Equip. Corp. v. United States*,
    24 C.I.T. 572 (2000) ............................................................................................................6, 21

*Hubbell Power Sys. v. United States*,
    2019 Ct. Intl. Trade LEXIS 146, SLIP OP. 2019-145 (2019) ...........................................26, 27

*Neo Solar Power Corp. v. United States*,
    190 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) ..........................................................................19

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003).........................................................................................23, 24

*Stanley Works (Langfang) Fastening Systems Co., Ltd. and the Stanley
Works/Stanley Fastening Systems, LP v. United States*,
    Slip Op. 13-118 (Ct. Int'l Trade Sept. 3, 2013) .....................................................................35

*Tau-Ken Temir LLP v. United States*,
    2022 Ct. Intl. Trade LEXIS 82, SLIP OP. 2022-82 (2022) .....................................................19

*Yantai Timken Co. v. United States*,
   521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007) ......................................................13

**Federal Statutes**

19 U.S.C. §§ 1677b(a)(6)(C)(iii) and (a)(8) ...........................................................37

19 U.S.C. § 1677b(e)(2) ...........................................................................................28

19 U.S.C. § 1677b(e)(2)(B)(i) ..................................................................................31

19 U.S.C. § 1677e ....................................................................................................26

19 U.S.C. § 1677e(a)(2) ...........................................................................................23

19 U.S.C. § 1677e(b) ...............................................................................................23

19 U.S.C. § 1677e(b)(1)(B) ......................................................................................25

19 U.S.C. § 1677e(c) ................................................................................................26

19 U.S.C. § 1677e(d) ...............................................................................................25

19 U.S.C. § 1677e(d)(3) ...........................................................................................26

19 U.S.C. § 1677m(e) ..........................................................................................19, 20

**Regulations**

19 C.F.R. § 351.102(b)(21)(i) .....................................................................................6

19 C.F.R. § 351.102(b)(21)(v) ....................................................................................5

19 C.F.R. § 351.301(c) ..........................................................................................9, 10

19 C.F.R. § 351.301(c)(1) ...........................................................................................9

19 C.F.R. § 351.301(c)(5) ...........................................................................................5

19 C.F.R. § 351.301(c)(5)(i) ........................................................................................5

19 C.F.R. § 351.302(b) ................................................................................................9

19 C.F.R. § 351.302(d) .............................................................................................4, 8

19 C.F.R. § 351.303(b)(1) .......................................................................................9, 20

19 C.F.R. § 351.302(c)(2) ...........................................................................................15

19 C.F.R. § 351.102(b)(21)(i)-(iv) ...............................................................................5

## Administrative Decisions

*Carbon and Alloy Steel Threaded Rod From India: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 8,818 (Feb. 18, 2020) ................................................................................................................35

*Certain Chassis and Subassemblies Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 26,694 (May 17, 2021) ...............................................................14, 24

*Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Apr. 26, 2004) ................................................................................................................28

*Certain Steel Nails from Taiwan: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 28,959 (May 20, 2015).............................................................31

*Certain Steel Nails from the Sultanate of Oman: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 28,972 (May 20, 2015) ..................................30

*Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2016–2017*, 83 Fed. Reg. 58,231 (Nov. 19, 2018) ................................................................................................................30

*Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2017–2018*, 84 Fed. Reg. 71,372 (Dec. 27, 2019)....................30

*Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2019– 2020*, 86 Fed. Reg. 67,690 (Nov. 29, 2021) ................................................................................................................29

*Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2014-2016,* 82 Fed. Reg. 36,738 (Aug. 7, 2017) ....................................................................................27, 30, 35

*Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2019–2020*, 86 Fed. Reg. 29,244 (June 1, 2021).....................................................................................................30

*Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No-Shipments; 2018–2019*, 85 Fed. Reg. 61,720 (Sept. 30, 2020).........................................30

*Certain Stilbenic Optical Brightening Agents from Taiwan*, 81 Fed. Reg. 43,991 (July 6, 2016) ........................................................................................................17

iv

*Certain Tool Chests and Cabinets From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value,* 83 Fed. Reg. 15,365 (April 10, 2018) ...............................................................................16

*Certain Walk-Behind Snow Throwers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 17,987 (Mar. 29, 2022)...............................................................15, 24

*Circular Welded Carbon-Quality Steel Pipe From the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2018–2019,* 86 Fed. Reg. 59,364 (Oct. 27, 2021)..........................................................................16

*Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,793 (Sept. 20, 2013) ....................................10

*Honey From the People's Republic of China: Preliminary Rescission of the New Shipper Review and Preliminary Results of the Administrative Review; 2015–2016*, 82 Fed. Reg. 31,557 (July 17, 2017)..............................................................17

*Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Sept. 27, 2001) ..........................................28

*Silicon Metal From the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 11,725 (February 26, 2021)...............................14

*Stainless Steel Flanges From India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances,* 83 Fed. Reg. 40,748 (Aug. 16, 2018)............................................15

*Stainless Steel Flanges From India: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstance Determination*, 83 Fed. Reg. 40,745 (Aug. 16, 2018) ...........................................16

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020*, 87 Fed. Reg. 7,118 (Feb. 8, 2022)....................................17

*Utility Scale Wind Towers From India: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 56,890 (Oct. 13, 2021)...............................15

## Other Authority

Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, §§ 501–07, 129 Stat. 362 ............................................................................................................25

## I.     INTRODUCTION

On behalf of Mid Continent Steel & Wire, Inc. ("Mid Continent" or "Petitioner"), we submit this rebuttal brief in response to the case brief submitted by Oman Fasteners LLC ("Oman Fasteners")[1] regarding issues raised in the Department of Commerce's (the "Department" or "Commerce") preliminary results in the 2020-2021 administrative review of certain steel nails ("steel nails") from the Sultanate of Oman ("Oman"). *See Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020–2021*, 87 Fed. Reg. 43,240 (July 20, 2022) ("Preliminary Results"), and accompanying Issues and Decision Memorandum ("Preliminary IDM").

Prior to the Preliminary Results, Oman Fasteners failed to submit in its entirety its response to the Department's Section C Supplemental Questionnaire by the established deadline and failed to seek a timely extension.[2] Thus, the Department properly rejected and removed from the record Oman Fasteners' untimely response. The Department also found that Oman Fasteners failed to demonstrate extraordinary circumstances supporting a retroactive extension of the deadline.[3] Consequently, the Department preliminarily determined that the record does not contain a reliable basis to calculate a dumping margin for Oman Fasteners and determined the dumping rate based on total facts available with an adverse inference ("AFA").[4] As further discussed below, the Department's decision is supported by the statute, its own regulations, longstanding practice and the facts of this administrative review.

---

[1] *See* Letter from Perkins Coie to Sec'y of Commerce, Re: Certain Steel Nails from Oman, Sixth Administrative Review: Oman Fasteners' Case Brief (Aug. 23, 2022) ("Oman Fasteners' Case Brief").

[2] *See* Preliminary IDM at 3.

[3] *Id.* at 7.

[4] *Id.* at 8-12.

1

In its Case Brief spanning over 100 pages, replete with apocalyptic claims, Oman Fasteners presents a more verbose version of its arguments that it previously made to the Department multiple times but fails to present any valid basis to warrant a reconsideration of the Department's decision. Instead, Oman Fasteners resorts to a campaign of pressure from politicians and importers and threats of alleged doom to the U.S. construction industry. The Department should continue to resist these undue pressure tactics and render its final decisions based on the applicable law and the facts on the record of this review.

With respect to the unsupported claim that the Department's decision would lead to "devastating shortages and inflation in the beleaguered U.S. residential construction, light commercial construction, and shipping pallet industries,"[5] we note that similar claims of shortages and hardship are a common refrain in many antidumping or countervailing duty proceedings in which importer may face interruptions to their supply of unfairly traded imports. Moreover, as evidenced by the fact that Petitioner has had to file multiple successive antidumping and countervailing duty petitions on steel nails from various countries, importers have always managed to find the next source of imports to supply the market and Oman Fasteners itself only entered the U.S. market after imports of steel nails from the United Arab Emirates were curtailed by antidumping duties. More importantly, the imposition of antidumping duties in accordance with U.S. law and the facts of the review does exactly what these cases are designed to do, i.e., restore the level playing field in which the U.S. industry may compete fairly. Finally, Oman Fasteners' predicament (or the purported hardship to importers) is one of its own making, resulting from its own delay in completing the response, errors in judgment and poor planning.

---

[5] *See* Oman Fasteners' Case Brief at 3-4.

For the reasons discussed below, the Department should continue to reject Oman Fasteners' untimely supplemental questionnaire response for the final determination and base Oman Fasteners' final duty rate on total adverse facts available.

## II.     SUMMARY OF ARGUMENT

Oman Fasteners' arguments are based on additional new factual information that should be rejected from the record and otherwise mischaracterize the facts, Department practice and the law. The Department properly rejected Oman Fasteners' supplemental section C questionnaire response because the submission was not made in its entirely by the established deadline. Oman Fasteners failed to demonstrate the existence of extraordinary circumstances that prevented it from submitting a timely response or a timely extension request. The Department thus properly rejected Oman Fasteners' request for a retroactive extension of time.

The supplemental section C questionnaire addressed fundamental issues regarding the accuracy and completeness of Oman Fasteners' sales and cost data. Because such issues remain unanswered, the Department does not have a reliable basis on which to calculate Oman Fasteners' dumping margin. References to information from prior reviews do not demonstrate that the data in the current review are accurate or complete. Accordingly, the Department properly resorted to total facts available. Furthermore, Oman Fasteners' failure to submit a timely response evidences a failure to act to the best of its ability, justifying the use of adverse inferences. As the AFA rate, the Department correctly selected 154.33 percent, which was applied to another respondent in a previous segment and further corroborated based on Oman Fasteners' own data.

In addition, if the Department decides to calculate Oman Fasteners' dumping margin in this review based on Oman Fasteners' sales and cost data, it should rely on the financial statements of Indian Steel and Wire Products Ltd. ("ISWP") and Sundram Fasteners ("Sundram"), which best reflect the profit and selling experience of Oman Fasteners. ISWP produces identical merchandise

as well as comparable merchandise, i.e., nails, wire and wire rod. Similarly, Sundram produces comparable merchandise. In addition, their financial statements are contemporaneous to the period of review ("POR"), show a profit during the reporting period, and break down selling expenses to identify ISE. Finally, the customer bases of ISWP and Sundram are similar to those of Oman Fasteners. As such, ISWP's and Sundram's financial statements are the best available information on the record.

## III. OMAN FASTENERS' UNTIMELY FILED SUPPLEMENTAL QUESTIONNAIRE RESPONSE WAS PROPERLY REJECTED FROM THE RECORD AND IN ACCORDANCE WITH THE LAW, REGULATIONS AND ITS LONGSTANDING PRACTICE

### A. The Department Should Reject Additional New Factual Information Submitted by Oman Fasteners

As an initial matter, Oman Fasteners, in the course of arguing that its untimely submission should be accepted by the Department, continues to rely on new factual information that is not properly nor timely submitted on this record of this administrative review. The Department should reject Oman Fasteners' Case Brief from the record because it contains new factual information that has not been submitted on the record of this proceeding. Specifically, pages 14 through 18 of Oman Fasteners' Case Brief contain discussion of at least 15 documents – consisting of various correspondence and memoranda – that are contained on the record of different proceedings and have not been properly placed on the record of this administrative review. Accordingly, the Department, pursuant to 19 C.F.R. § 351.302(d), should reject and remove Oman Fasteners' Case Brief from the record of this case. If the Department decides to allow Oman Fasteners to refile its Case Brief, the respondent should be instructed to remove all references to such new factual information.

Similarly, the arguments contained in pages 35-50 of Oman Fasteners' Case Brief rely largely on submissions and documents from prior administrative reviews. While Oman Fasteners

has attempted to inundate the record with copies of these submissions and documents from different administrative records,[6] the Department has yet to accept these voluminous documents pursuant to 19 C.F.R. § 351.301(c)(5)(i).[7] As discussed in our letter dated June 2, 2022, the Department should reject and remove from the record these large volumes of new factual information.[8] Oman Fasteners' submission consists of various selected documents such as verification reports, calculation memoranda, and questionnaire responses from prior segments of this proceeding, which, according to Oman Fasteners, falls under the residual category of factual information in 19 C.F.R. § 351.102(b)(21)(v).[9]

Pursuant to 19 C.F.R. § 351.301(c)(5), the Department will reject information filed under this subsection if such information satisfies the definition of information described in § 351.102(b)(21)(i)-(iv), and that was not filed within the deadlines applicable to such information. Furthermore, the submitter is required to provide "a detailed narrative of exactly what information is contained in the submission and why it should be considered."

Oman Fasteners claims that "these materials support the completeness and accuracy of Oman Fasteners' factual submissions in this (sixth) review and therefore support the Department's reliance on that factual data to calculate the dumping margin in the preliminary results."[10]

---

[6] *See* Letter from Perkins Coie to Sec'y Commerce, re: Certain Steel Nails from Oman; 6th Administrative Review Submission of Factual Information Pursuant to 19 C.F.R. § 351.301(c)(5) (June 1, 2022) ("Oman Fasteners' NFI Submission").

[7] Under 19 C.F.R. § 351.301(c)(5)(i), the Department must issue a memorandum either accepting or rejecting such new factual information.

[8] *See* Letter from Greenberg Traurig LLP to Sec'y Commerce, re: Certain Steel Nails from the Sultanate of Oman – Request to Reject New Factual Information Submitted by Oman Fasteners (June 2, 2022).

[9] *See* Oman Fasteners' NFI Submission at 1.

[10] *See* Letter from Perkins Coie to Sec'y Commerce, re: Certain Steel Nails from Oman; 6th Administrative Review Response to Request to Reject FI Submission (June 7, 2022) at 2.

However, the record of each administrative review stands on its own[11] and responses or the Department's findings from a prior review do not support the completeness and accuracy of the data submitted in the current review. It is Oman Fasteners' burden to demonstrate the necessity of such new factual information at this late stage of the review and its argument that the documents "support the completeness and accuracy of Oman Fasteners' submissions" in subsequent reviews does not come close to meeting that burden. Furthermore, to the extent that Oman Fasteners refers to the prior segment documents to supplement its responses in the current review or somehow take place of the untimely supplemental questionnaire response that has been rejected, the information would fall under § 351.102(b)(21)(i) and should be rejected as being untimely.

Maintaining on the record the large volume of new factual information that has not been justified by Oman Fasteners further impedes the review and adds to the administrative burdens because the Department and Mid Continent must analyze information from prior segments in addition to the information from the current record. Accordingly, the Department should reject from the record the new factual information submission dated June 1, 2022, as well as Oman Fasteners' Case Brief, and instruct Oman Fasteners to refile its Case Brief after removing all references to such new factual information.

**B.      Oman Fasteners is Not "Entitled" to a Retroactive Extension of Time**

Oman Fasteners argues the Department "must accept" Oman Fasteners' Supplemental Section C Response because (1) its delay in submitting the response by the deadline was "understandable and excusable," (2) the delay did not impede the proceeding or prejudice any

---

[11]  *See Gourmet Equip. Corp. v. United States*, 24 C.I.T. 572, 577-578 (2000) ("Commerce's longstanding practice, upheld by this court, is to treat each segment of an antidumping proceeding, including the antidumping investigation and the administrative reviews that may follow, as independent proceedings with separate records and which lead to independent determinations.").

party and that (3) it is "entitled" to leniency under the Department's practice.[12] Oman Fasteners also contends that, at a minimum, the Department "must accept" the portions of the Supplemental Section C Response that was submitted prior to the 5 pm deadline.[13] On the contrary, the Department is not required to accept Oman Fasteners' untimely submission and there is nothing in the Department's practice that "entitles" Oman Fasteners to a retroactive extension of time.

### 1. The Supplemental Section C Response Was Properly Rejected As Untimely

First, the undisputed facts surrounding Oman Fasteners' Supplemental Section C Response justify the rejection of the submission. On January 24, 2022, the Department issued to Oman Fasteners a supplemental section C questionnaire with the deadline of February 3, 2022.[14] The supplemental questionnaire instructed: "If you are unable to respond completely to every question in the attached questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official(s) in charge and submit a request for an extension of the deadline for all or part of the questionnaire response."[15] The supplemental questionnaire also stated that "{i}f Commerce does not receive either the requested information or a written extension request before 5 p.m. EST on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Pursuant to 19 CFR § 351.302(d), any information submitted after this date will be untimely filed and may be returned

---

[12] *See* Oman Fasteners' Case Brief at 4 and 6-22.

[13] *Id.* at 7-8.

[14] Letter to Oman Fasteners, re: Antidumping Duty Administrative Review of Certain Steel Nails from Oman: Section C Supplemental Questionnaire (Jan. 24, 2022) ("Section C Supplemental Questionnaire").

[15] *Id.*

to you."[16] The Department also instructed that "{i}n all cases where we have requested a re-submission of data, you should ensure that we receive information in the same format that was requested in the original questionnaire."[17]

On February 1, 2022, Oman Fasteners sought an extension of this deadline until February 14, 2022,[18] which was granted in part until February 10, 2022. On February 9, 2022, Oman Fasteners requested another extension until February 14, 2022,[19] which was granted by the Department. In other words, Oman Fasteners was granted the full amount of additional time that it sought and was aware that the response had to be submitted by 5:00 pm ET on February 14, 2022.

On February 14, 2022, Oman Fasteners did not upload to the Department's ACCESS system all parts of its Supplemental Section C Response by the 5:00 pm ET deadline. Specifically, Oman Fasteners failed to submit the excel files for 15 exhibits and the SAS dataset for the U.S. sales database prior to the 5:00 pm ET deadline.[20] It is undisputed that Oman Fasteners did not seek another extension prior to the 5:00 pm ET deadline nor contact the Department about missing the deadline. Oman Fasteners also did not contact the Department about any technical issues related to the ACCESS system.

On March 22, 2022, the Department rejected Oman Fasteners' Supplemental Section C Response as untimely because the submission was not made in its entirely by the deadline. Only

---

[16] *Id.*

[17] *Id.*

[18] *See* Oman Fasteners' Letter, re: Certain Steel Nails from Oman; Sixth Review; Oman Fasteners' Supplemental Section C Extension Request (Feb. 1, 2022).

[19] *See* Oman Fasteners' Letter, re: Certain Steel Nails from Oman; Sixth Review; Oman Fasteners' Supplemental Section C Extension Request (Feb. 9, 2022).

[20] *See* the Department's Letter to Oman Fasteners (March 22, 2022) ("First Rejection Letter").

then, Oman Fasteners reacted with expressions of regret and claimed that it faced unexpected technical issues[21] – arguments that are repeated in its Case Brief and remain unconvincing.

Under 19 C.F.R. § 351.303(b)(1), "an electronically filed document must be received successfully in its entirety by the Department's electronic record system, ACCESS, by 5:00 pm ET on the due date." 19 C.F.R. § 351.302(b) provides that the Department will not consider or retain in the official record of the proceeding any untimely filed submission that the Department rejects. As detailed above, 16 parts of Oman Fasteners' Supplemental Section C Response was submitted after 5:00 pm ET on the due date and thus the response was not "received successfully in its entirety." Accordingly, the Department properly rejected the submission pursuant to its rules, which were communicated clearly to Oman Fasteners.

### 2. The Department Properly Rejected Oman Fasteners' Request for a Retroactive Extension of Time

Under 19 C.F.R. § 351.301(c)(1), a request for an extension of the time limit must be received prior to the expiration of the time limit. As noted above, Oman Fasteners failed to submit an extension request prior to the expiration of the time limit. "An untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists." 19 C.F.R. § 351.301(c). The Department makes a determination "whether extraordinary circumstances exist based on the specific facts, taking into account whether reasonable means could have been used to file a timely request or if reasonable measures could have been taken to prevent the unexpected event from occurring."[22] Examples of extraordinary circumstances cited by the Department "include a natural disaster, riot, war, *force majeure,* or medical emergency.

---

[21] *See, e.g.,* Oman Fasteners' Letter, re: Certain Steel Nails from Oman; Sixth Review; Request for Reconsideration and Out-of-Time Extension Request (Mar. 24, 2022).

[22] *See Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,793 (Sept. 20, 2013).

Examples that are unlikely to be considered extraordinary circumstances include insufficient resources, inattentiveness, or the inability of a party's representative to access the Internet on the day on which the submission was due."[23] The Department also specified that a technical failure of the ACCESS system generally is not an extraordinary circumstance.[24]

After the rejection of its Supplemental Section C Response, Oman Fasteners submitted multiple requests for a retroactive extension of time and to resubmit its response, each of which was rejected by the Department.[25] In its Case Brief, Oman Fasteners repeats the litany of reasons why its response was untimely, such as the length of the supplemental questionnaire, limited personnel resources, and overlapping deadlines.[26] Such reasons could have been the basis for a timely extension request, had Oman Fasteners submitted one prior to the expiration of the time limit, but they simply do not constitute extraordinary circumstances under 19 C.F.R. § 351.301(c).

Oman Fasteners also claims that it experienced technical issues with the ACCESS system close to the filing deadline and that prior filings done by counsel took less time to complete on ACCESS.[27] The technical issues described by Oman Fasteners do not constitute extraordinary circumstances but are part of the normal process of document preparation and reflects Oman Fasteners' failure to allocate sufficient resources. As an experienced respondent with experienced counsel, Oman Fasteners was well aware of the steps required to prepare the document for filing

---

[23] *Id.*

[24] *Id.*

[25] *See* Oman Fasteners' Letter, re: Certain Steel Nails from Oman; Sixth Review; Request for Reconsideration and Out-of-Time Extension Request (Mar. 24, 2022); Oman Fasteners' Letter, re: Certain Steel Nails from Oman; 2020-2021 Administrative Review; Oman Fasteners' Request for Leave to Submit Supplemental Section C Response (April 22, 2022).

[26] *See* Oman Fasteners' Case Brief at 8-10.

[27] *Id.* at 10-12.

on ACCESS and should have managed its time and resources to address any unexpected issues. Oman Fasteners' assertion that certain prior filings took less time to file is irrelevant and certainly does not provide a basis for Oman Fasteners to rely on the current filing to take similar amount of time.[28]

Oman Fasteners further argues that "out of all the files uploaded to ACCESS by counsel after 5:00pm, only the SAS database had been actually requested by the Department," and that counsel uploaded the Excel versions of PDF exhibits only "voluntarily."[29] Contrary to Oman Fasteners' claims, the submission of the Excel files was not "voluntary." The Department's initial questionnaire clearly instructed Oman Fasteners to submit electronic versions of all calculation worksheets and data, which is well-understood to apply to all subsequent supplemental questionnaires, as with all other instructions provided in the initial questionnaire.[30] Moreover, Oman Fasteners was specifically instructed to submit information "in the same format that was requested in the original questionnaire."[31] And as Oman Fasteners acknowledges, the submission of the SAS dataset containing the revised U.S. sales database was not voluntary but constituted an essential – and perhaps the most critical – part of the supplemental questionnaire response and was specifically requested by the Department in question 37 of the supplemental questionnaire. There is no question that the revised U.S. sales database was untimely submitted and a timely extension

---

[28] Rather, given that the time required to file prior submissions varied, counsel should have anticipated that more time may be required for what counsel describes as a lengthier-than-usual supplemental response.

[29] *Id.* at 13.

[30] *See* Questionnaire at B-1 and C-1 (requesting respondents to "submit a copy of the computer program/spreadsheet/worksheet that you used to calculate the prices, expenses, and adjustments reported in your … sales lists").

[31] Supplemental Section C Questionnaire.

was not sought.

Oman Fasteners contends that the untimely submission did not impede the Department's investigation or prejudice any party.[32] However, the Department does not bear the burden of demonstrating actual or theoretical prejudice or harm caused by Oman Fasteners' untimely filed submission. Arguably, any time an interested party untimely files a response to a supplemental questionnaire there could be limited or virtually no prejudice or harm caused by the delay of a few minutes. However, the same could be said for a delay of 16 minutes, an hour, a few hours, or even a few days. The Department maintains strict deadlines to conduct its proceedings in an orderly manner and to meet its statutory deadlines. If the Department had to consider the extent of prejudice or harm caused by each late submission before rejecting the same, the 5:00 pm deadline would effectively become meaningless as every deadline could be pushed to the latest time and date after which the filing could be prejudicial, and thereby severely compromising the Department's ability to manage its proceedings. Oman Fasteners was well aware of the deadline and was warned repeatedly that a failure to submit its responses in their entirety by the established deadline could result in the submission being rejected from the record. All parties, including Petitioner, are subject to filing deadlines and excusing late submissions caused by Oman Fasteners' wholly avoidable failures would be fundamentally unfair to all other participants in Department proceedings.

---

[32] *See* Oman Fasteners' Case Brief at 13.

### 3. The Department's Longstanding Practice and Court Precedents Support the Rejection of a Retroactive Extension

Oman Fasteners cites a letter issued by the Department in another proceeding, *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*,[33] and argues that that letter referred to a "practice," there is an established Department practice of allowing the refiling of a submission as long as the law firm had not previously missed a deadline.[34] Notwithstanding the use of this term in a single letter in another proceeding, there is no such Department practice. Instead, the Department is accorded broad discretion to extend certain deadlines and may choose to exercise such discretion as appropriate and reasonable under the particular circumstances of each case. *See, e.g., Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1360 (Ct. Intl. Trade 2007) ("{T}he U.S. Department of Commerce has broad discretion to establish its own rules governing administrative procedures, including the establishment and enforcement of time limits."). To the extent that the Department may have allowed refiling of late submissions in other cases, such decisions pertain only to the facts of those cases and do not control the instant proceeding.

Moreover, in the cases cited by Oman Fasteners, the circumstances were generally distinguishable from the instant case. For instance, in the *Ripe Olives from Spain* and *Solid Urea from the Russian Federation*, the respondent itself alerted the Department of the filing lapses shortly after the late submissions. By contrast, Oman Fasteners, despite being aware that its submission was filed late, did nothing for over a month until the Department took action to reject the submission. As noted above, Oman Fasteners' claim that it did not contact the Department due to its belief that the late portions of its supplemental questionnaire response were merely

---

[33] As discussed above, Petitioner believes that references to letters and memoranda from other proceedings constitute new factual information that should be rejected from the record.

[34] *See* Oman Fasteners' Case Brief at 14-15.

voluntarily submitted back-up files is belied by the fact that one of the late files was its U.S. sales database, which was a critical and material part of the response.

The Department's regulations and practice are clear and consistent: submissions that are not submitted in their entirety by the established deadline are rejected and retroactive deadline extensions are granted only upon a showing of extraordinary circumstances. A few examples are summarized below:

- *Silicon Metal From the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 11,725 (February 26, 2021), and accompanying Issues and Decision Memo at cmt. 1: The respondent filed an extension request at 3:40 pm on the date of the deadline. Commerce did not answer the request and the respondent began the submission of its supplemental questionnaire response at 5:31 a.m. of the following day and continued filing its submission through 10:10 a.m. that morning. Because TKS/TKT, the respondent, did not meet the revised deadline of 8:30 a.m., Commerce rejected the TKS/TKT's response as untimely. Commerce explained that "TKS/TKT argues that it was not possible to provide the responses sooner, and it provides a litany of reasons why this was so. However, Commerce provided TKS/TKT with multiple extensions in order to submit its responses in a timely manner, extending the original 39-day deadline by more than two weeks. Although TKS/TKT explains many of its difficulties as arising from its own officials' unfamiliarity with the questionnaire process, the difficulties arising from COVID-19 preventing in-person meetings, and computer/technical issues, the fact remains that TKS/TKT was represented by experienced counsel, and Commerce had already granted multiple extensions as a result of these issues."

  "TKS/TKT's extension requests indicate that TKS/TKT was aware of its communication difficulties, the inexperience of its personnel in responding to such questionnaires, and issues related to COVID-19; however, these factors did not prevent TKS/TKT from filing previous additional extension requests early enough for Commerce to respond. Nonetheless, on the final due date for the questionnaire response, TKS/TKT failed to submit a similarly-early additional extension request, concluding on its own that just over six hours was enough time for its counsel to receive and submit the documents via ACCESS. In this regard, TKS/TKT and its counsel gambled unwisely, as their responses contained numerous 'Unauthorized Comment Type(s)' that prevented their acceptance in the ACCESS system, despite the presence of experienced counsel…."

- *Certain Chassis and Subassemblies Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value,* 86 Fed. Reg. 26,694 (May 17, 2021), and accompanying Issues and Decision Memorandum at cmt. 1: Respondent filed 11 out of 14 parts of the BPI version of a supplemental questionnaire response and the entire public version after 5 pm of the due date. Two days later, the respondent filed an untimely request for an extension of 15 minutes explaining that extraordinary

14

circumstances existed due to technical difficulties. Commerce rejected the response and the extension request explaining that computer/technical issues are not extraordinary circumstances within the meaning of the regulations. Moreover, Commerce found that that the respondent failed to demonstrate that the circumstances: (1) could not have been prevented if reasonable measures had been taken; or (2) precluded the law firm from timely filing an extension request through all reasonable means within the meaning of 19 C.F.R § 351.302(c)(2).

- *Certain Walk-Behind Snow Throwers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 17,987 (Mar. 29, 2022), and accompanying Issues and Decision Memorandum at cmt. 1: The respondent filed BPI and public versions of a verification response between 5:27 and 5:30 pm. Counsel of respondent explained that mistakenly believed that the filing was due the following day. Before 5 pm, however, he realized his mistake and contacted the program manager and left a message explaining that he needed until 6 pm to complete the filing. Respondent did not file an extension request instead a response was filed at 5:27 pm. Commerce rejected the submission and found that there was no timely written extension request received before the 5:00 pm deadline. Moreover, Commerce found that the respondent failed to meet its burden to demonstrate an extraordinary circumstance which prevented the timely submission of its questionnaire response or an extension request.

- *Utility Scale Wind Towers From India: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 56,890 (Oct. 13, 2021), and accompanying Issues and Decision Memorandum at cmt. 2: The respondent filed an incomplete response to a supplemental section D questionnaire. The response was missing the narrative portion which was filed the following day along with an errata letter. Commerce rejected the entire response. Commerce explained that its "regulations are clear that a submission is not complete until it is filed in its entirety. Section 351.301(b) of Commerce's regulations provides that "{a}n electronically filed document must be received successfully in its entirety by {Commerce's} electronic records system, ACCESS, by 5 p.m." In this case, Commerce found that the respondent did not file part one of its response to the supplemental questionnaire in its entirety by the established deadline. Moreover, Commerce found that that the events explained by the respondent do not meet the definition of an extraordinary circumstance set forth in 19 C.F.R. § 351.302(c)(2), that prevented the timely filing of an extension request through all reasonable means.

- *Stainless Steel Flanges From India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances,* 83 Fed. Reg. 40,748 (Aug. 16, 2018), and accompanying Issues and Decision Memo at cmt. 1: Shortly before the deadline of 5:00 p.m. on the date of the deadline, Commerce received a third request for an extension from the respondent Bebitz, which was not answered by Commerce on the same day. The respondent filed the response the following day between 10:24 am and 2:10 pm. Commerce rejected the untimely response explaining that it "gave Bebitz multiple opportunities and has provided Bebitz two months to provide the responses. Although Commerce is sympathetic to the difficulties inherent in responding to the questionnaire,

Bebitz was represented by experienced counsel, and multiple extensions were granted, as explained above."

- *Stainless Steel Flanges From India: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstance Determination*, 83 Fed. Reg. 40,745 (Aug. 16, 2018), and accompanying Issues and Decision Memo at cmt. 1: Shortly before the deadline of 12:00 p.m., the respondent Bebitz and its affiliates submitted portions of their supplemental questionnaire response but submitted neither the complete narrative response nor sales databases with calculation worksheets by the deadline. Bebitz also failed to notify Commerce that it experienced filing issues until after the deadline. Commerce rejected the submission.

- *Circular Welded Carbon-Quality Steel Pipe From the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2018–2019,* 86 Fed. Reg. 59,364 (Oct. 27, 2021), and accompanying Issues and Decision Memo at cmt. 1: On the date of the deadline, the respondent filed an extension request at 6:10 pm explaining that "the technical difficulties that arose were the result of work changes caused by the COVID-19 pandemic and constitute an 'extraordinary circumstance.'" The respondent explained that "due to the large document size of the submission and other technical restraints from working from a laptop, they encountered a delay in submitting their response." Commerce rejected the request explaining that "Technical difficulties due to the size of a submission or the constraints related to working from a laptop from home do not constitute extraordinary circumstances. These technical difficulties could have been prevented or addressed if reasonable measures had been taken. For example, the firm could have enlisted the help of other paralegals and/or other attorneys to upload the submission or separated the submission into smaller more manageable files… Furthermore, once the paralegal was experiencing technical difficulties, the firm could have notified Commerce, but Ajmal's counsel failed to notify Commerce through any means, official or unofficial, before the deadline."

- *Certain Tool Chests and Cabinets From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value,* 83 Fed. Reg. 15,365 (April 10, 2018), and accompanying Issues and Decision Memo at cmt. 2: Nine companies filed public versions of separate rate applications at 7:42 pm of the due date. Four days after the deadline, these companies filed a letter claiming they encountered technical difficulties at the time of filing and requested that Commerce accept their separate rate applications as timely filed. Commerce rejected the documents as untimely filed and explained that technical difficulties do not constitute "extraordinary circumstances." Commerce did not find that these nine separate rate applicants provided evidence supporting their assertion that the technical difficulties at issue were Commerce's ACCESS error. "Also, regardless of the source of the technical difficulties at issue, the nine separate rate applicants failed to contact us at the time they claim to have experienced the technical difficulties that led to the untimely filing of their SRAs… these nine separate rate applicants could have contacted Commerce before the filing deadline to request technical assistance and/or notify Commerce of their filing difficulties and request an extension of time to file their SRAs, but they did not do so."

16

- *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020*, 87 Fed. Reg. 7,118 (Feb. 8, 2022), and accompanying Issues and Decision Memo at 11-12: Commerce rejected additional exhibits filed in response to a ILOV questionnaire 5 days after the deadline. Commerce explained that "Technical difficulties preparing excel and PDF exhibits, while regrettable, do not qualify as extraordinary circumstances. Although counsel also states that they experienced technical difficulties uploading the filing to ACCESS, we checked with the Central Records Unit and there were no issues with ACCESS at the time of your filing."

- *Certain Stilbenic Optical Brightening Agents from Taiwan*, 81 Fed. Reg. 43,991 (July 6, 2016), and accompanying Issues and Decision Memo at cmt. 4: The respondent filed the public version of section A response at 5:10 pm. Commerce rejected the response. The respondent filed extension requests letters after the deadline explaining that extraordinary circumstances existed because of technical issues accessing access, a medical leave, among other reasons. Commerce found that those reasons do not constitute extraordinary circumstances that would justify the consideration of the untimely filed submissions.

- *Honey From the People's Republic of China: Preliminary Rescission of the New Shipper Review and Preliminary Results of the Administrative Review; 2015–2016*, 82 Fed. Reg. 31,557 (July 17, 2017), and accompanying Issues and Decision Memo at 5-7 (unchanged in final results): The respondent submitted the public version of Sections C and D after 5:00 pm. At 5:03 pm, counsel of the respondent called ACCESS to inform that the public version of its section C/D response had not been uploaded at the time of the call. The helpdesk explained that there were no system-wide problems with ACCESS. Commerce rejected and removed from the record the entirety of the late section C/D response. Commerce explained that the "apparent issues with ACCESS did not constitute extraordinary circumstances, which would have precluded Jiangsu Runchen from filing a timely extension request, because there were no system-wide issues with ACCESS at the time as documented in the Department's Phone Call Memo. Additionally, counsel for Jiangsu Runchen had reasonable notice that PDF documents cannot be uploaded if they contain links, and finally, counsel waited until after the deadline to contact the Department despite, per its request, apparently encountering said difficulties before the deadline."

These cases demonstrate that the Department has a clear and consistent practice pertaining to untimely submissions, notwithstanding its use of discretion in certain limited instances. Contrary to Oman Fasteners' assertions, the Department does *not* have an established practice of allowing *all* late submissions in instances involving "first-time offenders." Oman Fasteners' claim regarding the existence of such practice would imply that the Department has some affirmative obligation to canvas all of its proceedings to determine whether a particular respondent or law firm had ever

17

previously missed a deadline in any other case – an impractical and unduly burdensome task that is not required by law or regulations. Instead, *Corrosion-Resistant Steel from Korea* and other cases cited by Oman Fasteners demonstrate only that the Department has the discretion to accept a late filing if it finds it to be appropriate in the context of that particular case. In exercising the Department's discretion, whether a law firm is a "repeat offender" may be a relevant consideration; however, that does not mean that the Department must accept all late filings from all "first offenders." Although the Department has exercised its discretion to accept late filings in some cases based on particular facts, the Department's clear and overwhelming practice is to reject a late filing and denying a retroactive extension unless the requester demonstrates the existence of extraordinary circumstances. Simply put, the Department has the discretion to grant a retroactive extension if warranted by the facts and has repeatedly concluded that no such extension is warranted in this case.

Oman Fasteners also argues that the U.S. Court of International Trade ("CIT") has "consistently reversed" the Department's departure from "its longstanding practice."[35] Oman Fasteners' references to this "consistent" jurisprudence consist of only three decisions, two of which involved the same parties and were issued concurrently by the same judge: *Celik Halat Ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ("*Celik Halat I*"); *Celik Halat Ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1363 (Ct. Int'l Trade 2022) ("*Celik Halat II*"); and *Bosun Tools Co. v. United States*, 405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019).

Again, these three decisions pertain only to the facts of those particular cases and do not carry precedential value in the instant case. The cases are also distinguishable. In *Celik Halat,* the respondent had requested multiple extensions which were not granted in full by the Department.

---

[35] *See* Oman Fasteners' Case Brief at 22-26.

By contrast, Oman Fasteners was ultimately granted the full extension that it requested. In *Bosun*, the late filing involved only a public version of a response. The fact that the CIT or the Department found the exercise of discretion to be appropriate in those cases has no bearing on this case.

Rather, the CIT and the U.S. Court of Appeals for the Federal Circuit ("CAFC") have repeatedly upheld the Department's authority and discretion to reject late submissions. *See, e.g., Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1352 (Fed. Cir. 2015) (upholding the rejection of the untimely response and finding that the Department properly determined that the respondent was at least capable of filing a timely extension request but simply failed to do so); *Tau-Ken Temir LLP v. United States*, 2022 Ct. Intl. Trade LEXIS 82, *24-25, SLIP OP. 2022-82 (2022) (holding that Commerce's rejection of the response that was filed more than one hour late did not constitute an abuse of discretion); *Bebitz Flanges Works Private Ltd. v. United States*, 433 F. Supp. 3d 1297, 1305 (Ct. Intl. Trade 2020) (upholding the rejection of a response that was filed the next morning at 10:24 a.m. following an extension request filed 20 minutes before the 5:00 pm deadline); *Bebitz Flanges Works Private Ltd. v. United States*, 433 F. Supp. 3d 1309, 1327-1328 (Ct. Intl. Trade 2020) (upholding the rejection of a response of which portions, including sales database, was foled after the deadline); *Neo Solar Power Corp. v. United States*, 190 F. Supp. 3d 1255, 1263 (Ct. Intl. Trade 2016) (finding that "technical issues, by themselves, were not an 'extraordinary circumstance'" and that the party "could have ameliorated harm caused by technical problems by taking 'reasonable measures.'").

**C. There is No Basis to Allow the Refiling of Certain Portions of the Supplemental Section C Response**

Citing 19 U.S.C. § 1677m(e), Oman Fasteners contends that the Department "must allow" it to resubmit the portions of the Supplemental Section C Response that was submitted before the

5:00 pm deadline of February 14, 2022.[36] However, 19 U.S.C. § 1677m(e), which instructs the Department to consider certain information that "is necessary to the determination but does not meet all the applicable requirements established by the {Department}, applies to information that is "submitted by the deadline established for its submission." Under 19 C.F.R. § 351.303(b)(1), a document that is not submitted *in its entirety* by the deadline is not considered to be submitted by the deadline established for its submission. Thus, 19 U.S.C. § 1677m(e) is not applicable.[37]

## IV. THE RECORD DOES NOT CONTAIN A RELIABLE COST AND SALES DATA BASED ON WHICH ACCURATE DUMPING MARGINS MAY BE CALCULATED

Oman Fasteners argues that, even if the Department does not permit the refiling of its untimely Supplemental Section C Response, the record contains reliable and accurate cost and sales data on which the Department should base its dumping margin calculations. Referring to the record of the previous administrative reviews, Oman Fasteners contends that "the Department's questions in the supplemental Section C questionnaire have been asked and answered repeatedly in the prior administrative reviews of this proceeding," and the Department "can rely on data on the record of this review to confirm the accuracy of the reported data or to revise Oman Fasteners' data as needed."[38] Oman Fasteners also argues that the Department can conduct a verification to check the accuracy and completeness of the reported data.[39]

On the contrary, responses submitted in prior administrative reviews do not take place of questionnaire responses in the current review nor demonstrate the accuracy of the missing

---

[36] *See* Oman Fasteners' Case Brief at 27-30.

[37] Applying 19 U.S.C. § 1677m(e) to submissions that not submitted *in its entirety* by the deadline would render 19 C.F.R. § 351.303(b)(1) essentially meaningless.

[38] Oman Fasteners' Case Brief at 31.

[39] *See id.*

information and data in the current review. If that were the case, why does the Department bother issuing supplemental questionnaires in any new administrative reviews?

As the CIT has repeatedly confirmed, the record of each segment of a proceeding stands on its own and findings and data from an earlier review do not translate to same conclusions in subsequent reviews. *See, e.g., Gourmet Equip. Corp. v. United States*, 24 C.I.T. 572, 577-578 (2000) ("Commerce's longstanding practice, upheld by this court, is to treat each segment of an antidumping proceeding, including the antidumping investigation and the administrative reviews that may follow, as independent proceedings with separate records and which lead to independent determinations."). In other words, the fact that the Department found certain data to be accurate and reliable in one review does not mean that the data in subsequent reviews would be accurate and reliable.

Here, Oman Fasteners suggests that the Department does exactly that, by assuming that nothing has changed from prior reviews and should be presumed to be accurate.[40] However, information from prior reviews cannot substitute Oman Fasteners' untimely submission that has been rejected from the record. Moreover, even if the information from prior reviews pertains to similar types of expenses or other items, there is no basis to conclude that the data or the methodology has not changed from one review to the next.

Similarly, the Department cannot conduct a verification to fill the gaps in the record caused by Oman Fasteners' untimely submission. Verifications are conducted to check the accuracy and completeness of the information already on the record and are not intended to collect new factual information. If there is no timely information submitted, there is nothing to verify.

---

[40] As discussed above, the Department should reject and remove from the record the unsolicited copies of the responses and other documents from prior reviews that Oman Fasteners has submitted in an attempt to replace the rejected untimely submission.

Setting aside Oman Fasteners' misplaced reliance on the record of prior reviews and because Oman Fasteners' untimely Supplemental Section C Response has been rejected from the record of this proceeding, the Department does not have a reliable U.S. sales database on which the margin calculations could be based. Although the record still has Oman Fasteners' responses to the Department's initial questionnaire, the Department cannot rely on that data. The Department issued a supplemental questionnaire because there were numerous deficiencies and inconsistencies in Oman Fasteners' initial questionnaire responses. However, because Oman Fasteners failed to submit a timely response to the Department's Supplemental Section C Questionnaire, the deficiencies and inconsistencies noted therein remain unanswered.

Importantly, the issues addressed in the Supplemental Section C Questionnaire were extensive and pertained to fundamental issues such as sales reconciliation, CONNUMs, sales values, nail weights for all sales, as well as most billing adjustments and expenses.[41] The failure to remedy those fundamental deficiencies renders the entire U.S. sales database wholly unreliable and not usable for the Department's analysis. For instance, the Department asked several questions requesting Oman Fasteners to support and explain the sales reconciliation.[42] Since those questions are unanswered, there is no basis to conclude that the reported sales are complete and accurate. Similarly, the Department requested Oman Fasteners to support the reported physical characteristics comprising the control numbers (CONNUMs) and clarifications on the reported physical characteristics.[43] Because these questions are unanswered, the Department can only assume that the reported CONNUMs are incorrect. If the Department cannot be sure that the

---

[41] *See* Section C Supplemental Questionnaire.

[42] *See id.* at questions 3a through 3h.

[43] *See id.* at questions 4 through 9.

reported sales are complete or that the CONNUMs are correct, there is simply no basis for a margin comparison or to apply any sort of partial facts available to "fill in the gaps." The supplemental questionnaire also addresses almost all of reported adjustments and expenses. Because there is no basis to find those items to be correct, there is also no basis to rely on them or apply some sort of partial facts available. Accordingly, the Department has no option but to determine Oman Fasteners' dumping margin based on total facts available and should continue to do so for the final results.

## V. THE DEPARTMENT SHOULD CONTINUE TO APPLY ADVERSE INFERENCES

Under 19 U.S.C. § 1677e(a)(2), the Department must rely on facts otherwise available when, *inter alia*, a respondent (1) withholds information requested by the Department; (2) fails to provide information in a timely manner or in the form requested; (3) significantly impedes a proceeding; or (4) provides information that cannot be verified. In relying on facts available, the Department "may use an inference that is adverse to the interests" of the party providing deficient information if the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . ."[44] The "best of its ability" standard "assumes that the {respondents} are familiar with the rules and regulations" of the Department and "does {not} require findings of motivation or intent."[45]

Oman Fasteners argues that its untimeliness does not reflect a failure to act to the best of its ability and that it did not benefit from the missing response.[46] However, under longstanding Department practice, the Department has found that a failure to submit a timely response justifies

---

[44] 19 U.S.C. § 1677e(b).

[45] *Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1382-83 (Fed. Cir. 2003).

[46] *See* Oman Fasteners' Case Brief at 52-56.

the application of facts available because the respondent has failed to provide information in a timely manner or in the form requested and such failure significantly impedes a proceeding. The Department has also found repeatedly that a failure to submit a timely response also evidences a failure to cooperate by not acting to the best of its ability, warranting the use of adverse inferences.[47] Furthermore, as noted above, the use of adverse inferences does not require findings of any sinister motivation or intent nor any evidence that the respondent would have benefited from its lapses.[48] As the CAFC has stated, "while the {best of its ability} standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping."[49] In this case, Oman Fasteners' untimely submission was not caused by a single mistake, but resulted from the fact that Oman Fasteners apparently did not complete the response until close to the deadline and its delay was exacerbated by poor planning and errors in judgement in not seeking a timely extension. Oman Fasteners' failure to inform the Department promptly of its late filing as well as its continued insistence that the late portions of the response were "voluntary" also exhibit bad faith. These circumstances point to inattentiveness, carelessness and failure to act to the best of its ability, warrantig the use of adverse inferences.

---

[47] *See, e.g., Certain Chassis and Subassemblies Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value,* 86 Fed. Reg. 26,694 (May 17, 2021), and accompanying Issues and Decision Memorandum at cmt. 1 (applying a margin based on total adverse facts available where the respondent filed portions of the BPI version and the public version of a supplemental questionnaire response between 5 pm and 5:15 pm); *Certain Walk-Behind Snow Throwers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 87 Fed. Reg. 17,987 (Mar. 29, 2022), and accompanying Issues and Decision Memorandum at cmt. 1 (applying a margin based on total adverse facts available where the respondent filed the BPI and public versions of a verification questionnaire response between 5:27 and 5:30 pm).

[48] *See Nippon Steel Corp.,* 337 F.3d at 1382-83.

[49] *Id.* at 1382.

## VI.    THE DEPARTMENT SHOULD CONTINUE TO ASSIGN 154.33 PERCENT AS THE TOTAL AFA RATE

In the Preliminary Results, the Department assigned to Oman Fasteners a total AFA rate of 154.33 percent, which represents the highest dumping margin alleged in the Petition and was also applied to another respondent in the first and second administrative reviews of this proceeding.[50] The selection of this rate is consistent with 19 U.S.C. § 1677e(d), which allows the Department to use as the AFA rate the highest of "any dumping margin from any segment of the proceeding under the applicable antidumping order."

Oman Fasteners asserts that the Department must select a "reasonable" total AFA rate that "best reflects the commercial reality of Oman Fasteners' sales and costs of subject merchandise" and considers the degree of Oman Fasteners' level of culpability.[51] According to Oman Fasteners, a reasonable AFA rate would be 1.65%, the rate calculated in the fifth administrative review, or "at most" 4.22%, which is the rate calculated in the remand proceeding of the original investigation that is not yet final.[52] Oman Fasteners' arguments lack merit and should be disregarded by the Department.

First, the applicable law does not require the Department to consider Oman Fasteners' "commercial reality." Specifically, 19 U.S.C. § 1677e(b)(1)(B), as amended in 2015 by the Trade Preferences Extension Act of 2015 ("TPEA"), Pub. L. No. 114-27, §§ 501–07, 129 Stat. 362, 383–87, instructs that the Department "is not required to determine, or make any adjustments to a . . . weighted average dumping margin based on any assumptions about information any interested party would have provided if the interested party had complied with the request for information."

---

[50] Preliminary IDM at 12.

[51] *See* Oman Fasteners' Case Brief at 57 and 60.

[52] *See id.* at 73-74.

Further, 19 U.S.C. § 1677e(d)(3), as amended by the TPEA, provides that the Department, when applying AFA, is not required "to demonstrate that the . . . dumping margin used by the {Department} reflects an alleged commercial reality of the interested party." In this regard, we note that the cases cited by Oman Fasteners in support of its argument, *Gallant Ocean (Thailand) Co. v. United States,* 602 F.3d 1319 (Fed. Cir. 2010) and *BMW of N. Am. LLC v. United States,* 926 F.3d 1291 (Fed. Cir. 2019) involved the pre-TPEA amended version of 19 U.S.C. § 1677e, which did not contain the specific provisions disregarding the respondent's "commercial reality" or what the actual rate for the respondent could have been. *See Hubbell Power Sys. v. United States*, 2019 Ct. Intl. Trade LEXIS 146, *11-12, SLIP OP. 2019-145 (2019) ("Although cases prior to the TPEA required Commerce to demonstrate a relationship between an AFA rate and a respondent's actual estimated dumping margin, that is no longer the case. Commerce no longer has to 'demonstrate that the countervailable subsidy rate or dumping margin used by the administering authority reflects an alleged commercial reality of the interested party.'").

Second, consistent with the applicable law, the Department selected 154.33 percent as the total AFA rate. Because this rate was previously applied to another respondent in previous segments of this proceeding, the Department, pursuant to 19 U.S.C. § 1677e(c), is not required to corroborate this rate. That said, this 154.33 percent rate was, in fact, further corroborated by the Department in the prior review by comparing the rate to the transaction-specific margins calculated for Oman Fasteners during the same review. The Department found that "the 154.33 percent petition margin falls within the range of the highest transaction-specific margins calculated for Oman Fasteners, which appear to be non-aberrational sales in terms of transaction quantities or

other such terms when compared with other sales in Oman Fasteners' database."[53] Given that the 154.33 percent rate was corroborated by Oman Fasteners' own data, the Department is further justified in finding the rate to be reasonable AFA for Oman Fasteners. *See Hubbell Power Sys.,* 2019 Ct. Intl. Trade LEXIS 146, *11-12 (upholding an AFA rate of 206% that was derived from the petition and was corroborated at the time because the rate was in the range of margins calculated for the respondent).

Finally, the situation leading to the Department's application of AFA supports the use of the 154.33 percent rate. As discussed above, Oman Fasteners failed to submit its Supplemental Section C Response by the deadline due to its own delay, carelessness, poor planning and errors in judgment, evidencing that it did not act to the best of its ability. Its actions further show a lack of good faith by failing to inform the Department of the missed deadline. Accordingly, the Department properly applied an AFA rate that is higher than Oman Fasteners' prior weight-averaged margins and should continue to do so for the final results.

## VII. IF THE DEPARTMENT DECIDES TO CALCULATE A DUMPING MARGIN BASED ON OMAN FASTENERS' SUBMITTED DATA, IT SHOULD DISREGARD THE FINANCIAL STATEMENTS SUBMITTED BY THE RESPONDENT AS SOURCES FOR VALUING CV PROFIT AND SELLING EXPENSES

Because, as discussed above, the Department should continue to resort to total AFA to determine Oman Fasteners' dumping margin, the Department needs not consider the sources for valuing constructed value ("CV") profit and indirect selling expense ("ISE") ratios. If, however, the Department decides to rely on any part of Oman Fasteners' sales or cost data to calculate the

---

[53] *See Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2014-2016,* 82 Fed. Reg. 36,738 (Aug. 7, 2017), and accompanying Issues and Decision Memorandum at 10 (unchanged at final).

dumping margin, the Department should reject the sources submitted by Oman Fasteners to value CV profit and ISE ratios. Instead, the Department should rely in the sources submitted by Mid Continent in the current administrative review.

Because the only respondent in this review, Oman Fasteners, did not have a viable comparison market, the Department is unable to calculate CV profit and ISE ratios using the preferred method under 19 U.S.C. § 1677b(e)(2) and may resort to one of the three alternatives specified in the statute.[54] In previous segments of this proceeding, the Department relied on the third alternative specified in the statute, i.e., any other reasonable method, by determining CV profit and ISE ratios based on the financial data of a third-party producer and it is expected that the Department will do the same in this review if it decides to calculate a dumping margin for Oman Fasteners based on its data.

When determining whether a third party producer's financial data represents an appropriate source for calculating CV profit and ISE ratios, the Department considers: (1) the similarity between a potential surrogate's business operations and products and the products and operations of the respondent; (2) the extent to which a potential surrogate has sales in the United States and the home market; (3) the contemporaneity of the surrogate data; and (4) the similarity of the customer base between a potential surrogate and the respondent.[55] The Department has also repeatedly declined to use financial statements that do not itemize selling expenses and were

---

[54] *See* Letter from Robert Bolling to All Interested Parties, Re: Antidumping Duty Review of the Antidumping Duty Order on Certain Steel Nails from Oman; 2020-2021: Request for Constructed Value Profit and Selling Expense Comments and Information (Jan. 6, 2022) at 1.

[55] *See Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Sept. 27, 2001), and accompanying Issues and Decision Memorandum at cmt. 8; *see also Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Apr. 26, 2004), accompanying Issues and Decision Memorandum at cmt. 26.

therefore unable to provide a reasonable indirect selling expense ratio and also those companies that have benefited from subsidies that have been previously determined to be countervailable.[56]

In its case brief, Oman Fasteners requests the Department to rely on the financial statements of Al Jazeera Steel Products Co. SAOG ("Al Jazeera") as the source of CV profit and ISE ratios, because it is "the only company on the record from Oman Fasteners' home market of Oman."[57] In the alternative, Oman Fasteners requests the Department to rely on any of the third-country producer financial statements submitted by the Respondent, which "reflect primarily production and sales of steel nails or steel fasteners, comparable to the merchandise under review in this proceeding."[58] In its February 7 submission, Oman Fasteners provided financial statements of a large number of companies.[59] However, these financial statements are flawed because, as detailed below, the companies do not produce comparable merchandise, do not provide information regarding the extent to which they sell in the home market and do not itemize indirect selling expenses. Additionally, the majority of the financial statements are for 2020, and thus do not cover the entire POR.

### A. Al Jazeera is Not a Reliable Surrogate Source For CV Profit And ISE Because It Does Not Produce Comparable Merchandise

As explained in Petitioner's rebuttal comments on CV profit and selling expenses, Al Jazeera's financial statements do not serve a reliable surrogate source for CV profit and ISE ratios

---

[56] *See, e.g., Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2019– 2020,* 86 Fed. Reg. 67,690 (Nov. 29, 2021), and accompanying Issues and Decision Memorandum at 9 ("2019-2020 Final Results").

[57] Oman Fasteners' Case Brief at 76.

[58] *Id.*

[59] *See* Letter from Perkins Coie to Sec'y of Commerce re: Certain Steel Nails from Oman; 6th Administrative Review Constructed Value Profit and Indirect Selling Expenses (Feb. 7, 2022) ("Oman Fasteners' CV Profit Submission").

because the business operations, production processes, and products of Al Jazeera are dissimilar to those of Oman Fasteners. Al Jazeera is an Omani company that manufactures steel pipes, hollows sections, CTL sheets and merchant bars, not steel nails or other products that are comparable to nails.[60] In addition, the financial statements provided by Oman Fasteners are for the 2020 fiscal year, which overlaps with the period of review ("POR") only for six months. The Department has repeatedly rejected this company in all previous segments of this proceeding,[61] finding that this company does not produce or sell merchandise identical or comparable to the subject merchandise, and its business operations, production processes, and products are dissimilar to those of Oman Fasteners.[62]

Contrary to Oman Fasteners' arguments, the statute does *not* have only "a clear preference for data reflecting production and sales in the home market in calculating CV profit," but also "that

---

[60] *See* Letter from Greenberg Traurig, LLP to Sec'y of Commerce, Re: Certain Steel Nails from Oman – Rebuttal Comments on Constructed Value Profit and Selling Expenses (Feb. 14, 2022) ("Petitioner's Rebuttal Cmts. on CV Profit") at 3, Exhibit 1.

[61] *See Certain Steel Nails from the Sultanate of Oman: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 28,972 (May 20, 2015), and accompanying Issues and Decision Memorandum at cmt. 1; *see also Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2014–2016*, 82 Fed. Reg. 36,738 (Aug. 7, 2017), and accompanying Issues and Decision Memorandum at cmt. 2; *Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2016–2017*, 83 Fed. Reg. 58,231 (Nov. 19, 2018), and accompanying Issues and Decision Memorandum at cmt. 6; *Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2017–2018*, 84 Fed. Reg. 71,372 (Dec. 27, 2019), and accompanying Issues and Decision Memorandum at cmt. 1; *Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No-Shipments; 2018–2019*, 85 Fed. Reg. 61,720 (Sept. 30, 2020), and accompanying Issues and Decision Memorandum at 12; *Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2019–2020*, 86 Fed. Reg. 29,244 (June 1, 2021), and accompanying Decision Memorandum at 12 (unchanged in Final Results) ("2019-2020 Prelim. Results").

[62] *See id.*

the profit reasonably reflects the merchandise under investigation."[63] In past cases, the Department has explained that it "prefer{s} to use the financial statements of a company that primarily produces and sells either identical or comparable products in {the subject country}."[64] That is not Al Jazeera's case which does not produce comparable merchandise. Accordingly, the Department should continue to reject Al Jazeera as a third-country source for CV profit and ISE.

### B. The Department Should Disregard the Other Financial Statements Submitted by Oman Fasteners as Sources For Valuing CV Profit and Selling Expenses

In its case brief, Oman Fasteners requests the Department to use as a source for CV profit and selling expenses calculation the financial statements of seventeen additional companies:

1. Bangkok Fastening Co., Ltd. ("Bangkok Fastening")
2. Jinhai Hardware Co., Ltd. ("Jinhai Hardware")
3. Sangchai Factory Co., Ltd. ("Sangchai Factory")
4. Alsons Manufacturing India LLP ("Alsons Manufacturing")
5. Ganpati Fastners Pvt. Ltd. ("Ganpati")
6. Geekay Wires Pvt. Ltd. ("Geekay")
7. Hiten Fasteners Pvt. Ltd. ("Hiten")
8. J&K Wire and Steel Industries Pvt. Ltd. ("J&K Wire")
9. Jai Fasteners Pvt. Ltd. ("Jai Fasteners")
10. KBV Industries Pvt. Ltd. ("KBV")
11. Mita Fasteners Pvt. Ltd. ("Mita")
12. Salasar Alloy & Steel Industries Pvt. Ltd. ("Salasar")
13. Shivalik Wires Private Limited ("Shivalik")
14. Techbolt Industries Pvt. Ltd. ("Techbolt")
15. Utech Fasten Private Limited ("Utech")
16. Kardemir Karabuk Demir Celik Sanayi Ve Ticaret A.S. ("Kardemir")
17. Hašpl a.s. ("Hašpl")

The financial statements of these companies, however, are not an appropriate source for calculating CV profit and selling expense ratios. As detailed in Petitioner's rebuttal comments on CV profit and selling expenses, the majority of these companies do not produce identical or comparable

---

[63] *See Certain Steel Nails from Taiwan: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 28,959 (May 20, 2015) ("Steel Nails from Taiwan"), and accompanying Issues & Dec. Mem. at cmt. 1 (citing 19 U.S.C. § 1677b(e)(2)(B)(i)).

[64] *See id.*

merchandise or at least, from the information on the record, it is not clear the proportion of revenue generated by the sale of merchandise under consideration compared to the revenue generated by the sale of other products. In addition, in most cases, there is no information on the record indicating the markets where the products are sold. Moreover, in many cases, the financial statements are not contemporaneous to the POR or only overlap for a few months. Furthermore, an important number of these financial statements do not itemize indirect selling expenses and are, therefore, unable to provide a reasonable indirect selling expense ratio for CV.

Specifically, Alsons Manufacturing, Ganpati, Hiten, KBV, Mita, Salasar, Shivalik and Kardemir do not produce steel nails or comparable merchandise.[65] Although information provided by Oman Fasteners shows that companies like Hiten, J&K Wire, Utech and Hašpl may produce nails or similar products, there is no information regarding the proportion of revenue generated by the company's sale of merchandise under consideration.[66] Similarly, the financial statements of Bangkok Fastening and Jinhai Hardware do not show what proportion, if any, of their sales are to the United States because they do not detail where their products are sold.[67] In addition, the financial statements of Bangkok Fastening, Jinhai Hardware, Sangchai Factory, Alsons Manufacturing, Ganpati, Geekay, J&K Wire, Jai Fasteners, KBV, Mita, Salasar, Shivalik, Techbolt, Utech and Hašpl are not contemporaneous to the POR. Also, the financial statements of companies like Bangkok Fastening, Jinhai Hardware, Ganpati, KBV and Shivalik fail to itemize selling expenses to identify indirect and direct selling expenses.

---

[65] *See* Petitioner's Rebuttal Cmts. on CV Profit.

[66] *See id.*

[67] *See id.*

In addition, like Al Jazeera's, the financial statements of Hašpl, Bangkok Fastening, and Sangchai Factory, have been rejected by the Department in past cases as a source for CV profit and selling expenses. Recently, in the 2019-2020 administrative review, the Department found that because the financial statements of the three companies fail to identify their distribution of sales to respective selling markets, it was unable to determine what proportion, if any, of their sales are to the United States.[68] The Department concluded that financial data containing exclusive or predominant U.S. sales information and/or very little home market sales (i.e., the market under consideration) are unsuitable in the calculation of a normal based on CV. As a result, the Department rejected Hašpl, Bangkok Fastening, and Sangchai Factory financial statements as a third-country source for CV profit and selling expenses. As explained in Petitioner's rebuttal comments on CV profit and selling expenses, Oman Fasteners has submitted no information that would warrant a change to the Department's previous determinations.

Contrary to Oman Fasteners' assertions, these companies' financial statements are not a reliable source for valuing CV profit and selling expenses ratios. Thus, the Department should disregard the financial statements of these seventeen companies.

### C. The Department Should Rely on ISWP and Sundram as the Source of CV Profit and ISE Ratios

ISWP and Sundram best reflects the profit and selling experience of Oman Fasteners. As the Department found in the final results of the 2019-2020 administrative review, ISWP produces identical merchandise as well as comparable merchandise, i.e., nails, steel products and fasteners. ISWP and Oman Fasteners also produced nails of the same sizes,[69] same finish (i.e., electroplated

---

[68] *See* 2019-2020 Final Results at 10; *see also* Petitioner's Rebuttal Cmts. on CV Profit.

[69] *See* Letter from Greenberg Traurig, LLP to Sec'y of Commerce, Re: Certain Steel Nails from Oman – Comments and Factual Information for Valuing Constructed Value Profit and Selling Expenses (Feb. 7, 2022) ("Petitioner's CV Cmts.") at Exhibit 3 (showing ISWP catalog of steel

with zinc, bright),[70] and same uses, which indicate that the two companies would have similar customer bases. Moreover, ISWP's financial statements are contemporaneous to the POR, demonstrate the company operated at a profit during the reporting period, and reasonably break down selling expenses to identify indirect selling expenses.[71]

Oman Fasteners argues that ISWP financial statements are not suitable for use as a basis to calculate CV profit because they do not reflect the experiences of a nail producer similar to Oman Fasteners. Oman Fasteners contends that nails accounted for "merely 13 percent of ISWP's revenues," and "are dwarfed as a business segment by the company's two leading products: wire rod and wire, which account for 42 percent and 29 percent of revenue, respectively."[72]

Citing to a prior review in the instant case and *Steel Nails from China Remand Results,* Oman Fasteners argues that "the Department has previously applied this standard and determined that companies with nail production the range of 13 percent to 17 percent of total production was insufficient to deem the companies producers of identical merchandise." However, Oman Fasteners' reliance on those cases is misplaced and misleading.

In *Steel Nails from Oman (AR 14-16)*, the Department's decision to disregard VPTG's financial statements, as well as other eleven financial statements was not based on meeting a strict 17-percent threshold of nail production, but was based on the conclusion that another company had business operations, production processes, and products that were most similar to those of the

---

nails with length ranging from 1.5' to 6' and gauge ranging from 6 to 14) compare with Section A Response at Exhibit A-10 (showing product brochure of steel nails with length ranging from 1' to 6').

[70] *See* Petitioners' CV Cmts. at Exhibit 3; *see also* Oman Fasteners' Section A Response at Exhibit A-10.

[71] *See* Petitioners' CV Cmts. at Exhibit 4.

[72] Oman Fasteners' Case Br. at 96.

mandatory respondent.[73] In *Steel Nails from China Remand Results*, the Department decided to average the financial statements of companies that produced both identical and comparable merchandise.[74] The Department found that these companies did not receive countervailable subsidies during the period of review, their financial statements were contemporaneous with the POR, from an approved surrogate country, and profitable.[75] In other words, the Department's selection of surrogate financial statements was based on the totality of circumstances and the consideration of best information available, rather than some bright-line numerical threshold with respect to the production of comparable merchandise.

In this regard, the Department has noted that

> … the specific language of both the preferred and alternative methods appears to show a preference that the profit and selling expenses reflect: (1) production and sales in the foreign country; and (2) the foreign like product, *i.e.,* the merchandise under consideration. However, when selecting a profit rate from available record evidence, we may not be able to find a source that reflects both factors. In addition, there may be varying degrees to which a potential profit source reflects the merchandise under consideration. Consequently, ***we must weigh the quality of the data against these factors***. For example, we may have profit information that reflects production and sales in the foreign country of merchandise that is similar to the foreign like product, but also includes significant sales of completely different merchandise, or profit information that reflects production and sales of the merchandise under consideration but no sales in the foreign country. Determining how specialized the foreign like product is, what percentage of sales are of the foreign like product or general category of merchandise, what portion of sales are to which markets, *etc.,* judged against the above criteria, may help to determine which profit source to rely on.[76]

---

[73] *See Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2014–2016*, 82 Fed. Reg. 36,738 (Aug. 7, 2017), and accompanying Issues & Dec. Mem. at 17.

[74] *See* Final Results of Redetermination Pursuant to *Stanley Works (Langfang) Fastening Systems Co., Ltd. and the Stanley Works/Stanley Fastening Systems, LP v. United States*, Slip Op. 13-118 (Ct. Int'l Trade Sept. 3, 2013).

[75] *See id.*

[76] *Carbon and Alloy Steel Threaded Rod From India: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 8,818 (Feb. 18, 2020), and accompanying Issues & Dec. Mem. at 6-7 (emphasis added).

Thus, the fact that ISWP produces other products in addition to nails does not make ISWP's financial statements less preferable, in light of the significant flaws of the other data sources, as discussed above. Moreover, ISWP, like Oman Fasteners, is a significant producer of wire in addition to nails.[77] ISWP also produces other downstream products made from wire, which are comparable to nails. Thus, it is likely ISWP's production processes and profit experience are similar to those of Oman Fasteners.

Regarding Sundram's financial statements, according to the Respondent, Sundram's financial statements are unsuitable because the company received countervailable subsidies and does not produce identical merchandise. However, in the recent remand redetermination in Steel Nails from Oman, the Department found Sundram's financial statements to be suitable for calculating the indirect selling expense ratio for CV.[78] Specifically, the Department found that because Sundram produce comparable merchandise, its production experience, raw materials consumption, supply and demand conditions, and facilities should resemble those of Oman Fasteners. Further, its profit experience and customer base should also closely match those of Oman Fasteners. For the reasons explained above, the Department should rely on ISWP and disregard LSI, Bangkok, Sangchai and Haspl financial statements in calculating CV profit and ISE ratios if such information becomes necessary.

## VIII. THE DEPARTMENT SHOULD DISREGARD OMAN FASTENERS' ARGUMENT REGARDING A CIRCUMSTANCES-OF-SALE ADJUSTMENT

Referring to the calculations in the previous administrative review, Oman Fasteners argues that the Department should not make a circumstances-of-sale adjustment for U.S. imputed credit

---

[77] *See* Petitioners' CV Cmts. at Exhibits 3, 4, and 5.

[78] *See* Oman Fasteners' Case Br. at 91.

expenses because the Department, in the previous review, made no corresponding circumstances-of-sale adjustment for home market imputed interest expenses.[79] This argument is moot because, as discussed above, because the Department should continue to determine Oman Fasteners' dumping margin based on total AFA. In any case, Oman Fasteners' argument is incorrect as a matter of methodology. The Department properly makes a circumstances-of-sale adjustment to normal value for U.S. imputed credit expenses. Contrary to Oman Fasteners' claims (for which it provides no support), U.S. imputed credit expenses account for the opportunity cost related to carrying unpaid accounts receivable for sales made and an circumstances-of-sale adjustment is required by 19 U.S.C. §§ 1677b(a)(6)(C)(iii) and (a)(8).

## IX. CONCLUSION

For the reasons discussed above, the Department should disregard the arguments raised in Oman Fasteners' Case Brief and continue to determine Oman Fasteners' final dumping margin based on total AFA.

Date:  September 2, 2022

Respectfully submitted,

*/s/ Rosa S. Jeong*
Rosa S. Jeong
Stephanie Velez, Assistant Director*
GREENBERG TRAURIG, LLP
2101 L Street, NW
Suite 1000
Washington, D.C.  20037
Telephone: (202) 331-3100

*Counsel for Mid Continent Steel & Wire, Inc*

* Not engaged in the practice of law in the District of Columbia. Work performed under the supervision of attorneys who are members for the District of Columbia Bar. Licensed only in Colombia.

---

[79] *See id.* at 99.

# Exhibit 7

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-469-817
Administrative Review
POR: 8/1/19-7/31/20
Public Document
E&C/OI: CW

January 25, 2021

Agro Sevilla Aceitunas S.Coop. And. (Agro Sevilla)
c/o Matthew P. McCullough
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Re:     Errata to Agro Sevilla's Section D Response: Ripe Olives from Spain (08/01/2019 –
         07/31/2020)

Dear Mr. McCullough:

On January 21, 2021, we received the business proprietary information (BPI) one-day lag
version of your response to the Department of Commerce's (Commerce's) section D
questionnaire.  Pursuant to 19 CFR 351.303(c)(2)(ii), "{b}y the close of business one business
day after the date the business proprietary document is filed under paragraph (c)(2)(i) of this
section, a person must file the complete final business proprietary document with {Commerce}."
Further, 19 CFR 351.303(c)(2)(ii) states, "{t}he final business proprietary document must be
identical in all respects to the business proprietary document filed on the previous day except for
any bracketing corrections and the omission of the warning 'Bracketing of Business Proprietary
Information Is Not Final for One Business Day After Date of Filing' in accordance with
paragraph (d)(2)(v) of this section."  While you timely filed a final BPI version of your
questionnaire response on January 22, 2021, the final BPI version was not identical to the one-
day lag version submitted on January 21, 2021:  the consolidated PDF containing Exhibits D-8 to
D-24 was not included in the one-day lag submission.[1]  Thus, your final BPI version included
untimely information not included in your BPI one-day lag version of your response filed by the
January 21, 2021 deadline.

Accordingly, we are rejecting both the final BPI version (barcodes 4078530-01 through
4078530-37) and public version (barcode 4078600-01 and 4078600-02) of your section D
questionnaire response from the record because they are in violation of 19 CFR
351.303(c)(2)(ii).  One copy of the rejected documents will be kept for the official record, solely
for the purposes of establishing and documenting the basis for rejecting the document, as
required by 19 CFR 351.104(a)(2)(ii)(A).  In addition, through this letter, we are also instructing
all other interested parties that were served with a copy of the Agro Sevilla's final BPI and
public versions of its section D questionnaire response to destroy or return their copy(ies) to
Agro Sevilla and to notify Commerce that they have done so.  You may resubmit a final BPI
version and public version of your section D questionnaire response that is identical to the BPI

---

[1] See Agro Sevilla's Letter, "Errata to Agro Sevilla's Section D Response: Ripe Olives from Spain (08/01/2019 –
07/31/2020).



one-day lag version of your response except for any bracketing corrections. Do not make any other changes to your submission. The deadline to refile both the final BPI and public versions of your section D questionnaire response is by no later than **5:00 p.m. Eastern Time (ET) on Tuesday, January 27, 2021**.

Pursuant to 19 CFR 351.302(d), any information submitted after the applicable deadline will be considered untimely and rejected. In such case, we may have to use the facts available as required by section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences

If you have any questions regarding this matter, please contact Jacob Keller at (202) 482-4849.

Sincerely,

1/25/2021

X _Minoo Hatten_
_____

Minoo Hatten
Program Manager, AD/CVD Operations, Office I
Signed by: MINOO HATTEN

2

# Exhibit 8

Barcode:3997914-01 A-570-119 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-119
Investigation
**Public Document**
E&C/VII: LA

**DATE:**  July 7, 2020

**MEMORANDUM TO:**  The File

**FROM:**  Leo Ayala
International Trade Compliance Analyst
Enforcement & Compliance, Office VII

**RE:**  Antidumping Duty Investigation of Certain Vertical Shaft Engines
between 225cc and 999cc, and Parts Thereof from the People's
Republic of China: Petitioner's Information on Surrogate Values

---

On July 7, 2020, the Department of Commerce (Commerce) informed Ms. P. Marcus of King &
Spalding (counsel to Petitioner) by email, regarding missing information on surrogate value
comments in the above-referenced investigation.  Commerce provided the Petitioner the
opportunity to file the missing information on ACCESS by **COB Tuesday, July 7, 2020**.[1]

---

[1] *See* Attachment.



# Attachment

| | |
|---|---|
| **From:** | Leo Ayala |
| **To:** | pmarcus@kslaw.com |
| **Cc:** | Myrna Lobo; Thomas Gilgunn |
| **Subject:** | Large Vertical Shaft Engines - Missing Surrogate Value data |
| **Date:** | Tuesday, July 7, 2020 2:41:00 PM |
| **Attachments:** | image001.png |

Hi Pam,

We spoke earlier in regard to the submission of surrogate value information in the subject investigation that was due yesterday 7/6/2020.  You mentioned that while the PDF versions of the Excel exhibits listed in the submission were filed timely, the companion excel data were not filed. Additionally,  after a review of the submissions, we found that no information was filed for Exhibits 2, 15 and 23.  Please submit the missing PDF pages and Excel data, as well as any un-legible pages before close of business today.  Please call me if you have any questions.

Thanks,

**Leo Ayala**

International Trade Analyst

Enforcement and Compliance, Office VII

U.S. Department of Commerce | International Trade Administration

(202)-482-3945 | leo.ayala@trade.gov



# Exhibit 9

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-124, C-570-125
Investigations
**Public Document**
E&C/OII: AKM

DATE: May 22, 2020

MEMORANDUM TO: The File

THROUGH: Elizabeth Eastwood
Program Manager, Office II
AD/CVD Operations

FROM: Ajay K. Menon
Senior International Trade Compliance Analyst, Office II
AD/CVD Operations

SUBJECT: Antidumping and Countervailing Duty Investigations of Certain
Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts
Thereof, from the People's Republic of China

---

On May 22, 2020, I called Jamieson Greer, counsel to Briggs and Stratton Corporation. I informed Mr. Greer that his client filed his scope rebuttal comments solely on the record of the antidumping duty (AD) investigation; however, we instructed parties to file scope rebuttal comments on the record of both the AD and countervailing (CVD) investigations. Therefore, I informed Mr. Greer: 1) to remedy his error and file his client's scope rebuttal comments on the record of the CVD investigation by no later than **5:00 p.m. Eastern Time (ET) on Friday, May 22, 2020**; or 2) if he did not do so, Commerce would reject his client's scope rebuttal comments from the record of the AD investigation. Mr. Greer indicated that he understood my instructions and would submit his clients comments on the record of the CVD investigation by the stated deadline.


INTERNATIONAL TRADE ADMINISTRATION

# Exhibit 10

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-523-810
Administrative Review
05/01/2017 - 04/30/2018
**Public Document**
ITA/E&C/Office IV: JDH

March 28, 2019

OCTAL SAOC – FZC
c/o Daniel Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Dear Mr. Porter:

This letter concerns the antidumping duty administrative review of certain polyethylene terephthalate resin from the Sultanate of Oman (Oman), covering the period May 1, 2017 through April 31, 2018, and your client, OCTAL SAOZ – FZC (OCTAL). On March 19, 2019, the Department of Commerce (Commerce), pursuant to section 777(b)(1)(B) of the tariff Act of 1930, as amended (the Act) and 19 CFR 351.304(c) and (d), removed OCTAL's February 19, 2019, proprietary supplemental questionnaire response (*i.e.*, bar codes 3794992-01 through 06) from the record because OCTAL failed to file a public version of its submission.[1] Subsequently, on March 21, 2019, you filed a letter on behalf of OCTAL, requesting that Commerce reinstate the February 19, 2019, proprietary supplemental questionnaire response and accept an untimely filed public version of this supplemental questionnaire response.[2]

In your March 21, 2019, letter, you explained the circumstances surrounding the late filing of OCTAL's supplemental questionnaire response. In addition, you: 1) provided information confirming that you understand Commerce's filing requirements; and 2) detailed the steps you and your firm take internally to ensure that all submissions, in this proceeding or in others, are filed in a timely manner.

Given the above, Commerce is allowing OCTAL to submit the proprietary and public versions of its February 19, 2019, supplemental questionnaire response so long as they are properly filed by no later than **5:00 p.m. Eastern Time on March 31, 2019**. Please be advised that, from this point forward, we expect to reject all late submissions from you (or your firm) in this or any other proceeding before Commerce, unless you contact Commerce to request an extension of time in accordance with 19 CFR 351.302(c). We emphasize that further deficiencies such as

---

[1] *See* Commerce Letter dated March 19, 2019, *see also* 19 CFR 351.304(d)(1) ("The Secretary will reject a submission that does not meet the requirements of section 777(b) of the Act and this section with a written explanation."); *see also* 777(b)(1)(B) of the Act ("The administering authority and the Commission shall require that information for which proprietary treatment is requested be accompanied by (i) either (I) a non-proprietary summary in sufficient detail to permit a reasonable understanding of the substance of the information submitted in confidence,... .")

[2] *See* OCTAL Letter, "Request for Beyond Deadline Acceptance of the Public Version of OCTAL's Feb. 19, 2019 Supplemental Section C Response and Reinstatement of BPI Version: Certain Polyethylene Terephthalate Resin from the Sultanate of Oman," dated March 21, 2019.

INTERNATIONAL
T R A D E
ADMINISTRATION

those of this nature may warrant the use of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

If you have any questions regarding this matter, please contact Jonathan Hill at (202) 482-3518.

Sincerely,

Howard Smith
Program Manager
AD/CVD Operations, Office IV
Enforcement & Compliance

2

# Exhibit 11

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-583-844
Administrative Review
POR: 9/1/2013 – 8/31/2014
**Public Document**
E&C Office II: DC

February 27, 2015

J. David Park
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036

Re: Narrow Woven Ribbons with Woven Selvedge from Taiwan: 2013-2014 Antidumping
Duty Administrative Review

Dear Mr. Park:

This concerns your February 23, 2015, letter in which you request that the Department of
Commerce (the Department) permit your client, Roung Shu Industry Corporation (Roung Shu),
to submit a response to section D of the Department's questionnaire. Based on the information
you provided in your letter, including your description of the procedures you now have in place
to prevent missed deadlines, we will allow Roung Shu to submit its response to section D of the
questionnaire.

Please be advised that, from this point forward, if you (or your firm) miss an established deadline
in this or any other proceeding before the Department, you will not be permitted to submit the
information at a later date. Note also that all late submissions from your firm will be rejected,
unless you contact the Department to request an extension of time in accordance with 19 CFR
351.302(c), or you alert the Department of any technical difficulties encountered during an
attempt to file a submission via ACCESS, in accordance with 19 CFR 351.303(b)(2)(ii)(C).

Given that Roung Shu's section D response was originally due on February 4, 2015, the
Department is requiring that your client submit its response within two business days. Therefore,
Roung Shu's section D response is now due no later than **5 p.m. Eastern Time (ET) on
Tuesday, March 3, 2015**. Please note that pursuant to 19 CFR 351.303(c)(2) and 351.304(c),
you must also submit an appropriate public summary of the proprietary data in Roung Shu's
response no later than **5 p.m. ET on Wednesday, March 4, 2015**. Additionally, pursuant to 19
CFR 351.302(d), any information submitted after the applicable deadlines will be considered
untimely filed and rejected. In such case, we may rely on the facts available as outlined in
section 776 of the Tariff Act of 1930, as amended, for the preliminary results in this
administrative review.



If you have any questions on this matter, please contact David Crespo at (202) 482-3693 or Alice Maldonado at (202) 482-4682.

Sincerely,

Shawn Thompson
Program Manager
AD/CVD Operations, Office II
Enforcement and Compliance

# Akin Gump

## STRAUSS HAUER & FELD LLP

**J. DAVID PARK**
+1 202.887.4585/fax: +1 202.887.4288
dpark@akingump.com

February 23, 2015

Case No.: A-583-844
Total Pages: 4
Administrative Review
POR: 9/1/13 – 8/31/14
ITA/E&C/Office II

### PUBLIC DOCUMENT

### VIA ELECTRONIC FILING

The Honorable Penny Pritzker
Secretary of Commerce
International Trade Administration
Enforcement and Compliance
APO/Dockets Unit, Room 1870
14th Street & Constitution Avenue, NW
Washington, DC 20230

Re:     **Narrow Woven Ribbons with Woven Selvedge from Taiwan**

Dear Secretary Pritzker:

We represent Roung Shu Industry Corporation ("Roung Shu"), a mandatory respondent

in the above-referenced proceeding.  This letter concerns our February 18, 2015 request for

reconsideration of Roung Shu's Section D extension request and our subsequent meeting with

Department officials on February 20, 2015.  As discussed in our February 18, 2015 letter, Roung

Shu's responses to Sections B through D of the Department's December 29, 2014 questionnaire

were originally due on February 4, 2015.  On January 22, 2015, we requested an extension for

the submission of Roung Shu's responses.  However, due to a clerical error, our extension

request only referenced Sections B and C and inadvertently omitted a reference to Section D. Accordingly, the Department's extension letter likewise only referenced Sections B and C.

In accordance with the Department's request of February 20, 2015, we hereby explain in detail the remedial actions our firm is taking to ensure that this error does not occur again in this or other proceedings before the Department. These measures are in addition to the steps our firm normally follows in tracking and meeting the Department's deadlines. First, a minimum of three separate individuals will review all extension requests and compare such requests with the Department's requests for information. Further, our extension requests will separately identify each submission that is currently pending before the Department for the party in question. Such letters will identify the current due dates and requested extension dates for each section, if multiple deadlines are indicated.

In addition, we will follow similar steps once the Department issues an extension letter. Specifically, three individuals will independently review the extension letter and will verify whether the letter covers all relevant portions of our upcoming submissions. Each individual will also confirm the extended due date and confirm that the date is accurately reflected in our internal materials.

Our firm recognizes that the efficient and timely completion of the Department's proceedings require that parties strictly adhere to the Department's established deadlines. As previously indicated, our error was an inadvertent clerical oversight, and we apologize for the inconvenience caused. In light of these additional steps taken, Roung Shu respectfully requests leave from the Department to submit a response to Section D of the Department's questionnaire. Roung Shu greatly appreciates the Department's attention to this matter.

*       *       *       *       *

February 23, 2015
Page 3

     In accordance with the Department's regulations, we are filing this submission

electronically via ACCESS at access.trade.gov.  Copies of this submission have been served on

parties as indicated in the attached certificate of service.  If you have any questions or desire any

additional information, please feel free to contact the undersigned.


                      Respectfully submitted,

                      /s/ J. David Park
                      J. David Park
                      Phyllis L. Derrick
                      Henry D. Almond
                      Yujin K. McNamara
                      Yun H. Lee
                      Cynthia Y. Liu

                      AKIN GUMP STRAUSS HAUER & FELD LLP
                      **Counsel for Roung Shu**
                      **Industry Corporation**

**PUBLIC CERTIFICATE OF SERVICE**
**Narrow Woven Ribbons with Woven Selvedge from Taiwan**
**Case No. A-583-844**
**9/1/13-8/31/14**
**Administrative Review**

   I hereby certify that, on this day, copies of the foregoing submission were served upon the following parties by first class mail:

On Behalf of Berwick Offray LLC:
Gregory C. Dorris, Esq.
Pepper Hamilton LLP
600 Fourteenth Street, NW
Washington, DC 20005

| 2/23/2015 | /s/ Henry Almond |
|---|---|
| Date | Henry Almond |
|  | Akin Gump Strauss Hauer & Feld LLP |

# Exhibit 12

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-570-936
Sunset Review (2019)
Public Document
E&C OFIII: KJ

April 18, 2019

Chris T. Cloutier, Esq.
Schagrin Associates
900 Seventh Street, NW
Suite 500
Washington, DC 20001

Re: Sunset Review of Countervailing Duty Order on Circular Welded Carbon
Quality Steel Line Pipe from the People's Republic of China

Subject: Acceptance of Notice of Intent to Participate

Dear Mr. Cloutier:

We considered your submission of April 17, 2019,[1] filed with the Department of Commerce
(Commerce) on behalf of California Steel Industries, TMK IPSCO, Welspun Tubular, and
Zekelman Industries (collectively, the domestic interested parties), in which you explain why
the notice of intent to participate in the above-referenced sunset review, pursuant to 19 CFR
351.218(d)(1)(i), was not timely filed by the deadline of 5:00pm Eastern Time on April 16, 2019.
Based on the measures outlined in the letter, which refer to procedures being implemented by
your firm to prevent the recurrence of a missed deadline, we are accepting the domestic
interested parties' April 16, 2019, notice of intent to participate in the review, which is part of the
April 17, 2019, submission.

It is imperative that counsel for domestic interested parties adhere strictly to Commerce's
submission deadlines and observe the steps a party must take when it is unable to comply with
the filing requirements.[2] We expect to reject all late submissions by counsel in this or any other
proceeding before Commerce, unless counsel contacts Commerce in accordance with
Commerce's regulations or requests an extension of time in a proper manner.[3]

---

[1] See Letter from California Steel Industries, TMK IPSCO, Welspun Tubular, and Zekelman Industries regarding,
"Notice of Intent to Participate in Second Five-Year Review of the Antidumping and Countervailing Duty Orders on
Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China – Request for Extension of
Deadline and Acceptance of Submission," dated April 17, 2019 (barcode 3821488).
[2] See generally 19 CFR 351.303.
[3] See 19 CFR 351.302(c) and (d).



If you have any questions regarding this matter, please contact Kristen Johnson, case analyst, at 202-482-4793.

Sincerely,

Erin Begnal
Director
AD/CVD Operations, Office III

# Schagrin Associates

900 Seventh Street, N.W. · Suite 500 · Washington, D.C. 20001
P: (202) 223-1700 E:CCloutier@schagrinassociates.com F: (202) 429-2522

April 17, 2019

DOC Case No. C-570-936
Total Pages: 9
Sunset Review (2nd Review) (2019)
AD/CVD Operations
**PUBLIC DOCUMENT**

**VIA ELECTRONIC FILING**

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
U.S. Department of Commerce
Attn: Import Administration
Central Records Unit, Room 1870
Pennsylvania Avenue and 14th Street, NW
Washington, D.C. 20230

> **Re:** **Notice of Intent to Participate in Second Five-Year Review of the Antidumping and Countervailing Duty Orders on Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China – Request for Extension of Deadline and Acceptance of Submission**

Dear Mr. Secretary:

On behalf of California Steel Industries, TMK IPSCO, Welspun Tubular, and Zekelman Industries (collectively, "Domestic Interested Parties"), we hereby confirm to the U.S. Department of Commerce (the "Department") our intent to participate in the second sunset review of both the antidumping and countervailing duty orders on *Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China*.

Yesterday we timely filed our notice of intent to participate in the companion antidumping investigation. For reasons including a miscommunication with clerical staff, we did not make the same filing in the companion countervailing duty proceeding because the documents appear to be identical except for the case numbers. More senior attorneys were

informed yesterday that the filings had been made but had difficulty verifying due to apparent lags in documents being uploaded to Access. We ask that Commerce accept this virtually identical submission in the countervailing duty proceeding as filed today. Had we known of the problem yesterday we would have timely requested an extension.

The firm regrets this error and will take steps to ensure that it will not happen again. Among other things, we will require that future submissions be reviewed by a partner prior to submission and that a partner confirm required submissions in all related proceedings are timely filed by the relevant deadline.

Please contact the undersigned with questions regarding this submission.

Respectfully submitted,

Roger B. Schagrin, Esq.
Chris T. Cloutier, Esq.
Elizabeth J. Drake, Esq.
Luke A. Meisner, Esq.
Kelsey M. Rule, Esq.

**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to California Steel Industries, TMK
IPSCO, Welspun Tubular, and Zekelman Industries*

2

# ATTACHMENT

# SCHAGRIN ASSOCIATES

900 Seventh Street, N.W. - Suite 500 - Washington, D.C. 20001
P: (202) 223-1700 E:krule@schagrinassociates.com F: (202) 429-2522

April 16, 2019

DOC Case Nos. C-570-936
Total Pages: 5
Sunset Review (2nd Review) (2019)
AD/CVD Operations
**PUBLIC DOCUMENT**

**VIA ELECTRONIC FILING**

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
U.S. Department of Commerce
Attn: Import Administration
Central Records Unit, Room 1870
Pennsylvania Avenue and 14th Street, NW
Washington, D.C. 20230

> Re:  **Notice of Intent to Participate in Second Five-Year Review of the Countervailing Duty Order on Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China**

Dear Mr. Secretary:

On behalf of California Steel Industries, TMK IPSCO, Welspun Tubular, and Zekelman Industries (collectively, "Domestic Interested Parties"), we hereby notify the U.S. Department of Commerce (the "Department") of our intent to participate in the second sunset review of the countervailing duty order on *Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China*.

This submission is timely filed within 15 days of the *Notice of Initiation* published by the Department in the *Federal Register*.[1]

---

[1]  *Initiation of Five-Year (Sunset) Reviews*, 84 Fed. Reg. 12,227 (Dep't Commerce April 1, 2019). *See also* 19 C.F.R. § 351.218(d)(1)(i).

Pursuant to 19 C.F.R. § 351.218(d)(1)(ii), we hereby provide the following information to the Department:

## I.     DOMESTIC INTERESTED PARTIES INFORMATION

Domestic Interested Parties intend to participate and support continuation of the countervailing duty order on circular welded carbon-quality steel line pipe in the above-referenced proceeding. Domestic Interested Parties are all manufacturers of the domestic like product in the United States and, accordingly, are domestic interested parties pursuant to 19 U.S.C. § 1677(9)(C) and 19 C.F.R. § 351.102(b)(29)(v).

In accordance with 19 C.F.R. § 351.218(d)(1)(ii)(A), provided below are the names, addresses, and telephone numbers of Domestic Interested Parties.

| California Steel Industries | Welspun Tubular |
|---|---|
| P.O. Box 5080 | 15721 Park Row, Suite 230 |
| 1 California Steel Way | Houston, Texas 77084 |
| Fontana, CA 92335 | Phone: (281) 492-3220 |
| Phone: (909) 350-6300 | |
| **TMK IPSCO** | **Zekelman Industries** |
| 10120 Houston Oaks Dr | 227 W. Monroe St., 26th Floor |
| Houston, TX 77064 | Chicago, IL 60606 |
| Phone: (281) 949-1023 | Phone: (312) 275-1600 |

## II.     RELATED PARTY AND IMPORTER STATUS UNDER SECTION 771(4)(B) OF THE ACT

No Domestic Interested Party is related to any foreign producer or foreign exporter of the subject merchandise.[2] Additionally, no Domestic Interested Party is an importer of circular welded carbon-quality steel line pipe or is related to any importer of circular welded carbon-quality steel line pipe.[3]

---

[2]    *See* 19 C.F.R. § 351.218(d)(1)(ii)(B)(1).

[3]    *See* 19 U.S.C. § 1677(4)(B); 19 C.F.R. § 351.218(d)(1)(ii)(B)(2).

2

III.    **LEGAL COUNSEL INFORMATION**

Domestic Interested Parties are represented in this sunset review by the following legal

counsel:

> Roger B. Schagrin, Esq.
> Elizabeth J. Drake, Esq.
> Luke A. Meisner, Esq.
> Kelsey M. Rule, Esq.
> **SCHAGRIN ASSOCIATES**
> 900 Seventh Street, NW
> Suite 500
> Washington, DC 20001
> Phone: (202) 223-1700
> Fax: (202) 429-2522
> *Counsel to California Steel Industries, TMK
> IPSCO, Welspun Tubular, and Zekelman
> Industries*

IV.    **SUBJECT MERCHANDISE AND COUNTRY**

The subject merchandise is circular welded carbon-quality steel line pipe from China.[4] The

Department has defined the scope of the Order as follows:

> The merchandise covered by this order is circular welded carbon
> quality steel pipe of a kind used for oil and gas pipelines (welded
> line pipe), not more than 406.4 mm (16 inches) in outside diameter,
> regardless of wall thickness, length, surface finish, end finish or
> stenciling.
>
> The term "carbon quality steel" includes both carbon steel and
> carbon steel mixed with small amounts of alloying elements that
> may exceed the individual weight limits for nonalloy steels imposed
> in the Harmonized Tariff Schedule of the United States (HTSUS).
> Specifically, the term "carbon quality" includes products in which
> (1) iron predominates by weight over each of the other contained
> elements, (2) the carbon content is 2 percent or less by weight and

---

[4]    *See Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China:
Continuation of Antidumping and Countervailing Duty Orders*, 79 Fed. Reg. 28,895 (Dep't
Commerce May 20, 2014).

3

(3) none of the elements listed below exceeds the quantity by weight respectively indicated:

(i) 2.00 percent of manganese,
(ii) 2.25 percent of silicon,
(iii) 1.00 percent of copper,
(iv) 0.50 percent of aluminum,
(v) 1.25 percent of chromium,
(vi) 0.30 percent of cobalt,
(vii) 0.40 percent of lead,
(viii) 1.25 percent of nickel,
(ix) 0.30 percent of tungsten,
(x) 0.012 percent of boron,
(xi) 0.50 percent of molybdenum,
(xii) 0.15 percent of niobium,
(xiii) 0.41 percent of titanium,
(xiv) 0.15 percent of vanadium, or
(xv) 0.15 percent of zirconium.

Welded line pipe is normally produced to specifications published by the American Petroleum Institute (API) (or comparable foreign specifications) including API A-25, 5LA, 5LB, and X grades from 42 and above, and/or any ther proprietary grades or non-graded material. Nevertheless, all pipe meeting the physical description set forth above that is of a kind used in oil and gas pipelines, including all multiple-stenciled pipe with an API welded line pipe stencil is covered by the scope of this investigation.

Excluded from this scope are pipes of a kind used for oil and gas pipelines that are multiple-stenciled to a standard and/or structural specification and have one or more of the following characteristics: is 32 feet in length or less; is less than 2.0 inches (50 mm) in outside diameter; has a galvanized and/or painted surface finish; or has a threaded and/or coupled end finish. (The term ``painted'' does not include coatings to inhibit rust in transit, such as varnish, but includes coatings such as polyester.)

## V.     CITATION AND DATE OF PUBLICATION OF NOTICE OF INITIATION

The *Notice of Initiation* of this sunset review is was published at 84 Fed. Reg. 12,227 (Dep't

Commerce April 1, 2019).

If you have any questions regarding this submission, please contact the undersigned.

4

Respectfully submitted,

_____
Roger B. Schagrin, Esq.
Elizabeth J. Drake, Esq.
Luke A. Meisner, Esq.
Kelsey M. Rule, Esq.

**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to California Steel Industries, TMK
IPSCO, Welspun Tubular, and Zekelman Industries*

5

# PUBLIC CERTIFICATE OF SERVICE

### Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China
### C-570-936
### Sunset Review (2019)

I, Ariana Mercado, hereby certify that copies of the attached public document were served today, April 17, 2019 by first class mail upon the following parties:

Yu Gu
**Embassy of the People's Republic of China**
2133 Wisconsin Avenue, NW
Washington, DC 20007
Phone: 202-625-3345
Email: guyu@mofcom.gov.cn

Ariana Mercado, *Paralegal*
SCHAGRIN ASSOCIATES

# Exhibit 13

C-533-876
Investigation
**Public Document**
OFFICE IV: TT

August 23, 2017

Bombay Dyeing & Manufacturing Company Limited
c/o Mr. Sharad Bhansali
APJ-SLG Law Office
F-21, Geetanjali Enclave,
New Delhi, India 110017

RE:    Countervailing Duty Investigation of Certain Fine Denier Polyester Staple Fiber from
       India: Untimely Filed Questionnaire Response to the Department's July 24, 2017,
       Countervailing Duty Initial Questionnaire

Dear Mr. Bhansali:

This letter concerns the countervailing duty investigation of certain fine denier polyester staple
fiber (PSF) from India. On July 24, 2017, the Department of Commerce (the Department) issued
a countervailing duty (CVD) questionnaire with a response to Section III Identifying Affiliated
Companies with a deadline of August 7, 2017.  On August 7, 2017, Bombay Dyeing &
Manufacturing Company Limited (Bombay Dyeing) emailed its response to the Department.  On
August 10, 2017, the Department responded via email reminding Bombay Dyeing of the proper
filing requirements and that email does not constitute proper filing in the context of a
countervailing duty proceeding.  The Department also explicitly specified in the email that the
deadline to file Section III was extended to Friday, August 11, 2017 by close of business 5 p.m.[1]
Further, the original questionnaire specifically identifies 5:00 PM Eastern Standard Time (EST)
as the time by which responses must be filed on the date specified.  Bombay Dyeing failed to
submit a response to or timely request an extension of the deadline by close of business 5:00 PM
EST on August 11, 2017.

On August 18, 2017, the Department provided Bombay Dyeing with an opportunity to submit a
letter explaining the circumstances surrounding the filing error and late filing, confirming that it
understood the Department's filing requirements and detailing the steps it would take internally
to ensure that all future submission, in this proceeding or in others, are filed in a timely manner.
Bombay Dyeing filed a letter on August 18, 2017 providing the Department with the requested
information.  Based on the information outlined in your August 18, 2017 letter, which also refers
to procedures being implemented by your firm to prevent the recurrence of such a missed
deadline, we are allowing Bombay Dyeing to submit a response so long as it is properly filed by

---

[1] *See* Letter to the Government of India on (July 24, 2017).

no later than **5:00 p.m. EST** on **August 25, 2017.**

Please be advised that, from this point forward, all late submissions from you (or your firm) in this or any other proceeding before the Department will be rejected, unless you contact the Department to request an extension of time in accordance with 19 CFR 351.302(c), or you alert the Department of any technical difficulties encountered during an attempt to file a submission via ACCESS, in accordance with 19 CFR 351.303(b)(2)(ii)(C). We emphasize that further deficiencies such as those of this nature may warrant the use of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 11930, as amended (the Act).

If you have any questions, please contact Robert Bolling at (202) 482-3434 or Trisha Tran at (202) 482-4852.

Sincerely,

Abdelali Elouaradia
Office Director
Enforcement & Compliance, Office IV

# Exhibit 14



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-533-825
ITA/E&C/OFC VII: KW
POR: 01/01/16-12/31/16
*Public Document*

August 1, 2018

**Government of India**
C/o Sanjay Notani, Partner
ELP Advocates & Solicitors
109A, 1st Floor, Dalamal Towers
Free Press Journal Road, Nariman Point
Mumbai, Maharashtra India (400021)

<u>Countervailing Duty Administrative Review of Polyethylene Terephthalate Film, Sheet and Strip (PET film) from India (01/01/2016-12/31/2016):  Request to Refile Rejected Supplemental Questionnaire</u>

Dear Mr. Notani:

On July 26, 2018 your firm, ELP Advocates and Solicitors, filed a response to the Department of Commerce (Commerce)'s July 12, 2018 supplemental questionnaire on behalf of your client, the Government of India (GOI).[1]  However, due to a typographical error demarcating the public version as a business proprietary document, Enforcement and Compliance's electronic filing system, ACCESS, rejected the public version of the document.  The deadline to file a response to Commerce's supplemental questionnaire was July 26, 2018.  On July 27, 2018, you refiled the public version of the supplemental questionnaire response.  On the same day, you called Kathryn Wallace of Commerce to request that we accept the untimely filed public version of the GOI's supplemental questionnaire response.

At the conclusion of the phone call, Ms. Wallace requested that your firm submit a letter on the record of the instant review: 1) confirming that ELP Advocates and Solicitors understands Commerce's filing requirements; and 2) detailing the steps that ELP Advocates and Solicitors will internally to ensure that all future submissions, in this proceeding or in others, are filed in a timely manner.  You indicated that you would file the requested letter and ensured Ms. Wallace that ELP Advocates and Solicitors would prevent similar filing problems from arising in the future.

Accordingly, on July 30, 2018, you filed a letter on behalf of the GOI, requesting that Commerce accept the untimely filed public version of its supplemental questionnaire response.[2]

---

[1] *See* GOI's Letter, "Countervailing Duty Administrative Review of Polyethylene Terephthalate Film, Sheet, and Strip from India: Response to Section II of the CVD First Supplemental Questionnaire" dated July 26, 2018.
[2] *See* GOI's Letter, "Countervailing Duty Administrative Review of Polyethylene Terephthalate Film, Sheet, and Strip from India: Response to Section II of the CVD First Supplemental Questionnaire - Correction" dated July 30, 2018.

INTERNATIONAL
**TRADE**
ADMINISTRATION

In your July 30, 2018 letter, you explained the circumstances surrounding the late filing of the GOI's supplemental questionnaire response.  In addition, you: 1) confirmed that you understood Commerce's filing requirements; and 2) detailed the steps you will take internally to ensure that all future submissions, in this proceeding or in others, are filed in a timely manner.

Given the above, Commerce has decided to accept the GOI's July 27, 2018 filing of the public version of the supplemental questionnaire response.  Please note that, typically, Commerce would reject any late filling and require a party to refile with the permission of Commerce.  However, due to time constraints in this proceeding, rather than reject the late filing, we elected to maintain the GOI's late filing on the record of this review.

Please be advised that, from this point forward, all late submissions from your firm in this or any other proceeding before Commerce will be rejected, unless you contact Commerce to request an extension of time in accordance with 19 CFR 351.3012(c), or you alert Commerce of any technical difficulties encountered during an attempt to file a submission via ACCESS, in accordance with 19CFR 351.303(b)(2)(ii)(C).  We emphasize that further deficiencies such as those of this nature may warrant the use of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences, pursuant to section 776(b) of the Act.

Should you have any questions about this matter, please contact Elfi Blum at (202) 482-0197.

Sincerely,

Thomas Gilgunn
Program Manager
AD/CVD Operations, Office VII

# Exhibit 15

**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

A-570-912
AR:  9/1/2015 – 8/31/2016
**Public Document**
E&C AD/CVD OIII:  MKM

December 20, 2016

**Weihai Zhongwei Rubber Co., Ltd.**
c/o R Kevin Williams
Clark Hill PLC
150 N. Michigan Avenue
Suite 2700
Chicago, IL 60601

Re:     2015-2016 Administrative Review of the Antidumping Duty Order on Certain New
         Pneumatic Off-the-Road Tires from the People's Republic of China:  Untimely Submitted
         Request for Extension of Time to Provide a Separate Rate Application/Certification

Dear Mr. Williams:

This concerns the administrative review of the antidumping duty order on certain new pneumatic
off-the-road tires from the People's Republic of China ("PRC") and your client, Weihai Zhongwei
Rubber Co., Ltd. ("Weihai Zhongwei") and Super Grip Corporation ("Super Grip").  Weihai
Zhongwei and Super Grip failed to submit a response to, or timely request for extension of, the
Department of Commerce's ("Department") November 9, 2016, *Initiation Notice*[1] for the instant
antidumping duty administrative review which specified that Separate Rate
Applications/Certifications are due to the Department no later than 30 calendar days after
publication of the notice (*i.e.*, December 9, 2016).

On December 13, 2016, Weihai Zhongwei and Super Grip Corporation, submitted a request for
extension of time to submit a separate rate certification/separate rate application, *i.e.*, five days <u>after</u>
the due date for this submission.[2]  On December 16, 2016, the Department denied this untimely *post
hoc* request, noting that Weihai Zhongwei failed to identify extraordinary circumstances that
prevented Weihai Zhongwei, Super Grip or their representatives from filing a timely request for an
extension of time to submit a response, as required by 19 CFR 351.302(c).[3]  On December 19.
2016, the respondent resubmitted its request, further detailing the circumstances which prevented
timely filing of the Separate Rate Certification, amending the requested timeframe for submission
of certification, and requesting the Department reconsider its prior denial of the request.[4]

We have evaluated Weihai Zhongwei's second request and, based on the measures outlined in your
December 19, 2016 letter, which provides greater detail on the circumstances and refers to

---

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 81 FR78778 (November 9, 2016)
("*Initiation Notice*").
[2] *See* Letter from Weihai Zhongwei and Super Grip, "New Pneumatic Off-the-Road Tires from the People's Republic of
China: Request for Administrative Review," dated December 14, 2016.
[3] *See* the Department's letter to Weihai Zhongwei and Super Grip, "2015-2016 Administrative Review of the
Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Denial
of Extension of Time to Provide a Separate Rate Application/Certification," dated December 16, 2016.
[4] *See* Letter from Weihai Zhongwei and Super Grip, "New Pneumatic Off-the-Road Tires from the People's Republic
China: Request for Administrative Review," dated December 19, 2016.

procedures being implemented by your firm to prevent the recurrence of such a missed deadline, we are granting the request, in full, and will allow Weihai Zhongwei and Super Grip to submit their separate rate application/certification so long as it is properly filed by no later than **5:00 p.m. Eastern Time on December 22, 2016**.

Please be advised that, from this point forward, all late submissions from you (or your firm) in this or any other proceeding before the Department will be rejected, unless you contact the Department to request an extension of time in accordance with 19 CFR 351.3012(c), or you alert the Department of any technical difficulties encountered during an attempt to file a submission via ACCESS, in accordance with 19CFR 351.303(b)(2)(ii)(C). We emphasize that further deficiencies such as those of this nature may warrant the use of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences, pursuant to section 776(b) of the Act.

If you have any questions, please contact Mandy Mallott at (202) 482-6430.

Sincerely,

Brendan Quinn
Program Manager, Office III
Antidumping and Countervailing Duty Operations

2

# CLARK HILL

Clark Hill PLC
130 E. Randolph Street
Suite 3900
Chicago, IL 60601
T 312.985.5900
F 312.985.5999

R. Kevin Williams
T 312.985.5907
F 312.985.5956
Email: kwilliams@clarkhill.com

**clarkhill.com**

December 19, 2016

## *VIA ELECTRONIC FILING*

Secretary of Commerce
U.S. Department of Commerce
ATTN: Import Administration
Central Records Unit, Room #1870
14th Street and Constitution Avenue, N.W.
Washington, DC 20230

Case No. A-570-912
Total Pages: 3
Administrative Review
POR: 9/1/15 – 8/31/16
**Public Document**

Re:    **New Pneumatic Off-the-Road Tires from the People's Republic of China:**
             **Request for Administrative Review**

Dear Madam Secretary:

We represent Weihai Zhongwei Rubber Co., Ltd. ("Weihai") and Super Grip Corporation ("Super Grip"), a producer and importer, respectively, of the subject merchandise in this review. Weihai's separate rate certification was due on December 9, 2016. For the reasons outlined below, we request permission to file the certification on or before December 22, 2016.

As noted in your letter of December 16, 2016, denying our initial request for an extension of time, Section 351.302(c) of the Department's regulations requires a request for an extension of time to must be filed prior to the expiration of the applicable time limit. Untimely requests for an extension of time must be in writing, in a separate stand-alone submission and filed consistent with Section 351.303 of the regulations. Extraordinary circumstances must exist in order for an extension request to be granted. Extraordinary circumstances are defined in the regulations as an

December 19, 2016
Page 2

"unexpected event" that "could not have been prevented if reasonable measures had been taken."
We submit that such circumstances exist in our case and support granting our request.

The separate certification was not timely filed due to a docketing error. Our long-term docketing clerk left our firm earlier this year. Miscommunication between myself and our new clerk resulted in the due date for the separate rate certification not being placed on the docket. This error also resulted in my not receiving a reminder to begin the preparation of the certification.

I realized this error early in the morning of December 14, 2016, while out of town on an extended business trip. I had limited resources available at the time and quickly crafted a request for an extension of time based on the one timely submitted by Guizhou Tyre on December 7, 2016, and submitted it via ACCESS before going to meetings that lasted all day. I recognize that this was an ill-advised decision and that I should have consulted with the Department prior to submitting the request.

Upon returning from my trip late last week, I investigated the circumstances surrounding the docket error and confirmed that it was the result of miscommunication. We have since reviewed our procedures and are confident that a similar error will not occur again. We also note that undersigned counsel and his firm have not previously committed an error of this type.

While consideration of additional factors is not required by section 351.302 of the Department's regulations, we submit that it is relevant for the Department to consider the following. First, we note that Weihai has successfully maintained its separate status in each administrative review of this order since its initial separate rate application was approved in the first administrative review. Second, granting our request will not cause significant additional

CLARK HILL
205292105.1 41497165942
Filed By: kgilliams@clarkhill.com, Filed Date: 12/19/16 4:48 PM, Submission Status: Approved

December 19, 2016
Page 3

work for the Department because the Department has not yet selected mandatory respondents in this investigation and, thus, has likely not yet begun its review of the separate rate applications and certifications submitted by other parties. In fact, the Department granted Guizhou Tyre an extension of time to file its SRC to two weeks after the Department selects the mandatory respondents. We do not request an extension of that length because it is highly unlikely that Weihai will be selected as a mandatory respondent and the preparation of an SRC for Weihai will involve the review and updating of the ones filed in previous reviews.

We regret this error and apologize to the Department for any inconvenience it has caused. We respectfully request that the Department grant our request to file a separate rate certification on behalf of Weihai on or before December 22, 2016.

Please contact the undersigned if you have any questions regarding this request.

Respectfully Submitted,

**CLARK HILL PLC**

By: _____

R. Kevin Williams
Lara A. Austrins

RKW:rkw

## CERTIFICATE OF SERVICE
### Case No. A-570-912
**Certain New Pneumatic Off-The-Road Tires from the People's Republic of China**
**Administrative Review (9/1/2015 – 8/31/2016)**

As counsel for Super Grip Corporation and Weihai Zhongwei Rubber co., Ltd., I hereby certify that on the date hereinafter shown, I have caused a copy of the foregoing document to be served upon the following parties, by depositing copies in the U.S. mail in securely sealed envelopes with first-class postage affixed and addressed as follows on the date shown below:

William A. Fennell, Esq.
STEWART AND STEWART
2100 M Street, NW
Suite 200
Washington, DC 20037

Matthew J. McConkey, Esq.
Mayer Brown, LLP
1999 K Street, NW
Washington, DC 20006-1101

Richard P. Ferrin
Drinker Biddle & Reath, LLP
1500 K Street, NW
Washington, DC 20005-1209

Meng Jing
Guantao Law Firm
18/F, Tower B, Xinsheng Plaza
5 Finance Street, Xicheng District
Beijing 100032
China

Mark E. Pardo
Grunfeld, Desiderio
1201 New York Avenue, NW
Suite 650
Washington, DC 20005

R. Kevin Williams
Clark Hill PLC
130 E. Randolph Street, Suite 3900
Chicago, IL 60601

Dated:  December 19, 2016

# Exhibit 16

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-580-889
POR: 02/03/2017-07/31/2018
**Public Document**
E&C AD/CVD OIII: LG

June 12, 2019

**MEMORANDUM TO:**   The File

**FROM:**   Laura Griffith
International Trade Analyst
AD/CVD Operations, Office III

**RE:**   Dioctyl Terephthalate from the Republic of Korea

**SUBJECT:**   Acceptance of AKP's Sections A, B, and C Exhibits After Deadline

On June 7, 2019, I received a phone call from Glaucia Johnson at the Law Office of Jeffrey M. Winton PLLC, counsel to respondent Aekyung Petrochemical Co., Ltd. (AKP), concerning its submission of certain exhibits from AKP's Sections A, B, C, and D Supplemental Questionnaire Response, which was due June 6, 2019. Ms. Johnson informed me of the technical difficulties she encountered in attempting to file the exhibits on time, and requested an extension of time to file the exhibits. Ms. Johnson uploaded the exhibits to ACCESS and we received notification of receipt on June 7, 2019 at 12:07 p.m. Eastern Time (ET). By means of this memorandum, we accept the filing as timely.



# Exhibit 17

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

August 4, 2017

A-552-821
Investigation
Public Document
AD/CVD I:  YJC

Clearwater Metal VN JSC, Rabat Corporation, and CSPS Co., Ltd.
  c/o Benjamin Blase Caryl, Esq.
Crowell & Moring LLP
1001 Pennsylvania Ave. NW
Washington, DC 20004

Dear Mr. Caryl:

This concerns the letter you filed on August 3, 2017, on behalf of Clearwater Metal VN JSC, Rabat Corporation, and CSPS Co., Ltd. (collectively, Clearwater Metal) requesting permission from the Department of Commerce (the Department) to submit its section D response in the antidumping duty investigation on certain tool chests and cabinets from the Socialist Republic of Vietnam.  Based on the information you provided in your letter, including your description of the procedures you now have in place to prevent missed deadlines, we will allow Clearwater Metal to submit its section D response.

From this point forward, if you or Crowell & Moring LLP misses an established deadline in this or any other proceeding before the Department, we will not allow you or Crowell & Moring to submit the information at a later time.  All late submissions from Crowell & Moring LLP will be rejected, unless you or someone in Crowell & Moring LLP submit a written request for an extension of time in accordance with 19 CFR 351.302(c).  If you experience filing problems during an attempt to timely file a submission in accordance with 19 CFR 351.303(b)(2)(i), you must alert ACCESS staff and Department officials assigned to this case of such problems and ask Department officials assigned to this case for an extension of time before the established deadline.

Given that Clearwater Metal's section D response was originally due on July 19, 2017, Clearwater Metal may submit its section D response within the next business day from the date of this letter, *i.e.*, **no later than 5:00 p.m. Eastern Time on Monday, August 7, 2017**.  Again, any information submitted after the applicable deadlines will be considered untimely filed and rejected in accordance with 19 CFR 351.302(d).  In such case, we may rely on the facts available as outlined in section 776 of the Tariff Act of 1930, as amended, for the preliminary determination in this investigation.



INTERNATIONAL
T R A D E
ADMINISTRATION

If you have any questions, please contact Dmitry Vladimirov at (202) 482-0665.

Sincerely,

8/4/2017

X  ~Minoo Hatten~

Minoo Hatten
Program Manager, AD/CVD Operations, Office I
Signed by: International Trade Administration

2

crowell moring

August 3, 2017

**VIA ELECTRONIC FILING**

**PUBLIC DOCUMENT**

The Honorable Wilbur L. Ross Jr.
Secretary of Commerce
U.S. Department of Commerce
Enforcement and Compliance
International Trade Administration
APO/Dockets Unit, Room 18022
14th St. & Constitution Avenue, N.W.
Washington, D.C. 20230

Case No.: A-552-821
Total Page: 7
Investigation
E&C Office I

Attn: Minoo Hatten; Dmitry Vladimirov

Re: **Antidumping Duty Investigation on Certain Tool Chests and Cabinets from the Socialist Republic of Vietnam: Request for Reconsideration of the Department's Rejection of Clearwater's Section D Questionnaire Response and Response to the Department's Request of August 2, 2017**

Dear Secretary Ross:

On behalf of Clearwater Metal VN Joint Stock Company, Rabat Corporation, and CSPS Co., Ltd. (collectively "Clearwater"), in response to the Department's August 2 request, we hereby explain in detail: (1) the circumstances surrounding why portions of Clearwater's July 19 Section D Questionnaire Response ("DQR") were not filed until after 5:00 pm on the due date, and (2) the remedial steps taken by Crowell & Moring to ensure that these circumstances would not be repeated in this proceeding or other proceedings before the Department in which Crowell & Moring participates as counsel. We respectfully request that the Department reconsider its decision to reject the DQR in full and allow us to refile it.

We thank the Department for meeting with counsel on August 2, 2017 and appreciate the opportunity to explain the circumstances surrounding the filing of an Exhibit to Clearwater's

DQR after 5:00 pm on July 19.  We are also documenting the remedial steps that counsel and the

firm has undertaken to ensure that untimely filings will not be made in this case or in any other

case in which Crowell & Moring participates as counsel.  We understand the importance of the

Department's deadlines and our attorneys and staff work extremely hard to make accurate and

timely filings with the Department on a daily basis.

The deadline for Clearwater's DQR was July 19 at 5:00 pm.  As noted by the

Department's August 1 letter, we began filing the DQR at 4:19 pm.  Normally, given its size, we

would have been able to complete the entire filing in about 15 to 20 minutes.  We timely

submitted the DQR including 21 exhibits, except for part of one extraneous exhibit (Exhibit D-

10), which was submitted by 6:16 pm that same day.  The DQR as filed by 5:00 pm comprised a

complete response to the Department's Section D questionnaire, as Exhibit D-10 only contained

backup data to the per-unit data already reported in two exhibits.  As explained in the DQR at

page D-12, Exhibit D-10 contained internal worksheets and supporting documents (bill of

materials) for each material input and the allocation calculations that serve the basis for the

factors of production reported to the Department in Exhibit D-1 (FOP Database) and Exhibit D-9

(Summary of Unit Consumption of Raw Material).  Thus, Exhibit D-10 contained backup

information beyond that requested in the Department's questionnaire and was included merely to

assist the Department in its review of Clearwater's DQR.

When we began filing Exhibit D-10, we attempted to upload an Excel document to

ACCESS, but received an error message "not acceptable file type."  We could not determine

why the Excel document was not an acceptable file type, given that (a) it did not exceed 20 MB,

contain comments, or have any other apparent issue; (b) we have submitted many Excel files on

ACCESS without issue, including minutes earlier for the DQR; and (c) the Department's questionnaire explains that Excel or any other spreadsheet format was acceptable.[1]  As soon as we received the error message, we began troubleshooting but were unable to fix the technical issue for part of the exhibit in time to submit it by 5:00 pm.  Due to us trying to fix this technical issue, we filed three parts of Exhibit D-10 between 5:00 pm and 5:08 pm.  After multiple unsuccessful attempts to file the Excel version of the final part of Exhibit D-10, we printed it out, scanned it into a pdf, and filed the pdf version at 6:16 pm.

At 6:52 pm, after filing all of Exhibit D-10, we filed an extension request for the four parts filed after 5:00 pm under the Department's extraordinary circumstances regulation (19 CFR 351.302(c)). Later that night, our technical staff was able to remove/disable the macros from the final part and we filed it in acceptable Excel format first thing the next day.   We ultimately determined that ACCESS will not accept Excel files with macros enabled.  Counsel apologizes for being unaware of the limitation on the types of  Excel acceptable for ACCESS.

Below this letter sets forth measures we have taken to ensure the timely submission of responses to future questionnaires and information requests from the Department.

We emphasize that we are well aware of and appreciate the Department's detailed requirements for the submission of factual information (19 CFR 351.301), the requirements for seeking extensions of deadlines established by the Department (pursuant to 19 CFR 351.302), and the Department's requirements for submissions on ACCESS.  We also fully understand and appreciate the Department's interest in the consistent enforcement of these procedural requirements to ensure orderly conduct of the proceedings before it.

---

[1] *See* Questionnaire at D-5 ("The Department uses Microsoft Excel for spreadsheets, but any other spreadsheet format is also acceptable").

Because of this event, we have reviewed our existing practice for tracking and complying with the Department's deadlines and have implemented the following new internal policies and safeguards.  We are updating our Commerce Department and ACCESS practice manual with:

- an updated checklist for document formats that are not compatible with ACCESS to include macro-enabled Excel documents;

- new guidelines to strive to file submissions as early as possible, but if a filing is not complete by 3:00 pm of the day of the filing, for those preparing and filing the submission to immediately contact the supervising partner or counsel to address the situation;

- new guidelines to immediately call the ACCESS help desk and the Department case analyst if we run into technical issues, and to timely request an extension if needed up until the applicable deadline for the submission;

- planned technical software and ACCESS training for all attorneys and analysts involved in antidumping and countervailing duty proceedings before the Department.

Finally, we note that allowing Clearwater to refile its DQR will not prejudice the Department or any of the other parties to this investigation, including the petitioners, as they were served with the DQR on the correct day and will be reserved if the Department allows Clearwater to refile its DQR.  In fact, petitioners have not objected to Clearwater's original extension request or otherwise challenged the timeliness of the DQR.  It is still early in the investigation so no statutory deadlines are affected that would prejudice the Department.  On the other hand, allowing Clearwater to refile its DQR would enable the Department to accurately calculate a dumping margin for Clearwater, as envisioned by the statute and the overarching purpose of U.S. antidumping duty law.  We would be pleased to discuss with the Department any of the remedial steps undertaken by our firm.

Again, we apologize for the confusion, technical issue, and the inconvenience caused to

the Department.  Please direct any questions concerning this submission to the undersigned.

Respectfully submitted,

/s/ Daniel Cannistra

_____
John Brew
Alexander Schaefer
Daniel Cannistra
Robert LaFrankie
Benjamin Blase Caryl
Yun Gao

CROWELL & MORING LLP

**Tool Chests and Cabinets from Vietnam (A-552-821)**

Certification in Accordance with
19 C.F.R. § 351.303(g)(2)

I, Benjamin Blase Caryl with Crowell & Moring, LLP, counsel to Clearwater Metal VN JSC, Rabat Corporation, and CSPS Co., Ltd., certify that I have read the attached submission of Request for Reconsideration of the Department's Rejection of Clearwater's Section D Questionnaire Response and Response to the Department's Request of August 2, 2017, dated August 3, 2017, pursuant to the antidumping investigation of Certain Tool Chests and Cabinets from the Socialist Republic of Vietnam (A-552-821). In my capacity as an adviser, counsel, preparer or reviewer of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: _____8/3/17_____

# CERTIFICATE OF SERVICE

I, Benjamin Blase Caryl, hereby certify that a copy of the foregoing submission was served on each of the following parties on August 3, 2017:

**PUBLIC DOCUMENT,**
**BY E-MAIL:**

Joshua Morey, Esq.
Representative of Waterloo Industries Inc.
Kelley Drye & Warren LLP
3050 K Street, NW
Suite 400
Washington, DC 20007
Email: jmorey@kelleydrye.com, TradeNotifications@kelleydrye.com

Douglas J. Heffner, Esq.
Representative of The Home Depot, Inc.
Drinker Biddle Reath LLP
1500 K Street, NW
Suite 1100
Washington, D.C. 20005-1209
 Email: Douglas.Heffner@dbr.com


/s/ Benjamin Blase Caryl
Benjamin Blase Caryl

# Exhibit 18

## DECLARATION OF GEORGE J. SKARICH

I, George J. Skarich, declare and state as follows:

1.      I am the Executive Vice President of Sales & Marketing for Mid

Continent Steel & Wire, Inc. ("Mid Continent"), a U.S. manufacturer of

steel nails.  I have served as Mid Continent's Executive Vice President

for over 12 years, and have over 30 years' experience in the steel nail

and wire finished goods industries.  I have been with Mid Continent

since 2007.  Before joining Mid Continent, I was with another U.S.

producer of steel nails, Tree Island Industries, for 16 years.

2.      Mid Continent is the largest producer of steel nails in the United

States and produces a full range of steel nails used in both the

construction and the wood pallet industries.

3.      My references to "steel nails" in this declaration mean steel nails

that are covered by the antidumping order in the U.S. Department of

Commerce's proceeding *Certain Steel Nails from the Sultanate of Oman*,

Case Number A-520-808.

4.      By virtue of my many years of experience in this industry and my

responsibilities, I have a detailed, expert understanding of the U.S. and

global markets for steel nails, as well as an extensive network of contacts across the globe involved in all parts of this industry.

5.     Since late Q3-2022 the U.S. market for steel nails has deteriorated significantly due to the following factors.  First, new significantly higher mortgage interest rates have significantly reduced demand for home purchasing.  Second, we have seen a 21% decline in residential wood to wood construction.  Third, inflation has caused a decline in the consumption of wood pallets, the second largest market segment for nails.  Fourth, currently there is a glut of nail inventories at all customer levels in the United States.  Due to supply chain issues over the pandemic, shipments of imported steel nails that were scheduled to arrive in early 2022 were delayed.  As supply chain problems eased over the course of 2022, large amounts of orders began all arriving in close succession, with many arriving just as demand dropped for the reasons above.

6.     As a result of these factors, customers across the entire United States have excessive inventories of steel nails.  New orders for steel nails are off by more than [    ] as customers try to right size their stocking levels to meet the new slower demand.  This is the situation

across the board.  The glut of steel nails in the United States combined with the capacity of other import sources and domestic steel nail producers far exceeds the supply needed to match the current and projected demand for steel nails over the next few years.

7.    In the residential construction market, the seasonally adjusted annual rate of new privately-owned housing units started is down 21% from April 2022 to November 2022.  New permits issued over the same time-period are down 29%.  *See* Exhibit 1.

8.    As seen in Exhibit 2, "Pallet Customer 12.12.22 Inventory Levels", Mid Continent did an evaluation by contacting over 30 customers to determine when they would need to start ordering pallet nails again. Pallet nails are one type of steel nails.  In normal times, pallet producers carry 30 days of inventory of pallet nails, but now, due to all the changes noted above, [

].  *See* Exhibit 2.  In Exhibit 2, references to [

].

9.    Exhibit 3 provides an email from one of the largest pallet producers in the United States, [

].

10.     On January 5, 2023, I spoke with [

].  He indicated that they have
available capacity to produce steel nails of [   ] containers per month
([     ] tons/month) right now and that no U.S. customers are placing
orders for steel nails.

11.     In late October 2022, I spoke with the owner of the [

], who informed me that
they have idled [     ] of their steel nail production equipment due to
lack of orders and future projected demand for steel nails from
customers.

12.     On January 6, 2023, [                              ] informed me that
[                                    ] of the [     ] nail producer [

], told him that [        ] company has [    ]
containers of available capacity to produce steel nails (*i.e.*, [     ]
tons/month) and that their largest customer for steel nails,

[                                    ], has no orders on file with them

because they are selling off their bloated inventories of steel nails before placing any new orders.

13.     Pricing of steel nails in the United States has fallen dramatically since the end the summer of 2022.  Prices of imported steel nails have fallen 30 to 40% since Q3-2022 and prices of domestically-produced steel nails are down [   ]% over the same time period.

14.     Prices of imported pallet nails are down 34% since Q3-2022 and prices of domestically-produced pallet nails are down [   ]% as the domestic industry tries to retain its market share.

15.     As shown in Exhibit 4, large U.S. importers of steel nails have resorted to extreme offers in an effort to reduce excess inventory.  For example, as Exhibit 4 shows, [



                                                                                        ].

## CERTIFICATION

I declare under penalty of perjury under the laws of the United States that to the best of my knowledge, the foregoing is true and correct.

Date:  January 9, 2023

George J. Skarich

# Exhibit 1

**FOR RELEASE AT 8:30 AM EST, TUESDAY, DECEMBER 20, 2022**

# MONTHLY NEW RESIDENTIAL CONSTRUCTION, NOVEMBER 2022

Release Number: CB22-210

**Notice of methodology change:**  Beginning with the January New Residential Construction release on February 16, 2023, the Building Permits survey will change its target universe from the current 2014 basis to an annually updated universe.  This change will allow for more accurate and quicker coverage when jurisdictions change from not issuing building permits to issuing them.  For additional details on this change and the impact on New Residential Construction, see our 2023 Methodology Change FAQs.

**December 20, 2022** - The U.S. Census Bureau and the U.S. Department of Housing and Urban Development jointly announced the following new residential construction statistics for November 2022:



**NEW RESIDENTIAL CONSTRUCTION NOVEMBER 2022**

| | |
|---|---|
| Building Permits: | 1,342,000 |
| Housing Starts: | 1,427,000 |
| Housing Completions: | 1,490,000 |

Next Release:  January 19, 2023

Seasonally Adjusted Annual Rate (SAAR)
Source:  U.S. Census Bureau, HUD, December 20, 2022



## Building Permits

Privately-owned housing units authorized by building permits in November were at a seasonally adjusted annual rate of 1,342,000.  This is 11.2 percent below the revised October rate of 1,512,000 and is 22.4 percent below the November 2021 rate of 1,729,000.  Single-family authorizations in November were at a rate of 781,000; this is 7.1 percent below the revised October figure of 841,000.  Authorizations of units in buildings with five units or more were at a rate of 509,000 in November.

## Housing Starts

Privately-owned housing starts in November were at a seasonally adjusted annual rate of 1,427,000.  This is 0.5 percent (±12.3 percent)* below the revised October estimate of 1,434,000 and is 16.4 percent (±13.4 percent) below the November 2021 rate of 1,706,000.  Single-family housing starts in November were at a rate of 828,000; this is 4.1 percent (±11.3 percent)* below the revised October figure of 863,000. The November rate for units in buildings with five units or more was 584,000.

## Housing Completions

Privately-owned housing completions in November were at a seasonally adjusted annual rate of 1,490,000.  This is 10.8 percent (±15.8 percent)* above the revised October estimate of 1,345,000 and is 6.0 percent (±17.6 percent)* above the November 2021 rate of 1,406,000.  Single-family housing completions in November were at a rate of 1,047,000; this is 9.5 percent (±12.9 percent)* above the revised October rate of 956,000. The November rate for units in buildings with five units or more was 430,000.

**Data Inquiries**
Economic Indicators Division, Residential Construction Branch
301-763-5160
eid.rcb.customer.service@census.gov

**Media Inquiries**
Public Information Office
301-763-3030
pio@census.gov



**U.S. Department of Commerce**
U.S. CENSUS BUREAU
*census.gov*



The December report is scheduled for release on January 19, 2023. View the full schedule in the Economic Briefing Room: <www.census.gov/economic-indicators/>. The full text and tables for this release can be found at <www.census.gov/construction/nrc/>.

## EXPLANATORY NOTES

In interpreting changes in the statistics in this release, note that month-to-month changes in seasonally adjusted statistics often show movements which may be irregular. It may take three months to establish an underlying trend for building permit authorizations, six months for total starts, and six months for total completions. The statistics in Table 1 in this release are based on a non-probability sample and not subject to sampling error. They are, however, still subject to nonsampling error. On average the total quantity response rate for these estimates is 75.6%. The statistics in Tables 2-5 in this release are estimated from sample surveys and are subject to sampling variability as well as nonsampling error including bias and variance from response, nonreporting, and undercoverage. Estimated relative standard errors of the most recent data are shown in the tables. Whenever a statement such as "2.5 percent (±3.2 percent) above" appears in the text, this indicates the range (-0.7 to +5.7 percent) in which the actual percentage change is likely to have occurred. All ranges given for percentage changes are 90 percent confidence intervals and account only for sampling variability. If a range does not contain zero, the change is statistically significant. If it does contain zero, the change is not statistically significant; that is, it is uncertain whether there was an increase or decrease. The same policies apply to the confidence intervals for percentage changes shown in the tables. On average, the preliminary seasonally adjusted estimates of total building permits, housing starts and housing completions are revised 2.7 percent or less. Explanations of confidence intervals and sampling variability can be found on our website. <www.census.gov/construction/nrc/how_the_data_are_collected/>

## API

The Census Bureau's application programming interface lets developers create custom apps to reach new users and makes key demographic, socio-economic and housing statistics more accessible than ever before. <www.census.gov/developers/>

## FRED Mobile App



Receive the latest updates on the nation's key economic indicators by downloading the FRED App <https://fred.stlouisfed.org/fred-mobile/> for both Apple and Android devices. FRED, the signature database of the Federal Reserve Bank of St. Louis, now incorporates the Census Bureau's 13 economic indicators.

###

\* The 90 percent confidence interval includes zero. In such cases, there is insufficient statistical evidence to conclude that the actual change is different from zero.

**Data Inquiries**
Economic Indicators Division, Residential Construction Branch
301-763-5160
eid.rcb.customer.service@census.gov

**Media Inquiries**
Public Information Office
301-763-3030
pio@census.gov





# New Privately-Owned Housing Units Authorized in Permit-Issuing Places

(Thousands of Units.  Detail may not add to total because of rounding.)

## Table 1a - Seasonally adjusted annual rate

| Period | United States | | | | Northeast | | Midwest | | South | | West | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 1 unit | 2 to 4 units | 5 units or more | Total | 1 unit | Total | 1 unit | Total | 1 unit | Total | 1 unit |
| **2021** | | | | | | | | | | | | |
| November | 1,729 | 1,111 | 48 | 570 | 151 | 60 | 214 | 143 | 918 | 653 | 446 | 255 |
| December | 1,896 | 1,118 | 68 | 710 | 272 | 74 | 260 | 152 | 941 | 657 | 423 | 235 |
| **2022** | | | | | | | | | | | | |
| January | 1,841 | 1,197 | 57 | 587 | 151 | 71 | 270 | 158 | 958 | 679 | 462 | 289 |
| February | 1,857 | 1,204 | 54 | 599 | 179 | 75 | 249 | 146 | 954 | 696 | 475 | 287 |
| March | 1,879 | 1,163 | 56 | 660 | 185 | 66 | 260 | 143 | 972 | 679 | 462 | 275 |
| April | 1,823 | 1,109 | 56 | 658 | 163 | 62 | 250 | 133 | 989 | 671 | 421 | 243 |
| May | 1,695 | 1,051 | 55 | 589 | 128 | 61 | 230 | 132 | 941 | 624 | 396 | 234 |
| June | 1,696 | 970 | 50 | 676 | 151 | 52 | 198 | 119 | 922 | 595 | 425 | 204 |
| July | 1,685 | 932 | 52 | 701 | 164 | 61 | 215 | 122 | 927 | 559 | 379 | 190 |
| August | 1,542 | 900 | 47 | 595 | 138 | 56 | 202 | 111 | 826 | 540 | 376 | 193 |
| September | 1,564 | 870 | 49 | 645 | 129 | 58 | 209 | 109 | 847 | 526 | 379 | 177 |
| October (r) | 1,512 | 841 | 51 | 620 | 112 | 51 | 210 | 110 | 860 | 513 | 330 | 167 |
| November (p) | 1,342 | 781 | 52 | 509 | 114 | 51 | 197 | 100 | 755 | 476 | 276 | 154 |
| Percent Change[1] | | | | | | | | | | | | |
| *Nov. 2022 from Oct. 2022* | *-11.2%* | *-7.1%* | *2.0%* | *-17.9%* | *1.8%* | *0.0%* | *-6.2%* | *-9.1%* | *-12.2%* | *-7.2%* | *-16.4%* | *-7.8%* |
| *Nov. 2022 from Nov. 2021* | *-22.4%* | *-29.7%* | *8.3%* | *-10.7%* | *-24.5%* | *-15.0%* | *-7.9%* | *-30.1%* | *-17.8%* | *-27.1%* | *-38.1%* | *-39.6%* |

*(handwritten annotation: "−28.6%" with red arrow pointing from March Total down to November Total)*

## Table 1b - Not seasonally adjusted

| Period | United States | | | | Northeast | | Midwest | | South | | West | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 1 unit | 2 to 4 units | 5 units or more | Total | 1 unit | Total | 1 unit | Total | 1 unit | Total | 1 unit |
| 2020 Annual | 1,471.1 | 979.4 | 47.2 | 444.5 | 134.8 | 56.3 | 202.1 | 128.0 | 776.3 | 568.5 | 358.0 | 226.7 |
| 2021 Annual | 1,737.0 | 1,115.4 | 52.9 | 568.8 | 164.8 | 65.0 | 227.6 | 142.9 | 917.5 | 655.2 | 427.1 | 252.2 |
| 2021 Year to date | 1,581.7 | 1,033.3 | 47.7 | 500.7 | 138.8 | 59.7 | 210.0 | 133.4 | 843.1 | 605.7 | 389.7 | 234.5 |
| 2022 Year to date | 1,543.1 | 921.3 | 49.1 | 572.6 | 131.1 | 55.1 | 209.0 | 116.0 | 838.4 | 546.9 | 364.5 | 203.4 |
| *Year to date percent change[1]* | *-2.4%* | *-10.8%* | *2.9%* | *14.4%* | *-5.6%* | *-7.7%* | *-0.5%* | *-13.0%* | *-0.6%* | *-9.7%* | *-6.5%* | *-13.3%* |
| **2021** | | | | | | | | | | | | |
| November | 133.4 | 81.1 | 3.9 | 48.4 | 12.7 | 4.8 | 17.0 | 10.7 | 69.2 | 47.6 | 34.5 | 18.1 |
| December | 155.3 | 82.1 | 5.2 | 68.0 | 25.9 | 5.3 | 17.6 | 9.6 | 74.5 | 49.5 | 37.4 | 17.7 |
| **2022** | | | | | | | | | | | | |
| January | 132.3 | 83.4 | 3.8 | 45.1 | 10.3 | 4.6 | 14.5 | 7.9 | 75.6 | 51.7 | 31.9 | 19.1 |
| February | 131.5 | 87.1 | 3.8 | 40.6 | 11.4 | 4.6 | 13.4 | 8.3 | 72.4 | 53.6 | 34.2 | 20.6 |
| March | 169.0 | 107.4 | 5.0 | 56.7 | 15.9 | 5.3 | 21.6 | 12.3 | 89.5 | 64.0 | 42.0 | 25.8 |
| April | 156.6 | 98.2 | 4.8 | 53.6 | 12.8 | 5.3 | 23.3 | 12.9 | 84.5 | 58.0 | 36.0 | 22.1 |
| May | 149.0 | 95.4 | 4.7 | 48.9 | 10.9 | 5.8 | 22.2 | 13.0 | 81.2 | 55.3 | 34.6 | 21.3 |
| June | 157.2 | 91.5 | 4.8 | 60.9 | 15.2 | 5.3 | 19.1 | 12.1 | 82.9 | 53.9 | 40.0 | 20.2 |
| July | 134.4 | 75.6 | 4.2 | 54.6 | 13.0 | 5.4 | 17.8 | 10.4 | 73.4 | 43.9 | 30.2 | 15.9 |
| August | 139.0 | 81.0 | 4.5 | 53.4 | 11.4 | 5.2 | 19.9 | 11.0 | 75.7 | 47.1 | 32.0 | 17.7 |
| September | 129.6 | 70.8 | 4.1 | 54.6 | 10.3 | 5.3 | 19.9 | 10.2 | 68.8 | 41.2 | 30.6 | 14.1 |
| October (r) | 120.8 | 65.9 | 4.6 | 50.4 | 8.3 | 4.3 | 19.9 | 9.7 | 67.6 | 39.2 | 25.0 | 12.6 |
| November (p) | 101.7 | 55.6 | 4.0 | 42.1 | 9.5 | 4.0 | 15.5 | 7.3 | 55.6 | 33.5 | 21.2 | 10.7 |

p  Preliminary

r  Revised

S  Does not meet publication standards because tests for identifiable and stable seasonalilty do not meet reliability standards

X  Not applicable

[1]  Computed using unrounded data

Note:  Year-to-date permits estimates reflect revisions not distributed to months.

Source: U.S. Census Bureau and U.S. Department of Housing and Urban Development, New Residential Construction, December 20, 2022.
Additional information on the survey methodology may be found at <www.census.gov/construction/nrc/how_the_data_are_collected/>.

**New Privately-Owned Housing Units Authorized, but Not Started, at End of Period**

(Thousands of Units. Detail may not add to total because of rounding.)

**Table 2a - Seasonally adjusted**

| Period | United States | | | | Northeast | | Midwest | | South | | West | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 1 unit | 2 to 4 units | 5 units or more | Total | 1 unit | Total | 1 unit | Total | 1 unit | Total | 1 unit |
| **2021** | | | | | | | | | | | | |
| November . . . . . . . . . . . . . . . . . . . . . . . | 266 | 149 | S | 114 | 26 | 13 | 27 | 16 | 150 | 88 | 63 | 32 |
| December . . . . . . . . . . . . . . . . . . . . . . . | 263 | 140 | S | 120 | 33 | 14 | 25 | 12 | 143 | 84 | 62 | 30 |
| **2022** | | | | | | | | | | | | |
| January . . . . . . . . . . . . . . . . . . . . . . . . | 274 | 149 | S | 122 | 37 | 15 | 25 | 14 | 150 | 90 | 62 | 30 |
| February . . . . . . . . . . . . . . . . . . . . . . . | 276 | 151 | S | 121 | 37 | 14 | 26 | 14 | 149 | 92 | 64 | 31 |
| March . . . . . . . . . . . . . . . . . . . . . . . . . | 290 | 152 | S | 134 | 38 | 13 | 24 | 14 | 160 | 94 | 68 | 31 |
| April . . . . . . . . . . . . . . . . . . . . . . . . . . | 288 | 151 | S | 132 | 40 | 14 | 25 | 14 | 158 | 94 | 65 | 29 |
| May . . . . . . . . . . . . . . . . . . . . . . . . . . . | 285 | 147 | S | 134 | 37 | 13 | 24 | 14 | 156 | 91 | 68 | 29 |
| June . . . . . . . . . . . . . . . . . . . . . . . . . . | 286 | 143 | S | 139 | 39 | 13 | 23 | 12 | 151 | 89 | 73 | 29 |
| July . . . . . . . . . . . . . . . . . . . . . . . . . . . | 300 | 148 | S | 148 | 39 | 13 | 23 | 13 | 160 | 91 | 78 | 31 |
| August . . . . . . . . . . . . . . . . . . . . . . . . . | 297 | 145 | S | 148 | 39 | 14 | 24 | 13 | 160 | 90 | 74 | 28 |
| September (r) . . . . . . . . . . . . . . . . . . . . | 299 | 145 | S | 151 | 38 | 16 | 24 | 12 | 165 | 89 | 72 | 28 |
| October (r) . . . . . . . . . . . . . . . . . . . . . . | 299 | 148 | S | 147 | 38 | 17 | 22 | 12 | 168 | 89 | 71 | 30 |
| **November (p)** . . . . . . . . . . . . . . . . . | **293** | **143** | **S** | **147** | **38** | **17** | **19** | **11** | **168** | **87** | **68** | **28** |
| *Average RSE (%)* [1] . . . . . . . . . . . . . . . . | *5* | *6* | *X* | *8* | *16* | *23* | *10* | *13* | *6* | *7* | *9* | *9* |
| Percent Change[2] | | | | | | | | | | | | |
| *Nov. 2022 from Oct. 2022* . . . . . . . . . . | ***-2.0%*** | ***-3.4%*** | ***S*** | ***0.0%*** | ***0.0%*** | ***0.0%*** | ***-13.6%*** | ***-8.3%*** | ***0.0%*** | ***-2.2%*** | ***-4.2%*** | ***-6.7%*** |
| *90 percent confidence interval* [3] . . . . . | *± 3.4* | *± 3.8* | *X* | *± 4.9* | *± 9.4* | *± 15.3* | *± 7.6* | *± 9.2* | *± 4.9* | *± 4.5* | *± 4.8* | *± 4.4* |
| *Nov. 2022 from Nov. 2021* . . . . . . . . . . | ***10.2%*** | ***-4.0%*** | ***S*** | ***28.9%*** | ***46.2%*** | ***30.8%*** | ***-29.6%*** | ***-31.3%*** | ***12.0%*** | ***-1.1%*** | ***7.9%*** | ***-12.5%*** |
| *90 percent confidence interval* [3] . . . . . | *± 10.3* | *± 9.5* | *X* | *± 20.2* | *± 26.2* | *± 54.8* | *± 22.7* | *± 32.5* | *± 11.8* | *± 9.9* | *± 17.7* | *± 11.3* |

**Table 2b - Not seasonally adjusted**

| Period | United States | | | | Northeast | | Midwest | | South | | West | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 1 unit | 2 to 4 units | 5 units or more | Total | 1 unit | Total | 1 unit | Total | 1 unit | Total | 1 unit |
| **2021** | | | | | | | | | | | | |
| November . . . . . . . . . . . . . . . . . . . . . . . | 249.9 | 138.7 | 2.6 | 108.6 | 23.2 | 11.8 | 25.5 | 13.0 | 141.7 | 84.9 | 59.5 | 28.9 |
| December . . . . . . . . . . . . . . . . . . . . . . . | 267.7 | 138.6 | 3.2 | 125.9 | 35.3 | 13.0 | 23.2 | 11.0 | 144.6 | 83.5 | 64.6 | 31.1 |
| **2022** | | | | | | | | | | | | |
| January . . . . . . . . . . . . . . . . . . . . . . . . | 270.0 | 141.5 | 3.3 | 125.2 | 37.4 | 13.9 | 22.5 | 11.8 | 148.5 | 86.9 | 61.6 | 28.9 |
| February . . . . . . . . . . . . . . . . . . . . . . . | 273.2 | 147.0 | 4.3 | 121.9 | 39.6 | 14.1 | 23.6 | 13.1 | 146.8 | 89.7 | 63.2 | 30.1 |
| March . . . . . . . . . . . . . . . . . . . . . . . . . | 298.4 | 158.0 | 4.3 | 136.1 | 40.6 | 14.2 | 25.6 | 15.3 | 160.9 | 95.3 | 71.3 | 33.2 |
| April . . . . . . . . . . . . . . . . . . . . . . . . . . | 293.1 | 155.0 | 4.8 | 133.3 | 40.5 | 13.9 | 29.0 | 16.6 | 156.9 | 94.9 | 66.7 | 29.7 |
| May . . . . . . . . . . . . . . . . . . . . . . . . . . . | 289.0 | 151.4 | 4.2 | 133.4 | 38.6 | 13.8 | 24.8 | 15.1 | 156.8 | 93.2 | 68.7 | 29.3 |
| June . . . . . . . . . . . . . . . . . . . . . . . . . . | 294.6 | 149.1 | 4.3 | 141.2 | 40.5 | 13.9 | 22.5 | 12.9 | 156.3 | 91.4 | 75.3 | 30.9 |
| July . . . . . . . . . . . . . . . . . . . . . . . . . . . | 295.9 | 147.4 | 3.7 | 144.8 | 39.1 | 13.3 | 22.2 | 12.5 | 158.5 | 90.8 | 76.1 | 30.8 |
| August . . . . . . . . . . . . . . . . . . . . . . . . . | 297.5 | 147.4 | 4.0 | 146.2 | 36.4 | 14.1 | 24.7 | 12.9 | 162.2 | 91.8 | 74.2 | 28.6 |
| September (r) . . . . . . . . . . . . . . . . . . . . | 299.4 | 147.6 | 3.0 | 148.9 | 35.1 | 16.0 | 24.5 | 12.7 | 168.1 | 90.7 | 71.7 | 28.2 |
| October (r) . . . . . . . . . . . . . . . . . . . . . . | 292.8 | 144.7 | 3.7 | 144.4 | 34.2 | 16.6 | 21.8 | 11.1 | 168.1 | 88.4 | 68.6 | 28.7 |
| **November (p)** . . . . . . . . . . . . . . . . . | **279.2** | **136.6** | **3.1** | **139.5** | **34.8** | **16.3** | **18.9** | **9.5** | **162.5** | **84.9** | **62.9** | **26.0** |
| *Average RSE (%)* [1] . . . . . . . . . . . . . . . . | *5* | *6* | *26* | *8* | *16* | *23* | *10* | *13* | *6* | *7* | *9* | *9* |

p Preliminary

r Revised

S Does not meet publication standards because tests for identifiable and stable seasonalilty do not meet reliability standards

X Not applicable

[1] Average relative standard error for the latest 6-month period

[2] Computed using unrounded data

[3] See the Explanatory Notes in the accompanying text for an explantion of 90 percent confidence intervals

Note: These data represent the number of housing units authorized in all months up to and including the last day of the reporting period and not started
    as of that date without regard to the months of original permit issuance. Cancelled, abandoned, expired, and revoked permits are excluded.

Source: U.S. Census Bureau and U.S. Department of Housing and Urban Development, New Residential Construction, December 20, 2022.
Additional information on the survey methodology may be found at <www.census.gov/construction/nrc/how_the_data_are_collected/>.

# New Privately-Owned Housing Units Started

(Thousands of Units. Detail may not add to total because of rounding.)

## Table 3a - Seasonally adjusted annual rate

| Period | United States | | | | Northeast | | Midwest | | South | | West | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 1 unit | 2 to 4 units | 5 units or more | Total | 1 unit | Total | 1 unit | Total | 1 unit | Total | 1 unit |
| **2021** | | | | | | | | | | | | |
| November | 1,706 | 1,220 | S | 469 | 114 | 63 | 216 | 137 | 946 | 726 | 430 | 294 |
| December | 1,768 | 1,212 | S | 553 | 141 | 69 | 335 | 212 | 901 | 670 | 391 | 261 |
| **2022** | | | | | | | | | | | | |
| January | 1,666 | 1,157 | S | 499 | 105 | 48 | 196 | 142 | 919 | 661 | 446 | 306 |
| February | 1,777 | 1,213 | S | 532 | 134 | 71 | 234 | 157 | 999 | 681 | 410 | 304 |
| March | 1,716 | 1,191 | S | 511 | 211 | 64 | 239 | 161 | 846 | 674 | 420 | 292 |
| April | 1,805 | 1,173 | S | 619 | 133 | 52 | 219 | 154 | 1,025 | 679 | 428 | 288 |
| May | 1,562 | 1,073 | S | 459 | 130 | 55 | 230 | 141 | 860 | 625 | 342 | 252 |
| June | 1,575 | 1,013 | S | 554 | 127 | 47 | 206 | 140 | 875 | 617 | 367 | 209 |
| July | 1,377 | 900 | S | 462 | 168 | 73 | 161 | 105 | 708 | 513 | 340 | 209 |
| August | 1,508 | 923 | S | 565 | 178 | 60 | 183 | 127 | 794 | 517 | 353 | 219 |
| September (r) | 1,465 | 893 | S | 555 | 148 | 61 | 209 | 123 | 741 | 515 | 367 | 194 |
| October (r) | 1,434 | 863 | S | 557 | 102 | 53 | 230 | 131 | 787 | 516 | 315 | 163 |
| November (p) | 1,427 | 828 | S | 584 | 83 | 61 | 215 | 96 | 788 | 482 | 341 | 189 |
| *Average RSE (%)* [1] | *6* | *5* | *X* | *12* | *17* | *21* | *12* | *12* | *8* | *7* | *12* | *11* |
| Percent Change [2] | | | | | | | | | | | | |
| *Nov. 2022 from Oct. 2022* | *-0.5%* | *-4.1%* | *S* | *4.8%* | *-18.6%* | *15.1%* | *-6.5%* | *-26.7%* | *0.1%* | *-6.6%* | *8.3%* | *16.0%* |
| *90 percent confidence interval* [3] | *± 12.3* | *± 11.3* | *X* | *± 21.8* | *± 31.8* | *± 69.3* | *± 30.5* | *± 29.9* | *± 21.2* | *± 14.6* | *± 23.6* | *± 26.9* |
| *Nov. 2022 from Nov. 2021* | *-16.4%* | *-32.1%* | *S* | *24.5%* | *-27.2%* | *-3.2%* | *-0.5%* | *-29.9%* | *-16.7%* | *-33.6%* | *-20.7%* | *-35.7%* |
| *90 percent confidence interval* [3] | *± 13.4* | *± 8.7* | *X* | *± 37.4* | *± 38.2* | *± 49.3* | *± 30.5* | *± 19.2* | *± 21.7* | *± 13.1* | *± 18.4* | *± 9.7* |

## Table 3b - Not seasonally adjusted

| Period | United States | | | | Northeast | | Midwest | | South | | West | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 1 unit | 2 to 4 units | 5 units or more | Total | 1 unit | Total | 1 unit | Total | 1 unit | Total | 1 unit |
| 2020 Annual | 1,379.6 | 990.5 | 12.3 | 376.8 | 111.5 | 60.2 | 191.6 | 135.6 | 735.5 | 553.1 | 341.0 | 241.5 |
| 2021 Annual | 1,601.0 | 1,127.2 | 11.7 | 462.1 | 136.5 | 67.6 | 215.5 | 148.2 | 848.1 | 643.7 | 400.8 | 267.7 |
| *RSE (%)* | *2* | *2* | *19* | *7* | *7* | *7* | *2* | *2* | *2* | *3* | *4* | *3* |
| 2021 Year to date | 1,476.7 | 1,043.8 | 11.5 | 421.4 | 126.4 | 62.8 | 194.0 | 135.7 | 782.1 | 594.7 | 374.1 | 250.5 |
| 2022 Year to date | 1,458.4 | 946.1 | 15.8 | 496.5 | 128.1 | 54.2 | 195.6 | 124.3 | 786.7 | 546.5 | 348.0 | 221.2 |
| *RSE (%)* | *2* | *1* | *21* | *6* | *3* | *6* | *3* | *4* | *2* | *1* | *5* | *3* |
| *Year to date percent change* [2] | *-1.2%* | *-9.4%* | *37.5%* | *17.8%* | *1.3%* | *-13.8%* | *0.8%* | *-8.4%* | *0.6%* | *-8.1%* | *-7.0%* | *-11.7%* |
| *90 percent confidence interval* [3] | *± 2.7* | *± 3.8* | *± 43.3* | *± 8.0* | *± 9.9* | *± 5.2* | *± 5.5* | *± 6.9* | *± 3.8* | *± 5.1* | *± 5.0* | *± 3.7* |
| **2021** | | | | | | | | | | | | |
| November | 130.8 | 91.2 | 1.4 | 38.1 | 9.1 | 5.0 | 17.0 | 10.6 | 71.7 | 53.7 | 33.0 | 21.9 |
| December | 124.2 | 83.4 | 0.2 | 40.7 | 10.0 | 4.8 | 21.5 | 12.4 | 66.0 | 49.0 | 26.7 | 17.2 |
| **2022** | | | | | | | | | | | | |
| January | 121.0 | 81.6 | 0.8 | 38.6 | 7.4 | 3.1 | 11.0 | 6.9 | 69.5 | 49.5 | 33.0 | 22.2 |
| February | 126.1 | 85.0 | 2.4 | 38.8 | 8.2 | 3.6 | 13.2 | 7.5 | 75.1 | 51.9 | 29.7 | 22.0 |
| March | 142.6 | 100.1 | 1.2 | 41.3 | 16.8 | 5.0 | 17.5 | 11.1 | 72.7 | 58.7 | 35.6 | 25.3 |
| April | 164.3 | 109.7 | 1.1 | 53.5 | 11.8 | 4.8 | 19.7 | 14.1 | 92.7 | 62.9 | 40.0 | 27.9 |
| May | 140.6 | 96.7 | 2.7 | 41.2 | 11.7 | 4.9 | 23.0 | 15.0 | 76.0 | 54.9 | 29.9 | 21.9 |
| June | 144.9 | 96.9 | 0.7 | 47.4 | 11.6 | 4.8 | 20.7 | 15.0 | 79.7 | 57.6 | 33.1 | 19.5 |
| July | 123.7 | 83.2 | 1.3 | 39.2 | 15.6 | 7.5 | 15.5 | 10.8 | 62.5 | 46.0 | 30.0 | 18.9 |
| August | 134.5 | 82.4 | 1.8 | 50.2 | 15.9 | 5.4 | 17.2 | 12.2 | 69.5 | 44.9 | 31.8 | 19.9 |
| September (r) | 127.5 | 76.1 | 1.6 | 49.8 | 13.5 | 5.6 | 19.3 | 11.6 | 62.9 | 42.7 | 31.8 | 16.2 |
| October (r) | 122.2 | 72.8 | 1.2 | 48.2 | 8.8 | 4.5 | 21.7 | 13.1 | 65.5 | 42.0 | 26.3 | 13.1 |
| **November (p)** | 111.1 | 61.5 | 1.2 | 48.3 | 6.8 | 5.0 | 16.9 | 7.1 | 60.6 | 35.3 | 26.8 | 14.2 |
| *Average RSE (%)* [1] | *6* | *5* | *37* | *12* | *17* | *21* | *12* | *12* | *8* | *7* | *12* | *11* |

p Preliminary
r Revised
S Does not meet publication standards because tests for identifiable and stable seasonality do not meet reliability standards
X Not applicable

[1] Average relative standard error for the latest 6-month period
[2] Computed using unrounded data
[3] See the Explanatory Notes in the accompanying text for an explantion of 90 percent confidence intervals

Source: U.S. Census Bureau and U.S. Department of Housing and Urban Development, New Residential Construction, December 20, 2022.
Additional information on the survey methodology may be found at <www.census.gov/construction/nrc/how_the_data_are_collected/>.

## New Privately-Owned Housing Units Under Construction at End of Period

(Thousands of Units.  Detail may not add to total because of rounding.)

### Table 4a - Seasonally adjusted

| Period | United States Total | 1 unit | 2 to 4 units | 5 units or more | Northeast Total | 1 unit | Midwest Total | 1 unit | South Total | 1 unit | West Total | 1 unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2021** | | | | | | | | | | | | |
| November . . . . . . . . . . . . . . . . . . . . . . | 1,493 | 755 | S | 725 | 204 | 63 | 185 | 102 | 687 | 396 | 417 | 194 |
| December . . . . . . . . . . . . . . . . . . . . . . | 1,525 | 770 | S | 742 | 202 | 62 | 197 | 107 | 697 | 404 | 429 | 197 |
| **2022** | | | | | | | | | | | | |
| January . . . . . . . . . . . . . . . . . . . . . . . . | 1,553 | 790 | S | 750 | 199 | 61 | 202 | 109 | 713 | 416 | 439 | 204 |
| February . . . . . . . . . . . . . . . . . . . . . . . | 1,582 | 798 | S | 769 | 201 | 61 | 206 | 111 | 728 | 418 | 447 | 208 |
| March . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,629 | 812 | S | 803 | 212 | 63 | 216 | 112 | 739 | 424 | 462 | 213 |
| April . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,668 | 828 | S | 827 | 213 | 61 | 219 | 115 | 765 | 437 | 471 | 215 |
| May . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,677 | 828 | S | 834 | 216 | 61 | 223 | 113 | 771 | 440 | 467 | 214 |
| June . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,687 | 827 | S | 845 | 218 | 59 | 225 | 113 | 778 | 444 | 466 | 211 |
| July . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,682 | 815 | S | 851 | 221 | 60 | 215 | 109 | 776 | 438 | 470 | 208 |
| August . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,702 | 808 | S | 877 | 225 | 60 | 213 | 108 | 789 | 435 | 475 | 205 |
| September (r) . . . . . . . . . . . . . . . . . . . . | 1,700 | 793 | S | 889 | 225 | 61 | 214 | 106 | 787 | 424 | 474 | 202 |
| October (r) . . . . . . . . . . . . . . . . . . . . . . | 1,709 | 787 | S | 905 | 223 | 61 | 217 | 106 | 799 | 421 | 470 | 199 |
| **November (p) . . . . . . . . . . . . . . . . . . . .** | **1,709** | **777** | **S** | **915** | **212** | **60** | **220** | **105** | **805** | **416** | **472** | **196** |
| *Average RSE (%)* [1] *. . . . . . . . . . . . . . .* | *3* | *3* | *X* | *6* | *7* | *5* | *4* | *4* | *4* | *5* | *5* | *5* |
| Percent Change[2] | | | | | | | | | | | | |
| *Nov. 2022 from Oct. 2022 . . . . . . . . . .* | **0.0%** | **-1.3%** | **S** | **1.1%** | **-4.9%** | **-1.6%** | **1.4%** | **-0.9%** | **0.8%** | **-1.2%** | **0.4%** | **-1.5%** |
| *90 percent confidence interval* [3] *. . . . .* | ± 1.1 | ± 1.0 | X | ± 1.7 | ± 5.4 | ± 4.0 | ± 2.1 | ± 1.9 | ± 1.3 | ± 1.7 | ± 1.1 | ± 1.3 |
| *Nov. 2022 from Nov. 2021 . . . . . . . . . .* | **14.5%** | **2.9%** | **S** | **26.2%** | **3.9%** | **-4.8%** | **18.9%** | **2.9%** | **17.2%** | **5.1%** | **13.2%** | **1.0%** |
| *90 percent confidence interval* [3] *. . . . .* | ± 3.2 | ± 4.9 | X | ± 5.7 | ± 8.7 | ± 5.0 | ± 5.6 | ± 7.0 | ± 5.9 | ± 8.1 | ± 4.3 | ± 4.2 |

### Table 4b - Not seasonally adjusted

| Period | United States Total | 1 unit | 2 to 4 units | 5 units or more | Northeast Total | 1 unit | Midwest Total | 1 unit | South Total | 1 unit | West Total | 1 unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2021** | | | | | | | | | | | | |
| November . . . . . . . . . . . . . . . . . . . . . . | 1,502.2 | 764.1 | 12.9 | 725.1 | 205.3 | 64.2 | 189.0 | 105.7 | 689.7 | 398.9 | 418.2 | 195.3 |
| December . . . . . . . . . . . . . . . . . . . . . . | 1,500.0 | 750.5 | 12.7 | 736.9 | 200.1 | 61.3 | 197.7 | 108.1 | 681.8 | 391.0 | 420.5 | 190.1 |
| **2022** | | | | | | | | | | | | |
| January . . . . . . . . . . . . . . . . . . . . . . . . | 1,529.4 | 767.0 | 12.7 | 749.8 | 198.3 | 60.3 | 199.3 | 106.3 | 700.3 | 403.5 | 431.5 | 196.8 |
| February . . . . . . . . . . . . . . . . . . . . . . . | 1,558.1 | 773.0 | 14.5 | 770.6 | 199.1 | 58.8 | 199.1 | 104.3 | 718.8 | 408.3 | 441.0 | 201.6 |
| March . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,609.6 | 789.9 | 13.7 | 806.0 | 210.2 | 60.6 | 207.7 | 103.7 | 732.6 | 416.7 | 459.2 | 208.9 |
| April . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,664.0 | 818.8 | 13.5 | 831.7 | 213.9 | 61.1 | 212.9 | 108.1 | 764.2 | 433.9 | 473.0 | 215.8 |
| May . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,686.1 | 829.6 | 15.4 | 841.1 | 218.1 | 61.4 | 221.8 | 111.1 | 774.5 | 440.8 | 471.7 | 216.3 |
| June . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,701.4 | 839.0 | 15.4 | 846.9 | 219.2 | 59.8 | 226.4 | 114.5 | 785.9 | 450.5 | 469.9 | 214.2 |
| July . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,703.9 | 838.2 | 15.8 | 849.9 | 222.2 | 61.8 | 218.3 | 112.2 | 788.1 | 450.4 | 475.3 | 213.8 |
| August . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,718.1 | 830.0 | 17.0 | 871.1 | 225.1 | 61.2 | 216.9 | 112.7 | 797.9 | 446.2 | 478.2 | 209.9 |
| September (r) . . . . . . . . . . . . . . . . . . . . | 1,721.1 | 815.3 | 17.8 | 888.0 | 226.9 | 62.9 | 218.8 | 110.9 | 798.4 | 435.9 | 477.0 | 205.7 |
| October (r) . . . . . . . . . . . . . . . . . . . . . . | 1,726.5 | 806.1 | 17.1 | 903.2 | 223.8 | 61.9 | 223.3 | 112.3 | 808.4 | 431.1 | 470.9 | 200.8 |
| **November (p) . . . . . . . . . . . . . . . . . . . .** | **1,718.6** | **784.8** | **17.4** | **916.5** | **213.4** | **61.2** | **223.6** | **108.5** | **807.9** | **418.0** | **473.7** | **197.0** |
| *Average RSE (%)* [1] *. . . . . . . . . . . . . . .* | *3* | *3* | *14* | *6* | *7* | *5* | *4* | *6* | *4* | *5* | *5* | *5* |

p  Preliminary

r  Revised

S  Does not meet publication standards because tests for identifiable and stable seasonality do not meet reliability standards

X  Not applicable

[1]  Average relative standard error for the latest 6-month period

[2]  Computed using unrounded data

[3]  See the Explanatory Notes in the accompanying text for an explantion of 90 percent confidence intervals

Source: U.S. Census Bureau and U.S. Department of Housing and Urban Development, New Residential Construction, December 20, 2022.
Additional information on the survey methodology may be found at <www.census.gov/construction/nrc/how_the_data_are_collected/>.

## New Privately-Owned Housing Units Completed

(Thousands of Units.  Detail may not add to total because of rounding.)

Table 5a - Seasonally adjusted annual rate

| Period | United States | | | | Northeast | | Midwest | | South | | West | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 1 unit | 2 to 4 units | 5 units or more | Total | 1 unit | Total | 1 unit | Total | 1 unit | Total | 1 unit |
| **2021** | | | | | | | | | | | | |
| November . . . . . . . . . . . . . . . . . . . . . | 1,406 | 953 | S | 444 | 114 | 52 | 213 | 134 | 744 | 526 | 335 | 241 |
| December . . . . . . . . . . . . . . . . . . . . . | 1,326 | 1,014 | S | 306 | 120 | 66 | 171 | 105 | 747 | 600 | 288 | 243 |
| **2022** | | | | | | | | | | | | |
| January . . . . . . . . . . . . . . . . . . . . . . | 1,247 | 929 | S | 305 | 84 | 51 | 139 | 125 | 670 | 517 | 354 | 236 |
| February . . . . . . . . . . . . . . . . . . . . . | 1,380 | 1,076 | S | 296 | 133 | 85 | 196 | 142 | 759 | 626 | 292 | 223 |
| March . . . . . . . . . . . . . . . . . . . . . . | 1,366 | 1,052 | S | 303 | 108 | 61 | 192 | 143 | 793 | 624 | 273 | 224 |
| April . . . . . . . . . . . . . . . . . . . . . . | 1,339 | 1,013 | S | 311 | 99 | 59 | 170 | 118 | 734 | 567 | 336 | 269 |
| May . . . . . . . . . . . . . . . . . . . . . . . | 1,440 | 1,043 | S | 392 | 104 | 67 | 174 | 145 | 789 | 586 | 373 | 245 |
| June . . . . . . . . . . . . . . . . . . . . . . | 1,391 | 1,006 | S | 379 | 101 | 61 | 195 | 133 | 773 | 586 | 322 | 226 |
| July . . . . . . . . . . . . . . . . . . . . . . | 1,411 | 1,007 | S | 399 | 94 | 62 | 285 | 152 | 719 | 557 | 313 | 236 |
| August . . . . . . . . . . . . . . . . . . . . . | 1,352 | 1,024 | S | 321 | 125 | 64 | 202 | 130 | 674 | 567 | 351 | 263 |
| September (r) . . . . . . . . . . . . . . . . . . | 1,433 | 1,046 | S | 384 | 118 | 40 | 207 | 150 | 754 | 627 | 354 | 229 |
| October (r) . . . . . . . . . . . . . . . . . . . | 1,345 | 956 | S | 371 | 99 | 58 | 182 | 126 | 690 | 569 | 374 | 203 |
| **November (p)** . . . . . . . . . . . . . . . . | **1,490** | **1,047** | S | 430 | 223 | 58 | 197 | 126 | 755 | 632 | 315 | 231 |
| *Average RSE (%)* [1] . . . . . . . . . . . . . . . | 6 | 5 | X | 17 | 24 | 14 | 15 | 10 | 7 | 7 | 10 | 10 |
| Percent Change[2] | | | | | | | | | | | | |
| *Nov. 2022 from Oct. 2022* . . . . . . . . . . | **10.8%** | **9.5%** | **S** | **15.9%** | **125.3%** | **0.0%** | **8.2%** | **0.0%** | **9.4%** | **11.1%** | **-15.8%** | **13.8%** |
| *90 percent confidence interval* [3] . . . . . | ± 15.8 | ± 12.9 | X | ± 44.2 | (A) | ± 35.2 | ± 27.6 | ± 20.0 | ± 15.9 | ± 19.1 | ± 17.0 | ± 19.2 |
| *Nov. 2022 from Nov. 2021* . . . . . . . . . . | **6.0%** | **9.9%** | **S** | **-3.2%** | **95.6%** | **11.5%** | **-7.5%** | **-6.0%** | **1.5%** | **20.2%** | **-6.0%** | **-4.1%** |
| *90 percent confidence interval* [3] . . . . . | ± 17.6 | ± 15.5 | X | ± 45.9 | (A) | ± 44.5 | ± 43.8 | ± 49.7 | ± 14.5 | ± 16.8 | ± 18.3 | ± 23.6 |

Table 5b - Not seasonally adjusted

| Period | United States | | | | Northeast | | Midwest | | South | | West | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 1 unit | 2 to 4 units | 5 units or more | Total | 1 unit | Total | 1 unit | Total | 1 unit | Total | 1 unit |
| 2020 Annual . . . . . . . . . . . . . . . . . . . | 1,286.9 | 911.7 | 10.5 | 364.7 | 95.2 | 56.7 | 182.5 | 125.6 | 678.4 | 506.1 | 330.9 | 223.4 |
| 2021 Annual . . . . . . . . . . . . . . . . . . . | 1,341.0 | 969.7 | 7.7 | 363.7 | 110.9 | 60.5 | 184.2 | 125.3 | 727.0 | 546.6 | 318.9 | 237.2 |
| *RSE (%)* . . . . . . . . . . . . . . . . . . . . | 2 | 1 | 22 | 6 | 8 | 8 | 3 | 3 | 3 | 2 | 4 | 3 |
| 2021 Year to date . . . . . . . . . . . . . . . . | 1,213.7 | 870.5 | 7.2 | 336.1 | 99.4 | 53.8 | 168.4 | 115.5 | 654.7 | 487.5 | 291.2 | 213.7 |
| 2022 Year to date . . . . . . . . . . . . . . . . | 1,252.7 | 918.9 | 8.4 | 325.4 | 105.2 | 54.3 | 179.4 | 123.2 | 666.8 | 529.5 | 301.2 | 211.9 |
| *RSE (%)* . . . . . . . . . . . . . . . . . . . . | 2 | 2 | 27 | 7 | 11 | 6 | 5 | 3 | 2 | 3 | 4 | 4 |
| *Year to date percent change[2]* . . . . . . . | **3.2%** | **5.6%** | **17.6%** | **-3.2%** | **5.9%** | **0.8%** | **6.6%** | **6.7%** | **1.9%** | **8.6%** | **3.4%** | **-0.8%** |
| *90 percent confidence interval* [3] . . . . . | ± 3.9 | ± 3.8 | ± 59.0 | ± 7.7 | ± 20.0 | ± 10.7 | ± 11.1 | ± 10.8 | ± 5.5 | ± 6.2 | ± 6.7 | ± 6.6 |
| **2021** | | | | | | | | | | | | |
| November . . . . . . . . . . . . . . . . . . . . . | 111.7 | 78.2 | 0.7 | 32.8 | 9.2 | 4.6 | 17.8 | 11.9 | 58.4 | 42.2 | 26.4 | 19.4 |
| December . . . . . . . . . . . . . . . . . . . . . | 127.3 | 99.2 | 0.5 | 27.6 | 11.5 | 6.7 | 15.8 | 9.9 | 72.3 | 59.1 | 27.6 | 23.6 |
| **2022** | | | | | | | | | | | | |
| January . . . . . . . . . . . . . . . . . . . . . . | 87.1 | 65.6 | 0.9 | 20.6 | 5.8 | 3.6 | 9.4 | 8.5 | 48.1 | 37.7 | 23.8 | 15.9 |
| February . . . . . . . . . . . . . . . . . . . . . | 98.6 | 78.6 | 0.5 | 19.5 | 8.6 | 5.5 | 13.4 | 9.8 | 56.1 | 47.3 | 20.5 | 16.0 |
| March . . . . . . . . . . . . . . . . . . . . . . | 112.7 | 87.9 | 0.9 | 23.9 | 7.9 | 4.2 | 14.9 | 11.0 | 68.7 | 55.3 | 21.3 | 17.4 |
| April . . . . . . . . . . . . . . . . . . . . . . | 107.4 | 81.2 | 1.2 | 25.0 | 7.5 | 4.3 | 13.5 | 9.4 | 60.0 | 46.6 | 26.4 | 21.0 |
| May . . . . . . . . . . . . . . . . . . . . . . . | 120.9 | 87.1 | 0.5 | 33.3 | 8.3 | 5.1 | 14.3 | 11.8 | 66.8 | 49.6 | 31.5 | 20.6 |
| June . . . . . . . . . . . . . . . . . . . . . . | 122.4 | 87.5 | 0.6 | 34.3 | 9.5 | 5.8 | 17.2 | 11.6 | 66.2 | 49.2 | 29.5 | 20.9 |
| July . . . . . . . . . . . . . . . . . . . . . . | 123.5 | 82.9 | 0.5 | 40.2 | 8.8 | 5.6 | 25.9 | 12.5 | 61.9 | 45.6 | 26.9 | 19.1 |
| August . . . . . . . . . . . . . . . . . . . . . | 122.2 | 90.0 | 0.7 | 31.6 | 12.1 | 6.1 | 18.7 | 11.6 | 58.9 | 48.5 | 32.5 | 23.9 |
| September (r) . . . . . . . . . . . . . . . . . . | 120.4 | 88.5 | 0.2 | 31.8 | 9.9 | 3.4 | 18.7 | 13.9 | 61.8 | 51.3 | 30.1 | 19.8 |
| October (r) . . . . . . . . . . . . . . . . . . . | 116.7 | 82.6 | 1.6 | 32.5 | 8.7 | 5.1 | 16.9 | 12.0 | 57.5 | 46.9 | 33.6 | 18.6 |
| **November (p)** . . . . . . . . . . . . . . . . | **120.7** | **87.0** | **1.0** | **32.8** | **18.1** | **5.6** | **16.6** | **11.2** | **60.8** | **51.4** | **25.2** | **18.8** |
| *Average RSE (%)* [1] . . . . . . . . . . . . . . . | 6 | 5 | 57 | 17 | 24 | 14 | 15 | 10 | 7 | 7 | 10 | 10 |

p  Preliminary

r  Revised

S  Does not meet publication standards because tests for identifiable and stable seasonality do not meet reliability standards

X  Not applicable

[1]  Average relative standard error for the latest 6-month period

[2]  Computed using unrounded data

[3]  See the Explanatory Notes in the accompanying text for an explantion of 90 percent confidence intervals

Source: U.S. Census Bureau and U.S. Department of Housing and Urban Development, New Residential Construction, December 20, 2022.
Additional information on the survey methodology may be found at <www.census.gov/construction/nrc/how_the_data_are_collected/>.

# Exhibit 2

# EXHIBIT NOT SUSCEPTIBLE TO PUBLIC SUMMARY

# Exhibit 3

**EXHIBIT NOT SUSCEPTIBLE TO PUBLIC SUMMARY**

# Exhibit 4

**EXHIBIT NOT SUSCEPTIBLE TO PUBLIC SUMMARY**