## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| OMAN FASTENERS, LLC, | ) | |
| | ) | **PUBLIC** |
| Plaintiff, | ) | **VERSION** |
| | ) | |
| v. | ) | Court No. 22-00348 |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MID CONTINENT STEEL & WIRE, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:                          KELLY M. GEDDES
IAN A. MCINERNEY                     Trial Attorney
Attorney                             Commercial Litigation Branch
Office of the Chief Counsel          Civil Division
  for Trade Enforcement and        Department of Justice
Compliance                           P.O. Box 480
U.S. Department of Commerce          Ben Franklin Station
                                     Washington, D.C.  20044
                                     Telephone: (202) 307-2867
                                     Facsimile: (202) 305-2062
                                     Email: kelly.geddes2@usdoj.gov


January 10, 2023                     Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ...................................................... iii

INTRODUCTION ................................................................... 2

BACKGROUND ..................................................................... 3

ARGUMENT ......................................................................... 8

I.   Standard Of Review ...................................................... 8

II.  Oman Fasteners Has Failed To Demonstrate That Paying Cash Deposits At The Final Antidumping Duty Rate Will Cause Immediate Irreparable Harm ...................................... 11

    A.   Oman Fasteners Relies Entirely On A Single Declaration From An Interested Party .................................. 12

    B.   Oman Fasteners Fails To Show Why It Could Not Avoid Irreparable Harm By Paying The Increased Duty Rate Or Shifting Its Focus To Other Markets ............................... 15

III. The Balance Of Hardships And Public Interest Factors Disfavor An Injunction Against The Collection Of Cash Deposits At The Final Antidumping Duty Rate .................................... 23

IV.  Oman Fasteners Has Not Shown A Likelihood Of Success On The Merits ................................................................. 32

    A.   Standard of Review ........................................... 33

    B.   Commerce Acted Within Its Discretion By Rejecting The Supplemental Section C Questionnaire Response After Finding No "Extraordinary Circumstances" Prevented Oman Fasteners From Timely Requesting An Extension ........................................................ 34

    C.   Commerce Lawfully Applied Facts Available With An Adverse Inference After Reasonably Finding Oman Fasteners Failed To Cooperate To The Best Of Its Ability ........................................................ 42

    D.   Commerce's Selection Of A Rate Based On An Adverse Inference Was Lawful .......................... 45

      E.     Commerce's Determination Comports With This Court's Precedents......................................................................... 47

V.    The Court Should Not Consolidate The Preliminary Injunction Motion Hearing With The Merits Without An Opportunity For Supplemental Briefing................................................................ 55

CONCLUSION ........................................................................ 57

# TABLE OF AUTHORITIES

## Cases

*Am. Silicon Techs. v. United States*, 261 F.3d 1371 (Fed. Cir. 2001) ..... 33

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343 (Fed. Cir. 2001) ................................................................................. 9

*Bosun Tools Co. v. United States*, 405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) .......................................................................... 48, 52

*Business Integra, Inc. v. United States*, 116 Fed. Cl. 328 (2008) ........... 56

*Celik Halat ve Sanayi A.S. v. United States*, 557 F. Supp. 3d 1363 (Ct. Int'l Trade 2022) ..................................................... 47, 48, 52

*Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) .............................................. 47, 48, 51

*Chilean Nitrate Corp. v. United States*, 11 C.I.T. 538 (1987) .... 16, 18, 20, 29

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 393 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) ................................................................................ 11

*Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015) ...................................................... 40, 41, 53, 54

*Ferrostaal Metals GmbH v. United States*, 518 F. Supp. 3d 1357 (Ct. Int'l Trade 2021) ...................................................................... 41

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) ......... 33

*GPX Int'l Tire Corp. v. United States*, 587 F. Supp. 2d 1278 (Ct. Int'l Trade 2008) ...................................................................... 10

*Harmoni Int'l Spice, Inc. v. United States*, 211 F. Supp. 3d 1298, 1318 (Ct. Int'l Trade 2017) ................................................................ 31

*Int'l Custom Prod.*, *Inc. v. United States*, 30 C.I.T. 21 (2006) .......... 18, 27

*Int'l Fresh Trade Corp. v. United States*, 26 F. Supp. 3d 1363 (Ct. Int'l Trade 2014) ............................................................ 14, 15, 17

*J. Conrad LTD v. United States*, 457 F. Supp. 3d 1365 (Ct. Int'l Trade 2020) ................................................................................ 10

iii

*Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014) ..................................................................................22

*KYD, Inc. v. United States*, 607 F.3d 760 (Fed. Cir. 2010) ....................46

*MacMillan Bloedel Ltd. v. United States*, 16 CIT 331 (1992) ...............26

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ............................................8

*Munaf v. Geren*, 553 U.S. 674 (2008) .......................................................9

*Nan Ya Plastics Corp. Ltd. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016) ..................................................................................44

*Nken v. Holder*, 556 U.S. 418, 435 (2009) ..............................................23

*Olympia Indus., Inc. v. United States*, 30 C.I.T. 12 (2006) ....................31

*Otter Prods., LLC v. United States*, 37 F. Supp. 3d 1306 (Ct. Int'l Trade 2014) ...............................................................................9, 11

*Palatine v. United States Postal Service,* 756 F. Supp. 1079 (N.D. Ill. 1992) ..................................................................................56

*PAM, S.p.A. v. United States*, 582 F.3d 1336 (Fed. Cir. 2009)..............33

*Premier Trading, Inc. v. United States*, 144 F. Supp. 3d 1354 (Ct. Int'l Trade 2016)...................................................................... 14, 15, 16

*Queen's Flowers de Colombia v. United States*, 947 F. Supp. 503 (Ct. Int'l Trade 1996)..................................................................10

*Shandong Huarong Gen. Grp. v. United States*, 122 F. Supp. 2d 143 (Ct. Int'l Trade 2000)........................................................ passim

*Shree Rama Enterprises v. United States*, 983 F. Supp. 192 (Ct. Int'l Trade 1997).................................................................. 13, 28

*Sumecht NA, Inc. v. United States*, 331 F. Supp. 3d 1408 (Ct. Int'l Trade 2018) ...............................................................................11

*Sunpreme Inc. v. United States*, 145 F. Supp. 3d 1271 (Ct. Int'l Trade 2016) ...............................................................................22

*Tau-Ken Temir LLP v. United States*, 587 F. Supp. 3d 1346 (Ct. Int'l Trade 2022).................................................................. 48, 53, 54

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ................................33

*Valeo N. Am., Inc. v. United States*, 277 F. Supp. 3d 1361 (Ct. Int'l Trade 2017) ........................................................................... 26

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .. 9, 10, 23, 29

## **Statutes**

19 U.S.C. § 1516a .................................................................. 24, 33

19 U.S.C. § 1673f ........................................................................ 32

19 U.S.C. § 1675 ......................................................................... 24

19 U.S.C. § 1677e ................................................................. passim

19 U.S.C. § 1677m ...................................................................... 42

28 U.S.C. § 1581 ......................................................................... 55

28 U.S.C. § 2639 ......................................................................... 31

## **Regulations**

19 C.F.R. § 351.303 ............................................................ 5, 35, 40

19 C.F.R. § 351.308 ..................................................................... 46

## **Administrative Determinations**

*Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed. Reg. 39,994 (Dep't Commerce Jul. 13, 2015) ................................... 4

*Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,793 (Dep't of Commerce Sept. 20, 2013) ........................................... 35, 38, 39

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 50,034 (Dep't Commerce Sep. 7, 2021) ............. 4

*Steel Nails from Oman, Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) ...................................................... 7

*Welded Stainless Pressure Pipe from Thailand: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 31,093 (Dep't of Commerce May 30, 2014) ................................................... 46

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| OMAN FASTENERS, LLC, | ) | |
| | ) | |
| | ) | **PUBLIC** |
| Plaintiff, | ) | **VERSION** |
| | ) | |
| v. | ) | Court No. 22-00348 |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MID CONTINENT STEEL & WIRE, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully submits this response in opposition to the motion for a preliminary injunction filed by plaintiff, Oman Fasteners, LLC (Oman Fasteners). *See* ECF No. 36 (Pl. Mot.), ECF No. 36-1 (Pl. Br.). For the reasons set forth below, Oman Fasteners' motion should be denied.

## **INTRODUCTION**

When a party seeks judicial review of the final results of an antidumping duty determination by the Department of Commerce, Commerce will, consistent with the statutory scheme, consent to the suspension of liquidation of the entries at issue, during the pendency of the litigation.  However, Oman Fasteners asks for relief far beyond these usual procedures, by asking that the collection of duty deposits at the current rate be enjoined, such that the United States would have almost no security to cover future duty liability.  Such an injunction is rare and requires a strong showing of imminent irreparable harm.

Oman Fasteners seeks to make this showing by claiming that, without injunctive relief, it will be forced to cease imports of subject merchandise to the United States and therefore faces bankruptcy, catastrophic loss of revenue, widespread layoffs, and a massive long-term reduction in business operations.  But its motion must fail, not because such occurrences would not constitute irreparable harm, but because this Court has clearly established the evidentiary burden for substantiating such claims, and Oman Fasteners has ignored that burden.  Specifically, Oman Fasteners relies entirely on a single

affidavit from its own CEO, and produces no independent documents, and no explanation as to why it could not avoid all the dire, speculative consequences it describes by taking other action, such as obtaining outside financing, raising prices, or drawing on existing assets to pay the increased duties during the pendency of litigation.  Accordingly, the Court should reject Oman Fasteners' claim of irreparable harm and deny its motion.

In addition, to meet the high standard for preliminary injunctive relief, Oman Fasteners must demonstrate a likelihood of success on the merits, but has failed to do so.  Oman Fasteners challenges Commerce's determination that it failed to show "extraordinary circumstances" justifying a late-filed motion for an extension of a deadline.  However, Oman Fasteners does not contend that it met that standard, relying instead on cases with similar fact patterns but which were decided on legal grounds that do not apply here.  Accordingly, it has failed to show a likelihood of success on the merits and its motion should be denied.

## **BACKGROUND**

Commerce published an antidumping duty order covering certain steel nails from Oman on July 13, 2015.  *See Certain Steel Nails from*

3

*the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed. Reg. 39,994 (Dep't Commerce Jul. 13, 2015).  On September 7, 2021, Commerce initiated the sixth administrative review of that antidumping duty order, covering the period from July 1, 2020, to June 30, 2021.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 50,034 (Dep't Commerce Sep. 7, 2021).  Oman Fasteners was the sole mandatory respondent.  *See* Pl. Mot. at Exhibit 3 (ECF 36-3).[1]

During its review, Commerce issued a supplemental section C questionnaire to Oman Fasteners on January 24, 2022.  *See* Pl. Mot. at Exhibit 4.  Commerce then granted two extensions of the submission deadline, such that the deadline was February 14, 2022 at 5:00 p.m. *See* Pl. Mot. at Exhibits 6, 8.  Oman Fasteners' second extension request was submitted the day before the deadline, and Commerce granted the request in full.  Pl. Mot. at Exhibit 8.  Further, Commerce notified Oman Fasteners that it did "not anticipate providing any additional

---

[1]  Commerce has not yet filed the administrative record.  We, however, do not dispute that the exhibits attached to Oman Fasteners' memorandum in support of its motion are documents that are part of the record of proceedings before Commerce.

extension" because it had already extended the deadline twice. *Id.*
Commerce also reminded Oman Fasteners that information submitted
after the deadline might not be accepted, and if necessary information
was missing from the record, Commerce might be required to rely on
the facts available, and also explained that it may rely on adverse
inferences if warranted pursuant to 19 U.S.C. § 1677e(a)(2)(B). *Id.*

Commerce did not receive the complete supplemental section C
questionnaire response until 5:16 p.m. on February 14, 2020. *See* Pl.
Mot. at Exhibit 14. Pursuant to 19 C.F.R. § 351.303(b)(1), an electronic
filing not received in its entirety by 5:00 p.m. on the due date is
considered untimely. Further, Commerce never received—before or
after the deadline—any extension request or any notification, formal or
informal, that Oman Fasteners might be unable to timely submit the
supplemental section C questionnaire response. *Id.* Accordingly,
Commerce rejected the filing, and notified Oman Fasteners of its
decision on March 22, 2022. *Id.*

Oman Fasteners requested reconsideration of the decision on
March 24, 2022. *See* Pl. Mot. at Exhibit 9. In that request, for the first
time, it requested an extension of the February 14, 2022 deadline. *Id.*

It explained that the reason for its untimely submission was that
Commerce's electronic filing system (ACCESS) was slower than usual.
*Id.* Oman Fasteners began filing its submission at 4:10 p.m., received
several rejection messages from ACCESS, and finally made its full
submission by 5:16 p.m. *Id.*

Commerce denied the request for reconsideration, along with the
untimely extension request, on April 20, 2022. *See* Pl. Mot. at Exhibit
15. In its denial letter, Commerce reiterated that its practice is to reject
untimely filings, meaning filings not received in their entirety by the
deadline. *Id.* It further explained that where a party fails to request an
extension before the deadline, the party must demonstrate
"extraordinary circumstances" in order for Commerce to accept an
untimely extension request. *Id.* (citing 19 C.F.R. § 351.302(c)(2)).
Commerce found that the unusually slow filing speed on the day of the
deadline, when Oman Fasteners did not begin its filing until 50 minutes
before the deadline, did not constitute extraordinary circumstances. *Id.*
Further, even if the technical difficulties experienced by Oman
Fasteners did amount to extraordinary circumstances, Oman Fasteners
failed to demonstrate that extraordinary circumstances prevented it

from seeking an extension request before the deadline, or at least
notifying Commerce of its technical issues. *Id.* Commerce rejected
Oman Fasteners' request for leave to resubmit the filing, because Oman
Fasteners failed to offer any new information in support of its request.
*See* Pl. Mot. at Exhibit 19.

Because Commerce did not accept the untimely questionnaire
response, necessary information concerning Oman Fasteners' sales into
the United States was missing from the record, such that Commerce
relied on facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1)
to determine Oman Fasteners' dumping margin. *See Steel Nails from
Oman, Final Results of Antidumping Duty Administrative Review;
2020-2021*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) (Final
Results), and accompanying issues and decisions memorandum (IDM)
at 12-15 (IDM available as Exhibit 2 to Oman Fasteners' motion).
Further, because Commerce found that Oman Fasteners had failed to
cooperate to the best of its ability in responding to Commerce's requests
for information, Commerce applied an adverse inference in selecting
from among the facts otherwise available on the record to reach the
final rate of 154.33%. IDM at 19-20.

The day after the final results were published, on December 23, 2022, Oman Fasteners filed this action. *See* ECF 10 (Complaint).  It moved for a preliminary injunction on December 26, 2022.  *See* ECF 18 (Motion for Preliminary Injunction).[2]  In its motion, Oman Fasteners asks the Court to enjoin Customs & Border Protection (CBP) from collecting cash deposits at the 154.33% rate established by the final results of the administrative review, and require CBP instead to collect cash deposits on subject merchandise at the prior review's established rate of 1.65%.  ECF 36.  Since the motion for a preliminary injunction was filed, CBP has received the instructions to begin collecting cash deposits at the new rate.

## ARGUMENT

## I.    Standard Of Review

Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)

---

[2]  The confidential motion was not successfully filed until December 27, 2022 because Oman Fasteners had not yet received confidential filer status, but Oman Fasteners filed the public version and served defendant with the confidential version on December 26, in accordance with the briefing schedule.

(citation omitted).  A preliminary injunction is "never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)).

To obtain a preliminary injunction, a party must establish each of four elements: "(1) that it will be immediately and irreparably injured; (2) that there is a likelihood of success on the merits; (3) that the public interest would be better served by the relief requested; and (4) that the balance of hardship on all the parties favors the {movant}." *Otter Prods., LLC v. United States*, 37 F. Supp. 3d 1306, 1314 (Ct. Int'l Trade 2014) (citation omitted); *see also Winter*, 555 U.S. at 20–21.

Because the movant "must establish" all four factors, the failure to prove any one of them compels the denial of injunction relief.  *See Winter*, 555 U.S. at 20; *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001), *abrogated on other grounds by eBay, Inc. v. MercExchange, L.L.C,* 547 U.S. 388 (2006) ("Our case law and logic both require that a movant cannot be granted preliminary relief unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm.") (citations omitted); *Shandong Huarong Gen. Grp. v. United States*, 122 F. Supp. 2d 143,

145 (Ct. Int'l Trade 2000) ("If Plaintiff fails to prove any one of these factors, its motion must fail.").

Although some courts have previously employed a "sliding scale" in evaluating the four injunctive factors, "{i}nsofar as the sliding scale standard relaxes the necessary showing of irreparable harm to something less than a likelihood, that standard is no longer viable after *Winter*." *J. Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1374 (Ct. Int'l Trade 2020); *see also Winter*, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.").

Moreover, an injunction against the collection of cash deposits will be granted "only in the rarest of instances." *GPX Int'l Tire Corp. v. United States*, 587 F. Supp. 2d 1278, 1284 (Ct. Int'l Trade 2008) (quoting *Queen's Flowers de Colombia v. United States*, 947 F. Supp. 503, 506 (Ct. Int'l Trade 1996)).

## II.    Oman Fasteners Has Failed To Demonstrate That Paying Cash Deposits At The Final Antidumping Duty Rate Will Cause Immediate Irreparable Harm

A plaintiff seeking an injunction bears an "extremely heavy burden" to establish irreparable injury. *Shandong Huarong*, 122 F. Supp. 2d at 146. "In evaluating irreparable harm, the court must consider 'the magnitude of the injury, the immediacy of the injury, and the inadequacy of future corrective relief.'" *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 393 F. Supp. 3d 1271, 1276 (Ct. Int'l Trade 2019) (*Lumber*) (citations and alteration omitted). "It is not enough to establish 'a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown.'" *Id.* (citations omitted). "Critically, irreparable harm may not be speculative" or "determined by surmise." *Id.* (citations omitted). It must be "demonstrated by probative evidence." *Otter*, 37 F. Supp. 3d at 1315 (citations omitted). "Failure as to this factor is grounds for denying injunctive relief." *Lumber*, 393 F. Supp. 3d at 1277; *see also, e.g.*, *Sumecht NA, Inc. v. United States*, 331 F. Supp. 3d 1408, 1412 (Ct. Int'l Trade 2018), *aff'd*, 923 F.3d 1340 (Fed. Cir. 2019); *Otter*, 37 F. Supp. 3d at 1316.

Further, as explained in detail below, the relevant authorities—including the cases cited by plaintiff—establish a clear requirement for plaintiffs who seek to enjoin the collection of cash deposits based on the claim that they cannot afford to pay them.  Those plaintiffs must present independent evidence corroborating their assertions, and that evidence should include, at the very least, (1) audited financial documents showing insufficient resources, (2) proof that they have tried but failed to obtain outside funding, and (3) proof that they could not feasibly raise prices.  Oman Fasteners has not provided any such evidence, but rather asks the Court to enjoin CBP's collection of cash deposits based entirely on unsupported assertions in a single affidavit from its own CEO.  Granting such relief would disregard the established legal framework, and Oman Fasteners has offered no reason why the Court should do so.

### A.   Oman Fasteners Relies Entirely On A Single Declaration From An Interested Party

Oman Fasteners paints a grim picture of the supposed consequences of requiring it to make cash deposits, but its fears do not meet the high burden required for preliminary injunctive relief.  Oman Fasteners relies *entirely* on a single declaration by its own CEO, Steve

Karaga.  *Id.*  Mr. Karaga's declaration relies on exhibits "prepared by Oman Fasteners personnel at {Karaga's} direction," such that these exhibits essentially amount to more uncorroborated assertions by an interested party.  Karaga Decl. ¶3 (ECF 36-2).

This Court has consistently found affidavits prepared by interested parties, without support from independent sources, to be insufficient to demonstrate irreparable harm.  "{E}ven if {plaintiff's affidavits} claim a threat of extinction, affidavits submitted by interested parties are weak evidence, unlikely to justify a preliminary injunction."  *Shree Rama Enterprises v. United States*, 983 F. Supp. 192, 195 (Ct. Int'l Trade 1997).  In *Shree Rama*, plaintiff submitted affidavits alleging that its increased rates would "affect between 59 and 81 percent of plaintiffs' sales revenues" and also submitted "customer letters and descriptions of conversations with customers in which the customers state that they have switched or will switch suppliers rather than pay the higher deposit rate."  983 F. Supp. at 195.  The Court explained that with "no evidence from independent sources, and…no witnesses available for cross-examination," there was simply too little evidence to support the injunction.  *Id.*

13

Similarly, in *Shandong Huarong*, 122 F. Supp. 2d at 147, the Court rejected plaintiff's claim of irreparable harm where its evidence consisted "solely of an affidavit from its 'major customer.'"  *Id.*  The Court noted that the affidavit was not bolstered by "independent evidence" or financial statements.  *Id.*; *see also Premier Trading, Inc. v. United States*, 144 F. Supp. 3d 1354, 1359 (Ct. Int'l Trade 2016) ("proffering a single affidavit from a manager without more, may be considered weak evidence, unlikely to justify a preliminary injunction") (cleaned up); *Int'l Fresh Trade Corp. v. United States*, 26 F. Supp. 3d 1363, 1368 (Ct. Int'l Trade 2014) (rejecting claim of irreparable harm where plaintiff "produced neither independent evidence nor witnesses for cross examination to support its affidavits.").

Accordingly, without even reaching the substance of Oman Fasteners' evidence, the Court should deny the motion because Oman Fasteners' uncorroborated assertions do not meet the standard to demonstrate imminent irreparable harm.  Absent support such as independent sources or witnesses available for cross-examination, evidence of this nature is simply insufficient.

14

### B.     Oman Fasteners Fails To Show Why It Could Not Avoid Irreparable Harm By Paying The Increased Duty Rate Or Shifting Its Focus To Other Markets

The case law further establishes that where a plaintiff claims irreparable harm because it cannot pay increased duties, the evidence in support should specifically include financial statements demonstrating the plaintiff's insufficient resources, proof that they have tried but failed to obtain outside funding, and proof that they could not feasibly raise prices.  Oman Fasteners has produced none of these.

First, this Court has explained that a plaintiff's claim of an inability to pay increased duties must be supported with actual financial statements.  *Int'l Fresh Trade*, 26 F. Supp. 3d at 1368 (rejecting arguments that plaintiffs lacked sufficient finances to pay increased duties where they did not produce "financial statements to prove lack of necessary capital reserves"); *Shandong Huarong Gen. Grp. v. United States*, 24 C.I.T. at 1290–91 ("no financial statements have been proffered indicating that Plaintiff does not possess the capital reserves necessary to remain viable during this litigation"); *Premier Trading*, 144 F. Supp. 3d at 1359 ("Plaintiff does not include any financial statements to prove lack of necessary capital reserves…");

*Chilean Nitrate Corp. v. United States*, 11 C.I.T. 538, 541 (1987) ("No financial statement demonstrating lack of reserves was presented.").

Mr. Karaga claims that making cash deposits at the rate set in this review would cost Oman Fasteners [ ███████ ], and that this is [ ██ ]% of its annual revenues, but he provides no support whatsoever for these figures. *Id.* ¶24. He also provides a document purporting to show that Oman Fasteners' cash reserves [ ████████████ ] if it were forced to pay the new assessment rate, but this is yet another uncorroborated chart created by an interested party and therefore is of limited probative value. *Id.* at Exhibit D. Accordingly, Oman Fasteners has offered no proof beyond its bare assertion that its existing resources could not cover the increased duties.

Second, plaintiffs seeking to enjoin operation of the statutory cash deposit requirement show that they have at least attempted to obtain additional financing to cover increased duties. *See Chilean Nitrate*, 11 C.I.T. at 541 ("Plaintiff's witness did not testify that financing was sought and denied."); *Premier Trading*, 144 F. Supp. 3d at 1359 ("Plaintiff does not include…any documents indicating that plaintiff sought and was denied financing to meet its enhanced bonding

obligations."); *Shandong Huarong*, 122 F. Supp. 2d at 147  ("Plaintiff has offered no proof that it would be unable to obtain outside financing to cover the costs of the higher antidumping duty deposit rate and thereby sustain its business throughout the course of this litigation."). *Int'l Fresh Trade*, 26 F. Supp. at 1368 ("Plaintiff has not shown that it sought and was denied financing to meet its enhanced bonding obligations.").

Oman Fasteners never explains whether it has actually sought financing or why it could not obtain outside funding to cover the increased duty rates.  At one point, Mr. Karaga assumes that "{g}iven the existing credit facilities, Oman Fasteners' dramatically reduced revenue prospects while the estimated antidumping duty deposit rate remains at 154.33 percent, and the extraordinary business risk created by {} Commerce's Final Results, it would {} not be possible for Oman Fasteners to secure additional debt funding." *Id.* ¶32.  But this assertion does not address why Oman Fasteners could not obtain financing to cover the cash deposits for the short term, in which case there would be no need for it to suffer "dramatically reduced revenue prospects" in the first place. *Id.*  Further, Oman Fasteners' claims

17

remain entirely speculative, as it has not presented any evidence of any actual attempt to secure funding despite this Court's clear requirement to do so in order to demonstrate imminent irreparable harm.

Third, this Court has rejected uncorroborated claims that a plaintiff could not cover increased duties by increasing prices. *Chilean Nitrate*, 11 C.I.T. at 541 (rejecting uncorroborated assertion that plaintiff could not raise prices, noting that "{w}hen questioned about which customers would tolerate a price increase and in what amounts, plaintiff's witness was vague"); *Int'l Custom Prod., Inc. v. United States*, 30 C.I.T. 21, 28 (2006) ("{P}laintiff has not substantiated its claim that, in the event plaintiff is forced to raise the price of its white sauce to offset the effect of the new duty, its customers will choose to purchase white sauce from another source.").

Mr. Karaga repeatedly asserts that Oman Fasteners could not raise prices, but the only actual reasoning he provides in support is that its products are [ ███████████████████████████████████████ ███████████████████████████ ] *Id.* ¶25. But if [ ███████████████████ ███████████████████████ ], he does not explain why he assumes [ ████ ██████████████████████████████████████████ ]

18

█████████████ ], at least in the short-term.  In fact, Mr. Karaga casts doubt on this assumption by emphasizing that it is "highly unlikely that {Oman Fasteners'} customers would be able to quickly find alternate suppliers to make up such a significant supply shortfall."  *Id.* ¶22.  He believes they may do so "if Oman Fasteners cannot resume importation of Subject Merchandise for a year or more" but there is no basis to believe this litigation will be so prolonged—indeed, it is within the Court's power to ensure that it is not.  *Id.*  Accordingly, by Mr. Karaga's own reasoning, it would seem that [ ███████████

██████████ ], at least in the short-term, to offset the increased antidumping rates.

Even if Oman Fasteners could not possibly make deposits at the 154.33% rate, it fails to explain why it could not avoid irreparable harm by selling the subject merchandise in other markets besides the United States, or by shifting its resources to its other merchandise.  Mr. Karaga avers that [ ████████████████

██████████ ] "{b}ased on {his} knowledge," but offers no supporting evidence.  *Id.* ¶14.  He makes essentially the same argument as to why [ █████████████████████████████. ]  *Id.* ¶15.

He simply speculates, without documentary support, "{b}ased on {his} knowledge" of past efforts. *Id.* He further speculates that customers who buy multiple products would cease buying products other than the subject merchandise if Oman Fasteners ceased shipments of the subject merchandise. *Id.* ¶¶16-18. Without further explanation or documentary support, these statements once again demonstrate only "possible"—but not "probable"—harm. *See Chilean Nitrate*, 11 C.I.T. at 541.

To the extent that any of Oman Fasteners' fears do not rely on the assumption that it would suffer an "enormous" loss of revenue, Pl. Br. at 61, they are too speculative to support an injunction against the collection of cash deposits for prospective entries. Mr. Karaga asserts, for instance, that because the increased assessment rates significantly affect its business, [█████████████████████████████████ ███████████████████████. ] *Id.* ¶¶30-31. This concern is premised on the assumption that Oman Fasteners has been "forced" to cease shipments of subject merchandise to the United States, an assumption Oman Fasteners has failed to convincingly support, as discussed above. *Id.* ¶31. But in any case, without any concrete

showing that [█████████████████████████████████],

this concern is pure speculation.  Mr. Karaga also claims imminent

harm in the form of damaged customer relationships if Oman Fasteners

raises prices or cuts back its shipments.  Such vague, unquantified, and

uncorroborated sorts of arguments could be made in any case where a

plaintiff complains that the cash deposit rate is too high.  If such

arguments were a sufficient basis to enjoin collection of cash deposits,

such preliminary injunctions would become the norm rather than the

rare exception.  Such a result would undermine the operation of our

retrospective antidumping duty scheme and therefore cannot be the

correct one.

Oman Fasteners cites two cases where the Court "found

irreparable harm in similar situations," Pl. Br. at 59-60, but these cases

simply reaffirm the principle espoused in the line of cases discussed

above—that Oman Fasteners cannot prevail based on an

uncorroborated affidavit, but rather must present independent sources

affirmatively demonstrating that it lacks resources to pay the duties

and cannot remedy this through raised prices or outside financing.  In

*Sunpreme Inc. v. United States*, 145 F. Supp. 3d 1271 (Ct. Int'l Trade

2016), plaintiff prevailed because it submitted precisely the sort of evidence lacking here.  Sunpreme supported its motion with bank statements, audited financial statements, and tax returns.  *See* C.I.T. Case No. 15-cv-00315, ECF No. 23, at 22 and Exhibits 18-21.  It also presented evidence that it had in fact sought a loan and been denied, and that it had attempted to raise prices but lost significant orders as a result.  *Id.* at 23.

It is less clear what precise documents were offered in support of the preliminary injunction motion in the other case cited by Oman Fasteners, *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014).  But at the very least, plaintiff provided bank statements to prove it did not have the cash on hand for the collateral required by the surety to issue single transaction bonds that CBP had determined were required.  *Id.* at 1328.  Further, *Kwo Lee* is distinguishable because it concerned the importation of garlic, a perishable good.  The threat of irreparable harm is more serious in the case of perishable merchandise because any temporary delay in sales will result in the permanent loss of the product.  *Shandong Huarong*, 122 F. Supp. 2d at

148 (denying preliminary injunction and distinguishing another case where goods were perishable).

Accordingly, the Court should find that Oman Fasteners' unsupported claims fail to establish immediate irreparable harm. On this basis alone, the Court should deny the request for a preliminary injunction.

## III. The Balance Of Hardships And Public Interest Factors Disfavor An Injunction Against The Collection Of Cash Deposits At The Final Antidumping Duty Rate

The balance of hardships does not weigh in Oman Fasteners' favor, nor is it in the public interest to enjoin the collection of cash deposits at the rate set in this administrative review. When assessing the balance of hardships, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter* 555 U.S. at 24 (citation omitted). "{W}hen the Government is the opposing party, the balance of hardships and public interest 'merge.'" *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As an initial matter, Congress established a framework that balances the interests of the parties, and the request to enjoin

23

collection of cash deposits pursuant to the rate established by the most recent administrative review disrupts that framework.  Antidumping duty rate disputes are governed by 19 U.S.C. § 1516a, which gives interested parties the right to challenge antidumping duty orders in this Court.  That section specifically provides that the Court may "enjoin the liquidation of some or all entries of merchandise *covered by*" the determination in dispute, that is, entries subject to the retroactive administrative review in question, "upon a request by an interested party for such relief and a proper showing that the requested relief should be granted under the circumstances."   19 U.S.C. § 1516a(c)(2) (emphasis added).

However, no part of the statute envisions the injunction of the *collection* of cash deposits for prospective (*i.e.*, as-yet unreviewed) entries during the pendency of liquidation.  Indeed, Congress determined that the rate established in the administrative review would serve as the cash deposit rate for future entries.  19 U.S.C. § 1675(a)(2)(C).  Congress thereby made a deliberate choice to balance the competing interests of both parties—the Government's interest is secured by the cash deposits, but the deposits remain unliquidated

until the completion of an administrative review of those entries to ensure that a prevailing plaintiff's entries are ultimately assessed at the appropriate rate. Excess deposits collected are refunded with interest.

By asking the Court to enjoin the collection of prospective cash deposits, Oman Fasteners asks the Court to ignore Congress's direction and disregard the public's interest in protecting the public fisc. Indeed, if Oman Fasteners truly cannot afford to make cash deposits during the short pendency of this litigation, it presumably would also be unable to make those payments after the fact. Therefore, an injunction would force the Government to permanently abandon its interest in collecting the money it is owed for any entries made during that period. This would undermine the Government's and the public's legitimate interest in protecting the public fisc and enforcing the law. It also would not further the remedial purpose of the antidumping duty statute, if CBP cannot ultimately collect antidumping duties found to be owed.

Further, all of Oman Fasteners' arguments concerning the balance of hardships and the public interest rely on the assumption that

it has offered persuasive evidence that it is at risk of catastrophic revenue losses or bankruptcy.  But as discussed above, Oman Fasteners has not substantiated these claims.

Indeed, the only established "harm" Oman Fasteners faces is paying the higher cash deposit rate pending judicial review of Commerce's determination.  "{P}aying deposits pending court review," however, is not a hardship warranting an injunction; it is merely "an ordinary consequence of the statutory scheme."  *Valeo N. Am., Inc. v. United States*, 277 F. Supp. 3d 1361, 1366 (Ct. Int'l Trade 2017) (quoting *MacMillan Bloedel Ltd. v. United States*, 16 CIT 331, 333 (1992)).

Oman Fasteners suggests that the harm to the United States is "nonexistent."  Pl. Br. at 62.  However, the United States has an interest in securing the duties to which it may ultimately be entitled if it prevails.  As explained earlier, the fact that Oman Fasteners claims to be unable to pay the duties suggests that, if Oman Fasteners is permitted to continue importing subject merchandise without making cash deposits at the rate established in this review, the Government may never see that revenue.  The United States therefore faces serious

26

harm in the form of loss of revenue it is entitled to and required to collect. *See Int'l Custom*, 30 CIT at 31 (finding hardship factor did not favor plaintiff where the Government faced potential loss of revenue, despite plaintiff having to pay a higher duty and find a domestic source for its merchandise).

Oman Fasteners argues that the Government will not collect duties in any case, because without an injunction, it will cease all imports. Pl. Br. at 62-63. But as explained, Oman Fasteners has failed to support its claim that such drastic action would be necessary.

The public interest does not favor Oman Fasteners either. According to Oman Fasteners, enjoining the collection of cash deposits at the rate determined by Commerce will serve the public interest of "ensuring that governmental bodies comply with the law." Pl. Br. at 63. But this argument presumes that Commerce acted unlawfully, which Oman Fasteners has yet to prove, and which it is unlikely to succeed in proving at the merits stage of this litigation, as we explain in the next section. Oman Fasteners also argues that an injunction would serve the public interest by ensuring it does not go bankrupt, such that the Court has an opportunity to reach a fair outcome before it becomes

moot.  *Id.* at 65.  But this once again assumes that Oman Fasteners has

demonstrated a genuine, imminent threat of bankruptcy, which it has

not.

Oman Fasteners next argues an injunction will serve the interests

of domestic industries because it will benefit Oman Fasteners'

customers, but this argument yet again requires the Court to rely on

letters "submitted by interested parties," which, again, "are weak

evidence, unlikely to justify a preliminary injunction."  *Shree Rama*

*Enterprises*, 983 F. Supp. at 195.  Further, the harms described in the

letters themselves rely, yet again, entirely on the assumption that

Oman Fasteners would cease exporting subject merchandise to the

United States altogether, which Oman Fasteners has failed to show is a

genuine risk.

Oman Fasteners' customers also describe the potential harm they

face in vague, unquantified terms, often using the same boilerplate

language that there will be "harm" to various parties, "havoc" on the

industry, and long-term and downstream consequences.  *See* Pl. Mot. at

Exhibits 28-32.  But to the extent the customers back up these claims

with specific facts, they are unpersuasive.  For instance, if Oman

Fasteners supplies only 18% of steel nails in the United States, a figure cited in almost every customer's letter, *see id.* at PDF 487, 493, 495, it would stand to reason that steel nails from the other suppliers constituting 82% of the supply might provide enough merchandise, at least for the pendency of this litigation, to prevent any catastrophic damage to United States industries. Several customers emphasize that collated nails generally, or nails supplied by Oman Fasteners in particular, comprise a significant portion of the company's business. *Id.* at PDF 489, 495, 499. But this is irrelevant if a company could simply switch to a different supplier. Finally, the emphasis on industry-wide downstream consequences appears overblown to the extent the Court is considering only the temporary consequences of a preliminary injunction. *See, e.g.*, *Winter*, 555 U.S. at 20, 129 S. Ct. at 374, 172 L. Ed. 2d 249 (plaintiff seeking preliminary injunction must demonstrate that he is "likely to suffer irreparable harm *in the absence of preliminary relief*") (emphasis added); *see also Chilean Nitrate*, 11 C.I.T. at 540 (noting that for preliminary injunction purposes, plaintiff's fear of "severe disruption" to its business was undermined by short-term option of relying on inventory already imported). In short, the

assertions of impending harm are so general and vague that if they were sufficient to justify an injunction, any party contesting an increased duty rate could obtain an injunction through similar letters from customers.

Finally, Oman Fasteners cites letters from the U.S. Ambassador to Oman and from the Government of Oman to demonstrate that absent an injunction, our international commercial relationships will suffer. But yet again, these letters are only persuasive to the extent that the Court is convinced that Oman will be required to lay off large numbers of workers or to go out of business altogether. *See* Pl. Br. at 66-67 (citing language from letters explaining that Oman provides livelihood to workers, and that it would be desirable to "permit the company to remain in business"). Nobody suggests it would be harmful to our international commercial relations if Oman Fasteners is, for instance, simply forced to obtain some additional financing to cover its higher duties during the pendency of litigation. Thus, to the extent that the Court is unpersuaded by Oman Fasteners' claim of irreparable harm— which, according to established case law, should be rejected—it must

similarly reject the argument that an injunction is necessary to protect the public interest.

On the other hand, "protecting the revenue of the United States" by requiring Oman Fasteners to pay cash deposits at the rate established in the review constitutes "a significant public interest." *See Harmoni Int'l Spice, Inc. v. United States*, 211 F. Supp. 3d 1298, 1318 (Ct. Int'l Trade 2017); *Olympia Indus., Inc. v. United States*, 30 C.I.T. 12, 18-19 (2006) (concluding the United States has a "substantial public interest claim" in protecting revenue).

Moreover, an injunction that disrupts the statutory scheme is not in the public interest, because it would disregard that Commerce's determination is presumed correct, *see* 28 U.S.C. § 2639(a)(1), and would "implicitly endorse {Oman Fasteners'} non-cooperation with Commerce," contrary to the public interest in promoting enforcement of the trade laws, *see Harmoni*, 211 F. Supp. 3d at 1318.

Fundamentally, any increase in a cash deposit rate is likely to affect the bottom line of a producer or importer; if every importer could obtain an injunction against the statutory cash deposit requirement, it would fundamentally undermine our retrospective statutory scheme.

31

Congress has determined that such security is required, and provided that excess duties collected will be refunded, with interest.  19 U.S.C. § 1673f(b)(2).  The public interest is served by maintaining the scheme that Congress has set.

## IV. Oman Fasteners Has Not Shown A Likelihood Of Success On The Merits

Finally, Oman Fasteners also fails to demonstrate that it would succeed on the merits.  With respect to the merits of this case, Oman Fasteners' argument essentially boils down to a claim that Commerce abused its discretion in finding that Oman Fasteners: (1) failed to demonstrate extraordinary circumstances justifying its untimely extension request, and (2) failed to cooperate to the best of its ability in responding to Commerce's requests for information by failing to timely submit its filing or to timely notify Commerce of its inability to do so. Under the applicable statutes and regulations, the application of adverse facts available is lawful and appropriate once these two findings are made.  And these are fact-intensive inquiries that Congress has left to the discretion of Commerce.  Oman Fasteners effectively asks the Court to substitute its own judgment.  The Court should decline this invitation, especially at the preliminary injunction stage.

A.   **Standard of Review**

When the Court reaches the merits of this case, it must "sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).  The possibility of "draw{ing} two inconsistent conclusions from evidence in the record . . . does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu*, 88 F.3d at 1044).

**B.      Commerce Acted Within Its Discretion By Rejecting The Supplemental Section C Questionnaire Response After Finding No "Extraordinary Circumstances" Prevented Oman Fasteners From Timely Requesting An Extension**

Commerce's regulations, which Oman Fasteners is wholly familiar with, provide that "{u}nless the Secretary extends a time limit…the Secretary will not consider or retain in the official record of the proceeding…{u}ntimely filed factual information, written argument, or other material that the Secretary rejects…" 19 C.F.R. § 351.302(d)(1). Accordingly, when a party files an untimely submission, Commerce will *only* consider that submission if the party obtains an extension of the deadline for the submission.

A party may submit an extension request but must do so before the applicable time limit expires, and "{a}n untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists."  19 C.F.R. § 351.302(c).  An extraordinary circumstance is an event that:

(i)     Could not have been prevented if reasonable measures had been taken, and

(ii)    Precludes a party or its representative from timely filing an extension request through all reasonable means.

*Id.* In 2013, when Commerce added the extraordinary circumstance requirement for an untimely extension request, Commerce elaborated:

> Examples of extraordinary circumstances include a natural disaster, riot, war, force majeure, or medical emergency. Examples that are unlikely to be considered extraordinary circumstances include insufficient resources, inattentiveness, or the inability of a party's representative to access the Internet on the day on which the submission was due.

*Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,793 (Dep't of Commerce Sept. 20, 2013).

It is undisputed that Oman Fasteners did not file its complete supplemental section C questionnaire response until 5:16 p.m. *See* Pl. Br. at 9; *see also id.* at 19 (acknowledging that it was a "briefly out-of-time" filing). Commerce's regulations expressly require that "{a}n electronically filed document" "be *received successfully in its entirety* by the Department's electronic records system, ACCESS, by 5 p.m. Eastern Time on the due date." 19 C.F.R. § 351.303(b)(1) (emphasis added). There is therefore no dispute that the supplemental section C questionnaire response was untimely filed. It is also undisputed that Oman Fasteners never asked for an extension of the February 14, 2022 deadline until March 24, 2022, more than a month later.

35

Accordingly, the standard that Commerce applies to evaluate the untimely request is "extraordinary circumstances." That standard asks not whether extraordinary circumstances prevented Oman Fasteners from making a timely submission, but rather whether extraordinary circumstances prevented Oman Fasteners from even *requesting* an extension of time to submit the required information.

Commerce acted within its discretion by concluding that Oman Fasteners failed to show any such extraordinary circumstances. When Oman Fasteners finally moved to extend the February 14, 2022, deadline, more than five weeks after that deadline, it cited "numerous obstacles" that it had to overcome, including the "lengthy" nature of the questionnaire, "limited personnel resources," "overlapping deadlines," and a "reduced accounting team" due to a case of COVID-19. Exhibit 9 to Pl. Mot. at 4-6. But these were the very obstacles that led Oman Fasteners to request an extension *until* February 14. *See* Exhibit 7 to Pl. Mot at 1-2. If Oman Fasteners anticipated that February 14 would not be enough time, it could have asked for a larger extension. Accordingly, the reasons that form the basis of its prior extension requests, which were granted, cannot reasonably be called

"extraordinary circumstances" preventing it from meeting the deadline it chose for itself, or from at least filing a timely extension request before that deadline.

Next, counsel for Oman Fasteners explained that it did not receive complete information from its client until mid-afternoon on the day of the deadline.  *Id.* at 6.  This was not an "extraordinary circumstance," but rather was within Oman Fasteners' power.  Further, this fact should have alerted counsel for Oman Fasteners to the risk that it might not meet the deadline, such that counsel should have either filed an extension request or notified Commerce that it might not be able to timely complete its filing.  Instead, counsel for Oman Fasteners began pre-screening its documents at 3:41 p.m., less than an hour and a half before the deadline.  *Id.*  It did not begin actually filing the submission until 4:10 p.m., only 50 minutes before the deadline.  *Id.*  At any point during these events, counsel for Oman Fasteners could have requested an extension of the deadline, in which case it likely would have received at least an automatic extension until the next morning.  While counsel for Oman Fasteners may have *expected* to file on time, the possibility

that technical hiccups would slow it down and cause it to miss the 5:00 p.m. deadline is hardly "extraordinary."

Indeed, counsel experienced several technical issues uploading the documents to ACCESS, and the uploading process ultimately took longer than usual, such that the final portion of the submission was not received by Commerce until 5:15 p.m.  These sorts of technical issues delaying the processing of large documents are commonplace.  They are far more analogous to internet access issues than to a natural disaster or medical emergency.  *See Extension of Time Limits*, 78 Fed. Reg. at 57,793.

Further, they fail to satisfy either prong of 19 C.F.R. § 351.302(c), which defines an extraordinary circumstance as an event that: (1) could not be prevented by "reasonable measures" and (2) prevented the party from a timely extension request "through all reasonable means."  If Oman Fasteners had taken the "reasonable measure" of giving itself more time to upload its submission, it could have made its deadline.  *See* IDM at 7 (noting that Oman Fasteners did not provide its counsel with the questionnaire response materials until late in the afternoon the day of the deadline).  Further, there were ample "reasonable means"

38

through which counsel for Oman Fasteners could have filed a timely extension request. It could have submitted a formal extension request when it had not yet received the necessary information from its client by the afternoon of the deadline. It could have submitted such a request after it began receiving error messages from ACCESS. *Id.* (explaining that "counsel became aware of filing difficulties at 4:18 p.m. and again at 4:27 p.m. but made no attempt to contact Commerce and request an extension of the deadline"). If it had to make such a request at the last minute, and Commerce was not able to respond before the deadline, it would have received an automatic regulatory extension to 8:30am the next business day. *See Extension of Time Limits*, 78 Fed. Reg. at 57,792. In short, Oman Fasteners fell far short of taking all "reasonable measures" to prevent any "extraordinary circumstances" from arising, and exhausting all "reasonable means" of requesting an extension in response to those circumstances.

Finally, even if Oman Fasteners was truly prevented from submitting a timely extension request, it could have promptly filed the request after the deadline passed. Instead, it waited more than *five weeks*. *See* IDM at 7. Oman Fasteners offers no explanation

39

whatsoever for its delay.  It appears Oman Fasteners simply hoped

Commerce would not notice the missed deadline, or would let the

untimely filing slide.  However, as explained above, Commerce's

regulations put Oman Fasteners on notice that Commerce *will not*

consider an untimely filing absent an extension of the deadline.  19

C.F.R. § 351.302(d)(1).  Similarly, Commerce's regulations clearly

explained that unless the entirety of the filing was timely submitted, it

was considered untimely.  19 C.F.R. § 351.303(b)(1).  Accordingly, Oman

Fasteners cannot argue that it did not understand its filing was

untimely and would be rejected absent an extension request.

Oman Fasteners cites a list of instances where Commerce was

allegedly more lenient with parties in similar positions.  However, as

the Federal Circuit explained in *Dongtai Peak*:

> Appellant's argument regarding Commerce's
> "long practice" of approving untimely extension
> requests is equally unpersuasive. As noted,
> Commerce may grant extension requests if it
> determines the extension request provides good
> cause for extending the deadline. 19 C.F.R. §
> 351.302(b). In the various administrative reviews
> cited by Appellant, Commerce found good cause
> was shown and therefore exercised its discretion
> in granting the untimely extension requests.
> Here, by contrast, Commerce did not find good
> cause. In addition, Dongtai Peak's argument

> ignores the fact that Commerce also routinely
> rejects untimely-filed submissions.

*Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1352

(Fed. Cir. 2015).  This Court may not substitute its judgment for that of

Commerce by comparing the particular facts of this case to other cases

and determining whether they are materially distinguishable, but

instead is limited to determining whether Commerce's decision is based

upon an "erroneous interpretation of the law, on factual findings that

are not supported by substantial evidence, or represent an

unreasonable judgment in weighing relevant factors."  *Ferrostaal*

*Metals GmbH v. United States*, 518 F. Supp. 3d 1357, 1366 (Ct. Int'l

Trade 2021) (citations omitted) (defining "abuse of discretion").

Commerce acted within its discretion and consistent with its

regulations when it found that there were no extraordinary

circumstances that would warrant granting the untimely extension

request.  Commerce therefore lawfully rejected the supplemental

section C questionnaire response and did not include it in the record.

**C.   Commerce Lawfully Applied Facts Available With An Adverse Inference After Reasonably Finding Oman Fasteners Failed To Cooperate To The Best Of Its Ability**

Commerce will rely on facts otherwise available to reach the applicable determination if "necessary information is not available on the record 19 U.S.C. § 1677e(a)(1), or if an interested party: "(A) withholds information that has been requested by {the Department}; (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to {19 U.S.C. § 1677m(c)(1) and (e)}; (C) significantly impedes a proceeding under the antidumping statute; or (D) provides such information but the information cannot be verified as provided for in 1677m(i)."  19 U.S.C. § 1677e(a)(2)(A)-(D).

In this case, Oman Fasteners does not dispute that the supplemental section C questionnaire response contained "necessary information."  Accordingly, as permitted by 19 U.S.C. § 1677e(a), Commerce applied facts otherwise available once it rejected the supplemental section C questionnaire response and declined to include it in the record.  The information was therefore "not available on the record," and it was also the case that Oman Fasteners had  "fail{ed} to

provide such information by the deadline{} for submission of the information," such that facts otherwise available were appropriate under both 19 U.S.C. § 1677e(a)(1) and § 1677e(a)(2)(B).

Oman Fasteners argues that "Commerce may not treat relevant information as missing from the record simply because of a brief and unintentional filing delay." Pl. Br. at 19. However, as explained above, Commerce's regulations provide that untimely submissions will not be included in the record absent an extension of the deadline. Accordingly, this argument is essentially an argument that Commerce abused its discretion in failing to extend the deadline. As we explained above, Commerce did not.

In addition to selecting from among the facts otherwise available on the record when necessary information is not the record or when the other elements of §1677e(b) are met, Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information{.}" 19 U.S.C. § 1677e(b)(1). This standard "requires the respondent to do the maximum it is able to do." *Nippon*

*Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Id.* Pursuant to this standard, it is irrelevant whether the respondent was intentionally evasive or whether respondent thought it had a valid legal basis for withholding the information requested of it. *See Nan Ya Plastics Corp. Ltd. v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016) ("Congress decided what requirements Commerce must fulfill in reaching its determinations, § 1677e(b), and we do not impose conditions not present in or suggested by the statute's text."). The best of its ability standard does not require perfection but does not condone inattentiveness, carelessness, or inadequate record keeping. *Nippon Steel Corp.*, 337 F.3d at 1382-83.

In this case, as already explained, Oman Fasteners did not do the maximum it was able to do to provide Commerce with necessary information in a timely manner. Again, Oman Fasteners neglected to recognize that it was unable to meet its filing deadline and to address that issue accordingly. It could have asked for a longer extension in the first place, rather than asking for the deadline of February 14th, 2022.

It could have asked for an extension when its client failed to provide the necessary information in a timely manner. It could have asked for an extension—or at least reached out to Commerce—when it began experiencing filing difficulties. Finally, it could have filed an untimely extension request immediately after it missed the deadline, rather than waiting an additional five weeks. Instead, it declined to take any of these actions, which may not have amounted to deliberate flouting of Commerce's deadlines, but certainly fell short of the "maximum" Oman Fasteners could have done. Commerce reasonably found that Oman Fasteners had therefore failed to act to the best of its ability, such that an adverse inference was appropriate. IDM at 15. Even if the Court would have reached a different conclusion, it must uphold Commerce's conclusion as long as it was supported by substantial evidence. Commerce clears that threshold here.

### D.  Commerce's Selection Of A Rate Based On An Adverse Inference Was Lawful

Moreover, Commerce selected the antidumping duty rate based on an adverse inference in accordance with the statute. When applying an adverse inference in selecting from facts otherwise available on the record, Commerce may rely on information from the petition, a final

determination in the investigation, a previous administrative review, or any other information placed on the record.  19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c)(1)-(2).  Commerce's practice is to select the higher of the highest dumping margin alleged in the petition or the highest calculated rate of any respondent.  *See, e.g.*, *Welded Stainless Pressure Pipe from Thailand: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 31,093 (Dep't of Commerce May 30, 2014), and accompanying IDM at Comment 3.   In this review, Commerce assigned the highest dumping rate alleged in the petition.  IDM at 7.

Oman Fasteners claims that this selected rate was unduly punitive.  Pl. Br. at 42-50.  However, "an AFA dumping margin determined in accordance with the statutory requirements is not a punitive measure, and the limitations applicable to punitive damages assessments therefore have no pertinence to duties imposed based on lawfully derived margins." *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010).  Oman Fasteners also argues that the selected rate is excessive in light of its own prior rates and the rate it believed should have been determined here, if Commerce had accepted its untimely filing.  Pl. Br. at 43-44.  However, Commerce is not required "to

estimate what the . . . dumping margin would have been if the interested party found to have failed to cooperate under subsection (b)(1) had cooperated" or to demonstrate that the AFA rate "reflects an alleged commercial reality of the interested party." 19 U.S.C. § 1677e(d)(3)(A) and (B); *see also* IDM at 19. Accordingly, it is appropriate that the rate established through the application of an adverse inference would be higher than Oman Fasteners' prior rates and any rate that Commerce might have determined if Oman Fasteners had timely submitted its responses.

For these reasons, Commerce's selection of the AFA rate was in accordance with the law and should be sustained.

### E. Commerce's Determination Comports With This Court's Precedents

Rather than argue that Commerce inappropriately applied the applicable legal standard, Oman Fasteners largely relies on the argument that this case is the same as the two *Celik* cases as well as *Bosun Tools*. *See Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348, 1357 (Ct. Int'l Trade 2022) (*Celik I*); *see also Celik Halat ve Sanayi A.S. v. United States*, 557 F. Supp. 3d 1363 (Ct. Int'l Trade 2022) (*Celik II*); *see also Bosun Tools Co. v. United States*, 405 F. Supp.

47

3d 1359, 1365 (Ct. Int'l Trade 2019).  Indeed, Oman Fasteners does not once discuss the "extraordinary circumstances" standard in its brief or make any effort to show it satisfied that standard.  The Court could deny its claim on that basis alone.  *See Tau-Ken Temir LLP v. United States*, 587 F. Supp. 3d 1346, 1352 (Ct. Int'l Trade 2022) (explaining that the Court could "deem this issue waived" where plaintiff's brief "develop{ed} no argument" as to the "good cause" standard applicable in that case.).

Further, Oman Fasteners' argument is unpersuasive because none of its cited cases addressed the "extraordinary circumstances" standard.  In those cases, the Court found that Commerce abused its discretion because it: (1) preemptively denied any further extension requests (*Celik I*) or (2) treated documents as "untimely filed" when in fact the entire submission was timely (*Celik II* and *Bosun Tools*).

In *Celik I*, the Court's decision was based on "record evidence that Celik Halat timely requested extensions to file the submission in question, which Commerce in large part denied."  *Celik I*, 557 F. Supp. 3d at 1357.  In finding that Commerce abused its discretion, the Court extensively recounts the extreme and unusual circumstances facing

Celik Halat, including "the COVID-19 pandemic, the corresponding lockdown of Turkey, Celik Halat's office closures, and the lack of a robust work-from-home infrastructure." *Id*. at 1358. Celik Halat was further delayed by a week-long Turkish holiday during which the entire country essentially closed down. *Id*. But Commerce only partially granted Celik Halat's first extension request. *Id*. Then, when Celik Halat later requested four days' additional time after its finance manager was in a traffic incident, Commerce refused to grant additional time for the submission. *Id*.

Celik Halat reiterated its request the next day, insisting that it would be "almost impossible" to fully answer the questionnaires at issue due to the unforeseen accident. *Id*. Commerce granted the extension but said it would not "grant <u>any</u> further extension" of the deadline. *Id*. at 1359 (emphasis in Commerce's original letter). Indeed, this final rejection was the reason that Celik Halat did not contact Commerce when it ultimately had technical difficulties in making its filing; it believed any additional extensions had already been definitively prohibited. *Id*. at 1359-60. Because Commerce had so emphatically discouraged Celik Halat from requesting a timely extension request, the

49

Court did not even consider the "extraordinary circumstances" test applicable. *Id.* at 1361.

Here, there were no unforeseen and extreme events to justify Oman Fasteners' delay. In its first request for an extension, Oman Fasteners merely cited the length of the questionnaire, the other workload obligations of its team, and the fact that its accounting team was "reduced" because one member was sick and another was on leave for a portion of the time period it had been given for its response. Pl. Mot. at Exhibit 5. Commerce granted a one-week extension. Then, Oman Fasteners requested another extension, citing nothing new but once again mentioning the lengthy questionnaire, other work obligations, and resources "stretched thin" due to sicknesses, annual leave, and deadlines. Despite these commonplace obstacles to timely submitting the response, Commerce granted the extension in full, cautioning only that it did not "anticipate" providing any additional extension after having granted two already. A reasonable party should have understood that if an unforeseen change in circumstances caused additional delay, Commerce would take that information into account in deciding whether to grant additional time.

Accordingly, while Celik Halat had been decisively denied any further extensions, despite serious and unforeseeable obstacles to its submissions, Oman Fasteners was delayed by mundane workload considerations and then simply did not bother to notify Commerce when it experienced technical difficulties delaying its submission, either before or after the deadline.

Contrary to Oman Fasteners' claim that the distinguishing facts in *Celik I* were "not the basis for this Court's decision," the Court specifically stated that it found Commerce abused its discretion because it decided to facts available with an adverse inference "despite record evidence that Celik Halat timely requested extensions to file the submission in question, which Commerce in large part denied." *Id.* at 1357. Further, since the Court found that Commerce had precluded the possibility of a timely extension request, it never applied the "extraordinary circumstances" test, which is the standard controlling this case. *Celik I* is therefore irrelevant with respect to the key question here, which is whether minor technical difficulties the day of a submission are "extraordinary circumstances" that excuse an out-of-time extension request filed *five weeks* after the deadline.

*Celik II* and *Bosun Tools* are similarly inapplicable.  There, the plaintiffs had made complete, timely filings of the submissions, but were delayed in submitting redacted versions of the responses for the public record.  *Celik II*, 557 F. Supp. 3d at 1372; *Bosun Tools*, 405 F. Supp. 3d at 1365.  Accordingly, Commerce erred by "assum{ing} that the submission{s} {were} late in the typical sense" when in fact they were not really untimely, and Commerce was therefore not required to reject them absent a deadline extension justified by extraordinary circumstances.  *Bosun Tools*, 405 F. Supp. 3d at 1366.  The Court in *Bosun Tools* explained that because plaintiff "did timely proffer its submission," the "extraordinary circumstances" test was inapplicable. *Id.* at 1367.  In *Celik II*, the Court explained that, in essentially the same circumstances, Commerce could not find that Celik Halat "withheld requested information" for the purposes of 19 U.S.C. § 1677e(2)(A).

In this case, however, Oman Fasteners' submission was indisputably untimely.  Commerce's regulations provide that Commerce will not accept such a filing without an extension request showing extraordinary circumstances.  For over a month, Oman Fasteners did

not even attempt to seek an extension, and when it did, it made no

showing of extraordinary circumstances.  Therefore, the submission was

lawfully excluded from the record, such that "necessary information

{was} not available on the record" and Commerce was justified in using

facts otherwise available under 19 U.S.C. § 1677e(1).  Having denied

the extension requests, Commerce also reasonably determined the

Supplemental Response was untimely and removed it from the record

pursuant to 19 C.F.R. § 351.302(d).  *See Dongtai Peak*, 777 F.3d at 1352

("Having properly denied the extension requests, Commerce also

reasonably determined the Supplemental Response was untimely and

removed it from the record pursuant to 19 C.F.R. § 351.302(d).").

*Dongtai Peak* and *Tau-Ken* are the more analogous and

instructive decisions.  In those cases, the Court considered the relevant

question: did Commerce abuse its discretion when finding, on the

particular facts of a case, that a party did not meet the relevant

standard (whether "good cause" or "extraordinary circumstances") for

supporting an extension request?  The opinions in those cases show that

Commerce acted within its discretion here.

53

In *Dongtai Peak*, the respondent had difficulty meeting a filing deadline but failed to adequately explain why it could not have sought an extension before the deadline. *See* 777 F.3d at 1351. The court of appeals concluded that "Commerce reasonably determined Dongtai Peak was entirely capable of at least submitting an extension request on time, but simply failed to do so; therefore, good cause did not exist to retroactively extend the deadline." *Id*. at 1342. Here, the applicable, and higher, standard is "extraordinary circumstances." Oman Fasteners did not even attempt to seek an extension until more than five weeks after the deadline passed. Even if the slow upload speed on the day of the deadline constituted an "extraordinary circumstance," which it did not, that issue certainly did not delay Oman Fasteners for five weeks.

In *Tau-Ken*, 587 F. Supp. 3d at 1357, the Court found that plaintiff failed to meet the more lenient "good cause" standard when it was "unclear why Plaintiffs did not file an extension request earlier," especially after plaintiff's counsel did not receive the complete response from the client until six hours before the deadline. In this case, not only is Oman Fasteners facing the more burdensome "extraordinary

circumstances" standard, but it also failed to submit the information for

its response to its counsel until *mid-afternoon* the day of the deadline,

such that it not begin processing those documents until 3:41 p.m.

Accordingly, if Tau-Ken Temir should have known to seek an extension,

Oman Fasteners has no plausible excuse to have not sought one here.

## V.   The Court Should Not Consolidate The Preliminary Injunction Motion Hearing With The Merits Without An Opportunity For Supplemental Briefing

The Court ordered the parties to address whether USCIT Rule

65(a)(2) permits the Court to treat the motion for a preliminary

injunction as a motion for judgment on the agency record, and if so,

whether the Court should do so.  ECF No. 26.

Although we did not identify any authority specific to this

question, we are not aware of any statutory or other barrier to the

Court employing Rule 65(a)(2) consolidation as a case management tool

in a case brought under 28 U.S.C. § 1581(c).  Therefore, as a general

matter, we do not dispute that it is within this Court's power to

consolidate "the trial on the merits" with the preliminary injunction

hearing in a 28 U.S.C. § 1581(c) case.  Such an approach has been taken

in cases that are normally decided on the administrative record.  *See,*

55

*e.g., Palatine v. United States Postal Service,* 756 F. Supp. 1079, 1083 (N.D. Ill. 1992) (consolidating the preliminary and permanent injunction stages of a challenge to environmental impact determination, while acknowledging court was limited to administrative record); *Business Integra, Inc. v. United States*, 116 Fed. Cl. 328, 332 (2008) (consolidating motion for a preliminary injunction with the hearing on the cross-motions for judgment on the administrative record in a bid protest pursuant to Rule of Court of Federal Claims 65(a)(2)).

However, in our view, the default should not be to consolidate a Rule 65(a)(2) response with a Rule 56.2 response.  Rather, the Court should do so when the particular facts of a case warrant it, in the interest of fairness and judicial economy.  In this case, justice would require that the parties receive sufficient time to bolster their arguments with additional briefing once the administrative record is filed,[3] so that the Court is able to fully consider all aspects of the case before making a final decision on the merits.  This is especially true given the extremely expedited briefing schedule for the preliminary injunction motion.  We did not oppose Oman Fasteners' proposed

---

[3]  The administrative record is currently due February 1, 2023.

schedule as a courtesy, given plaintiff's desire to receive a decision on the motion as quickly as possible, but we would not have done so had we understood this to be the only opportunity to brief the merits.

## CONCLUSION

For these reasons, the Court should deny Oman Fasteners' motion and issue judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:                          s/ Kelly M. Geddes
IAN A. MCINERNEY                     KELLY M. GEDDES
Attorney                             Trial Attorney
Department of Commerce               U.S. Department of Justice
Office of the Chief Counsel          Civil Division
    for Trade Enforcement     Commercial Litigation Branch
    & Compliance              P.O. Box 480
                                     Ben Franklin Station
                                     Washington, D.C.  20044
                                     Tel: (202) 451-7664
                                     E-mail: Kelly.Geddes2@usdoj.gov

January 10, 2023                     Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this brief complies with the Court's type-volume limitation rules.  According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 10,779 words.

<u>/s/ Kelly M. Geddes</u>

January 10, 2023

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____

| | |
|---|---|
| OMAN FASTENERS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 22-00348 |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| MID CONTINENT STEEL & WIRE, ) | |
| INC., ) | |
| ) | |
| Defendant-Intervenor. ) | |

_____

## <u>ORDER</u>

Upon consideration of the Motion for a Preliminary Injunction filed by plaintiff, Oman Fasteners, LLC, defendant's opposition thereto, and all other pertinent papers, it is hereby

ORDERED that Plaintiff's Motion for a Preliminary Injunction is DENIED.

SO ORDERED.

_____
Judge

Dated: _____, 2023
New York, New York