## UNITED STATES COURT OF INTERNATIONAL TRADE
### Hon. M. Miller Baker

OMAN FASTENERS, LLC,

      Plaintiff,

  v.

UNITED STATES,

      Defendant,

   and

MID CONTINENT STEEL & WIRE, INC.

      Defendant-Intervenor.

Court No. 22-00348

**PUBLIC VERSION**

## OMAN FASTENERS' REPLY IN SUPPORT OF ITS
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................1

ARGUMENT ..................................................................................3

I.  Oman Fasteners Will Suffer Irreparable Harm  Absent a
    Preliminary Injunction ...................................................3

    A.  Oman Fasteners has provided extensive and
        uncontroverted evidence of irreparable harm .................5

    B.  Oman Fasteners cannot pay the 154.33% duty
        deposit rate .......................................................................7

        1.  Oman Fasteners lacks the financial resources  to
            pay the duty deposits ........................................7

        2.  Oman Fasteners cannot raise prices to mitigate  its
            duty deposit burden ..........................................9

    C.  Oman Fasteners cannot offset its lost revenue with
        non-subject or non-U.S. sales ..........................................13

        1.  Oman Fasteners is likely to experience a decrease
            in sales  of non-subject merchandise ..........................13

        2.  Oman Fasteners' concerted efforts to increase
            non-U.S. sales have had very limited success ..............14

    D.  Oman Fasteners' irreparable harm is concrete,
        presently occurring, and mounting rapidly ...................15

        1.  Oman Fasteners has already begun  massive
            personnel reductions ........................................15

        2.  The threat to Oman Fasteners' goodwill and
            business reputation is clear and imminent ..................17

        3.  The threat of Oman Fasteners' bankruptcy is clear
            and imminent ....................................................18

        4.  Oman Fasteners will not be able to recover its
            economic losses ................................................19

PUBLIC VERSION

II.    **The Government's Brief Confirms that Oman Fasteners is Very Likely to Succeed on the Merits** ....................................20

    A.    **The Government has not shown that Commerce had  the power to reject Oman Fasteners' filing in its entirety** ...............................................................20

        1.    *The Government fails to distinguish this Court's precedent involving materially identical situations* ......21

        2.    *The Government fails to justify Commerce's departure from its established practice of leniency for first-time filing errors* ...............................26

    B.    **Commerce violated the statute and abused its discretion by applying an adverse inference** ................29

        1.    *The Government fails to defend Commerce's adverse inference  for a one-time minor mistake* ...........30

        2.    *Commerce applied the maximum punishment without evaluating individual circumstances* ...............36

III.    **The Government's Brief Confirms that the Balance of Hardships favors Oman Fasteners** .............................................41

IV.    **An Injunction Serves the Public Interest** ....................................43

V.    **This Court Should Not Consolidate the Preliminary Injunction Hearing with the Merits** ...........................................45

**CONCLUSION** ...................................................................................46

CASES

*Bosun Tools Co. v. United States,*
    405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019)................................20, 21, 23, 24

*BMW of N. Am. LLC v. United States,*
    926 F.3d 1291 (Fed. Cir. 2019)................................................................. 37-40

*Celik Halat Ve Tel Sanayi A.S. v. United States,*
    557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022).......... 3, 20, 21, 23, 24, 33, 34, 41

*Celik Halat Ve Tel Sanayi A.S. v. United States,*
    557 F. Supp. 3d 1363 (Ct. Int'l Trade 2022)............... 8, 20, 21, 23, 24, 30, 31

*Dongtai Peak Honey Industry Co. v. United States,*
    777 F.3d 1343 (Fed. Cir. 2015)...........................................................25, 27, 28

*Green Country Mobilephone, Inc. v. F.C.C.,*
    765 F.2d 235 (D.C. Cir. 1985)....................................................................27, 28

*Hitachi Energy USA Inc. v. United States,*
    34 F.4th 1375 (Fed. Cir. 2022).............................................................30, 31, 36

*J. Conrad LTD v. United States,*
    457 F. Supp. 3d 1365 (Ct. Int'l Trade 2020)....................................................5

*Kirk v. Comm'r of Soc. Sec. Admin.,*
    987 F.3d 314 (4th Cir. 2021)....................................................................23, 28

*KYD, Inc. v. United States,*
    607 F.3d 760 (Fed. Cir. 2010).........................................................................39

*Mid Continent Steel & Wire v. United States,*
    586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022)..................................................15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm
    Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).........................................................................................27

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003).....................................................30, 31, 34, 36

*Pang-Tsu Mow v. Republic of China,*
   201 F.2d 195 (D.C. Cir. 1952)..............................................................5

*Papierfabrik August Koehler AG v. United States,*
   180 F. Supp. 3d 1211 (Ct. Int'l Trade 2016)...................................37

*POSCO v. United States,*
   296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018)...................................37

*SKF USA Inc. v. United States,*
   630 F.3d 1365 (Fed. Cir. 2011).........................................................27

*Sunpreme Inc. v. United States,*
   145 F. Supp. 3d 1271 (Ct. Int'l Trade 2016)...................................42

*Tau-Ken Temir LLP v. United States,*
   587 F. Supp. 3d 1346 (Ct. Int'l Trade 2022)...................................25

## STATUTES

5 U.S.C. §706.........................................................................................23

19 U.S.C. §1516a.............................................................................7, 23, 42

19 U.S.C. §1677b..................................................................................14

19 U.S.C. §1677e..........................................................................30, 37-39

28 U.S.C. §1581......................................................................................7

28 U.S.C. §1746......................................................................................5

## RULES

Ct. Int'l Trade R. 56.2 ....................................................................7, 8, 45

Ct. Int'l Trade R. 65 .......................................................................42, 45

## REGULATIONS

19 C.F.R. §351.302.........................................................................20, 22

PUBLIC VERSION

19 C.F.R. §351.308 ............................................................................30

19 C.F.R. §351.404 ............................................................................14

**OTHER AUTHORITIES**

11A Wright & Miller, Fed. Prac. & Proc. Civ. (3d ed.) ......................................5

*Certain Corrosion-Resistant Steel Products from Korea*,
    No. A-580-878, Commerce Letter (Aug. 3, 2018) ...........................20, 21, 26

*Certain Steel Nails from China: Preliminary Determination*,
    73 Fed. Reg. 3,928 (Jan. 23, 2008) ....................................................12

*Certain Steel Nails from Oman*,
    79 Fed. Reg. 78,035 (Dec. 29, 2014) ..................................................12

*Certain Steel Nails from Oman*,
    83 Fed. Reg. 4,030 (Dec. 29, 2017) ...................................................12

*Certain Steel Nails from Oman*,
    86 Fed. Reg. 67,690 (Nov. 29, 2021) ..................................................15

## GLOSSARY OF ABBREVIATIONS

- "AFA" refers to "adverse facts available"—Commerce's conflation of its decision to resort to "facts otherwise available" in determining a dumping margin, and its decision to apply an adverse inference against a respondent when selecting from among the available facts.

- "Commerce" refers to the United States Department of Commerce, the agency which issued the determination that is the basis of this action—*Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 78,639 (Dec. 22, 2022).

- "Response" refers to the February 14, 2022 response of Oman Fasteners to Commerce's January 24, 2022 supplemental section C questionnaire. Commerce's subsequent rejection of the Response as untimely is one of the core issues in this case.

## INTRODUCTION

This Court should grant a preliminary injunction so that Oman Fasteners can remain solvent to pursue this case. The United States concedes (Opp. 1) that the grave harms inflicted by Commerce's 154.33% margin, when proven, "constitute irreparable harm" that can justify a preliminary injunction. The Government (Opp. 2) and Defendant-Intervenor ("Mid Continent") merely dismiss those harms as "speculative." Their unfounded attacks on Mr. Karaga's declaration will be resolved when this Court observes his testimony at the preliminary injunction hearing. But the surest proof of Oman Fasteners' irreparable harms is found in the company's *actions*: the company has *already* ceased *all* U.S. imports of subject merchandise and terminated hundreds of workers—costing tens of millions of dollars in revenue every month. No sensible company would incur those massive losses if, as the Government imagines, it had any possible path to avoid them.

The Government and Mid Continent have also failed to rebut Oman Fasteners' showing that it is likely to prevail on the merits. First, no matter how Commerce might read its regulations, it is prohibited *by statute* from acting arbitrarily and capriciously by rejecting barely-late information in

response to an unintentional, minor filing error that caused no prejudice. Second, Commerce unreasonably applied the statutory provision on adverse inferences by attempting to require perfection, instead of acknowledging the record evidence that Oman Fasteners' counsel put forth its best efforts at compliance but encountered a late-breaking and unforeseeable filing-system problem. And third, Commerce flouted its statutory obligation to evaluate all the facts and circumstances before selecting an adverse-inference rate; the Government instead *admits* that Commerce has a policy to reflexively apply the maximum penalty.

If the Commerce Department has the authority to bankrupt a company for a one-time minor filing error, then the rest of the federal bureaucracy — the Environmental Protection Agency, the National Labor Relations Board, and more — can wield that ruthless power too. Commerce's decision in this case breached its responsibilities to calculate a reasonably accurate dumping margin, and even more fundamentally, to do justice by the parties appearing before it. This Court should re-affirm what it has already held on strikingly similar facts: While Commerce has discretion to "establish its own rules governing the administrative procedures, … Commerce lack{s} the discretion to impose a draconian and punitive sanction" for "a minor incident of non-

compliance … that had no appreciable effect on the antidumping duty investigation." *Celik Halat Ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348, 1357-58 (Ct. Int'l Trade 2022).

The motion for a preliminary injunction should be granted.

## ARGUMENT

### I. Oman Fasteners Will Suffer Irreparable Harm Absent a Preliminary Injunction

The central facts establishing Oman Fasteners' irreparable harm, which are detailed by Oman Fasteners' President and Chief Executive Officer Steve Karaga, are undisputed. Specifically, defendants do not contest that (1) U.S. sales of subject merchandise account for [      ] of Oman Fasteners' revenue; (2) Oman Fasteners has completely ceased importing subject merchandise into the United States because of the 154.33% antidumping duty deposits resulting from Commerce's final results; (3) Oman Fasteners has already been forced to terminate [     ] workers, with further terminations imminent; and (4) Oman Fasteners' credit facilities [


]. Karaga Declaration ¶¶ 13, 20, 31, 37-38.

To accept Mid Continent's position that Oman Fasteners has not met its burden requires concluding that eliminating [      ] of a company's revenues and more than half its workforce, and [

                        ] does not constitute irreparable harm. Just stating that proposition is enough to refute it. As Mid Continent apparently would have it, Oman Fasteners would need to declare bankruptcy before it could show irreparable harm. But the very purpose of a preliminary injunction is to prevent that type of dire, irreversible result.

The Government at least acknowledges (Opp. 2) that the "{risk of} bankruptcy, catastrophic loss of revenue, widespread layoffs, and a massive long-term reduction in business operations" all "constitute irreparable harm" that would support a preliminary injunction. But the Government asserts that Oman Fasteners' evidence of these actual harms is insufficient because Mr. Karaga is not available for cross-examination and is not an "independent source." *Id.* at 14. Both assertions fail. First, defendants will be able to cross-examine Mr. Karaga at the January 23 hearing. Second, there is no legal requirement that Oman Fasteners establish irreparable harm through testimony from a witness outside the company, and no basis for suspecting that Mr. Karaga, under penalty of perjury, would misrepresent

PUBLIC VERSION

basic facts about Oman Fasteners' situation. If defendants have questions about the irreparable harm that Oman Fasteners is facing, then they can cross-examine Mr. Karaga.

## A.   Oman Fasteners has provided extensive and uncontroverted evidence of irreparable harm

Mr. Karaga's declaration and accompanying exhibits provide the Court with the type of detailed, non-speculative evidence necessary to prove irreparable harm; there is no requirement that this evidence come from a third party. As this Court has previously stated, "{a}ffidavits or … declarations executed pursuant to 28 U.S.C. §1746 … that are detailed, non-conclusory, and non-speculative might support a preliminary injunction in an appropriate case." *J. Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1376 n.9 (Ct. Int'l Trade 2020); *see also Pang-Tsu Mow v. Republic of China*, 201 F.2d 195, 199 (D.C. Cir. 1952); 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2949 (3d ed.). Mr. Karaga's declaration provides precisely this type of evidence, establishing the factual basis for the company's forced decision to cease U.S. sales of subject merchandise, Decl. ¶¶ 24-29; why the resulting lost revenues cannot be offset through sales of non-subject merchandise, *id.* ¶¶ 15-18, or sales in other countries, *id.* ¶ 14; and the necessity to terminate

[    ] workers and take other extraordinary measures, *id.* ¶¶ 33-39. Mr. Karaga's declaration also establishes that Oman Fasteners [

                                                                              ]. He provides copies of the [

                            ].

 Moreover, Mr. Karaga's statements are inherently credible. It defies belief and common sense that Oman Fasteners would end U.S. sales of subject merchandise if it had any other choice, *see id.* ¶ 13; that it would voluntarily terminate [    ] workers and [

 ]; or that the company could either absorb duty costs that exceed its revenue, or pass the cost to customers by nearly tripling its prices, *see id.* ¶¶ 24, 26.

 To the extent the Government and Mid Continent wish to probe Mr. Karaga's assertions regarding Oman Fasteners' financial condition, lack of access to additional credit, inability to raise prices, or inability to rapidly diversify away from U.S. sales of subject merchandise, they will be able to do so at the hearing.

## B. Oman Fasteners cannot pay the 154.33% duty deposit rate

### 1. *Oman Fasteners lacks the financial resources to pay the duty deposits*

Oman Fasteners has neither the cash on hand, nor ability to secure credit, to pay duty deposits of 154.33% for more than a few weeks. Before it was forced to stop shipment, Oman Fasteners imported [                    ] of subject merchandise into the United States, or over [              ] per week. At the 154.33% rate, this would mean a *weekly* antidumping duty deposit burden exceeding [              ]. Decl. ¶ 13. Even at significantly reduced levels of operations, however—equivalent to a weekly antidumping duty deposit burden of only [              ]—Oman Fasteners' cash reserves would be depleted after [                    ]. *Id.* ¶ 28.

[                            ] provides no comfort for the company, as this case is likely to continue for a year or more. The Government's assertion (Opp. 19) that the case will not "be so prolonged" misapprehends the nature of proceedings under 28 U.S.C. § 1581(c). Even if the Court dramatically expedites this proceeding compared with the timeline envisioned in Rule 56.2, a final merits opinion is still months away. If, as Oman Fasteners expects, the Court remands to Commerce for redetermination under 19 U.S.C. § 1516a(d),

then that proceeding likely will last at least three months, followed by another months-long proceeding before this Court under Rule 56.2(h)—with the possibly of additional remand(s). Throughout these proceedings, the deposit rate would remain at 154.33%. Notably, *Celik I* and *Celik Halat Ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1363 (Ct. Int'l Trade 2022) ("*Celik II*"), each took approximately 16 months, despite requiring a single remand to Commerce. *See* Case No. 21-00045 ECF 1, 38; Case No. 21-00050 ECF 1, 48.

Moreover, depleting its cash reserves would leave Oman Fasteners unable to operate even at its current, extremely diminished level. Even with the personnel reductions it has been forced to make, the company is operating at a significant loss. *See* Decl. ¶¶ 34-38. Oman Fasteners needs its remaining cash reserves to have even a chance at survival and cannot squander them on a brief resumption of U.S. subject merchandise shipments.

Nor could Oman Fasteners finance its antidumping duty deposits through credit. The defendants' contrary suggestion is unsupported by evidence and illogical—undermined by the stark reality that the company is no longer selling the subject merchandise that accounts for [      ] of its revenue, and that [

].

Nor is it realistic to expect that Oman Fasteners will be able to obtain new credit "for the short term," as the Government suggests (Opp. 17). As described above, the "short term" would be at least a year, representing [            ] in duty deposits at 2022 sales levels. No lender would extend that level of credit to Oman Fasteners, particularly upon learning that the company is subject to antidumping duties above the value of its sales and that the company's continued existence depends on the outcome of this case.

### 2. *Oman Fasteners cannot raise prices to mitigate its duty deposit burden*

Oman Fasteners also cannot raise its prices enough to defray any meaningful portion of the 154.33% duty deposits. As Mr. Karaga explained, "none of {the company's} customers are able or willing to pay a substantial premium over our current prices," much less 154.33% Decl. ¶ 26. This is because Oman Fasteners' customers are themselves resellers, who must find buyers based on prevailing market prices for nails.

Mid Continent's own witness confirms these market realities. That witness states that, "{s}ince late Q3-2022 the U.S. market for steel nails has deteriorated significantly due to" (1) "significantly reduced demand for home purchasing," (2) "a 21% decline in residential wood to wood

construction," (3) "decline in the consumption of wood pallets, the second largest market segment for nails," and (4) "a glut of nail inventories at all customer levels in the United States." M.C. Opp. 20-21. Indeed, Mid Continent claims that "{n}ew orders for steel nails are off more than [    ] as customers try to right size their stocking levels to meet the new slower demand." *Id.* at 21. It would be especially untenable for Oman Fasteners to *raise* prices given that falling demand.

As the U.S. International Trade Commission ("ITC") concluded in *Steel Nails from India, Oman, Sri Lanka, and Turkey*, Pub. 5370 (Oct. 2022), steel nails are "fungible," with "a moderate-to-high degree of substitutability between domestically produced steel nails and subject imported nails of the same type," limited only by "domestic availability to produce steel nails." *Id.* at 25, 38-39. Price is among the "top-three factors influencing {U.S. nail buyers'} purchasing decisions." *Id.* at 39. Of 45 purchasers surveyed, 28 rated price "very important" and 17 rated price "somewhat important" to their purchasing decisions. *Id.* at II-20. Moreover, nearly all indicated that nails produced in countries other than Oman "always" or "usually" met their minimum quality specifications. *Id.* at II-22. Based on these data, the ITC estimated that "the elasticity of substitution between U.S.-produced steel nails and

imported steel nails is likely to be in the range of 3 to 5," meaning that a 1% increase in price of nails by a particular supplier would likely result in a 3-5% decrease in its sales volume. *Id.* at II-34.

Tellingly, Mid Continent's own witnesses in this proceeding previously testified to the ITC that "Mid Continent … {had} attempted to raise prices by approximately 19 percent" to offset its higher material costs due to Section 232 tariffs on steel, "but was ultimately unsuccessful," and had to "roll{} back" those increases after "having lost 30 percent of its sales within the first 60 days, and 60 percent {of its sales} within six months. *Id.* at V-3. This testimony was consistent with Mid Continent's earlier representation to the ITC and Commerce that "steel nails are a substitutable product" whose "commodity nature … ensures that competition occurs primarily on the basis of price." *Petition for the Imposition of Antidumping and Countervailing Duties*, No. C-523-817 at 23, 33 (Dec. 29, 2021).

This is also borne out by the experience of Chinese nail producers, and of Oman Fasteners itself, when forced to raise prices due to prohibitive anti-dumping cash deposits. Chinese nail producers first became subject to antidumping duty deposits ranging from 20.77% to 118.04% in 2008. *See*

*Certain Steel Nails from China: Preliminary Determination*, 73 Fed. Reg. 3,928

(Jan. 23, 2008). Imports plummeted by nearly two-thirds:



Oman Fasteners' nails were subject to antidumping duty deposits

ranging from 9.07-9.10% between 2015 and 2017. *See Certain Steel Nails from*

*Oman: Affirmative Preliminary Determination*, 79 Fed. Reg. 78,035 (Dec. 29,

2014) (imposing 9.07% duty); *Certain Steel Nails from Oman: Final Results of*

*Antidumping Duty Administrative Review*, 83 Fed. Reg. 4,030 (Dec. 29, 2017)

(reducing duty from 9.10% to 0.63%). According to USITC Dataweb, during

this three-year period U.S. imports of steel nails from Oman dropped 11%, from 47.8 million kilograms to 42.8 million kilograms; once the duties dropped to 0.63% in 2018, import volumes jumped 37% to 58.7 million kilograms. This is consistent with Mr. Karaga's testimony that Oman Fasteners' sales suffered due to the 9.1% duty. Decl. ¶ 26.

In short, the ITC's findings and import data confirm what Mr. Karaga told the Court: Oman Fasteners cannot dramatically raise its prices and expect to sell subject merchandise in the United States.

## C.    Oman Fasteners cannot offset its lost revenue with non-subject or non-U.S. sales

### 1.    Oman Fasteners is likely to experience a decrease in sales of non-subject merchandise

Defendants' assertions that Oman Fasteners might increase U.S. sales of non-subject merchandise to offset its inability to sell subject merchandise are as fanciful as their other hypotheticals about how the company can overcome the gutting of its business. They have no evidence to contradict Mr. Karaga's testimony that Oman Fasteners' sales of non-subject merchandise will materially *decrease* because the company was forced to stop selling subject merchandise. *See* Decl. ¶¶ 16-18. Moreover, this argument assumes that Oman Fasteners can stop selling the product yielding [      ] of its revenues

and almost immediately replace it with other products that have never generated anything close to the demand and revenues necessary to support the hypothetical. Defendants' argument is like claiming that if Starbucks were forced to stop selling coffee, it could make up all its lost revenue by selling more muffins. That is entirely unrealistic because it ignores both the company's core business and the correlation between the core business and the ancillary revenue.

### 2. *Oman Fasteners' concerted efforts to increase non-U.S. sales have had very limited success*

Even while it faced no serious impediment to its U.S. sales, Oman Fasteners was highly motivated to increase its sales to other markets, both to expand its business and because Commerce refuses to use Oman Fasteners' own profit and selling expense data in its antidumping calculations so long as more than 95% of Oman Fasteners sales are to the United States. 19 U.S.C. §1677b(a)(1)(B)(ii)(II); 19 C.F.R. §351.404(b)(2). The company's focus on U.S. sales leaves Oman Fasteners vulnerable to higher antidumping rates depending on the surrogate company data Commerce chooses to apply— and is both the reason why Commerce initially selected a 9.1% dumping margin for Oman Fasteners in the original investigation and why Commerce

reduced that rate to 4.22% following remand. *See Mid Continent Steel & Wire v. United States*, 586 F. Supp. 3d 1349, 1353 (Ct. Int'l Trade 2022).

Over the past seven years, Oman Fasteners has engaged in a concerted effort to increase its sales outside the United States, [

]. Decl. ¶14. Despite these efforts, at no point has Oman Fasteners been able to raise its non-U.S. sales to even Commerce's 5% threshold. *Certain Steel Nails from Oman*, 86 Fed. Reg. 67,690 (final results) (Nov. 29, 2021), IDM at 6.

In short, Oman Fasteners has used every effort to expand its non-U.S. sales and cannot rapidly expand its non-U.S. sales to mitigate its inability to sell subject merchandise in the United States.

### D.   Oman Fasteners' irreparable harm is concrete, presently occurring, and mounting rapidly

#### 1.   *Oman Fasteners has already begun massive personnel reductions*

To have even a chance of surviving until the end of this case, Oman Fasteners has had to begin implementing cost-cutting measures resulting in massive personnel reductions. *See* Decl. ¶¶35-38. Mid Continent appears to misunderstand these measures, calling them "potential future events," and

claiming that Oman Fasteners' explanation for implementing such cost-cutting measures is "baseless." M.C. Opp. 17-18.

Oman Fasteners has *already* made drastic personnel reductions: the [                         ] whose contracts the company was forced to terminate. Even that painful termination of [

                         ] will be insufficient if Oman Fasteners cannot resume U.S. sales of subject merchandise in the immediate future. And any additional workforce reductions [

                         ]. Decl. ¶38.

Second, Oman Fasteners clearly explained that these personnel reductions are necessary because the company cannot absorb its prior fixed costs while unable to sell subject merchandise in the U.S. *Id.* ¶35. Before the recent terminations, labor (production plus administrative) accounted for [

   ] of Oman Fasteners' [                ] monthly fixed costs, and Oman Fasteners projects that it will have only [                         ] in receipts per month to apply toward fixed costs. *Id.* Even after the recent termination of [                                      ], Oman Fasteners' monthly fixed costs remain considerably higher than the drastically reduced revenue that the company is projecting if the Court does not grant a preliminary injunction.

> 2. *The threat to Oman Fasteners' goodwill and*
> *business reputation is clear and imminent*

As explained above, Oman Fasteners was forced to stop all U.S. sales of subject merchandise and cannot resume them while it faces 154.33% anti-dumping duty deposits. Oman Fasteners' largest customers will inevitably seek alternate suppliers due to Oman Fasteners' absence from the market. And once those customers replace Oman Fasteners as their supplier, it will be difficult for the company to win them back because of the significant investments that the customers and their new suppliers will have made in the interim. *Id.* ¶¶44-45.

Mid Continent claims (Opp. 20, 24) that any damage to customer relationships is attenuated because "the U.S. market for nails has" recently "deteriorated significantly," and "Oman Fasteners' customers will be working down excess inventory for a long period before contemplating new orders." But, even if the Court were to credit Mid Continent's claim that Oman Fasteners' customers could stretch their current inventories for some short period, Mid Continent fails to provide any evidence of how long such inventories would supposedly last. There is no basis for concluding that

Oman Fasteners' customers have amassed sufficient inventory to cover the company's absence from the market for a year or more.

       3.   *The threat of Oman Fasteners' bankruptcy is clear and imminent*

Oman Fasteners has also proven the threat of its imminent bankruptcy, due to the [

     ] Decl. ¶ 31. Oman Fasteners supported this assertion with the

[




]. *Id.* The Government claims that "without any concrete showing that

[                             ], this concern is pure speculation," Govt. Opp. 21, but the reality remains that Commerce's actions have placed Oman Fasteners [                   ]. It is unreasonable for the Government to demand [

   ] — which would be tantamount to Oman Fasteners' bankruptcy — to confirm the company's irreparable harm. And it would be suicidal for Oman Fasteners to [                       ] to further substantiate risk of [    ].

### 4.    *Oman Fasteners will not be able to recover its economic losses*

Finally, Oman Fasteners has proven that it will not be able to recover the value of hundreds of millions of dollars in lost sales if this case proceeds without a preliminary injunction. As explained above, this case is likely to last a year or more, during which time Oman Fasteners would be unable to resume U.S. sales of subject merchandise and be unable to offset those lost sales with other business. While Oman Fasteners may be entitled to "obtain{} a refund of any duties deposited if Commerce's determination is found to be unlawful," M.C. Opp. 25, even Mid Continent concedes that Oman Fasteners cannot "seek damages from Commerce" for its lost sales. *See id.*

Mid Continent's wild speculation (Opp. 25) that Oman Fasteners' "counsel's professional liability insurance carrier … will satisfy any and all damages incurred" is utterly baseless. Mid Continent cites no authority for the proposition that economic damages unrecoverable from the Government are not "irreparable" because Oman Fasteners *may* be able to assert a tort claim against a third party in another case to recover *some* part of its damages, and that third party *may* in turn carry insurance for *some* part of that tort claim. The Court cannot credit such unsupported and speculative assertions. But even if it could, Mid Continent's argument would shift the focus

-19-

away from Commerce's unlawful conduct. Moreover, any potential tort remedy in the future would not allow Oman Fasteners to resume U. S. sales and stave off the risk of bankruptcy.

## II. The Government's Brief Confirms that Oman Fasteners is Very Likely to Succeed on the Merits

### A. The Government has not shown that Commerce had the power to reject Oman Fasteners' filing in its entirety

Commerce's regulation states that it "will not consider or retain in the official record of the proceeding … {u}ntimely filed factual information … that the Secretary rejects." 19 C.F.R. § 351.302(d)(1). But for that regulation to be lawful, it cannot excuse Commerce from its *statutory* obligations to avoid abusing its discretion or acting arbitrarily and capriciously. This Court has recently and repeatedly held that, while Commerce has some authority to reject untimely filings, the agency "abuse{s} its discretion" by "imposing a drastic and disproportionate penalty" for a late filing that (1) was an unintentional minor "technical error" by counsel; and (2) "had no appreciable effect on the investigation." *Celik II*, 557 F. Supp. 3d at 1366; *see Celik I*, 557 F. Supp. 3d at 1361; *Bosun Tools Co. v. United States*, 405 F. Supp. 3d 1359, 1365-66 (Ct. Int'l Trade 2019). And Commerce has further constrained itself by establishing a policy of leniency for first-time late filings. *Certain*

*Corrosion-Resistant Steel Products from the Republic of Korea*, No. A-580-878, Commerce Letter (Aug. 3, 2018). Commerce overstepped those limits here.

> 1. *The Government fails to distinguish this Court's precedent involving materially identical situations*

The Government does not dispute that Commerce satisfied neither element of this Court's two-part test for rejecting a late filing. First, Oman Fasteners indisputably had no intention to miss Commerce's deadline; it strove diligently for cooperation but committed the very same "minor technical violation" as in *Celik I* when it encountered unexpected errors in Commerce's ACCESS filings system—errors that were unforeseeable in light of counsel's advance use of the check-file system. 557 F. Supp. 3d at 1361; *see* P.I. Br. 7. Second, that minor mistake indisputably did not "infringe{} or delay{} in any meaningful way Commerce's review of the information submitted," and Mid Continent similarly does not argue that it suffered any prejudice. *Bosun Tools*, 405 F. Supp. 3d at 1366. The Government does not defend Commerce's unsupportable assertion that prejudice is irrelevant to whether a late filing should be accepted. *See* P.I. Br. 25.

> a. The Government instead argues (Opp. 48) that this Court should ignore *Celik I*, *Celik II*, and *Bosun Tools* because "none" of them "addressed

the 'extraordinary circumstances' standard" in 19 C.F.R. § 351.302(c) for

requesting an "'untimely filed'" extension from Commerce.

Even if the Government were right that this case turns on the meaning

of "extraordinary circumstances," Oman Fasteners *has* "show{n that} it sat-

isfied that standard." *Contra* Gov't Opp. 48. Oman Fasteners took

"reasonable measures" to make a timely filing, including using ACCESS's

check-file feature and initiating the filing with more than enough time before

the deadline based on counsel's prior experience. 19 C.F.R. § 351.302(c)(2).

But counsel nevertheless encountered "an unexpected event"—the technical

failure of the ACCESS system—that left counsel without "reasonable

means" to request a further extension when the problem arose so close to the

deadline. *Id.*; *see* P.I. Br. 7-8. The Government's various arguments (Opp. 36-

40) that Oman Fasteners did not encounter "extraordinary circumstances"

are fully rebutted by Oman Fasteners' detailed showing that it attempted to

comply to the best of its ability. *See* Part II.B.1, *infra*.

But Commerce's errors in this case are more fundamental than parsing

what the agency does and does not consider extraordinary circumstances.

Both the Tariff Act and the Administrative Procedure Act (APA) prohibited

Commerce from applying its deadline in a manner that was "arbitrary,

capricious, {or} an abuse of discretion," 5 U.S.C. §706(2); *see* 19 U.S.C. §1516a(b)(1)(B)(i), including by "'treat{ing} similar situations dissimilarly,'" *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 321 (4th Cir. 2021) (citation omitted). The core holding of *Celik I*, *Celik II*, and *Bosun Tools* is that, notwith-standing what Commerce may consider extraordinary circumstances, Commerce abuses its discretion and acts arbitrarily and capriciously when it applies its regulation "in so harsh a way as to produce an unjust and punitive result." *Celik I*, 557 F. Supp. 3d at 1361.

b.    The Government attempts to distinguish the relevant precedents based on factual minutiae. But those distinctions ignore the thrust of each court's *legal* reasoning.

Regarding *Celik I*, the Government says that Commerce told Celik it would not "grant *any* further extensions," whereas it told Oman Fasteners that it "did not 'anticipate' providing any additional extension." Gov't Opp. 49-50 (quoting *Celik I*, 557 F. Supp. 3d at 1359). This Court should not permit Commerce's multi-hundred-million-dollar anti-dumping penalty to turn on such zealous hairsplitting. Just as in *Celik I*, Commerce's prior statements gave Oman Fasteners' counsel "a reasonable belief" that submitting a late-breaking extension request less than an hour before the deadline "would

have been futile." 557 F. Supp. 3d at 1359. And as previously explained (P.I. Br. 26-27), Commerce was if anything *stricter* with Oman Fasteners than with Celik regarding extensions to the deadline. *Contra* Gov't Opp. 48-51.

*Celik I* also provides a complete answer to the Government's brazen suggestion (Opp. 37, 39) that Oman Fasteners could have filed a further extension request in the last minutes before 5:00pm and thereby "likely" received "an automatic extension until {8:30am} the next morning." As this Court has explained, "it is not reasonable" for the Government "to expect a filer to be on notice of, or to allow a litigant to be prejudiced by, a substantive regulatory provision" that Commerce had "buried within preamble language." 557 F. Supp. 3d at 1361. Indeed, Commerce's automatic-regulatory-extension provision only highlights that "severely penalizing the {16}-minute delay … was an abuse of its discretion." *Id.* Oman Fasteners filed everything by 5:16pm. But supposedly if it had just tossed in a last-moment extension request, then it could have delayed until the next morning and all would be forgiven. That is no way to run a railroad, and certainly no way to determine whether a fully cooperative company is forced into bankruptcy.

The Government's only response (Opp. 52-53) to *Celik II* and *Bosun Tools* is that the initial filings there were "complete and timely," and the

parties missed a subsequent deadline. But the Government is quite clear (Opp. 35) that Commerce treats deadline compliance as an all-or-nothing matter. And regardless, this Court's conclusions were not premised on minutiae about the particular type of late filing; the Court held that Commerce abused its discretion by excluding relevant information due to minor filing mistakes by counsel that caused no prejudice.

c.   The Government invokes (Opp. 53-55) *Dongtai Peak Honey Industry Co. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015), and *Tau-Ken Temir LLP v. United States*, 587 F. Supp. 3d 1346, 1357 (Ct. Int'l Trade 2022), as purportedly "more analogous and instructive decisions." They are not. The filing in *Dongtai Peak* was much later than Oman Fasteners', and "*all* of the causes of delay … were known to {the late-filing party} *prior to* the {applicable} deadline," which made that party "*entirely capable* of at least submitting an extension request on time." 777 F.3d at 1351-52 (emphases added). Similarly in *Tau-Ken*, the late party's "vague and conclusory" assertions about filing difficulties left the court "unclear why Plaintiffs did not file an extension request earlier." 587 F. Supp. 3d at 1357, 1359. This case is starkly different. Oman Fasteners' error was far more minor. P.I. Br. 28-29. And Oman Fasteners has explained in detail why its counsel had no reason to believe that an

-25-

extension was necessary until minutes before the deadline, at which point counsel made a good-faith judgment to continue attempting the filing as quickly as possible. *See* Part II.B.1, *infra*.

 2. *The Government fails to justify Commerce's departure from its established practice of leniency for first-time filing errors*

Even if precedent did not limit Commerce's authority to reject Oman Fasteners' entire response for a short, unintentional, non-prejudicial, partial filing delay, Commerce's own stated policy did. "Commerce's practice is to allow a law firm that misses a filing deadline one opportunity to submit the untimely information where "the law firm failed to … file a complete submission before the specified hour on the date of the deadline" if "that law firm has: 1) not previously been afforded such an opportunity in any proceeding; and 2) identified the steps it has taken to avoid untimely filings in the future." *Corrosion-Resistant Steel Products*, No. A-580-878, *supra*.

The Government's brief does not contest Oman Fasteners' showing (P.I. Br. 30-31) that it qualified for leniency under this policy. Indeed, like Commerce's final decision, the Government's brief does not discuss the policy at all. "{O}nce an agency agrees to allow exceptions to a rule, it must provide a rational explanation if it later refuses to allow exceptions in cases

that appear similar." *Green Country Mobilephone, Inc. v. F.C.C.*, 765 F.2d 235, 237 (D.C. Cir. 1985). Commerce's failure to provide a "reasoned analysis" for deviating from its own established policy rendered its decision unlawful as a matter of administrative law. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 56-57 (1983); *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). And by declining to discuss the *State Farm* standard, the Government has now forfeited any defense of Commerce's decision on that point.

Oman Fasteners has also provided the Court with *thirteen* recent examples of Commerce's leniency. P.I. Br. 31-33. The Government does not address those specific examples at all. Instead, it merely points (Opp. 40-41) to *Dongtai Peak* for the proposition that an "argument regarding Commerce's 'long practice' of approving untimely extension requests is … unpersuasive" where "Commerce did not find good cause" to grant the extension. 777 F.3d at 1352. But *Dongtai Peak* did not address Commerce's first-time-mistake policy, which allows a late-filing party to submit the relevant information *even though* it is "untimely." That policy sets out its own good cause standard — no prior untimely filings in the proceeding and identified steps to avoid

future mistakes—and the Government nowhere disputes that Oman Fasteners satisfied that standard.

Furthermore, *Dongtai Peak* did not excuse Commerce from its basic obligation to treat similarly situated parties similarly. There, the court upheld differential treatment because Commerce had made differential findings: good cause in the granted untimely extensions and no good cause in the denials. 777 F.3d at 1352. Here, though, Commerce has granted leniency to others in materially indistinguishable situations, while refusing to extend the same treatment to Oman Fasteners. That "differential treatment is arbitrary and capricious in violation of the APA." *Kirk*, 987 F.3d at 321; *Green Country*, 765 F.2d at 237.

Mid Continent tries (Opp. 36-40) to pick up the Government's slack and address Oman Fasteners' cited examples. But its arguments are unpersuasive for three reasons. *First*, like the Government, Mid Continent does not address the first-time-mistake policy at all. Because that policy undisputedly applies to Oman Fasteners, Commerce's wholesale rejection of its submission was arbitrary and capricious.

*Second*, many of the putatively distinguishing facts invoked by Mid Continent (Opp. 36-38, 40) are legally irrelevant, such as a party notifying

Commerce of its late filing or quickly seeking an out-of-time extension. As explained below, there would be no point in a party attempting to hide a late filing from Commerce because ACCESS automatically notifies the agency of the time of every submission. *See* Part II.B.1, *infra*. And the Government's own argument shows (Opp. 36-39) that it would have rejected *any* out of time extension in this case—no matter how quickly submitted—for purportedly failing the extraordinary-circumstances standard.

*Third*, Mid Continent's other attempts to distinguish Commerce's prior acts of leniency (Opp. 36-40) either highlight far more egregious violations—like filing two days late or emailing submissions rather than filing in ACCESS at all—or else identify seemingly random factual differences without explaining why they are material.

## B. Commerce violated the statute and abused its discretion by applying an adverse inference

Even if Commerce had lawfully concluded that information was missing from the record, it still (1) lacked authority to apply an adverse inference on these facts, and (2) abused its discretion by selecting the petition rate—the maximum possible punishment.

     1.   *The Government fails to defend Commerce's adverse inference*
        *for a one-time minor mistake*

a.    The Tariff Act allows Commerce to apply an adverse inference *only* if a party "has failed to cooperate by not acting to the best of its ability to comply with {Commerce's} request for information." 19 U.S.C. § 1677e(b)(1); *see also* 19 C.F.R. § 351.308(a). The Federal Circuit has interpreted that provision to require that, "'{b}efore making an adverse inference, Commerce must examine a respondent's actions and assess the extent of the respondent's abilities, efforts, and cooperation in responding to Commerce{'s} requests for information.'" *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1385 (2022) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003)). The statutory "best of its ability" standard asks whether the company "t{ook} reasonable steps" and "put forth its maximum effort," but that standard "does not require perfection and recognizes that mistakes sometimes occur." *Nippon Steel*, 337 F.3d at 1382. Thus, "{n}ot every failure to comply with a filing deadline will result in authority to use an adverse inference." *Celik II*, 557 F. Supp. 3d at 1375.

Under that precedent, Commerce lacked authority to impose an adverse inference here. Oman Fasteners cooperated with Commerce's

investigation throughout this sixth review, just as in every prior proceeding, and submitted thousands of pages of information on time. The company merely failed to achieve *perfect* compliance. Its one-time, 16-minute delay due to unforeseeable technical difficulties was Commerce's *only* basis for applying an adverse inference; the agency's final decision did not discuss any other "action{}," "effort{}," or "cooperation," *Hitachi Energy*, 34 F.4th at 1386.

b.      The Government fails to support Commerce's conclusion that Oman Fasteners did "not act{} to the best of its ability." *See Nippon Steel*, 337 F.3d at 1381; *Celik II*, 557 F. Supp. 3d at 1375. The Government asserts (Opp. 44-45) that Oman Fasteners should have: (i) "asked for a longer extension in the first place, rather than asking for the deadline of February 14th"; (ii) "asked for an extension when its client failed to provide the necessary information in a timely manner"; (iii) "asked for an extension—or at least reached out to Commerce—when it began experiencing filing difficulties"; and (iv) "filed an untimely extension request immediately after it missed the deadline." *See also* Gov't Opp. 36-39 (making similar arguments). But this Court should reject the Government's absurd attempt to punish Oman Fasteners for not requesting extensions that Commerce either indicated or flat-out said that it would not grant.

i.      Oman Fasteners did not ask for an extension beyond February 14 because Commerce had denied Oman Fasteners' first request for an extension *until* February 14, giving the company only until February 10. The Government does not attempt to explain why Commerce might have granted a request for a longer extension. Oman Fasteners asked for February 14 because counsel reasonably believed that they could meet that deadline. And counsel would have been right, were it not for unforeseeable defects in Commerce's filing system.

ii.      The Government's suggestion that blame for the late filing lies with Oman Fasteners, instead of its counsel, has no basis in the record. Counsel has been clear (P.I. Br. 6-7) that, despite the burdens that Commerce imposed on Oman Fasteners through overlapping deadlines and lengthy requests for information, the company provided all the necessary information in time for the Response to be timely filed. Counsel accordingly never had reason to seek an extension based on the client's "failure" to provide information "in a timely manner." *Contra* Gov't Opp. 45.

iii.      When Oman Fasteners requested a second extension until February 14, Commerce granted it but stated that it "d{id} not anticipate providing any additional extension for Oman Fasteners' response to the

section C supplemental questionnaire." P.I. Motion Exhibit 8. Given that in-struction from Commerce not to seek further extensions, the Government cannot reasonably fault Oman Fasteners (Opp. 45) for failing to seek another extension "when it began experiencing filing difficulties." The same thing happened in *Celik I*, which is part of why this Court found that Commerce was unreasonable in blaming Celik—just like it blames Oman Fasteners here—for "fail{ing} to request an extension … when it encountered filing dif-ficulties." 557 F. Supp. 3d at 1359.

Moreover, the Government disregards the practical reality facing Oman Fasteners' counsel in the minutes before the 5:00pm deadline. As pre-viously explained (P.I. Br. 8), counsel received unexpected and un-foreseeable error messages from ACCESS at 4:18pm and 4:27pm. At that time, counsel still reasonably believed, based on experience with many other Commerce filings, that this filing would be completed on time. *See* P.I. Br. 7-8 (describing brief upload times for prior filings). (And indeed, counsel completed filing the *entire* Response in PDF form, minus some duplicative Excel-spreadsheet exhibits and one data file, well before 5:00pm.) That is the principal reason why counsel "did not file an extension request earlier." Gov't Opp. 54 (quoting *Tau-Ken*, 587 F. Supp. 3d at 1357). Based on that

reasonable belief, counsel decided to continue attempting to finish filing as soon as possible, rather than give up with ACCESS, attempt to draft and submit a last-minute extension request, and hope that Commerce would grant the very extension that it had previously foreclosed. *See Celik I*, 557 F. Supp. 3d at 1360 (counsel reasonably believed that "attempting to obtain {an additional extension} would only delay things further").

Hindsight, of course, is 20/20. But the record here does not show anything like "inattentiveness" or "carelessness." *Nippon Steel*, 337 F.3d at 1382. It shows that counsel made its best efforts at compliance, encountered a late-breaking and unexpected filing-system error, and then made a reasonable judgment call under the circumstances.

iv.   The Government's fourth argument—that Oman Fasteners should have sought an untimely extension or notified Commerce of the late filing *after* 5:00pm—is totally unavailing. In light of Commerce's published first-time-mistake policy discussed above, Oman Fasteners had no reason to think that Commerce would be so unreasonable as to reject altogether its first *barely* late filing.

The Government's assertion (Opp. 45) that Oman Fasteners delayed pursuing an out-of-time extension for "five weeks" is borderline

disingenuous. Once Commerce informed Oman Fasteners that it intended to reject the filing (notwithstanding its grace policy), Oman Fasteners requested an extension *the very next day*. And in any event, the Government's insistence that Oman Fasteners should have sought an untimely extension after 5:00pm is totally incompatible with its emphatic assertion (Opp. 38) that the filing-system's problems on February 14 "fail to satisfy" the "extraordinary circumstances" standard. This Court should not allow the Government to fault Oman Fasteners for failing to request an extension that Commerce has flatly stated would have been futile.

The Government accuses (Opp. 40) Oman Fasteners of "simply hop{ing} Commerce would not notice the missed deadline, or would let the untimely filing slide." No substantial evidence supports the notion that Oman Fasteners hoped to sneak one by; that would not have even been possible because the ACCESS system shows Commerce the time of each filing. And rather than hoping Commerce would "let {one} slide," Oman Fasteners could have reasonably expected Commerce to adhere to the terms of its own first-time-mistake policy, which Oman Fasteners undisputedly satisfied.

c.    The Government's last defense of its adverse inference (Opp. 45) is that, even if this Court "would have reached a different conclusion, it must

uphold" Commerce's application of an adverse inference. But as the Government concedes, this Court must invalidate a Commerce decision that is "not in accordance with the law," Gov't Opp. 33 (citation omitted), or that "represent{s} an unreasonable judgment in weighing relevant factors," *id.* at 41 (citation omitted). Commerce's decision contravenes *Nippon Steel*'s holding that the statutory "best of its ability" standard "does not require perfection." 337 F.3d at 1382. If a single, inadvertent 16-minute delay is unacceptable, then perfection *is* required. And Commerce also ignored *Hitachi Energy*'s mandate that it "must examine a respondent's actions and assess the extent of the respondent's abilities, efforts, and cooperation" before applying an adverse inference. 34 F.4th at 1386 (citation omitted). Commerce's conclusion that Oman Fasteners did not act to the "best of its ability"—based on a single minor mistake after years of perfect compliance—was a patently unreasonable judgment.

### 2.   *Commerce applied the maximum punishment without evaluating individual circumstances*

a.     While the Act permits Commerce to select the petition rate—the maximum statutory penalty—for particularly egregious misconduct, every adverse-inference rate must be "based on {an} evaluation … of the situation

that resulted in {Commerce} using an adverse inference in selecting among the facts otherwise available." 19 U.S.C. § 1677e(d)(2). Because that evaluation requirement "was *added* to the pre-existing statutory requirements for using adverse facts available, clearly some *additional evaluation is required* beyond that which justified the adverse inference." *POSCO v. United States*, 296 F. Supp. 3d 1320, 1349 (Ct. Int'l Trade 2018) (emphases added).

In *BMW of North America LLC v. United States*, the Federal Circuit similarly interpreted the Act to impose clear limits on adverse-inference rates: Commerce must "consider the overall facts and circumstances of each case, including the level of culpability of the non-cooperating party"; the AFA rate must "be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance"; and the rate must not be "punitive, aberrational, or uncorroborated." 926 F.3d 1291, 1300-01 (Fed. Cir. 2019) (cleaned up). The Federal Circuit further explained that "Commerce must not overreach reality in seeking to maximize deterrence," and "an unusually high rate" should be reserved for "serious misconduct," such as "deliberate falsity and intentional concealment." *Id.* (cleaned up); *see, e.g., Papierfabrik August Koehler AG v. United States*, 180 F. Supp. 3d 1211, 1231-32 (Ct. Int'l Trade 2016) (affirming

AFA rate based on "an elaborate scheme to conceal," including "intentional, and fraudulent, misreporting").

b.      The Government and Mid Continent never mention the Federal Circuit's controlling *BMW* precedent or argue that Commerce satisfied *BMW*'s prerequisites for an adverse-inference rate. The Government could not argue with a straight face that Oman Fasteners' "level of culpability" for a first-time, inadvertent, minor filing mistake warrants the ultimate punishment, or that 154.33% is anywhere near a "reasonably accurate estimate of {Oman Fasteners'} actual rate." *BMW*, 926 F.3d at 1300-01 (citation omitted).

Nor does the Government assert that Commerce conducted *any* additional "evaluation" under 19 U.S.C. §1677e(d)(2) before selecting the 154.33% rate. 19 U.S.C. §1677e(d)(2). Instead, the Government rather strikingly says (Opp. 46) that "Commerce's practice is to select the higher of the highest dumping margin alleged in the petition or the highest calculated rate of any respondent." That is more of an admission than a defense. The statute and precedent compelled Commence to make an individualized evaluation of the *whole* situation, including Oman Fasteners' long record of perfect compliance and the seriousness of its conduct. Yet the Government concedes that

it is Commerce's policy *not* to conduct any case-specific evaluation—
Commerce simply applies "the highest" possible rate from the proceeding.

The Government responds that "an AFA dumping margin determined
in accordance with the statutory requirements is not a punitive measure."
Gov't Opp. 46 (quoting *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir.
2010)). But *KYD* does not help the Government because the AFA rate here
was *not* "determined in accordance with the statutory requirement{}" in
§1677e(d)(2) to "evaluate" the whole "situation," including the party's
degree of culpability.

The Government also invokes (Opp. 47) 19 U.S.C. §1677e(d)(3), which
provides that an adverse-inference rate need not reflect "what the … dump-
ing margin would have been" with full cooperation or "an alleged
commercial reality." That provision does not authorize Commerce's rate
here. As the Federal Circuit has explained, an adverse-inference rate need
not be a "reality" in the sense that it may include "*some* built-in increase
intended as a deterrent." *BMW*, 926 F.3d at 1300 (emphasis added) (citation
omitted). But the adverse-inference rate must still "be a reasonably accurate
estimate of the respondent's actual rate." *Id.* The Government admits (Opp.
46) that Commerce did not even attempt to select a reasonably accurate

estimate—it just followed its "practice" to reflexively apply "the highest" possible rate.

c.    Mid Continent asserts (Opp. 49-54) that Commerce "corroborated" that rate for a *different* respondent in a prior review. Regardless, *BMW* still establishes that Commerce's adverse-inference rate for Oman Fasteners is unlawful because it is "aberrational" and not remotely a "reasonably accurate estimate" of Oman Fasteners' "actual rate." 926 F.3d at 1300 (citation omitted). Mid Continent's "corroboration" arguments about a different Omani entity disregard the fundamental point: In eight years of reviews, Commerce has *never* found that Oman Fasteners' imports warrant duties anywhere near 154.33%. The highest duty that Commerce ever imposed on Oman Fasteners was 9.10% (which was later reduced to 4.22% on remand), and all prior administrative reviews produced rates below 2%.

Mid Continent argues (Opp. 54-55) that any rate lower than 154.33% would be insufficient to "induce{} full cooperation" because Oman Fasteners has been able to do business under the "very low calculated margins" in prior reviews. But the prior-review margins were low precisely because Commerce *rejected* Mid Continent's assertion that Oman Fasteners engaged in significant dumping. And the punishment for a minor filing error cannot

be a rate that *prevents Oman Fasteners from doing business*. Mid Continent ignores the Federal Circuit's requirement that "Commerce must not 'over-reach reality in seeking to maximize deterrence.'" *BMW*, 926 F.3d at 1300 (citation omitted). The delay here occurred because unforeseeable problems with ACCESS left Oman Fasteners' counsel with insufficient time to complete the filing. For such a minor and unintentional error, "a warning" would have been an appropriate sanction, *Celik I*, 557 F. Supp. 3d at 1362—not the most recriminatory penalty on the books.

## III. The Government's Brief Confirms that the Balance of Hardships favors Oman Fasteners

The Government says (Br. 26) that Oman Fasteners' "only … 'harm' … is paying the higher cash deposit rate pending judicial review." That shows a flippant disregard for the reality of Commerce's decision. As Oman Fasteners has explained in detail, if this Court does not enjoin Commerce's draconian 154.33% duty rate, then Oman Fasteners will be forced to continue its complete suspension of subject-merchandise imports that is currently causing catastrophic and unrecoverable losses. The Government cannot seriously dispute the severity of those harms; it merely doubts (Br. 28) what it calls the "assumption" "that Oman Fasteners would cease exporting the

subject merchandise to the United States." But as explained above, Oman Fasteners' harms are not a matter of speculation: the company *already has* ceased all imports of subject merchandise to the United States, because Commerce's decision left it no other choice. The grave harm from that difficult choice compounds daily.

The Government's harms are trivial by comparison. The Government first suggests (Br. 23-25) that the statute does not even permit this Court to enjoin "the collection of cash deposits for prospective entries." That is plainly incorrect. As Oman Fasteners has explained (P.I. Br. 17), this Court has authority to "hold unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law"—including Commerce's decision imposing the 154.33% rate. 19 U.S.C. § 1516a(b)(1)(B)(i). This Court's Rule 65 authorizes a preliminary injunction while this case proceeds. And this Court has previously recognized its authority to enjoin an unlawful anti-dumping duty deposit order. *See, e.g.*, *Sunpreme Inc. v. United States*, 145 F. Supp. 3d 1271 (Ct. Int'l Trade 2016).

The Government next invokes (Br. 25-26) an "interest in securing the duties to which it may ultimately be entitled if it prevails." But denying an

injunction would do nothing to advance that interest, because Oman Fasteners cannot make any imports while the 154.33% duty rate is effective, so the Government will collect nothing. Moreover, the eight-year history of Oman Fasteners' proceedings shows conclusively that Commerce is not entitled to deposits anywhere near that 154.33% duty rate, which diverges wildly from the 0% to 1.65% rates that Commerce has previously applied. The Government's legitimate interest in adequate security will be fully served by an injunction requiring deposits at Oman Fasteners' historical rates.

## IV.  An Injunction Serves the Public Interest

A preliminary injunction would advance the public's interests in Commerce following the law, in the economic welfare of U.S. industry, and in the promotion of U.S. foreign policy, all of which would be diminished if Commerce were permitted to bankrupt Oman Fasteners before this Court's judgment.

The Government asserts (Opp. 25, 31) public interests "in protecting the public fisc" and "requiring Oman Fasteners to pay cash deposits at the rate established in the review." But as already explained, Commerce's 154.33% rate will not bring in any money for the public. And the public has

no legitimate interest in imposing an anti-dumping margin with no basis in the reality of Oman Fasteners' imports.

The Government disputes (Opp. 28-30) that an injunction will protect U.S. industry. But that argument reduces to suggesting that multiple American businesses lied in letters to Commerce explaining why the agency's 154.33% rate would "wreak havoc" and impose "a tremendous setback on {their} compan{ies}." P.I. Motion Exhibits 28-29. The Government thinks (Opp. 28-30) it knows the steel-nails business better than these companies, claiming "it would stand to reason that" that they "*might*" be able to "prevent any catastrophic damage," Opp. 29 (emphasis added), while ignoring the companies' detailed explanations of the problems Commerce has caused.

The Government also argues (Opp. 30) that this Court should ignore the foreign-policy perspective of the U.S. Ambassador to Oman based on its own doubts that Oman Fasteners "will be required to lay off large numbers of workers or to go out of business altogether." But here again the Government simply ignores the evidence: Oman Fasteners has already terminated hundreds of workers, and without an injunction will be forced to terminate even more. Mid Continent, for its part (Opp. 59-61), accuses the Ambassador of dereliction of duty. Needless to say, Ambassador Tsou has a better

understanding of U.S. foreign-policy interests than Mid Continent. This Court should take the Ambassador at her word that our foreign relations will suffer if Commerce renders Oman Fasteners insolvent.

A preliminary injunction here would not permit "every importer" to "obtain an injunction against the statutory cash deposit requirement." *Contra* Opp. 31. It would just restrain Commerce from abusing its discretion by inflicting maximal punishment for a one-time, minimal transgression.

## V.   This Court Should Not Consolidate the Preliminary Injunction Hearing with the Merits

Oman Fasteners agrees with the Government (Opp. 55-57) and Mid Continent (Opp. 62-63) that this Court should decide the preliminary injunction motion without consolidation under Rule 65(a)(2). The merits proceeding would entail motions for judgment on the agency record, *see* Rule 56.2, requiring production of the record and an opportunity for the parties to review it. Consolidation would thus significantly delay the preliminary injunction proceedings, severely prejudicing Oman Fasteners.

## CONCLUSION

The motion for a preliminary injunction should be granted.


Dated:        January 17, 2023

/s/ Michael R. Huston

Michael R. Huston

Michael P. House

Andrew Caridas

**PERKINS COIE LLP**

700 Thirteenth St., NW

Washington, D.C. 20005

202-654-6200

mhuston@perkinscoie.com

PUBLIC VERSION

## CERTIFICATE OF COMPLIANCE
## WITH WORD COUNT LIMITATION

This brief complies with the word count limitation in the Court's Standard Chambers Procedures, as modified by the Court's order of January 17, 2023, granting Oman Fasteners leave to file a brief no longer than 9,000 words. Excluding the portions exempted by those procedures, the brief contains 8932 words as counted by the word-processing software used to prepare it.

Dated:      January 17, 2023

/s/ Michael R. Huston

Michael R. Huston
