**PUBLIC VERSION**

**Slip Op. 23-17**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

─────────────

**Court No. 22-00348**

─────────────

OMAN FASTENERS, LLC,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

MID CONTINENT STEEL & WIRE, INC.,

*Defendant-Intervenor.*

─────────────

Before: M. Miller Baker, Judge

**OPINION**

[Consolidating Plaintiff's motion for a preliminary injunction with trial on the merits, granting judgment on the agency record in favor of Plaintiff, remanding for further proceedings, and enjoining Defendant from requiring Plaintiff to post 154.33 percent cash deposits on subject merchandise pending further order of the court.]

Dated: February 15, 2023
Amended: February 22, 2023

*Michael R. Huston*, Perkins Coie LLP of Washington, DC, argued for Plaintiff. With him on the briefs were

**PUBLIC VERSION**

*Michael P. House* and *Andrew Caridas*. *John M. Devaney* examined Plaintiff's witness.

*Kelly M. Geddes*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, argued for Defendant and cross-examined Plaintiff's witness. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; and *Tara K. Hogan*, Assistant Director. Of counsel on the brief was *Ian A. McInerney*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

*Adam H. Gordon*, The Bristol Law Group PLLC of Washington, DC, argued for Defendant-Intervenor and cross-examined Plaintiff's witness. With him on the brief were *Jennifer M. Smith* and *Lauren Fraid*.

*Baker*, Judge: "[T]he power to tax [is] the power to destroy." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819) (Marshall, C.J.). Wielding that power, the Commerce Department imposed a duty rate of 154.33 percent on Oman Fasteners, LLC (Oman), an importer of steel nails, solely for missing a filing deadline by 16 minutes. *See Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg.

**PUBLIC VERSION**

78,639 (Dep't Commerce Dec. 22, 2022).[1] The rate previously applicable to such imports was 1.65 percent, *see Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2019–2020*, 86 Fed. Reg. 67,690, 67,691 (Dep't Commerce Nov. 29, 2021), meaning that Commerce raised Oman's duty rate by more than *ninety-three-fold*.

Oman brings this suit challenging Commerce's decision. In the ordinary course, Oman would move for judgment on the agency record and, if successful, the court would remand to the Department for a recalculation of the challenged antidumping duties. In the meantime, however, Oman would still be required to pay estimated cash deposits[2] set at 154.33 percent

---

[1] For background on administrative reviews in antidumping proceedings and the role of mandatory respondents such as Oman, see *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1334–35 (CIT 2020).

[2] The Tariff Act of 1930 provides that when Commerce makes an affirmative determination that merchandise is being dumped, the Department "shall order the posting of a cash deposit, bond, or other security, as [Commerce] deems appropriate, for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin"—here, 154.33 percent. 19 U.S.C. § 1673d(c)(1)(B)(ii). This requirement is intended as security for the eventual payment of antidumping duties.

Later, U.S. Customs and Border Protection "liquidates" the entry to make a "final computation or ascertainment of duties owed." *ARP Materials, Inc. v. United States*, 520 F. Supp. 3d 1341, 1347 (CIT 2021) (citing 19 C.F.R. § 159.1;

**PUBLIC VERSION**

until the court entered a final judgment affirming a new rate recalculated by Commerce. The Department then would issue new cash deposit instructions and revoke the 154.33 percent rate. *See Guizhou Tyre Co. v. United States*, 557 F. Supp. 3d 1302, 1313–14 (CIT 2022) (discussing 19 U.S.C. § 1516a(c)(3) and holding that remand redeterminations do not become effective until sustained by a "final disposition of the court").

Claiming that it can't afford to pay such exorbitant cash deposits or (alternatively) shut down most of its business while this litigation and administrative proceedings play out, Oman moves for a preliminary injunction requiring the government to collect such deposits at the preexisting 1.65 percent rate set in the preceding administrative review. Exercising its discretion, the court consolidates Oman's motion with trial on the merits—in this context, a motion for judgment on the agency record.

Because Commerce's challenged actions here are the very definition of abuse of discretion, the court grants judgment on the agency record in favor of Oman and remands for further proceedings consistent with this opinion. And because the company has demonstrated the requirements for obtaining

---

19 U.S.C. § 1500), *aff'd*, 47 F.4th 1370 (Fed. Cir. 2022). Following liquidation, if the importer's deposit was lower than the final duty assessed, Customs collects any additional amounts due, with interest; if the deposit exceeded the final assessment, Customs refunds the difference, with interest. *Id.* (citing 19 U.S.C. § 1505(b)).

**PUBLIC VERSION**

injunctive relief, including showing irreparable injury, the court enjoins the government to collect cash deposits at the previous rate of 1.65 percent pending further order of the court. *Cf. Panhandle Oil Co. v. Mississippi ex rel. Knox*, 277 U.S. 218, 223 (1928) (Holmes, J., dissenting) ("The power to tax is not the power to destroy while this Court sits.").

I

A

The memorandum accompanying Commerce's decision explains that Oman had until 5:00 p.m. Eastern Time on February 14, 2022, to upload its supplemental section C questionnaire response to the Department's ACCESS electronic filing system, but Commerce received the response "between 4:41 p.m. ET and 5:16 p.m. ET." ECF 38-3, at 17.[3] The Department "received no notification from Oman . . . of filing difficulties or an additional request for extension of the deadline prior to 5:00 p.m." and cited a regulation providing that "[a]n electronically filed document must be received successfully *in its entirety* by . . . ACCESS, by 5 p.m. [ET] on the due date." *Id.* (emphasis and brackets in original) (quoting 19 C.F.R. § 351.303(b)(1)).

---

[3] ECF 38-3 contains exhibits to the public version of Oman's motion. ECF 36-3 contains sealed versions of the same material. In this opinion, citations to exhibits refer to the page numbers stated in the ECF header.

## PUBLIC VERSION

Oman explains[4] that ACCESS offers a "check file" feature that pre-screens a submission to ensure there are no technical issues that will cause it to be rejected. Counsel used that feature and it found no problems, so he began uploading material 50 minutes prior to the 5:00 p.m. deadline, which he believed—based on past experience—would be sufficient time. ECF 38-1, at 7–8. Unexpectedly, and notwithstanding the "check file" feature's approval of the submission, ACCESS rejected the first submission twice due to technical defects, and it took a total of 17 minutes for the system to issue the two error messages. *Id.* at 8. Counsel reformatted the problem materials and filed them at 4:41 p.m. and 4:46 p.m. He then began uploading additional files, "all but one of which were Excel-format copies of the PDF exhibits that counsel had already uploaded." *Id.* at 9. But the system ran slowly and did not accept the "U.S. sales SAS database" piece of the submission until 5:16 p.m. *Id.* at 9.

---

[4] Oman did not provide a declaration from counsel substantiating its account of the events surrounding its 16-minute delay in completing its filing. The record contains counsel's statements offered before Commerce that were not under oath but were subject to false statement liability under 18 U.S.C. § 1001. *See* 19 C.F.R. § 351.303(g). As the parties have not addressed whether representations encompassed by § 1001 suffice to support injunctive relief in lieu of sworn testimony, the court recounts counsel's explanation solely for purposes of providing context. No party disputes that Oman completed its filing 16 minutes late, so the court accepts that fact as true.

**PUBLIC VERSION**

Counsel decided not to contact Commerce about the matter for two reasons. First, the Department had said there would be no further extensions. *Id.* at 9–10; *see also* ECF 38-3, at 63 (Commerce letter to counsel stating, in relevant part, "Commerce does not anticipate providing any additional extension for Oman Fasteners' response . . . ."). Second, the February 14 submissions were "bracketing not final" versions, and the next day counsel timely filed the final versions under Commerce's "one-day lag rule."[5] ECF 38-1, at 10.

Just over five weeks later, the Department rejected Oman's entire supplemental section C questionnaire response (including the portions submitted prior to 5:00) as untimely and struck it from the record. ECF 38-3, at 17. In response, Oman made several requests that Commerce reconsider and grant a retroactive extension of time, but the Department refused, finding that "Oman . . . failed to demonstrate that a qualifying extraordinary circumstance existed to warrant an untimely extension of the deadline." *Id.* (citing 19 C.F.R.

---

[5] The "one-day lag rule" allows a party to submit only a business proprietary version of a document by the deadline with a notice that "bracketing of business proprietary information is not final for one business day after date of filing." 19 C.F.R. § 351.303(d)(2)(v) (title case removed). The party then has one extra business day to double-check its designations of confidential information and then to file a final confidential submission together with a redacted public version. *Id.* § 351.303(c), (c)(2)(iii). The party may make no changes to the final submission other than adjusting bracketing and removing the notice about bracketing not being final. *Id.* § 351.303(c)(2)(ii).

Ct. No. 22-00348                                                    **Page 8**
**PUBLIC VERSION**

§ 351.302(c)(2)).[6] Commerce faulted counsel for not seeking an extension before the deadline and instead "wait[ing] until 38 days after the untimely submission of the [response] to bring any filing issues to Commerce's attention . . . ." *Id.* The Department said counsel did not allow enough time to file because, as is often said on Wall Street, past performance is no guarantee of future results: Oman's "assertion that certain prior filings took a particular amount of time is not relevant.

---

[6] The regulation the Department cited provides as follows:

(c) *Requests for extension of specific time limit.* Before the applicable time limit established under this part expires, a party may request an extension pursuant to paragraph (b) of this section. An untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists. The request must be in writing, in a separate, stand-alone submission, filed consistent with § 351.303, and state the reasons for the request. An extension granted to a party must be approved in writing.

(1) An extension request will be considered untimely if it is received after the applicable time limit expires or as otherwise specified by the Secretary.

(2) An extraordinary circumstance is an unexpected event that:

(i) Could not have been prevented if reasonable measures had been taken, and

(ii) Precludes a party or its representative from timely filing an extension request through all reasonable means.

19 C.F.R. § 351.302(c).

PUBLIC VERSION

Prior filing times do not guarantee a given submission will require a specific length of time to file, and simply because filing on ACCESS had taken less time in previous cases does not constitute an extraordinary circumstance." *Id.* at 225.

The Department cited its "broad discretion" in establishing and enforcing deadlines and said past cases "demonstrate that Commerce establishes deadlines and maintains those deadlines throughout the proceeding and *occasionally accepts late filings depending on the facts of the particular case before it.*" *Id.* at 18 (emphasis added).

Commerce then found that "the record lacks necessary information because Oman Fasteners did not timely file its SCQR. Oman Fasteners failed to act to the best of its ability and provide requested information by the deadline for submission of that information. . . . Therefore, in accordance with [19 U.S.C. § 1677e(a)], we are relying on facts available." *Id.* at 25 (emphasis added).

In selecting from facts otherwise available, Commerce also applied an adverse inference. In considering what rate to assign Oman, the Department noted that "the record of this proceeding includes certain calculated margins, ranging from 0.63 percent to 9.10 percent, as well as the Petition rate of 154.33 percent from the initiation of the underlying investigation," *id.* at 29, and decided, "[I]t is appropriate to assign Oman Fasteners the Petition rate of 154.33 percent based on its failure to cooperate, because it is a rate on the

**PUBLIC VERSION**

record which would confer an adverse inference and induce cooperation." *Id.* at 30. Oman thus suffered what trade cases commonly refer to as "adverse facts available," or "AFA," a fate statutorily reserved to respondents that do not "cooperate . . . to the best of [their] ability" with an antidumping or countervailing duty investigation. 19 U.S.C. § 1677e(b).[7]

B

Oman timely sued on December 23, 2022, the day after Commerce issued its decision. *See* ECF 1 (summons); ECF 10 (complaint). Three days later, Oman filed public (ECF 38) and confidential (ECF 36) versions of its motion for a preliminary injunction. At that time the court set an expedited briefing schedule and advised the parties that it was considering consolidating Oman's preliminary injunction motion with trial on the merits—in this context, treating Oman's motion as a motion for judgment on the agency record. *See* USCIT R. 56.2 (providing for judgment on the agency record); *see also* USCIT R. 65(a)(2) (allowing consolidation of a preliminary injunction motion with trial on the merits).

Mid Continent Steel & Wire, Inc., then intervened as a defendant as of right. ECF 37. After the completion of briefing and limited discovery, the court conducted an evidentiary hearing with live witness

---

[7] For background on Commerce's use of adverse facts available in antidumping proceedings, see *Hung Vuong*, 483 F. Supp. 3d at 1336–39.

**PUBLIC VERSION**

testimony and heard legal argument on February 1, 2023. At the outset of the hearing, the court advised the parties that it would likely consolidate the preliminary injunction motion with trial on the merits by treating the motion as one for judgment on the agency record. *See* ECF 83, at 4:12–5:19.

## II

Oman sues under § 516A of the Tariff Act of 1930, 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (B)(iii), challenging Commerce's final determination in an administrative review of an antidumping order under 19 U.S.C. § 1675. ECF 10, at 2. The court has jurisdiction per 28 U.S.C. § 1581(c).

In cases brought under § 516A of the Tariff Act, the Court of International Trade "shall review the matter as specified in subsection (b) of such section." 28 U.S.C. § 2640(b). In relevant part, subsection (b) provides that "the Court of International Trade must sustain 'any determination, finding[,] or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.' " *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). In addition, Commerce's exercise of discretion in § 516A cases is subject to the default standard of the Administrative Procedure Act, which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see*

**PUBLIC VERSION**

*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020) (explaining that in cases reviewed under 28 U.S.C. § 2640(b), "section 706 review applies since no law provides otherwise").

## III

### A

Under Rule 65, the court has discretion to consolidate a hearing on a preliminary injunction with the trial on the merits. *See* USCIT R. 65(a)(2). In this administrative law context, that means treating Oman's motion as one for judgment on the agency record. *See* USCIT R. 56.2. Here, the court so consolidates Oman's motion with the trial on the merits. The court finds that so doing promotes judicial economy, reduces expense to the parties, and furthers speedy resolution of this dispute. *See* USCIT R. 1 (stating that the court's rules are to be "construed, administered, and employed by the court . . . to secure the just, speedy, and inexpensive determination of every action and proceeding").

### B

On the merits, Oman asserts three separate and independent theories challenging Commerce's decision to apply facts otherwise available with an adverse inference. *First*, the Department abused its discretion in denying Oman a retroactive extension of time in these circumstances. *Second*, even if the Department properly refused to grant Oman a retroactive extension, the Department abused its discretion in applying

**PUBLIC VERSION**

an adverse inference. *Finally*, even if the Department properly applied an adverse inference, the Department abused its discretion in selecting such a high rate (154.33 percent). The court easily agrees with Oman as to each of its theories; this is not a close case.

1

Oman argues that in denying it a retroactive extension, the Department abused its discretion for two reasons. The court considers each in turn.

a

Almost ten years ago, buried in a response to a party's comment made during rulemaking, Commerce casually revealed that it grants virtually automatic 15½-hour[8] extensions for completion of filings:

> Parties should be aware that the likelihood of the Department granting an extension will decrease the closer the extension request is filed to the applicable time limit because the Department must have time to consider the extension request and decide on its disposition. Parties should not assume that they will receive an

---

[8] As a technical matter, the automatic extension is actually a *minimum* 15½-hour extension due to the Department's reference to "the next work day." A party with a deadline of 5:00 p.m. on an ordinary Friday, for example, would receive an extension to 8:30 a.m. the following Monday, and a party whose deadline falls on the Friday before a holiday weekend would receive an extension to Tuesday. Here, however, the deadline was on a Monday.

PUBLIC VERSION

extension of a time limit if they have not re-
ceived a response from the Department. *For sub-
missions that are due at 5:00 p.m., if the Depart-
ment is not able to notify the party requesting the
extension of the disposition of the request by 5:00
p.m., then the submission would be due by the
opening of business (8:30 a.m.) on the next work
day.*

*Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,792
(Dep't Commerce Sept. 20, 2013) (emphasis added).
This offhand comment response—which has never
been codified through a regulation or otherwise rea-
sonably communicated to the bar—means that a party
in Oman's situation could (and unquestionably should)
have a boilerplate request for an extension ready to file
at 4:55 p.m. if a required filing encounters technical
difficulties of the type that Oman claims to have suf-
fered here. In the real world, such a last-minute exten-
sion request is virtually certain to obtain at least a
15½-hour extension for completing a filing.[9]

---

[9] Counsel for the government argued at the hearing that
the extension is not automatic because Commerce could
deny it, but when pressed by the court she conceded that it
would be very unlikely that Commerce would be able to
deny such a last-minute extension request prior to the 5:00
p.m. cutoff. ECF 83, at 275:7–276:8. The Department's
rulemaking comment response unambiguously states that
if Commerce does not rule on the extension request by 5:00
p.m., the deadline bumps to 8:30 a.m. the next work day—
thus making the extension essentially automatic in

PUBLIC VERSION

The court finds that because the Department has not codified its practice or otherwise provided clear notice to the bar that this virtually automatic 15½-hour extension is available, it is an abuse of discretion for Commerce to require a showing of "extraordinary circumstances" to support a retroactive extension request in the narrow circumstance where, as here, the filing is completed after 5:00 p.m. but prior to 8:30 a.m. the following work day—that is, when the filing is completed within the automatic window that Commerce's rulemaking comment response authorizes.[10]

---

practice because a ruling at 5:01 p.m. would be too late to prevent the extension from taking effect.

[10] The court emphasizes that Oman's completion of its filing within the 15½-hour window is essential to Part III.B.1.a of this decision and distinguishes this case from matters such as *Tau-Ken Temir LLP v. United States*, 587 F. Supp. 3d 1346 (CIT 2022), *appeal filed*, No. 22-2024 (Fed. Cir. Sept. 14, 2022), where counsel filed an extension request in time to get the "automatic extension" but then failed to complete the substantive filing by 8:30 a.m., and *Dongtai Peak Honey Industry Co. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015), in which the Federal Circuit found that Commerce was justified in excluding responses filed *ten days* after the deadline when the submitting party submitted an untimely request for extension and provided no explanation for why the party had not timely filed a request. The court expresses no view on whether the Department's failure to grant an extension in these circumstances would be an abuse of discretion if Commerce had clearly put the bar on notice of its last-minute extension policy through codification in a regulation or some other method reasonably calculated to provide notice to the bar. *See Celik*

**PUBLIC VERSION**

b

Oman also argues that the Department has a "policy of leniency" for filing errors, ECF 38-1, at 30, and erred by failing to explain its departure from past practice in this proceeding. Oman points to this statement by Commerce in another proceeding:

> . . . Commerce's *practice* is to allow a law firm that misses a filing deadline one opportunity to submit the untimely information where [the] law firm failed to: 1) file a complete submission before the specified hour on the date of the deadline; 2) timely file the public version of the response; or 3) respond on the date of the deadline, but promptly contacted Commerce. We also note that Commerce allows a law firm a second opportunity to submit the untimely information only if that law firm has: 1) not previously been afforded such an opportunity in a past segment of any proceeding; and 2) identified the steps it

---

*Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348, 1361 (CIT 2022) ("[I]t is not reasonable for the court to expect a filer to be on notice of, or to allow a litigant to be prejudiced by, a substantive regulatory provision buried within preamble language, especially a provision that was published in the Federal Register [approximately eight and a half] years before the due date of a filing and never issued as a regulation or rule."). *Celik Halat* issued on February 15, 2022—the day after the missed deadline in this case. At argument, counsel represented that Oman was unaware of Commerce's automatic extension policy until the court "unearthed it" in *Celik Halat*. ECF 83, at 248–51.

**PUBLIC VERSION**

has taken to avoid untimely filings in the future.
This practice is grounded in 19 CFR 351.301(a)
. . . .

. . . . Pursuant to the practice described above,
we previously accepted Hyundai Steel's narra-
tive response because we determined that the
law firm representing Hyundai Steel was eligi-
ble to receive a second opportunity. [Commerce
then discovered it had accepted untimely infor-
mation from that firm in a different matter two
and a half years earlier.] It is inconsistent with
Commerce's practice to allow the law firm an-
other opportunity to file untimely information in
this administrative review. . . .

. . . . As a result, pursuant to our regulations and
practice, [the Department rejected the untimely
filing and removed it from the record].

*Certain Corrosion-Resistant Steel Products from the
Republic of Korea*, Dep't No. A-580-878, Commerce
Letter to Respondent's Counsel at 2–3 (Aug. 3, 2018)
(emphasis added and footnote references omitted).

There is no dispute that Oman's counsel is eligible
for leniency under the "practice" quoted above. The
record shows that Oman brought the language to Com-
merce's attention and asked it to apply that "practice"
here. *See* ECF 38-3, at 234–41; *see also id.* at 261. The
Department, astonishingly, responded that it "does
not have an 'established' practice of leniency for first-
time offenders for late submissions." *Id.* at 269.

**PUBLIC VERSION**

Commerce's response disregards its own prior statements and therefore constitutes an abuse of discretion (at best) or arbitrary and capricious action (at worst). The Department said, *five times*, that it has a "practice" of allowing a law firm one tardy filing—a "one-bite rule," as it were.[11] This court will hold Commerce to its stated practice. *Cf. NLRB v. Wash. Star Co.*, 732 F.2d 974, 977 (D.C. Cir. 1984) (per curiam) ("The present sometimes-yes, sometimes-no, sometimes-maybe policy of [enforcing] due dates cannot, however, be squared with our obligation to preclude arbitrary and capricious management of the [agency]'s mandate."); *see also Cappadora v. Celebrezze*, 356 F.2d 1, 6 (2d Cir. 1966) (Friendly, J.) ("[O]nce appropriate rules have been established, the discretion conferred in day to day administration cannot have been assumed to extend to unreasonable deviation from such rules on an *ad hoc* basis at the whim of the [agency].").

\*    \*    \*

Under these circumstances, Commerce abused its discretion by not granting Oman a retroactive

---

[11] At common law, a plaintiff seeking damages for a dog bite "must prove that the defendant knew about the dog's vicious propensities, a scienter requirement commonly referred to as the 'one-bite rule.' " *Carreiro v. Tobin*, 66 A.3d 820, 822–23 (R.I. 2013) (quoting *DuBois v. Quilitzsch*, 21 A.3d 375, 380 (R.I. 2011)); *cf. McLaughlin v. Union Oil Co. of Cal.*, 869 F.2d 1039, 1045 (7th Cir. 1989) (Posner, J.) ("There is no 'one explosion' rule in OSHA cases comparable to the fabled 'one bite' rule of tort liability for injury inflicted by a house pet.").

PUBLIC VERSION

extension. That, in turn, means the Department's invocation of facts otherwise available here was unlawful—necessary information was *not* missing from the record, 19 U.S.C. § 1677e(a)(1), nor did Oman "fail[ ] to provide such information by the deadline[ ] for submission," *id.* § 1677e(a)(2)(B).

Because the court finds Commerce's resort to facts otherwise available unlawful, the court necessarily finds the same as to the use of an adverse inference. Proper invocation of facts otherwise available is a statutory prerequisite to use of an adverse inference. *See id.* § 1677e(b)(1)(A) (permitting the Department to "use an inference that is adverse to the interests of that party *in selecting from among the facts otherwise available*") (emphasis added).

2

Even if Commerce did not abuse its discretion in denying an extension of time to Oman and therefore properly applied facts otherwise available because of the company's late filing, *see id.* § 1677e(a)(2)(B), the court finds that Commerce abused its discretion in applying an adverse inference.

When the Department "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," *id.* § 1677e(b)(1), the Tariff Act permits (but does not require) Commerce to "use an inference that is adverse to the interests of that party in selecting from the facts otherwise available," *id.* § 1677e(b)(1)(A). On the one

### PUBLIC VERSION

hand, "the standard does not require perfection and recognizes that mistakes sometimes occur," but on the other, "it does not condone inattentiveness [or] carelessness . . . ." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Id.* at 1383. "Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information." *Id.* at 1382. Where "Commerce made no such examination," the Federal Circuit found invocation of an adverse inference to be unsupported by substantial evidence on the record. *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1386 (Fed. Cir. 2022).

Here, the extent of the Department's justification for applying an adverse inference consisted of a single clause within a single sentence: "Additionally, pursuant to section 776(b) of the Act [i.e., 19 U.S.C. § 1677e(b)], because Oman Fasteners failed to cooperate by not acting to the best of its ability when it failed to provide information to Commerce within established deadlines, we are applying an adverse inference when selecting from the facts available." ECF 38-3, at 25. That sentence tells the court nothing about *why* the Department concluded that Oman failed to cooperate to the best of its ability by missing a filing deadline by 16 minutes.

**PUBLIC VERSION**

Agency action is improper where the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 423 U.S. 29, 43 (1983). Here, Oman told Commerce that the ACCESS system initially notified counsel that his filings *met* the system's requirements, yet after some delay the system then unexpectedly rejected them. The Department did not address Oman's assertion that the ACCESS system's performance contributed to the late filing.

Beyond failing to address Oman's contention that the company was not wholly at fault, Commerce's application of an adverse inference is an abuse of discretion for the additional reason that the Department provided no explanation justifying its conclusion that a 16-minute filing delay is a failure to cooperate. Commerce's *ipse dixit* here is not enough. *See City of Miami, Okla. v. Fed. Energy Regulatory Comm'n*, 22 F.4th 1039, 1042, 1043 (D.C. Cir. 2022) (chiding agency for *ipse dixit* explanation and failure to analyze evidence and finding "[t]hat is hardly acceptable evaluation of the evidence"); *State Farm*, 463 U.S. at 48 ("We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner . . . .").

### 3

Finally, even if Commerce did not abuse its discretion by refusing to grant a retroactive extension to Oman, and even if the Department did not abuse its discretion by applying an adverse inference in

**PUBLIC VERSION**

selecting from facts otherwise available, the court finds that Commerce abused its discretion by selecting the punitive 154.33 percent rate. "That the facts merited the use of an adverse inference does not necessarily mean that those same facts merited selection of the highest rate." *POSCO v. United States*, 296 F. Supp. 3d 1320, 1349 (CIT 2018). Section "1677e(d)(2) contemplates the selection of the highest rate when the situation merits the highest rate." *Id.* at 1350. If Commerce fails to reasonably explain why its chosen rate was appropriate, the court must find it inappropriate. *See BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301 (Fed. Cir. 2019).

Here, the Department simply stated that 154.33 percent "is a rate on the record *which would confer an adverse inference* and induce cooperation." ECF 38-3, at 30 (emphasis added). That is not an explanation. It amounts to, "We choose this as the adverse rate because it's crushing." But the Federal Circuit has noted that while "Commerce is at liberty to exercise its judgment and select a rate it finds appropriate to deter non-compliance, there is an extremely large range of rates between 1.43% and 126.44%." *BMW*, 926 F.3d at 1302. The same is true here, except the relevant range is even greater. In past administrative reviews, the highest rate that Oman received was 1.65 percent, *see Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2019–2020*, 86 Fed. Reg. 67,690, 67,691 (Dep't

**PUBLIC VERSION**

Commerce Nov. 29, 2021),[12] yet Commerce inexplicably opted for a 154.33 percent rate this time. As the Federal Circuit has repeatedly admonished the Department, an adverse inference rate cannot be punitive or aberrational and must "reflect[ ] the seriousness of the non-cooperating party's misconduct." *BMW*, 926 F.3d at 1301. Commerce made no effort to justify the draconian sanction it imposed here.

\*　　\*　　\*

---

[12] *See also Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2014–2016*, 83 Fed. Reg. 4030, 4031 (Dep't Commerce Jan. 29, 2018) (0.63 percent); *Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2016–2017*, 83 Fed. Reg. 58,231, 58,232 (Dep't Commerce Nov. 19, 2018) (0.00 percent); *Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2017–2018*, 84 Fed. Reg. 71,372, 71,372 (Dep't Commerce Dec. 27, 2019) (also 0.00 percent); and *Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2018–2019*, 86 Fed. Reg. 14,309, 14,310 (Dep't Commerce Mar. 15, 2021) (also 0.00 percent). The highest margin Oman received was in the original antidumping order, *see Certain Steel Nails from the Republic of Korea, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 80 Fed. Reg. 39,994, 39,996 (Dep't Commerce July 13, 2015) (9.10 percent), although Commerce reduced that rate to 4.22 percent after multiple remands from this court, *see Mid Continent Steel & Wire, Inc. v. United States*, 586 F. Supp. 3d 1349, 1353 (CIT 2022), *appeal filed*, No. 23-1039 (Fed. Cir. Oct. 14, 2022).

**PUBLIC VERSION**

For the reasons outlined above, the court concludes that Oman is entitled to judgment on the agency record. *See* USCIT R. 56.2.

### IV

After a grant of judgment on the agency record, relief as of right is limited to a remand for further proceedings. *See* 19 U.S.C. § 1516a(c)(3) (authorizing the court to remand to Commerce "for disposition consistent with the" court's final decision). Oman, however, also seeks extraordinary relief in the form of an injunction enjoining the government from collecting cash deposits at a 154.33 percent rate pending further order of the court.

After prevailing on the merits of a cause of action created by Congress, and absent statutory direction to the contrary, *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (stating that "Congress may intervene and guide or control the exercise of the courts' [equitable] discretion, but we do not lightly assume that Congress has intended to depart from established principles") (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)), a plaintiff seeking permanent injunctive relief must demonstrate

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

### PUBLIC VERSION

public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[13] As nothing in the Tariff Act otherwise suggests an intent by Congress to depart from ordinary equitable principles in this context of a request to enjoin the collection of cash deposits, the court considers whether Oman has satisfied the three *eBay* requirements in dispute.[14]

### A

When a plaintiff demonstrates "a viable threat of serious harm which cannot be undone," *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (emphasis removed), such harm, economic or otherwise, can constitute irreparable injury for purposes of injunctive relief. For example, judicial relief "may come too late to save the plaintiff's business. He may go broke while waiting, or may have to shut down his business but without declaring bankruptcy." *J.*

---

[13] In the administrative law context, where a court must remand a successful challenge to agency action for further proceedings, "permanent" injunctive relief is something of a misnomer. Here, where the court has granted judgment on the agency record to Oman, the entry of injunctive relief is permanent only in the sense that it would remain in effect until the court sustains a final determination by Commerce.

[14] There is no dispute here that Oman has no other remedy at law against the government. Therefore, the company satisfies the second *eBay* requirement.

PUBLIC VERSION

*Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1377 (CIT 2020) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (Posner, J.)).

Oman's president and CEO, Steve Karaga, submitted a declaration in support of the company's motion and elaborated on that declaration in testimony in open court. In his testimony, he explained that Commerce's staggering increase in the duty rate requires the company to pick its poison: either shut down most of the business (to avoid paying cash deposits), fire most of the workforce, ruin customer relationships, and risk insolvency due to fixed costs exceeding revenue and/or [[                                    ]], or blithely continue business as usual for a few months (while paying the cash deposits that cannot be passed along to customers) until insolvency is reached. *Cf.* Ernest Hemingway, *The Sun Also Rises* 136 (1926) (" 'How did you go bankrupt?' Bill asked. 'Two ways,' Mike said. 'Gradually, then suddenly.' ").

1

As to shutting down most of the company's business to escape liability for cash deposits, the court finds that Mr. Karaga credibly identified at least four distinct kinds of ensuing irreparable injury, any one of which independently supports injunctive relief.

a. *Insolvency from running out of cash*

Mr. Karaga explained that more than [[          ]] of the company's revenue comes from U.S. market

**PUBLIC VERSION**

sales, ECF 83, at 61:15–22,[15] and more than [[

]] of the company's revenue comes from U.S. sales
of subject merchandise (steel nails subject to the anti-
dumping duty order),[16] *id.* at 58:22–59:5. The [[

]] figure represents between [[

]] of Oman's 2022 revenue. *Id.* at 62:15–
22. After nails, the company's second-largest product
consists of steel staples that represent [[          ]]
of its 2022 sales, or approximately [[

]]. *Id.* at 62:23–63:8. In his testimony, Mr. Ka-
raga referred to an exhibit (ECF 36-2, at 17) that
showed Oman's projected 2022 revenue through De-
cember 19 as [[                ]]. ECF 83, at 63:9–64:4.

Mr. Karaga stated that because Oman cannot af-
ford (as discussed further below) to pay cash deposits
for the 154.33 percent antidumping duties, *id.* at
65:23–66:9, the company has discontinued shipments
of nails to the United States,[17] which he said would
cause the company's sales revenue to drop to approxi-
mately [[          ]] of the company's 2022 revenue,
*id.* at 64:5–65:19. He noted that the company's
[[       ]] dropped from [[          ]] to [[

]] in November 2023, that [[          ]]
increased in the following month, and that he expected

---

[15] Citations to ECF 83 refer to the sealed hearing tran-
script.

[16] The remainder of this opinion uses the word "nails" in-
stead of the statutory term "subject merchandise."

[17] Oman has continued shipments of staples not subject to
the antidumping duty order. *Id.* at 76:9–16.

**PUBLIC VERSION**

January 2023 forward figures to show [[

]]. *Id.* at 83:3–23.

Asked about the government and Mid Continent's assertions that Oman can make up lost revenue from not shipping nails by selling other products, Mr. Karaga noted that the company's profit and loss statement shows that there was "[[


]]," i.e., at the same time the company stopped shipping nails. *Id.* at 83:24–84:17. He explained that a major reason for the [[     ]] is that [[



]]. *Id.* at 84:22–86:7. He also explained that "[[

]]," such that it would be implausible to suggest Oman could make up for lost sales of nails by selling other products. *Id.* at 86:8–21.[18]

---

[18] Asked whether the company can make up for the lost U.S. sales by selling to some other market, Mr. Karaga testified that other markets make up [[

]]. *Id.* at 125:14–126:7. He testified about the company's efforts to develop business in other countries but stated that Oman has never been able to develop a single market representing more than [[

]], in part because of [[

]] and in part because of heavy competition from other companies subject to U.S. antidumping orders. *Id.* at 126:11–129:9.

**PUBLIC VERSION**

Mr. Karaga testified extensively about the company's assets and the significance of lines of credit the company has with three Omani banks, including whether [[

]]. *Id.* at 112:16–116:25. [[

]] *Id.* at 111:2–13. He explained that regardless of whether [[

]],[19] the company faces imminent insolvency. *Id.* at 160:19–163:7. He stated that the company had [[          ]] of accessible cash in bank accounts as of January 2023, but that it is obligated to pay [[          ]] in the first quarter to [[

]],[20] [[          ]] for a tax payment due no later than March 31, and $22 million in Section 232 steel duties owed to the U.S. government. *Id.* at 211:25–214:9; *see also* ECF 79 (sealed demonstrative exhibit outlining those figures). Simple mathematics shows that these liabilities will exhaust the accessible cash by the end of March if [[

]]. Mr. Karaga testified that he is

---

[19] Mr. Karaga acknowledged that [[

]], but he also testified that the company must [[

]]. *Id.* at 170:21–171:13.

[20] Mr. Karaga said this figure represents amounts [[

]] and does not [[

]]. *Id.* at 222:8–223:9.

**PUBLIC VERSION**

certain that [[

                        ]], the company will not be able to generate enough profits to cover expenses and existing obligations, such as land leases and salaries, ECF 83, at 160:19–163:7, and he also testified that the company cannot pay its fixed costs based on the minimal revenue left after halting imports of nails, *id.* at 106:22–108:14.

The court finds that Oman will be insolvent by the end of March 2023 [[

                        ]] because the company will run out of cash due to the dramatic loss of revenue from sales of nails.[21] This looming insolvency constitutes irreparable injury. *J. Conrad*, 457 F. Supp. 3d at 1377.

### b. *Insolvency through default with lenders*

Mr. Karaga testified that he has been advised by the company's finance manager that the company is [[

    ]]. *Id.* at 112:16–115:25. The court finds that Oman is [[                                        ]]. For example, the [[



                                                ]]"

---

[21] Mr. Karaga also explained that the company has [[

    ]]. *Id.* at 111:14–112:15.

**PUBLIC VERSION**

ECF 36-2, at 47.[22] That is exactly what Oman has done—it has suspended most of its business because it can't pay the cash deposits.

Mr. Karaga testified that if the banks do invoke the default provisions, "[w]e would become immediately insolvent. We wouldn't be able to meet any of our obligations." *Id.* at 116:6–12.[23] The court finds that Oman is at immediate risk of insolvency because it is [[

                              ]]. Such injury is irreparable. *See J. Conrad*, 457 F. Supp. 3d at 1377.

---

[22] Oman's two other credit facilities have similar [[      ]] provisions. *See* ECF 36-2, at 69 ([[



      ]]); *id.* at 82 ([[



      ]]).

[23] Asked whether the company has attempted to obtain additional credit from other banks, he replied that it would be ridiculous to try because any bank would ask for the company's financial records; he further explained that [[



      ]]. *Id.* at 117:7–119:23. The court finds Mr. Karaga's answer convincing.

**PUBLIC VERSION**

### c.  *Damage to customer relationships*

Mr. Karaga explained that Oman faces the imminent loss of its customer base if it cannot resume shipments of nails to the United States. More than [[

  ]] of the company's business comes from [[

              ]]. ECF 83, at 89:9–19. Mr. Karaga testified that the customers whose letters and declarations the company submitted as part of the evidentiary record represent [[                    ]] of the company's business, and that they have advised him that [[                                 ]] in view of Oman's ceasing shipments. *Id.* at 94:10–96:20. "[[

    ]]" *Id.* at 98:23–99:7. He also explained that while Oman [[


          ]], *id.* at 104:15–105:17, competing companies [[                        ]] that would pose a significant obstacle to Oman being able to win back lost business. *Id.* at 178:2–22.

The court finds that the injury to Oman's customer relationships from having to cease importing nails is irreparable. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("[L]oss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.") (citing *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008), and *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382–83 (Fed. Cir. 2006)).

**PUBLIC VERSION**

d. *Termination of employees*

Mr. Karaga testified that his company has terminated [[                ]] to date and is preparing to terminate more. ECF 83, at 71:4–73:15. While the [[

]], he does not know whether [[

]] *Id.* Hiring new employees is not a straightforward matter because it requires visa applications, which typically takes a minimum of 30 days because the Omani government awards visas in batches. *Id.* at 207:6–208:6.

Moreover, Mr. Karaga testified that if the company doesn't receive relief from the court, it will certainly terminate [[          ]] more employees. *Id.* at 73:7–17. If Oman proceeds to a round of layoffs involving [[                    ]], Mr. Karaga estimates that it would take one or two years to replace them. *Id.* at 205:16–206:5.

The court finds that the disruption to Oman's business resulting from the previous layoffs and the risk of further such layoffs constitutes irreparable injury. *See Std. Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 515–16 (Fed. Cir. 1990) (employee layoffs are irreparable injury); *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1010–11 (Fed. Cir. 2009) (same).

**PUBLIC VERSION**

2

Instead of halting most of the company's imports (and thus most of the company's business), in theory Oman has another option: Mr. Karaga testified about a hypothetical in which his company continues to import nails into the United States, which would require paying the 154.33 percent cash deposits. He explained that Oman is the importer of record for its own products, which makes the company directly responsible for paying cash deposits at whatever dumping margin Commerce assigns. ECF 83, at 66:10–17. Asked whether Oman has the financial resources to pay the deposits, he replied, "The Company does not." *Id.* at 66:7–9. Mr. Karaga testified that the company has not determined what the precise annual cost of the cash deposits would be based on historical sales of nails, but he estimated it to be "[[

]]" based on the 2022 entry value of nails multiplied by 154 percent. *Id.* at 66:18–67:6. The financial data Mr. Karaga used were provided by the company's finance manager, "[[


]]." *Id.* at 67:7–17.

Mr. Karaga asked the financial manager to project the amount of time for which Oman could afford to pay the 154.33 percent duty if the company continued importing nails. He testified that "we would run out of cash in [[                    ]]. At this point in time, after looking at it again that would be in [[                ]] we would run out of cash." *Id.* at

**PUBLIC VERSION**

68:10–22. The reason he gave was that "[o]ur cash would be completely consumed by cash deposits for the 154 percent dumping margin." *Id*. at 68:23–69:3. Mr. Karaga testified about a cash flow projection submitted as Exhibit D in support of his declaration (ECF 36-2, at 24–25), which he explained was "[[


]]." ECF 83, at 137:23–139:8. He later reiterated that the document "is a simulation created for the purpose of demonstrating the cash burn rate if we continued to sell subject merchandise and posted deposits." *Id*. at 159:4–14. The exhibit shows Oman's opening cash balance on [[
]] and projects that the amount, again in the hypothetical scenario in which the company continues to import nails, will decline to [[
]]. ECF 36-2, at 24–25. Mr. Karaga testified that those figures reflect [[

]].[24] ECF 83, at 140:2–141:25.

Asked what effect the deposits would have on the company's sales if it just raised prices to compensate

---

[24] Mr. Karaga testified that the only asset the company can access to fund its ongoing operations is [[    ]]; he specifically said that the company cannot use [[
]],
nor can the company use [[


]]. ECF 83, at 215:16–219:13.

**PUBLIC VERSION**

for the duties, Mr. Karaga referred to Oman's previous price adjustments in response to antidumping duties. The company's antidumping duty increased between 2015 and 2017 and, in response, Oman raised prices for nails and [[

                                        ]] *Id.* at 119:24–120:21. In 2018, the duty decreased substantially; in response the company lowered prices by about [[

                                ]]. *Id.* at 120:22–121:21. Mr. Karaga said the company's takeaway from these experiences is that "nails are a commodity business" and "price is . . . a critical factor." *Id.* at 121:22–122:4. The company provided multiple declarations from customers stating that if Oman [[

                                ]]. *See* ECF 63-1, at 137–60. Mr. Karaga stated that he felt foolish having to ask the customers for these declarations because they state the obvious to anyone familiar with the industry. *See* ECF 83, at 95:9–12 ([[

                        ]]).

    The court finds that simply paying cash deposits at the 154.33 percent rate set by Commerce is not a viable option for Oman. If the company pays the cash deposits without raising its prices, it will run out of money no later than April. If the company raises its prices to compensate for the cash deposit payments, it will lose its customers for these price-sensitive commodity products, and the company will go insolvent

**PUBLIC VERSION**

even sooner because of lost revenue. These harms are irreparable. *See J. Conrad*, 457 F. Supp. 3d at 1377.

## B

To grant permanent injunctive relief, the court must consider "the balance of hardships" between Oman and the government. *eBay*, 547 U.S. at 391. That balance is lopsidedly in Oman's favor. Absent injunctive relief, the company faces catastrophe. The harm to the government from granting such relief, in contrast, is minimal to non-existent, because it will receive no revenue from Oman if the company goes bankrupt.

## C

The final *eBay* factor in dispute is whether Oman has shown "that the public interest would not be disserved by a permanent injunction." 547 U.S. at 391. Oman argues that the public interest is served by ensuring that Commerce "compl[ies] with the law, and interpret[s] and appl[ies] trade statutes uniformly and fairly." ECF 38-1, at 63 (quoting *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010)).

The government responds that the public interest is reflected in the balance struck in the antidumping statute, which authorizes injunctive relief against liquidation of entries covered by a challenged determination. *See* ECF 48, at 23–25 (citing 19 U.S.C. § 1516a(c)(2)). The statute, however, makes no provision for such relief against cash deposit requirements. *Id*. The government contends that this balance

**PUBLIC VERSION**

protects an importer's interest in ultimately recouping cash deposit overpayments while also protecting the government's interest in "collecting the money it is owed for any entries made during that period." *Id.* at 25. The government further contends the statute's remedial purposes will be undermined if it cannot collect cash deposits on an interim basis because the importer might be unable to pay its ultimate liability. *Id.*

The court, however, has determined on the merits that the 154.33 percent duty rate set by Commerce is unlawful. Therefore, the government has no legitimate interest in collecting cash deposits at that rate. Enjoining such collection cannot possibly undermine the statute's remedial purposes, because Oman has no liability to pay 154.33 percent duties. Injunctive relief here will not disserve the public interest.

\*   \*   \*

In sum, Oman has demonstrated that it will suffer irreparable injury in the absence of injunctive relief, that the balance of the hardships is in its favor, and that the public interest will not be disserved by such relief. As there is no dispute that Oman lacks any remedy at law, the company satisfies the *eBay* requirements for permanent injunctive relief.

## Conclusion

For the reasons provided above, the court grants judgment on the agency record in favor of Oman and enjoins Defendant from collecting cash deposits at the

**PUBLIC VERSION**

punitive rate set by Commerce. A separate order will
enter. *See* USCIT R. 58(a).

Dated: February 15, 2023    <u>/s/ *M. Miller Baker*</u>
          New York, New York  M. Miller Baker, Judge