**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE M. MILLER BAKER**

| | | |
|---|---|---|
| **OMAN FASTENERS, LLC,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| **UNITED STATES,** | ) | **Court No. 22-00348** |
| **Defendant,** | ) | |
| **and** | ) | **NON-CONFIDENTIAL VERSION** |
| **MID CONTINENT STEEL & WIRE, INC.,** | ) | |
| **Defendant-Intervenor.** | ) | |

**DEFENDANT-INTERVENOR'S COMMENTS IN OPPOSITION TO THE DEPARTMENT OF COMMERCE'S REMAND REDETERMINATION**

Adam H. Gordon, Esq.
Jennifer M. Smith, Esq.
Benjamin J. Bay, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street N.W.
Washington, D.C. 20036
(202) 991-2701

*Counsel to Mid Continent Steel & Wire, Inc.*

August 23, 2023

## TABLE OF CONTENTS

**Page**

Table of Authorities ..... ii

Glossary ..... iv

Introduction ..... 1

Discussion ..... 1

I. Oman Fasteners' Actions Warrant The Application Of Total Adverse Facts Available ..... 1

II. Commerce Improperly Used Quarterly Costs To Calculate Oman Fasteners' Dumping Margin ..... 6

III. Commerce Failed To Deduct Section 232 Duties On All Entries Of Subject Merchandise ..... 10

**NON-CONFIDENTIAL VERSION**

## Table of Authorities

Cases

*Dongtai Peak Honey Industries Co., Ltd. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015) .......... 3, 6

*Oman Fasteners, LLC v. United States* (CAFC No. 23-1661) .......... 2

*Oman Fasteners, LLC v. United States*, 520 F. Supp. 3d 1332 (Ct. Int'l Trade 2021 .......... 11

*Oman Fasteners, LLC v. United States*, 520 F. Supp. 3d 1332 (Ct. Intl. Trade 2021) .......... 11

*PrimeSource Bldg. Prods. v. United States*, 59 F.4th 1255 (Fed. Cir. 2023) .......... 11, 12

*PrimeSource Building Products, Inc. v. United States*, 505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021) .......... 11

*PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760-61 (Fed. Cir. 2012) .......... 3

Statutes

19 U.S.C. § 1677e .......... 1

Other Authorities

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2016*, 82 Fed. Reg. 32,170 (Dep't Commerce July 12, 2017), and accompanying Issues and Decision Memorandum .......... 12

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 24,387 (Dep't Commerce Apr. 20, 2023), and accompanying Issues and Decision Memorandum .......... 6, 7

*Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 75,398 (Dep't

Commerce Dec. 11, 2008), and accompanying Issues and Decision Memorandum........................................................................6, 7

*Stainless Steel Sheet and Strip in Coils from Mexico: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 6,627 (Dep't Commerce Feb. 10, 2010), and accompanying Issues and Decision Memorandum........................................................................6, 7

## Glossary

| Term | Acronym/Abbreviation |
|---|---|
| Adverse Facts Available | AFA |
| Control Number | CONNUM |
| Cost of Manufacture | COM |
| Cost of Production | COP |
| Department of Commerce | Commerce |
| Direct Material | DIRMAT |
| Period of Review | POR |

## Introduction

Defendant-Intervenor Mid Continent Steel & Wire, Inc. ("Mid Continent") respectfully presents these comments in opposition to the Final Results of Redetermination Pursuant to Court Remand, filed by the U.S. Department of Commerce ("Commerce") on July 17, 2023. Appx01000-01051. These comments are timely submitted according to the Court's Scheduling Order. ECF No. 133 (Aug. 1, 2023).

For the reasons discussed below, the Court should remand this redetermination to Commerce to address the issues discussed below.

## Discussion

### I. Oman Fasteners' Actions Warrant The Application Of Total Adverse Facts Available

On remand, Commerce determined a new dumping margin for Oman Fasteners "without relying on section 776 of the Tariff Act of 1930, as amended (the Act) {19 U.S.C. § 1677e}, with respect to the filing of Oman Fasteners' response to Commerce's supplemental questions regarding the U.S. market sections (i.e., section C) of Commerce's AD questionnaire," as specifically ordered by the Court. Appx01000-01002. In other words, Commerce, contrary to its own regulations, practice, decisions of this court, and precedent from the

Federal Circuit, allowed Oman Fasteners a second bite at the apple to not only refile the rejected, late-filed document at issue – a supplemental response pertaining to numerous flaws in Oman Fasteners' U.S. sales data reporting – but also further opportunities to provide supplemental responses and data in response to Commerce's initial questionnaire.

In order to fully preserve all issues for appeal, Mid Continent respectfully states its disagreement with Commerce's reversal on this issue. Mid Continent has articulated its position during the original administrative review, in briefs and during oral argument before this Court, and in comments filed with Commerce in the remand proceeding. *See e.g.*, Hearing Transcript (ECF No. 83) at 299-300 and Appx08955-08959. Mid Continent has also addressed this issue in the context of an ongoing interlocutory appeal to this court's reviewing court, the Federal Circuit. *Oman Fasteners, LLC v. United States* (CAFC No. 23-1661).

We continue to assert that clear, precedential Federal Circuit precedent confirms Commerce's authority to not only set and enforce deadlines, but also the discretion to reject a filing based on the particular circumstances before it, including the failure to file by the

applicable deadline – much less the failure to file by the applicable deadline and then to pretend nothing has happened *for nearly five weeks* until the agency itself recognizes the situation and rejects the filing. *Dongtai Peak Honey Industries Co., Ltd. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015).

Moreover, the Federal Circuit has held that a court "cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered." *Id.* at 1352 (citing *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760-61 (Fed. Cir. 2012)). Specifically, the Federal Circuit has found that a party aware of a deadline with an opportunity to file an extension request prior to the expiration of that deadline, but who failed to do so, "indicates an inattentiveness or carelessness with regard to its obligations" which warrants application of adverse facts available ("AFA"). *Id.* at 1355-1356.

The same factual scenario is present here. After requesting and receiving multiple extensions to prepare and file its response to a critical supplemental questionnaire, Oman Fasteners failed to file the

response in full by Commerce's deadline. Oman Fasteners' counsel knew that they would not be able to complete the filing on time, yet chose not to reach out to Commerce to seek assistance or a modest additional extension. Oman Fasteners' counsel completed filing the response after the deadline, and knew it was late. But even then, counsel did not file a request for a retroactive extension of time, as Commerce's regulations explicitly allow. Instead, Oman Fasteners ignored the problem, bringing it to no one's attention and evidently hoping that no one would notice the late filing. Thirty-eight days later, Commerce identified the issue and appropriately rejected the filing. Having properly rejected the late filing, Commerce correctly determined that its ability to conduct a reliable and accurate margin calculation was fatally undermined, and that the reason for this was Oman Fasteners' failure to file its important response in a timely manner, coupled with the company's choice to ignore the issue until Commerce rejected the late filing.

Because of this, and in order to induce future full cooperation by Oman Fasteners, Commerce correctly assigned a dumping margin based on total facts available with inferences adverse to Oman

Fasteners, as the statute permits, which is the margin alleged in the 2014 petition, 154.33 percent. This margin was not plucked from thin air; it was reviewed and its underlying calculations were validated by Commerce when determining whether all statutory requirements for initiation of the underlying investigation had been met. This margin had previously been used as a total AFA rate in earlier reviews, and indeed its earlier use had been validated by reference to the range of dumping margins observed in U.S. sales *made by Oman Fasteners itself*. Oman Fasteners cannot credibly claim to be surprised that this margin was the basis for AFA in the underlying review, or that its use was inappropriate, because the company had actual notice of its use in this manner.

Under the applicable standard of review, Commerce should not have been required to give Oman Fasteners this second chance. Commerce had correctly concluded that the circumstances surrounding the late filing – at best, carelessness, inattention, and incompetence of counsel in missing the deadline, coupled critically with deliberately ignoring the matter for 38 days in hopes it would not be noticed – failed to demonstrate the "extraordinary circumstances" that Commerce's

regulations require. The Court should reconsider its earlier analysis and render a determination consistent with *Dongtai Peak*. Commerce's redetermination should be remanded to Commerce for the agency to appropriately apply the 154.33 percent AFA rate due to Oman Fasteners' failure to cooperate by not acting to the best of its ability to comply with requests for information.

## II. Commerce Improperly Used Quarterly Costs To Calculate Oman Fasteners' Dumping Margin

Commerce's normal practice is to calculate weighted-average costs for the entire 12-month period of review ("POR"). *See Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 24,387 (Dep't Commerce Apr. 20, 2023), and accompanying Issues and Decision Memorandum at Comment 1 (citing *Stainless Steel Sheet and Strip in Coils from Mexico: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 6,627 (Dep't Commerce Feb. 10, 2010), and accompanying Issues and Decision Memorandum at Comment 6; *Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 75,398 (Dep't Commerce Dec. 11, 2008), and accompanying Issues and Decision

Memorandum at Comment 4). However, Commerce can depart from this practice and use quarterly average costs when "possible distortions may result if {Commerce's} normal POR-average cost methodology is used during a period of significant cost changes." *Id.* When determining whether it is appropriate to use annual or quarterly costs, Commerce evaluates two criteria: (1) whether significant cost changes (measured as changes that exceeded 25 percent between the high- and low-quarterly COM) took place during the POR, and (2) whether there is a link between the costs and sales prices during the shorter averaging periods. *Id.*

In its redetermination for this review, Commerce relied on quarterly costs, even though Oman Fasteners failed to demonstrate that the use of quarterly costs was appropriate. There are two significant issues with the agency's position.

First, Commerce asserted that, because the "majority of Oman Fasteners' top CONNUMs sold to the United States pass our test for significant changes in direct material costs and pass our test for correlation between cost of manufacturing and U.S. price," the

application of the quarterly cost methodology was appropriate. Appx01035.

However, [ ] CONNUMs sold in the U.S. market have a variation in prices and costs greater than 25 percent, and [ ] CONNUMs sold in the U.S. market have a variation of prices and costs greater than 25 percent. Appx07326-07328. Because [ ] of the CONNUMs meets the required threshold, the use of quarterly costs methodology is not warranted in this case.

Second, Oman Fasteners failed to provide actual direct material (or "DIRMAT") costs on a quarterly basis, undercutting the data supporting Commerce's analysis described above. In its redetermination, Commerce incorrectly dismissed this issue, stating:

> At Exhibit D-7 of the initial section D questionnaire response, Oman Fasteners provides quarterly-cost DIRMAT calculations showing the derived drawn wire costs based on the standard costs embedded in the cost accounting system, before *then applying the quarterly cost adjustment factor* to derive the adjusted cost (column E therein), which is then divided across the production quantity to derive the drawn wire per-unit adjusted cost. This adjusted drawn wire per-unit quarterly cost serves as the basis for the figures Oman Fasteners provided in Exhibit S3-3 to support the application of its quarterly cost methodology and the figures reported in the quarterly-cost COP database.

Appx01035-01036 (citations omitted, emphasis in original).

Commerce's position glosses over how the adjustment factor was calculated. The quarterly cost adjustment factor so emphatically relied upon by the agency is found in Exhibit S3-3 on a page titled "Drawn Wire Reconciliation Adjustment Factor." Appx07342. Not only is the calculation on this page subtitled "Annual," but the provided breakdown used annual adjustment costs and the "total drawn wire cost as per reallocation" to calculate a value labeled "Adjustment Factor (Annual)." *Id.* Below that calculation, additional values for "Adjustment Factors (Quarterly)" were provided, but no data, formulas,[1] or calculations for how those values were derived were given. *Id.* It is these "Adjustment Factors (Quarterly)" values that were applied by Oman Fasteners to "the derived drawn wire costs based on the standard costs embedded in the cost accounting system" in Exhibit D-7 to calculate[2] the supposedly

---

[1] There were also no formulas present in the excel spreadsheet submitted by Oman Fasteners that show how the "Adjustment Factors (Quarterly)" were derived. Appx07342.

[2] In the electronic version of Exhibit D-7, the numerical values provided in column E (which give the adjusted cost value, as discussed above) are hard-coded numerical values, that is, the value are manually typed into the cell. In other words, the exact formula and calculations used to calculate the values in column E are unknown. Defendant-Intervenor

adjusted drawn wire per-unit quarterly cost, which Commerce asserts "serves as the basis for the figures Oman Fasteners provided in Exhibit S3-3." Appx01036.

In other words, Commerce argues that the per-unit adjusted costs are on a quarterly basis merely because the company asserts that the adjustment factors were calculated on a quarterly basis. This, however, is patently false, given that the Exhibit S3-3 worksheet sets out an adjustment factor that was only calculated on an annual basis.

As such, Commerce does not have actual quarterly DIRMAT costs to analyze whether the quarterly cost methodology is appropriate, leaving the results of Commerce's changes in cost test discussed above unsupported. Commerce's determination should thus be remanded with instructions to use annual costs, per the agency's standard practice, to calculate Oman Fasteners' dumping margin.

## III. Commerce Failed To Deduct Section 232 Duties On All Entries Of Subject Merchandise

In its redetermination, Commerce declined to "deduct Section 232 duties or their equivalent value from Oman Fasteners' U.S. sales …

---

was only able to determine the adjustment factors used by backing out those values mathematically. Appx03348-03432.

except for the case of the three entries for which payments were made during the POR." Appx01048. The agency failed to provide the basis for its determination. Commerce appeared to take this approach because Oman Fasteners was allowed not to pay Section 232 duties at the time of importation on those entries of subject merchandise based on the CIT's injunction and decision in *Oman Fasteners, LLC v. United States*. Appx01048-01049 (citing *Oman Fasteners, LLC v. United States*, 520 F. Supp. 3d 1332 (Ct. Intl. Trade 2021)). Commerce's approach, however, ignored the decision by the Federal Circuit in *PrimeSource Bldg. Prods. v. United States.* In that decision, the Federal Circuit overturned the CIT and affirmed the applicability of Section 232 duties on steel derivatives, including Oman Fasteners' steel nails. *PrimeSource Bldg. Prods. v. United States*, 59 F.4th 1255 (Fed. Cir. 2023).[3] As a result, Section 232 duties presently are owed, and have accrued or been paid on Oman Fasteners' entries of steel nails made during the POR. Commerce, therefore, consistent with its normal

[3] In *PrimeSource Bldg. Prods. v. United States*, the Federal Circuit consolidated the appeals of two cases: *PrimeSource Building Products, Inc. v. United States*, 505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021) and *Oman Fasteners, LLC v. United States*, 520 F. Supp. 3d 1332 (Ct. Int'l Trade 2021).

practice, should have deducted these duties – whether accrued or paid – from the U.S. sales prices when calculating Oman Fasteners' dumping margin. *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2016*, 82 Fed. Reg. 32,170 (Dep't Commerce July 12, 2017), and accompanying Issues and Decision Memorandum at Comment 8 (deducting accrued warranty expenses from constructed export price).

Importantly, the entries in question remain unliquidated due to the pendency of this case. In other words, even though no Section 232 duties were paid on all but three of these entries at the time of importation, Section 232 duties are owed on those entries based on the Federal Circuit's decision in *PrimeSource Bldg. Prods* and the order of this Court instructing those entries to be liquidated accordingly.[4] Appx09668-09669. Moreover, as Oman Fasteners failed to report Section 232 duties applicable to its U.S. sales in its questionnaire

[4] This Court's judgement is dated July 13, 2023, four days prior to the date of Commerce's remand determination. Therefore, at the time of Commerce's remand determination, Section 232 duties were owed on these entries.

responses (*see* Appx02957), Commerce should have deducted 25 percent of the reported entered value for each sale from U.S. price, or, for those sales for which the entered value was not reported, deducted 25 percent of gross U.S. price, in its redetermination.[5] Alternatively, Commerce should have, at a minimum as neutral facts available, deducted Section 232 duties for those sales with delivery terms reported as [

] and those sales for which Oman Fasteners is reported as the importer of record.

Commerce, however, failed to address this issue. This Court, therefore, should remand this issue back to Commerce with the instruction for the agency to deduct these duties from U.S. price in calculating Oman Fasteners' dumping margin.

* * *

[5] Mid Continent notes that the proposed 25 percent reduction in price based on the general duty rate of the Section 232 action is a conservative calculation, as it is lower than the ultimate amount Oman Fasteners will need to pay once interest is added for the prior non-payment of duties at the time of entry.

**NON-CONFIDENTIAL VERSION**

Respectfully submitted,

*/s/ Adam H. Gordon*

Adam H. Gordon, Esq.
Jennifer M. Smith, Esq.
Benjamin J. Bay, Esq.

*Counsel to Mid Continent Steel & Wire, Inc.*

August 23, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor's Brief in Opposition to Motion for Preliminary Injunction, as computed by The Bristol Group PLLC's word processing system, is 3,050 words.

*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
*Counsel to Mid Continent Steel & Wire, Inc.*

Dated: August 23, 2023